IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE PORTLAND MINT,            )
                                   )
        Plaintiff,           )
                                   )
   v.                     )
                                   )      No. 20-518C
THE UNITED STATES OF AMERICA,  )
                                   )
        Defendant.     )
                                   )
                                   )

## **FIRST AMENDED COMPLAINT**

COME NOW, the plaintiff, the Portland Mint, by and through its attorneys Chiesa Shahinian & Giantomasi PC, as and for its Complaint against the defendant the United States of America, alleges as follows:

## **INTRODUCTION**

1.     The United States Bureau of the Mint (the "Mint") operated a Mutilated Coin Redemption Program (the "Redemption Program"). The Redemption Program began over 100 years ago, and until November 2015, operated without interruption. Under regulations governing the Redemption Program, the Program accepted bent and partial U.S. coins from individuals and businesses for payment. Payment was based on the weight and denomination of the mutilated coins redeemed, with, for example, nickels being redeemed at $4.5359 per pound, and dimes, quarters, and half-dollars being redeemed at $20 per pound. See 31 C.F.R. § 100.11(d). The Mint would melt the redeemed coins and use them to manufacture new coin roll. The Redemption Program was designed to accept both small shipments of mutilated coins, as well as bulk shipments.

2.      Plaintiff the Portland Mint was founded in Portland, Oregon in 2008 based, in part, on the existence of the Redemption Program.  The Portland Mint is an off-sort coin processor for a multitude of businesses, including banks, armored carriers, and coin kiosk companies, across several states and countries.

3.      As part of its business model, the Portland Mint aggregates mutilated U.S. coins, separates them by alloy, and bulk redeems them through the Redemption Program.  Since 2012, the Portland Mint has redeemed approximately 21 shipments of mutilated coins through the Redemption Program, and been paid approximately $229,632 by the Mint.  The Mint has never accused the Portland Mint of any wrongdoing or impropriety associated with the Redemption Program.

4.      In or about November 2015, following never substantiated allegations of improprieties in the Redemption Program, including never substantiated allegations that certain businesses redeeming mutilated coins through the Program were counterfeiting those coins, the Mint suspended the Redemption Program.

5.      The government even went so far, through the United States Attorney's Office for the District of New Jersey, to attempt to civilly forfeit millions of dollars in property from three businesses that were bulk redeeming mutilated coins.  See United States v. One 2014 Black Porsche Cayman, et al., Civ. No. 2:15-cv-05814-JS.[1]  The Portland Mint was not among the businesses involved, but its business was severely impacted nevertheless.

6.      In a seemingly coordinated response to the civil asset forfeiture complaint, the Department of Homeland Security ("DHS") detained mutilated coin shipments at the ports.  As

---

[1] Certain claimants filed a motion to dismiss the complaint for improper venue, and although the District Court for the District of New Jersey denied claimants' motion, the District Court sua sponte transferred the case to the Eastern District of Pennsylvania.

4832-3182-0239.v1

part of the government's coordinated effort, the Portland Mint had three of its shipments wrongly detained by DHS.

7.      For several months, the Portland Mint tried to explain to DHS that the mutilated coins it imported were genuine U.S. coins and should be immediately released.  DHS refused, and on October 29, 2015, the Portland Mint and others were forced to file an action against the Mint, DHS, and others challenging the suspension of the Redemption Program and the detention of the mutilated coin shipments at the ports.

8.      As part of that lawsuit, the Portland Mint obtained laboratory reports from the government reflecting tests conducted by DHS on the Portland Mint's shipments.  Those reports concluded: "The samples have a broad range of date mint marks and their weights and alloy compositions are indistinguishable from standard currency."  In other words, the reports concluded that the Portland Mint's shipments contained genuine, mutilated U.S. coins.  As a result of that lawsuit, DHS released to the Portland Mint the shipments DHS had wrongly detained.

9.      On January 26, 2017, the civil asset forfeiture action was dismissed with prejudice without any finding that any mutilated coins were counterfeit.  The government returned nearly all of the seized property to the three businesses.

10.     One year later, in January 2018, the Mint resumed the Redemption Program, and the Portland Mint submitted an application to again participate in the Program.  The Portland Mint submitted a written application to the Mint in January 2018, that application was processed and accepted by the Mint, and on June 29, 2018, the Mint approved the Portland Mint to again redeem coins through the Redemption Program.

11.     Specifically, the Mint approved the Portland Mint to redeem approximately 425,100 pounds of dimes, quarters, and half-dollars, and approximately 1,819 pounds of nickels,

4832-3182-0239.v1

with an approximate total value of $8.51 million.  Among those coins were the coins that DHS had previously tested and concluded were genuine.  The remainder of the shipment likewise contained genuine, mutilated U.S. coins.

12.     The Mint directed the Portland Mint to redeem its mutilated coins at Olin Brass – a foundry in Illinois specifically designated by the Mint to accept and redeem bulk shipments of mutilated coins – on August 1 and 2, 2018.

13.     The melt proceeded as planned on August 1 and 2, 2018.  Although Adam Youngs, the president of the Portland Mint, was not permitted to witness the melt (after originally being told by the Mint that he could), Mr. Youngs did meet with two employees of the Mint following the melt.  Those employees, Anthony Holmes, Jr. and Thomas Browne, relayed to Mr. Youngs that the melt had proceeded smoothly, there were no issues, and the Portland Mint should expect payment of approximately $8.51 million in between 4-6 weeks.

14.     More than two years later, the Mint still has not paid the Portland Mint for the mutilated coins that the Mint accepted, redeemed, and, on information and belief, melted into new coin roll.  Worse, the Portland Mint is without any explanation as to why – or under what authority – the Mint took the Portland Mint's property and converted it to its own use without just (or any) compensation.

15.     The Mint's actions were a breach of contract, a clear violation of the Mint's own regulations, and violated the Portland Mint's constitutional rights.

## JURISDICTION AND VENUE

16.     The United States Court of Federal Claims has jurisdiction and venue over this action pursuant to 28 U.S.C. § 1491(a)(1), as Plaintiff's claims are against the United States and

4832-3182-0239.v1

founded upon the Constitution, a regulation of an executive department, and upon an implied contract with the United States.

17.     The Portland Mint's takings claim is founded on the Fifth Amendment to the United States Constitution, which provides in pertinent part that "no person shall be … deprived of … property, without due process of law; nor shall private property be taken for public use, without just compensation."  The Portland Mint's breach of federal regulation claim is based on the Mint's violation of 31 C.F.R. § 100.11(d).  And the Portland Mint's contract claims are brought under 28 U.S.C. § 1491(a), which provides for claims founded on an implied contract with the United States.

## PARTIES

18.     Plaintiff the Portland Mint was founded in Portland, Oregon in 2008 based, in part, on the existence of the Redemption Program.  The Portland Mint is an off-sort coin processor for a multitude of businesses, including banks, armored carriers, and coin kiosk companies, across several states and countries.

19.     Defendant is the government of the United States of America, acting by and through the United States Department of the Treasury (the "Treasury") and the United States Bureau of the Mint.  The Treasury is a department within the executive branch of the United States government. Among other things, the Treasury operates and maintains systems that are critical to the nation's financial infrastructure, such as the production of coin and currency through the Mint.  Through its oversight of the Mint, the Treasury has ultimate responsibility for the Redemption Program. The Mint is housed within the Treasury Department.  The Mint is the nation's sole manufacturer of legal tender coinage and is responsible for producing and circulating coinage for the nation to conduct its trade and commerce.  The Mint is also charged with the operation of the Redemption Program.

4832-3182-0239.v1

## FACTUAL ALLEGATIONS

### A.  The Redemption Program

20.     Title 31, United States Code, Section 5120(a)(1) mandates: "The Secretary of the Treasury shall melt obsolete and worn United States coins withdrawn from circulation." (emphasis added).  In response to Congress's mandate, the Treasury established the Mutilated Coin Redemption Program within the Mint.

21.     According to its website, the Mint "established the Mutilated Coin Redemption Program so people and businesses could exchange bent and partial U.S. coins (commonly referred to as mutilated coins) for reimbursement."[2]  The Redemption Program began in or about February 1911 and operated continuously through in or about November 2015, when it was temporarily suspended for the first time.

22.     Payment to those redeeming mutilated coins was based on the weight and denomination of the coins, with, for example, nickels being redeemed at $4.5359 per pound, and dimes, quarters, and half-dollars being redeemed at $20 per pound.  See 31 C.F.R. § 100.11(d). The Mint would melt the redeemed coins and use them to manufacture new coin roll.

23.     Throughout much of the history of the Redemption Program, the Mint accepted and redeemed only small shipments of mutilated coins.  Then, in or about 1999, several businesses began to redeem a higher volume of mutilated coins with many of the coins originating from overseas, including China.

24.     Concerned about the increased volume of coins being submitted for redemption and the origin of those coins, the Treasury Office of Inspector General initiated an investigation of the

---

[2] See https://www.usmint.gov/news/consumer-alerts/mutilated-coin-program

Redemption Program in or about May 2008.  The investigation concluded in or about February 2010 with the issuance of a report (the "OIG Report").

25.     According to public reporting on the OIG Report, "agents from the Treasury Office of Inspector General, U.S. Secret Service, and Immigration and Customs Enforcement, along with Mint representatives, on July 15, 2008, inspected the delivery from three foreign companies of suspected mutilated coins contained in 37 crates on three tractor-trailer trucks. … Of the 37 crates, 11 were randomly selected, and the contents dumped onto a vibratory conveyor belt for coin inspection. … A Mint metallurgist examined 50 samples from each of the 11 crates inspected and confirmed the contents were genuine U.S. Mint coins." (emphasis added).[3]

26.     Public reporting on the OIG Report also revealed that the Treasury Office of Inspector General "recommended, and the Mint implemented, procedures to sample all incoming shipments and have them assayed by a Mint metallurgist.  The Treasury Office of Inspector General also recommended, and the Mint implemented, that the coins for redemption be submitted in smaller containers …" (emphasis added).[4]

27.     In short, the OIG Report revealed no evidence that bulk redeemers were counterfeiting mutilated coins.  The OIG Report also revealed that at least from February 2010 forward, the Mint assayed all shipments to ensure their authenticity before redeeming them.

**B.  The Portland Mint**

28.     The Portland Mint was founded by Adam Youngs in 2008 based, in part, on the existence of the Redemption Program.  The Portland Mint is an off-sort coin processor for a

---

[3]     See   https://www.coinworld.com/news/precious-metals/mint-adopts-mutilated-coin-redemption-program.html

[4] See id.

multitude of businesses, including banks, armored carriers, and coin kiosk companies, across several states and countries.

29.     As part of its business model, the Portland Mint aggregates mutilated U.S. coins, separates them by alloy, and redeems them through the Redemption Program.  Since 2012, the Portland Mint has redeemed approximately 21 shipments of mutilated coins through the Redemption Program, and been paid approximately $229,632 by the Mint.

30.     The Portland Mint's 21 redemptions have always been without issue.  The Mint has never accused the Portland Mint of any wrongdoing or impropriety associated with the Redemption Program.

### C.  The Civil Asset Forfeiture Complaint and the First Suspension of the Redemption Program

31.     Notwithstanding the OIG Report, the government was apparently still concerned about the volume and origin of coins submitted to the Redemption Program.  In March 2015, the government, through the United States Attorney's Office for the District of New Jersey, initiated a civil asset forfeiture action against three businesses that the government alleged were bulk redeeming counterfeit mutilated coins.  See United States v. One 2014 Black Porsche Cayman, et al., Civ. No. 2:15-cv-05814-JS.  The Portland Mint was not among the businesses named in the complaint, but as described below, its business was adversely impacted nevertheless.

32.     The government's civil complaint was deliberately misleading.  It alleged that the three businesses were engaged in a litany of federal crimes, including counterfeiting, but no business or individual was charged – ever.

33.     The complaint also alleged, through a combination of unverified statistics and interviews with unknown employees at several unidentified businesses, that it was impossible for the mutilated coins redeemed by the three businesses to be genuine.  But the complaint failed to

8

mention – and deliberately hid – the OIG Report.  The complaint concealed that the samples tested by the Mint as part of the OIG Report were all determined to be "genuine U.S. Mint coins."  The complaint likewise concealed that in response to the OIG Report, and since at least February 2010, the Mint assayed samples of all shipments submitted to the Redemption Program to verify their authenticity before redeeming the shipments.

34.     Unsurprisingly, the government ultimately agreed to dismiss its complaint with prejudice, and nearly all of the property seized by the government was returned to the three businesses.

35.     But while meritless, the complaint caused significant disruption for the Portland Mint and other businesses.

36.     In a seemingly coordinated response to the civil asset forfeiture complaint, the Department of Homeland Security detained mutilated coin shipments at the ports, including three of the Portland Mint's shipments.  And in or about November 2015, the Mint suspended the Redemption Program altogether.

37.     For several months, the Portland Mint tried to explain to DHS that the mutilated coins it imported were genuine U.S. coins and should be immediately released.  DHS refused, and on October 29, 2015, the Portland Mint and others were forced to file an action against the Mint, DHS, and others challenging the suspension of the Redemption Program and the detention of the mutilated coin shipments at the ports.

38.     As part of that litigation, the Portland Mint obtained laboratory reports from DHS evaluating samples from the detained shipments.  The DHS laboratory reports compared the composition of coins from the detained shipments to the composition of coins in circulation.

39.    For example, two quarters from circulation were found to have the following compositions:

|  | Aluminum | Silicon | Nickel | Copper | Other |
|---|---|---|---|---|---|
| 1981 | .1 | .4 | 23.7 | 73.7 | 2.0 |
| 1974 | .2 | .5 | 25.1 | 72.2 | 2.1 |

40.    The compositions of two quarters from the detained shipments were nearly identical:

|  | Aluminum | Silicon | Nickel | Copper | Other |
|---|---|---|---|---|---|
| 1995 | .1 | .3 | 25.8 | 72.5 | 1.3 |
| 1999GA | .2 | .6 | 24.7 | 72.4 | 2.1 |

41.    Having made the comparisons, the DHS laboratory reports concluded: "The samples have a broad range of date mint marks and their weights and alloy compositions are indistinguishable from standard currency."  In other words, the reports concluded that the Portland Mint's shipments contained genuine, mutilated U.S. coins.

42.    As a result of the Portland Mint's lawsuit, the shipments wrongly detained by DHS were released to the Portland Mint, but not without significant damage to the Portland Mint's business.  Although DHS released the shipments, the Portland Mint could not redeem them given the suspension of the Redemption Program.  If redeemed, the total value of those released shipments was approximately $550,000.

43.    In reliance on the Redemption Program, the Portland Mint had aggregated mutilated coins valued at approximately $550,000, and DHS had declared those coins to be genuine.  Nevertheless, because of the government's repeated wrongful actions, the Portland Mint

4832-3182-0239.v1

could do nothing with the coins other than warehouse them at significant additional expense – for years.

**D.  The Redemption Program Resumes and the Mint Approves the Portland Mint to Participate in the Program**

44.     Without explanation, in or about January 2018, the Mint resumed the Redemption Program, and in mid-January 2018, the Portland Mint submitted an application to again participate in the Program.

45.     On May 8, 2018, the Portland Mint received a "Deficiency Notification Letter" from the Mint alleging certain deficiencies with the Portland Mint's application.  Specifically, the Mint sought "sufficient information to demonstrate that the source(s) of Portland's mutilated coins uses adequate controls to ensure genuine U.S. coinage and prevent contamination."  The Mint also directed the Portland Mint to submit the Report of International Transportation of Currency or Monetary Instruments (CMIR), FinCen Form 105, because the Portland Mint had disclosed in its application that it "buys coins from international companies."

46.     Shortly thereafter, Adam Youngs responded to the "Deficiency Notification Letter" on behalf of the Portland Mint.  He explained:

> The Portland Mint, LLC has over 80 years of experience, between its owners and employees, in handling coins.  Our expertise is the main tool that we use to authenticate coins.  If there is ever any question about the authenticity of any coins we use the following tools: Scales that measure down to the hundredth of a gram[;] Microscopic cameras that allow us to pinpoint fine details[;] Infrared lasers/sensors that measure the electrical conductivity of each individual coin.  The readings show us 6 different measurements.

47.     Mr. Youngs continued:

> It is impossible and illegal to import currency without using a FinCen 105 form.  U.S. [C]ustoms and [B]order [P]atrol receives this form every time a shipment is imported.  All shipments are

4832-3182-0239.v1

imported to be verified before they are shipped to the [M]int.  I have attached 9 different FinCen 105 forms.

48.     Mr. Youngs also disclosed in his response that the coins he sought to redeem were from both domestic and foreign sources.  He acknowledged that the bulk of the coins were in fact from a foreign source, and provided the name, address, and telephone number for that foreign source.

49.     Satisfied that the "deficiencies" in the Portland Mint's application had been addressed, on or about June 29, 2018, Anthony Holmes, Jr., Materials Handler Supervisor at the Mint, informed Mr. Youngs that the Portland Mint's application to participate in the Redemption Program was approved.

**E.  The Mint and the Portland Mint Enter into a Contract to Redeem Mutilated Coins**

50.     The Portland Mint's application detailed the estimated size of the Portland Mint's shipment for redemption, specifically 409,427 pounds of dimes, quarters, half-dollars, and Susan B. Anthony dollars, and 2,400 pounds of nickels.

51.     In the correspondence approving the Portland Mint's application, and, with it, the Portland Mint's shipment for redemption, Mr. Holmes asked Mr. Youngs, "Are your coins ready for shipment?" and "How many trucks will you have ready for the melt?"

52.     Mr. Youngs responded that his coins were indeed ready for shipment, and the Mint scheduled the Portland Mint's melt for August 1 and 2, 2018 at the Olin Brass foundry in Illinois.

53.     Approximately one week prior to the scheduled melt, Mr. Youngs confirmed in writing with Mr. Holmes that the Portland Mint would be sending 11 trucks to Olin Brass, and revised, slightly, the total shipment size to include 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels.  The total approximate value of the Portland Mint's shipment was $8.51 million.

4832-3182-0239.v1

54.     The Mint instructed Mr. Youngs to proceed and deliver his 11 trucks to Olin Brass as previously directed by the Mint.

55.     Mr. Youngs informed Mr. Holmes that he would accompany the shipment to ensure that the melt proceeded smoothly.  Mr. Holmes voiced no objection, and put Mr. Youngs in direct contact with a representative from Olin Brass.

56.     One day before the melt, and after Mr. Youngs had traveled from Oregon to Illinois at significant expense, Olin Brass, through Mint employee Thomas Browne, informed Mr. Youngs that he could not be present for the melt.

57.     Although Mr. Youngs was not permitted to witness the melt, he did meet with Messrs. Holmes and Browne after the melt was completed.  Messrs. Holmes and Browne complimented Mr. Youngs on the professionalism of the Portland Mint's operation, and specifically stated that the coins redeemed by the Portland Mint were without issue.  They also encouraged the Portland Mint to redeem additional mutilated coins through the Redemption Program.[5]  Messrs. Holmes and Browne promised that the Portland Mint would receive payment for its redeemed shipment in 4-6 weeks.

58.     Messrs. Holmes and Browne's statement that the Portland Mint's shipment was "without issue" is unsurprising.  First, part of the shipment consisted of the coins that DHS had released to the Portland Mint in 2016, and had concluded were genuine.  See supra at ¶¶ 36-42. Second, since at least the issuance of the OIG Report in February 2010, the Mint has assayed samples from all shipments to ensure their authenticity before redeeming them.  If the Portland

---

[5] In reasonable reliance on his conversations with Messrs. Holmes and Browne, Mr. Youngs aggregated approximately 64,567 pounds of mutilated coins between August 2018 and April 2019.  The Portland Mint's costs to do so were approximately $653,700, and those coins, if redeemed, are valued at approximately $1,074,900.

4832-3182-0239.v1

Mint's shipment was not authentic, or in any way problematic, it would not have been melted by the Mint and Olin Brass.

59.      The Portland Mint's delivery and the Mint's acceptance of several hundred thousand pounds of mutilated coins at Olin Brass – a foundry specifically designated by the Mint to accept and redeem bulk shipments of mutilated coins – demonstrated that an implied-in-fact contract existed between the two parties.  The Mint agreed that it would accept, redeem, and melt the coins, and use them as it chose, including to manufacture new coin roll.  The Mint did.  In exchange, the Mint also agreed to pay the Portland Mint for the coins it redeemed at the rates specified in 31 C.F.R. § 100.11(d).  That the Mint failed to do.

**F.  <u>The Mint Refuses to Pay the Portland Mint in Violation of its Regulations</u>**

60.      The Portland Mint was not paid for its shipment in 4-6 weeks as promised by Messrs. Holmes and Browne.  The Portland Mint has still not been paid today.

61.      For months, Mr. Youngs contacted the Mint to inquire about payment.  His inquiries either went unanswered or were met with indecipherable responses.  For example:

    a.  On September 10, 2018, Mr. Youngs was told: "At this time, the United States Mint is still evaluating the coins for final receipts."

    b.  On September 20, 2018, Mr. Youngs was told: "At this time, we cannot provide additional information or a timeline.  When there is a change in status, we will contact you."

    c.  On October 23, 2018, the response from the Mint was identical to its response a month earlier: "[T]he United States Mint is still evaluating the coins for final receipts.  We will contact you upon completion of our evaluation."

4832-3182-0239.v1

62.     Exasperated by the Mint's refusal to meaningfully respond, Mr. Youngs enlisted the help of one of his United States senators, Senator Ron Wyden.  On or about March 14, 2019, Senator Wyden contacted the Mint on behalf of Mr. Youngs.

63.     On April 18, 2019, in response to Senator Wyden's inquiry, David Croft, Associate Director for Manufacturing at the Mint, claimed: "Preliminary testing of the materials submitted by the Portland Mint has identified technical anomalies that have required additional, detailed testing to ensure they are appropriate for redemption.  That testing is ongoing."  Mr. Croft's statement is demonstrably false for several reasons:

   a. First, the Portland Mint's shipment was accepted, processed, and melted by the Mint on August 1 and August 2, 2018 at Olin Brass.  Messrs. Holmes and Browne specifically said so.  There was nothing for the Mint to test.

   b. Second, there were no anomalies in the Portland Mint's shipment.  Part of that shipment included coins that had been detained and released by DHS in 2016 after DHS determined that the coins had a "broad range of date mint marks and their weights and alloy compositions [were] indistinguishable from standard currency."

   c. Third, since at least February 2010, the Mint has assayed samples of all shipments submitted to the Redemption Program to verify their authenticity.  If the Portland Mint's shipment was determined to be counterfeit or in any way problematic, it would not have been melted at Olin Brass.

   d. Fourth, according to the "Frequently Asked Questions" on the Mint's website, "bulk participants undergo a screening process to enhance security and ensure integrity in the redemption process."  The Portland Mint successfully underwent

that process, and only after that process was completed to the satisfaction of the Mint, was the Portland Mint's shipment redeemed.

64.     If Mr. Croft's statement to Senator Wyden was true, it would mean that the Mint is in clear violation of its own regulations (and that Messrs. Holmes and Browne lied to Mr. Youngs at Olin Brass).

65.     Where a "submission contains any contaminant that could render the coins unsuitable for coinage metal," i.e., the shipment contains "technical anomalies," the Mint is required to notify the business redeeming the coins within 30 days, and allow the business to "retrieve the entire submission" at its expense.   See 31 C.F.R. § 100.11(c)(6)(v).   The Mint provided no notification to the Portland Mint; it was the Portland Mint that contacted the Mint. Instead, the Mint converted the Portland Mint's property to its own use without just (or any) compensation.

66.     The Mint's decision to accept and redeem the Portland Mint's full shipment without paying the Portland Mint for the shipment was a clear violation of the Mint's regulations, which read in relevant part, "The United States Mint will redeem bent or partial coins on the basis of their weight and denomination at the following rates … ."   31 C.F.R. § 100.11(d) (emphasis added). The Mint redeemed the Portland Mint's shipment, but never paid the Portland Mint for it in violation of the Mint's own regulations.

67.     The Mint's refusal to provide the Portland Mint – or Senator Wyden – with any meaningful information about why the Portland Mint has not been paid is also contrary to the "Frequently Asked Questions" on the Mint's website.   One question reads: "What if my submission of mutilated coins is rejected?"   The Mint responds: "You will be notified of the reason

16

for the rejection and be given instructions on how to return your mutilated coin submission to you."  The Mint has notified the Portland Mint of nothing.

68.     In January 2018, the Portland Mint applied to the Redemption Program.  The Mint reviewed the Portland Mint's application, requested certain additional information, and the Portland Mint supplied that information.  It hid nothing.  The Mint accepted the Portland Mint's application, and thereafter directed the Portland Mint to redeem several hundred thousand pounds of mutilated coins at Olin Brass.  The Portland Mint dutifully followed the Mint's instructions. After the melt, two employees of the Mint who were onsite for the melt told the Portland Mint that the melt had proceeded smoothly, and there were no issues.  They promised prompt payment. Weeks, then months, and now years have passed with no meaningful response from the Mint as to why the Mint took the Portland Mint's property without paying for it.  The Mint breached the contract between it and the Portland Mint, violated its own regulations, and ignored the "Frequently Asked Questions" on its website.

69.     As a result of the failure to pay for the mutilated coins it accepted and redeemed, the Mint owes the Portland Mint approximately $8.51 million.

### G. The Portland Mint Exhausts Administrative Remedies

70.     On March 13, 2020, pursuant to 41 U.S.C. § 7103(f)(2), the Portland Mint sent a "Notice of Claim and Demand for Decision by Contracting Officer" to David Croft, the Associate Director for Manufacturing at the Mint.  Mr. Croft had previously corresponded with Senator Wyden about the Portland Mint's claim.

71.     Through the "Notice of Claim and Demand for Decision by Contracting Officer," the Portland Mint informed the Mint of the facts underlying its $8.51 million claim – facts that had

4832-3182-0239.v1

been well known to the Mint for over 19 months – and attached relevant documents, including

relevant correspondence between the Mint and the Portland Mint.

72.     On April 7, 2020, the Chief Counsel to the Mint responded to the Portland Mint's

"Notice of Claim and Demand for Decision by Contracting Officer."  His letter echoed the Mint's

previous obfuscation to both the Portland Mint and Senator Wyden.  The Chief Counsel wrote:

> The United States Mint is still reviewing the Portland Mint's August
> 2018 submission to the Mutilated Coin Redemption Program and
> has not made a final decision. … [P]reliminary testing of the
> materials submitted by the Portland Mint identified technical
> anomalies that have required additional, detailed testing to ensure
> the material is appropriate for redemption.  These anomalies are still
> being reviewed and investigated.[6]

73.     For the same reasons detailed above, see supra at ¶¶ 63-66, the Chief Counsel's

statements are either false or the Mint is in obvious violation of its own regulations.  The Chief

Counsel's statements are also incredible on their face.

74.     There are two industry-standard methods for completing metallurgical assays to

determine metal content: X-ray Fluorescence ("XRF") testing and fire assaying.  The first takes

minutes, and the second days (at most).  Neither requires years of testing.

75.     XRF testing is a non-destructive, analytical technique used to determine the

elemental composition of materials using a primary and secondary X-ray source.  Handheld and

portable XRF analyzers have become the standard for non-destructive elemental analysis in a wide

range of applications, including among numismatists.  XRF systems are very accurate, measuring

most of the common metals in alloys, e.g., iron, nickel, and copper, to less than 0.01%.  A XRF

---

[6] In that same letter, the Chief Counsel claimed that the Mint is not subject to 41 U.S.C. §
7103(f)(2) because it "is exempt from the provisions of law governing procurement or public
contracts."

4832-3182-0239.v1

test can be completed in 30 seconds (or less), with the XRF analyzer actually measuring the sample hundreds to thousands of times during that time.

76.     Fire assaying is a destructive test, and while more involved than a XRF test, takes days to complete (at most), not years.  Fire assaying is the industry standard for precious metal refining and assaying.  It involves the separation of a metal into its constituent alloys through the use of intense heat.  Fire assaying is accurate between one part per thousand and one part per ten-thousand.

77.     Either XRF testing or fire assaying would have allowed the Mint to determine that the Portland Mint's shipment contained genuine U.S. Mint coins only.  Those tests could have been performed – and should have been performed – 26 months ago.

78.     More than two years after the Portland Mint surrendered $8.51 million of its property to the Mint at the Mint's direction, and after the Mint redeemed that property and, on information and belief, used it to manufacture new coin roll, the Mint not only continues to refuse to pay the Portland Mint, but also continues to refuse to tell the Portland Mint why it will not pay it.

## COUNT ONE
## VIOLATION OF FEDERAL REGULATION
## FAILURE TO MAKE PAYMENTS PURSUANT TO 31 C.F.R. § 100.11

79.     The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

80.     The Mint agreed to accept, and did accept from the Portland Mint, a total of approximately 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels. The total approximate value of the Portland Mint's shipment was $8.51 million, according to the regulatory rates set forth in 31 C.F.R. § 100.11(d).

4832-3182-0239.v1

81.     The Mint instructed the Portland Mint to deliver its shipment to Olin Brass – a foundry in Illinois specifically designated by the Mint to accept and redeem bulk shipments of mutilated coins – on August 1 and 2, 2018.  The Portland Mint did as it was instructed.

82.     Employees of the Mint present at Olin Brass accepted the Portland Mint's shipment, redeemed it, and melted it.  On information and belief, the Mint used the melted shipment to manufacture new coin roll.

83.     The Mint never notified the Portland Mint of any problems with the shipment.  And there were none.  The shipment contained genuine, mutilated U.S. coins.  Indeed, employees of the Mint told the Portland Mint that the melt had proceeded smoothly and without issue.

84.     Pursuant to 31 C.F.R. § 100.11(d), where the Mint accepts and redeems mutilated coins, as it did here, it is required to pay for the redemption at the rates set forth in the regulation. See 31 C.F.R. § 100.11(d) ("The United States Mint will redeem bent or partial coins on the basis of their weight and denomination at the following rates … .") (emphasis added).

85.     The Portland Mint has suffered economic damages as a result of the Mint's violation of its regulations, including, but not limited to, the value of the coins the Mint redeemed but never paid for in the approximate amount of $8.51 million.

### COUNT TWO
### BREACH OF IMPLIED CONTRACT

86.     The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

87.     The facts set forth in the preceding paragraphs demonstrate that a valid implied contract existed between the Mint and the Portland Mint.

88.     The parties demonstrated a mutual intent to contract, whereby the Portland Mint, after having been accepted to participate in the Redemption Program, offered to deliver an agreed-

20

upon number of mutilated coins to the Mint, and the Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018.

89.     The essential terms of the implied contract were found in the Mint's own regulations, which state that the Mint will pay for mutilated coins it accepts and redeems at the rates specified in the regulations.  See 31 C.F.R. § 100.11(d).

90.     As demonstrated by the communications and actions of Anthony Holmes, Jr. and other Mint employees, arranging and contracting for the delivery of mutilated coins was an integral part of Mr. Holmes's duties as a supervisor employed by the Mint.

91.     The Portland Mint provided consideration by delivering the mutilated coins to Olin Brass on August 1 and 2, 2018 as instructed by the Mint.

92.     The Mint accepted the delivery, and redeemed the mutilated coins delivered by the Portland Mint.  In doing so, the Mint agreed to pay the Portland Mint for the value of the coins that the Mint accepted and redeemed, approximately $8.51 million.

93.     On August 1 and 2, 2018, the Portland Mint performed its contractual obligations by delivering the agreed-upon number of mutilated coins to Olin Brass.

94.     On August 1 and 2, 2018, the Mint accepted the Portland Mint's mutilated coins, melted them, and, on information and belief, used them to manufacture new coin roll.

95.     The Mint breached its contractual duties by accepting the coins for redemption and melting them, but failing and refusing to pay the Portland Mint for the value of the coins the Mint had accepted and redeemed.

96.     The Portland Mint has suffered economic damages as a result of the Mint's breach, including, but not limited to, the value of the redeemed coins in the approximate amount of $8.51 million.

## COUNT THREE
## BREACH OF IMPLIED DUTY OF
## GOOD FAITH AND FAIR DEALING

97.     The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

98.     Every contract has an implied duty for both parties, including the government, "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

99.     The Mint breached the duty of good faith and fair dealing by destroying the Portland Mint's reasonable expectations of the fruits of the contract.  Specifically, the Mint accepted and redeemed the coins provided to it by the Portland Mint, but refused to pay the Portland Mint for the property the Mint accepted and redeemed.

100.    Not only that, but over two years after taking the Portland Mint's property without paying for it, the Mint refuses to provide the Portland Mint – or a United States senator – with any explanation for its actions.  According to the Mint, it is without obligation to follow its own regulations or the "Frequently Asked Questions" on its own website, and its actions, however unreasonable or even unconstitutional, are unreviewable.

101.    The Portland Mint has suffered economic damages as a result of the Mint's breach of the implied duty of good faith and fair dealing, including, but not limited to, the value of the redeemed coins in the approximate amount of $8.51 million.

## COUNT FOUR
## EQUITABLE ESTOPPEL

102.    The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

4832-3182-0239.v1

103.    This Court has jurisdiction over a claim for equitable estoppel where it is used to bar a party from raising a defense or objection it otherwise would have.  Carter v. United States, 98 Fed. Cl. 632, 638 (2011); LaMirage, Inc. v. United States, 44 Fed. Cl. 192, 199 (1999), aff'd, 232 F.3d 912 (Fed. Cir. 2000).

104.    The Mint accepted and redeemed the coins delivered by the Portland Mint to Olin Brass on August 1 and 2, 2018, but refuses to pay the Portland Mint for those coins.  The Mint justifies its refusal based on purported "technical anomalies" with the redeemed coins.

105.    It is beyond dispute that the Portland Mint's shipment contained genuine U.S. coins that were free of "technical anomalies" for the following reasons:

a.    First, following the melt, two employees of the Mint, Messrs. Holmes and Browne, complimented Mr. Youngs on the professionalism of the Portland Mint's operation, and specifically stated that the coins redeemed by the Portland Mint were without issue.  They also encouraged the Portland Mint to redeem additional mutilated coins through the Redemption Program.  Messrs. Holmes and Browne promised that the Portland Mint would receive payment for its redeemed shipment in 4-6 weeks.

b.    Second, part of the Portland Mint's shipment had already been determined to be genuine by the government.  Specifically, part of the Portland Mint's shipment included coins that had been detained and released by DHS in 2016 after DHS determined that the coins had a "broad range of date mint marks and their weights and alloy compositions [were] indistinguishable from standard currency."

c.    Third, since at least February 2010, the Mint has assayed samples of all shipments submitted to the Redemption Program to verify their authenticity.  If the Portland

23

Mint's shipment was determined to be counterfeit or in any way problematic, it would not have been accepted by the Mint and melted at Olin Brass.

d.   Fourth, according to the "Frequently Asked Questions" on the Mint's website, "bulk participants undergo a screening process to enhance security and ensure integrity in the redemption process."  If the Portland Mint's shipment did not meet the requirements of that screening process to the satisfaction of the Mint, then the shipment would not have been accepted and melted.

e.   Fifth, under the Mint's own regulations, where a "submission contains any contaminant that could render the coins unsuitable for coinage metal," i.e., the shipment contains "technical anomalies," the Mint is required to notify the business redeeming the coins within 30 days, and allow the business to "retrieve the entire submission" at its expense.  See 31 C.F.R. § 100.11(c)(6)(v).  The Mint provided no notification to the Portland Mint of any "contaminant"; it was the Portland Mint that contacted the Mint.

f.   Sixth, the "Frequently Asked Questions" on the Mint's website read: "What if my submission of mutilated coins is rejected?"  The Mint responds: "You will be notified of the reason for the rejection and be given instructions on how to return your mutilated coin submission to you."  The Mint never notified the Portland Mint of any rejection.

106.   Based on the above, and in light of the fact that the Mint accepted, redeemed, and melted the Portland Mint's shipment, the Portland Mint reasonably expected that the Mint would pay for the shipment.  Indeed, the Mint's regulations required the Mint to pay for the shipment. See 31 C.F.R. § 100.11(d).

107.     The Portland Mint would be prejudiced if Defendant were to now raise as a defense to this action that the Portland Mint's shipment was counterfeit, contained "technical anomalies," or otherwise failed to meet the requirements of the Redemption Program.

108.     Based on the facts set forth above, Defendant must be equitably estopped from asserting that the shipment the Mint accepted, redeemed, melted, and, on information and belief, used to manufacture new coin roll, was counterfeit, contained "technical anomalies," or otherwise failed to meet the requirements of the Redemption Program.

**COUNT FIVE**
**DECLARATORY JUDGMENT**

109.     The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

110.     This Court may declare the rights and other legal relations of any interested party seeking such declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

111.     As set forth above, the Portland Mint delivered an agreed-upon number of mutilated coins to the Mint, and the Mint accepted that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018.  Further, because the Mint accepted and redeemed the mutilated coins delivered to it by the Portland Mint, the Mint was required to pay the Portland Mint the value of the coins it redeemed, approximately $8.51 million.

112.     The Mint has not honored its regulatory obligations and has failed to pay the Portland Mint for the value of the redeemed coins.

113.     Given the dispute between the parties regarding whether the Mint owes the Portland Mint the value of the coins the Mint accepted and redeemed, an actual and justiciable controversy exists.

4832-3182-0239.v1

114.    The controversy is real and immediate, and is ripe for judicial resolution.   A declaratory judgment is needed to resolve the existing uncertainty as to the parties' regulatory rights and obligations.

115.    As a result, the Portland Mint is entitled to declaratory relief as follows:

a.    A declaration that Defendant's failure to pay the Portland Mint for the value of the mutilated coins that the Mint accepted and redeemed on or about August 1 and 2, 2018 constitutes a violation of the Mint's own regulations, set forth in 31 C.F.R. § 100.11;

b.    A declaration that Defendant's failure to pay the Portland Mint for the value of the mutilated coins that the Mint accepted and redeemed on or about August 1 and 2, 2018 is a breach of the parties' implied contract; and

c.    A declaration that Defendant pay the Portland Mint $8.51 million for the coins the Mint accepted and redeemed.

## COUNT SIX
## VIOLATION OF FIFTH AMENDMENT
## TAKINGS CLAUSE

116.    The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

117.    The Fifth Amendment of the Constitution of the United States provides that private property shall not be taken for public use without just compensation.

118.    On August 1 and 2, 2018, the Portland Mint delivered to the Mint, and the Mint accepted and redeemed, a total of approximately 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels, as authorized by federal regulations.   The total approximate value of the Portland Mint's shipment was $8.51 million.

4832-3182-0239.v1

119.    The Mint accepted, redeemed and melted that shipment, and, on information and belief, used it to manufacture new coin roll.

120.    To date, the Mint has not paid the Portland Mint for the redeemed and melted coins, returned the coins to the Portland Mint, or provided the Portland Mint with anything of value for accepting and taking its property.

121.    This permanent impairment of the Portland Mint's property constitutes a taking without just compensation in violation of the Fifth Amendment.

122.    As a direct, foreseeable, and proximate result of the acts of the Mint, the Portland Mint has been damaged in an amount equal to the just compensation due it under the Fifth Amendment, approximately $8.51 million, together with interest thereon, at a rate to be established by this Court.

**COUNT SEVEN**
**EQUAL ACCESS TO JUSTICE ACT**

123.    The Portland Mint incorporates the allegations of the preceding paragraphs by reference as if set forth fully herein.

124.    Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, in the event the Portland Mint is the "prevailing party" in this matter, it is entitled to its reasonable attorneys' fees and expenses incurred during this litigation as long as the position of Defendant is not found to be "substantially justified."

125.    The Portland Mint seeks judgment for its reasonable attorneys' fees and expenses incurred during this litigation in an amount to be determined by appropriate petition at the conclusion of this matter.

4832-3182-0239.v1

## PRAYER FOR RELIEF

WHEREFORE, the Portland Mint prays that this Court grant relief against Defendant as follows:

   a.  Declaratory judgment that Defendant violated its own regulations and owes the Portland Mint for the value of the redeemed coins;

   b.  Declaratory judgment that Defendant breached its implied contract with the Portland Mint and owes the Portland Mint for the value of the redeemed coins;

   c.  Compensatory damages in the approximate amount of $8,510,250, plus accruing interest and expenses;

   d.  Attorneys' fees and costs of litigation, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

   e.  Such other legal and equitable relief as this Court deems just and proper.


Dated: October 23, 2020


Respectfully submitted,


/s/ Lee Vartan
LEE VARTAN
Chiesa Shahinian & Giantomasi PC
ONE BOLAND DRIVE
WEST ORANGE, NJ 07052
T: 973.325.1500
F: 973.325.1501
lvartan@csglaw.com
Attorneys for Plaintiff the Portland Mint

4832-3182-0239.v1