IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

20-518C
(Senior Judge Horn)

---

THE PORTLAND MINT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

---

LEE VARTAN
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
T:  973.325.1500
F:  973.325.1501
lvartan@csglaw.com

*Attorneys for Plaintiff*

January 15, 2021

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     Standard of Review under RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     Standard of Review under RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    DEFENDANT PRESENTS MATTERS OUTSIDE THE PLEADINGS
       THAT SHOULD BE EXCLUDED BY THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   PLAINTIFF HAS SUFFICIENLY PLEADED A CLAIM FOR A
       VIOLATION OF A MONEY-MANDATING REGULATION . . . . . . . . . . . . . . . . . . . . . . 9

IV.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S
       BREACH OF CONTRACT CLAIM, WHICH HAS BEEN
       SUFFICIENTLY PLEADED IN THE FAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.     The Contract between Plaintiff and Defendant Was an
              Implied-in-Fact Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       B.     Plaintiff Has Alleged a Plausible Claim for Relief Based
              on Defendant's Breach of an Implied-In-Fact Contract . . . . . . . . . . . . . . . . . . . . 13

              1.     The FAC Sets Forth Plausible Allegations of a
                     Mutual Intent to Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

              2.     The FAC Sets Forth Plausible Allegations of an
                     Unambiguous Offer and Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

              3.     The FAC Sets Forth Plausible Allegations of
                     Consideration for the Implied Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

              4.     The FAC Sets Forth Plausible Allegations Regarding
                     Anthony Holmes, Jr.'s Implied Actual Authority to
                     Bind the Government in Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.     PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIEF
       BASED ON THE GOVERNMENT'S BREACH OF THE IMPLIED
       DUTY OF GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4817-2232-8023.v1

VI.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S
       CLAIM FOR DECLARATORY RELIEF RELATING TO
       MONETARY DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII.   PLAINTIFF HAS SUFFICIENTLY PLEADED FACTS TO
       SUSTAIN AN EQUITABLE ESTOPPEL CLAIM, WHICH
       HAS BEEN RECOGNIZED AS VIABLE WITHIN THE
       COURT OF FEDERAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VIII.  THIS COURT HAS JURISDICTION OVER PLAINTIFF'S
       TAKINGS CLAIM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4817-2232-8023.v1

## TABLE OF AUTHORITIES

### Cases

*27-35 Jackson Ave. LLC v. United States,*
   No. 16-947C, 2017 WL 4296703 (Fed. Cl. Sept. 28, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Acadia Tech. Co., Inc. v. United States,*
   458 F.3d 1327 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Advanced Team Concepts, Inc. v. United States,*
   68 Fed. Cl. 147 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*AG Route Seven P'ship v. United States,*
   57 Fed. Cl. 521 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Agwiak v. United States,*
   347 F.3d 1375 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 10

*Ambrose v. United States,*
   106 Fed. Cl. 152 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Am. Airlines, Inc. v. United States,*
   77 Fed. Cl. 672 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*American Fed. Bank, FSB v. United States,*
   58 Fed. Cl. 429 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Anchorage v. United States,*
   119 Fed. Cl. 709 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Anderson v. United States,*
   344 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*ARRA Energy Co. I v. United States,*
   97 Fed Cl. 12 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Balt. & Ohio R.R. v. United States,*
   261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bank of Guam v. United States,*
   578 F.3d 1318 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Barlow & Haun, Inc. v. United States,*
   87 Fed. Cl. 428 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iii

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Briseno v. United States*,
　　83 Fed. Cl. 630 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Brunner v. United States*,
　　70 Fed. Cl. 623 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Buse Timber & Sales, Inc. v. United States*,
　　45 Fed. Cl. 258 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Carter v. United States*,
　　98 Fed. Cl. 632 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Centex Corp. v. United States*,
　　395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Chapman Law Firm Co. v. Greenleaf Constr. Co.*,
　　490 F.3d 934 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Consol. Edison Co. of N.Y. v. United States*,
　　67 Fed. Cl. 285 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*D & N Bank v. United States*,
　　331 F.3d 1374 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Davis Wetlands Banks, LLC v. United States*,
　　114 Fed. Cl. 113 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*DaVita, Inc. v. United States*,
　　110 Fed. Cl. 71 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Del–Rio Drilling Programs, Inc. v. United States*,
　　146 F.3d 1358 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Demodulation, Inc. v. United States*,
　　103 Fed. Cl. 794 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Detroit Edison Co. v. United States*,
　　56 Fed. Cl. 299 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Doe v. United States*,
　　463 F.3d 1314 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Doko Farms v. United States*,
　　13 Cl. Ct. 48 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4817-2232-8023.v1

*Easter v. United States*,
    83 Fed. Cl. 236 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Easter v. United States*,
    575 F.3d 1332 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Erickson v. Pardus*,
    551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Estate of Bogley v. United States*,
    206 Ct. Cl. 695 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fed. Crop Ins. Corp. v. Merrill*,
    332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*First Nat. Bank of Fort Worth v. United States*,
    8 Cl. Ct. 774 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Forest Glen Props., LLC v. United States*,
    79 Fed. Cl. 669 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fox Logistics & Constr. Co. v. United States*,
    145 Fed. Cl. 236 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*G4S Tech. LLC v. United States*,
    114 Fed. Cl. 662 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*H. Landau & Co. v. United States*,
    866 F.2d 322 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Halim v. United States*,
    106 Fed. Cl. 677 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Hanlin v. United States*,
    316 F.3d 1325 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hannon v. United States*,
    29 Fed. Cl. 142 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hercules, Inc. v. United States*,
    516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2 47 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*H.F. Allen Orchards v. United States*,
    749 F.2d 1571 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4817-2232-8023.v1

*Hydrothermal Energy Corp. v. United States*,
    26 Cl. Ct. 7, *supplemented*, 26 Cl. Ct. 1091 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*King v. United States*,
    81 Fed. Cl. 766 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*La Van v. United States*,
    382 F.3d 1340 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*,
    971 F.2d 732 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lion Raisins, Inc. v. United States*,
    416 F.3d 1356 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Love Terminal Partners v. United States*,
    97 Fed. Cl. 355 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Mendez v. United States*,
    121 Fed. Cl. 370 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Meschkow v. United States*,
    109 Fed. Cl. 637 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mountain Highlands, LLC v. Hendricks*,
    616 F.3d 1167 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*NSK Ltd. v. United States*,
    115 F.3d 965 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Parties v. Johnson*,
    No. CV-15-00250-TUC-DCB, 2017 WL 7512896 (D. Ariz. May 25, 2017) . . . . . . . . . . . . 27

*Patton v. United States*,
    64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Reynolds v. Army & Air Force Exch. Serv.*,
    846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rith Energy, Inc. v. United States*,
    247 F.3d 1355 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Scheuer v. Rhodes*,
    416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Scott Timber Co. v. United States*,
    692 F.3d 1365 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

vi

*Solaria Corp. v. United States*,
    123 Fed. Cl. 105 (2015), *aff'd*, 671 F. App'x 797 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . 25

*Stevens Van Lanes, Inc. v. United States*,
    80 Fed. Cl. 276 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

*Toon v. United States*,
    96 Fed. Cl. 288 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Trauma Serv. Grp. v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Turping v. United States*,
    913 F.3d 1060 (Fed. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Wade v. United States*,
    136 Fed. Cl. 232 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

*Woll v. United States*,
    45 Fed. Cl. 475 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## Constitutional Amendments

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## Regulations

31 C.F.R. § 100.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4817-2232-8023.v1

## PRELIMINARY STATEMENT

Plaintiff, the Portland Mint, alleges in its First Amended Complaint ("FAC") that it applied to participate in the United States Mint's Mutilated Coin Redemption Program; the Mint approved the Portland Mint to participate in the Redemption Program; at the Mint's direction, the Portland Mint delivered several hundred thousand pounds of mutilated coins to a foundry designated by the Mint in August 2018; the foundry accepted the Portland Mint's mutilated coins and redeemed them – that is, melted the coins and used them to manufacture new coin roll; and immediately following the redemption, two employees of the Mint stated, in sum and substance, that the redemption had proceeded smoothly and encouraged the Portland Mint to redeem additional mutilated coins through the Redemption Program.  The Mint promised the Portland Mint payment of approximately $8.51 million for the coins the Mint had redeemed.  Payment never came.

Instead, the Portland Mint was met with obfuscation.  First, the Mint claimed to be "evaluating the coins for final receipts."  Then it claimed that it had identified "technical anomalies" with the coins that required "ongoing" testing.  Still today, the Mint refuses to commit to a single narrative. In its Motion to Dismiss, the Mint at one point claims that it is "actively investigating the authenticity" of the coins and, at another, that the coins are indisputably "counterfeit" (although the report that led to that conclusion can never be shared with Plaintiff because it is protected by the "investigatory files privilege").  Notwithstanding the contradictory positions in its own motion (and Plaintiff's well-pleaded allegations that the coins are genuine), Defendant would have the Court skip to the end of the case, declare, without discovery, the coins that the Mint is still "investigating the authenticity of" are counterfeit, and dismiss the FAC in its entirety.  More remarkable still, Defendant makes this argument after admitting through counsel that the allegations in the FAC are true – all but a small sample of Plaintiff's coins were melted by the Mint and, on information and belief, used to manufacture new coin roll.

1

Stripped to its essentials, the Government's argument seems to be that even though Plaintiff did as it was told and delivered its mutilated coins to the foundry designated by the Government, and even though the Government accepted Plaintiff's coins, melted Plaintiff's coins, and, on information and belief, used them to manufacture new coin roll, the Government has no obligation to pay Plaintiff for what it took. Aside from being plain unfair, the Government's argument is contrary to the Constitution, the Mint's own regulations governing the Redemption Program, and basic principles of contract law. Defendant's Motion to Dismiss should be denied in its entirety.

## STATEMENT OF FACTS

By statute, the Treasury Department is required to melt "obsolete and worn United States coins withdrawn from circulation." (FAC ¶ 20). In response to Congress's mandate, the Treasury Department established the Mutilated Coin Redemption Program within the Mint in 1911. (*Id*. ¶¶ 20-21). Under the Program, individuals and businesses can redeem "[b]ent coins" – defined as "U.S. coins which are bent or deformed so as to preclude normal machine counting but which are readily and clearly identifiable as to genuineness and denomination[]" – and "[p]artial coins" – defined as "U.S. coins which are not whole . . . [but which are] readily and clearly identifiable as to genuineness and denomination[]" – for reimbursement.[1] 31 C.F.R. § 100.11(b). Reimbursement rates are fixed by regulation. *See* 31 C.F.R. § 100.11(d). The Redemption Program benefits all parties: individuals and businesses are able to redeem their mutilated coins for payment, and the Mint is able to use the coins it redeems to manufacture new coinage for circulation. (FAC ¶ 22). When the Mint melts a participant's coins and uses them to manufacture new coin roll, i.e., redeems them, the participant must be paid under the Program. *See* 31 C.F.R. § 100.11(d) ("The United States Mint *will redeem*

---

[1] Together, "bent coins" and "partial coins" are commonly referred to as mutilated coins.

2

bent or partial coins on the basis of their weight and denomination *at the following rates* …")
(emphasis added).

Plaintiff, the Portland Mint, is an off-sort coin processor founded by Adam Youngs in 2008.
(FAC ¶ 28.  As part of its business model, the Portland Mint redeems coins through the Redemption
Program.  (*Id*. ¶ 29).  Its first redemption was made in 2012, and since that first redemption, the
Portland Mint has redeemed approximately 21 shipments of mutilated coins through the Program and
been paid approximately $229,632 by the Mint.  (*Id*.).  The Portland Mint's redemptions have always
been without issue.  (*Id*. ¶ 30).

In November 2015, for the first time in the history of the Redemption Program, the Mint
suspended the Program.  (*Id*. ¶ 36).  Although the Mint did not say why, based on publicly available
court filings against three participants in the Program, it appeared that the Mint believed that certain
participants were bulk redeeming counterfeit mutilated coins.  (*Id*. ¶ 31).  Although the Portland Mint
was not among the suspected culprits, its business was impacted nonetheless.  In a seemingly
coordinated effort with the Mint, the Department of Homeland Security ("DHS") detained mutilated
coin shipments at the ports, including three of the Portland Mint's shipments.  (*Id*. ¶ 36).  DHS refused
to release the shipments, and the Portland Mint was forced to file a civil action seeking their release.
(*Id*. ¶ 37).

As part of that litigation, the Portland Mint obtained discovery from the Government,
including laboratory reports from DHS evaluating samples from the Portland Mint's detained
shipments.  (*Id*. ¶¶ 37-40).  The laboratory reports concluded that the shipments contained genuine,
mutilated U.S. coins.  Specifically, the reports read: "The samples have a broad range of date mint
marks and their weights and alloy compositions are indistinguishable from standard currency."  (*Id*.
¶ 41).  Unsurprisingly, the Government released the shipments to the Portland Mint.  (*Id*. ¶ 42). The

4817-2232-8023.v1

Government also dismissed its complaint against the suspected counterfeiters without any finding (or even evidence) that any mutilated coins had been counterfeited by anyone.  (*Id*. ¶ 34).

Its concerns about bulk counterfeiting presumably allayed, the Mint resumed the Redemption Program in January 2018.  (*Id*. ¶ 44).  The Portland Mint again applied to participate and was accepted into the Program in June 2018.  (*Id*. ¶ 49).  Anthony Holmes, Jr., a supervisor at the Mint, notified Mr. Youngs that the Portland Mint had been accepted into the Program.   Immediately upon acceptance, Mr. Youngs corresponded with Mr. Holmes to arrange for redemption of his first shipment of mutilated coins.  (*Id*. ¶¶ 50-52).  Mr. Holmes directed Mr. Youngs to deliver his shipment to the Olin Brass foundry in Illinois on August 1, 2018.  (*Id*. ¶ 52).  Approximately one week prior to the scheduled melt, Mr. Youngs confirmed in writing to the Mint that he would be delivering approximately 427,000 pounds of mutilated coins valued at $8.51 million – the equivalent of 11 truckloads.  (*Id*. ¶ 53).  Among those coins were the coins that had initially been detained by DHS, but which were later released to the Portland Mint after DHS determined the coins were genuine, mutilated U.S. coins.  (*Id*. ¶ 58).

Given the value of the shipment, Mr. Youngs sought special permission from the Mint to deliver the coins himself and witness the melt.  (*Id*. ¶ 55).  He was given that permission only to have it later rescinded by the Mint.  (*Id*. ¶ 56).  Although he was not allowed to watch the melt, Mr. Youngs did meet with Mr. Holmes and a second Mint employee after the melt was completed.  (*Id*. ¶ 57).  The employees complimented Mr. Youngs on the professionalism of the Portland Mint's operation, and specifically stated that the coins redeemed by the Portland Mint were without issue.  (*Id*.).  They also encouraged Mr. Youngs to redeem additional mutilated coins through the Redemption Program.  (*Id*.).  The employees promised that the Portland Mint would receive payment for its redeemed shipment in 4-6 weeks.  (*Id*.).  Payment never came.

4817-2232-8023.v1

Instead, Mr. Youngs and the Portland Mint were met with excuses.  First, the Mint claimed that it was "still evaluating the coins for final receipts."  (*Id*. ¶ 61).  When the Mint tired of that excuse, it claimed that "[p]reliminary testing of the materials submitted by the Portland Mint . . . identified technical anomalies that . . . required additional, detailed testing to ensure they are appropriate for redemption."  (*Id*. ¶ 63).  According to the Mint, that testing was "ongoing" in April 2019 and remained ongoing in April 2020.  (*Id*. ¶¶ 63, 72).  Depending on what part of the Government's Motion to Dismiss is to be believed, that testing either remains ongoing still today, or has concluded with a finding that the Portland Mint's coins were indisputably counterfeit  (*Compare* Def.'s Br. at 32 ("[T]he Mint is actively investigating the authenticity of Portland's coin submission[,]"), *with id*. at 12 ("[T]he Mint has not 'redeemed' the coins because it has determined that they are not suitable for redemption," and "believes they are counterfeit[.]")).

While the Government may not have arrived upon its preferred narrative, one fact is agreed to by all parties: all but an exceedingly small sample of the Portland Mint's shipment was melted at Olin Brass in August 2018.  Plaintiff alleges that the shipment was melted and used to make new coin roll.  (*See*, *e.g.*, FAC ¶ 82).  The Government does not dispute that allegation in its Motion to Dismiss.  So, regardless of which of the Government's narratives is to be believed, the Government is either still today attempting to determine the authenticity of a shipment years-ago used to manufacture new coinage or has determined the Portland Mint's shipment to be "counterfeit" even though it was years-ago used to manufacture genuine, U.S. coins.  The Court need not linger on which (if either) of Defendant's narratives is true.

On a motion to dismiss, Plaintiff's well-pleaded allegations must be accepted as true, and those well-pleaded allegations make clear that: the Portland Mint delivered approximately 427,000 pounds of genuine, mutilated U.S. coins to Olin Brass at the direction of the Mint in August 2018; those coins were accepted, melted, and used to manufacture new coin roll; and, over two years later,

the Mint has not paid for the coins it took.  The Mint's failure to pay is a violation of the Constitution, the Mint's own regulations, and basic principles of contract law.

## ARGUMENT

## I.   STANDARDS OF REVIEW

### A.   Standard of Review under RCFC 12(b)(1)

In considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), a court is "obligated to assume all factual allegations [in the complaint] to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-7, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).  The relevant issue on a motion to dismiss under RCFC 12(b)(1) "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236).  To meet its burden, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction[.]" RCFC 8(a)(1).

### B.   Standard of Review under RCFC 12(b)(6)

The standard of review under RCFC 12(b)(6) is likewise plaintiff-friendly.  A court "must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor."  *Wade v. United States*, 136 Fed. Cl. 232, 242 (2018) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (additional citation omitted)))).  A plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief."  RCFC 8(a)(2);

*see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 555-57). Similar to a motion under RCFC 12(b)(1), when considering a RCFC 12(b)(6) motion, a court "'must determine whether the claimant is entitled to offer evidence to support the claims, not whether the claimant will ultimately prevail.'" *Toon v. United States*, 96 Fed. Cl. 288, 296 (2010) (quoting *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (internal quotations and citation omitted)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556 (internal quotation marks and citations omitted); *see also Chapman*, 490 F.3d at 938 (noting that the court's duty is not to determine "whether the claimant will ultimately prevail" when ruling on a 12(b)(6) motion).

## II. DEFENDANT PRESENTS MATTERS OUTSIDE THE PLEADINGS THAT SHOULD BE EXCLUDED BY THE COURT

When deciding a motion to dismiss, courts "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Ambrose v. United States*, 106 Fed. Cl. 152, 156 (2012) (internal quotation marks and citation omitted). If, however, "on a motion under RCFC 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56." *See* RCFC 12(d); *see also G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014) (citing *Briseno v. United States*, 83 Fed. Cl. 630, 634 (2008) ("[W]hen the court considers – and does not exclude – materials outside of the pleadings, dismissal under RCFC 12(b)(6) or 12(c) is not appropriate.")). "Whether to accept extra-pleading matter on a motion for judgment on the pleadings and to treat the motion as one for summary judgment is within the trial court's discretion." *Easter v. United States*, 575 F.3d 1332, 1335 (Fed. Cir. 2009), *cert. denied*, 559 U.S. 1005, 130 S.Ct. 1883, 176 L.Ed.2d 363 (2010). In fact, "[c]ourts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule

4817-2232-8023.v1

12(b)(6) motion and rely upon that material." *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 379 (2011) (quotations and citation omitted).  "Before the court may convert a motion to dismiss into a motion for summary judgment, however, the court must ordinarily provide the parties with notice of its intention to do so."  *Wade*, 136 Fed. Cl. at 246 (citing RCFC 12(d)).  Moreover, the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  RCFC 12(d).

In its motion, Defendant presents matters outside the pleadings to support its contention that the coins submitted by Plaintiff to Defendant were "counterfeit."  Specifically, Defendant refers to "a final report regarding its investigation into the authenticity of Portland's submission[,]" but states that "[t]his report is subject to the investigatory files privilege as well as potentially subject to other privileges."  (Def.'s Br. at 7 n. 5).  The Mint further references "a letter officially denying redemption . . . because the coins are counterfeit."  (*Id.* at 7 n. 4).[2]  The Government's reliance on this report and letter is troubling.  First, at the time the FAC was filed, Plaintiff had neither.  Second, the Government appears unwilling to ever share the report with Plaintiff concerning Plaintiff's own coins.  And third, the reason for the Government's invocation of the report and letter is clear: the Government wants the Court to ignore the well-pleaded allegations in the FAC, declare the coins counterfeit based on a report that Plaintiff can never see, and deny Plaintiff payment.  That is not how a motion to dismiss works and is certainly not how civil litigation works.  The Government does not get to skip to the end of the litigation by relying upon a "privileged" report that Plaintiff is not even permitted to read, let

---

[2] Plaintiff received that letter on December 30, 2020.  The letter was undated.  The timing of the letter, of course, was no coincidence – sent while the Government's Motion to Dismiss in this action was pending, and a full 29 months after the Portland Mint redeemed its shipment.  Like nearly all previous communications from the Mint, the letter was imprecise, claiming that "detailed testing and thorough analysis" of 203 coins (from an 11-truckload shipment) allowed the Mint to conclude, based on undisclosed "[m]ethods of inferential statistics[,]" that the Portland Mint's "entire submission" was "counterfeit."  The letter does not mention the fate of the "counterfeit" shipment.

4817-2232-8023.v1

alone challenge.  The Court should exercise its discretion to exclude this material when deciding Defendant's Motion to Dismiss.  Alternatively, should the Court consider documents extraneous to the FAC, the Court should treat Defendant's motion as one for summary judgment pursuant to RCFC 56, order the Government to provide the report and all related materials to Plaintiff, and permit the parties a reasonable opportunity to engage in limited discovery so that all material pertinent to the motion may be presented to and considered by the Court.  *See Mendez v. United States*, 121 Fed. Cl. 370, 386 (2015) ("[I]n converting the motion, the court must provide the parties with an opportunity to litigate the government's Rule 12(b)(6) challenge through the procedures afforded by Rule 56."); *see also Easter v. United States*, 83 Fed. Cl. 236, 239 (2008) ("Conversion of a motion for judgment on the pleadings into one for summary judgment should only occur after the parties have been afforded a reasonable opportunity to present pertinent summary judgment materials.") (internal quotation and citation omitted).

## III.   PLAINTIFF HAS SUFFICIENLY PLEADED A CLAIM FOR A VIOLATION OF A MONEY-MANDATING REGULATION

Title 31, Code of Federal Regulations, Section 100.11(d) is clear: "The United States Mint *will redeem* bent or partial coins on the basis of their weight and denomination at the following rates …" 31 C.F.R. § 100.11(d) (emphasis added).  The FAC is equally clear: the Mint agreed to redeem approximately 427,000 pounds of mutilated coins from the Portland Mint; the Portland Mint dutifully followed the instructions of the Mint, delivering 427,000 pounds of mutilated coins to the foundry designated by the Mint; and the Mint did redeem those coins, that is, they accepted the coins, melted the coins, and on information and belief, used the coins to manufacture new coin roll.  (FAC ¶¶ 80-85).  Based on the plain language of the regulation, and the facts as pleaded, 31 C.F.R. § 100.11 required payment to the Portland Mint – that is, the regulation is money-mandating.  *See Agwiak v. United States*, 347 F.3d 1375, 1379 (Fed. Cir. 2003) (to be money-mandating, it is "enough" that the regulation be "reasonably amenable to the reading that it mandates a right of recovery in damages[]")

9

(quotations and citation omitted); *Hannon v. United States*, 29 Fed. Cl. 142, 146 (1993) (where a claimant alleges that "he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication" and his claim is "at least … arguable" and "not frivolous," the Court of Federal Claims has jurisdiction) (quotations and citation omitted).

The Government agrees that 31 C.F.R. § 100.11 is money-mandating, acknowledging: "[I]f genuine, lawfully-held coins are submitted, and none of the prohibitions on redemption apply, then the regulatory provision that Portland cites conceivably entitles a submitter of coins to damages if payment is refused." (Def.'s Br. at 10). Of course, that is exactly what the Portland Mint alleges in the FAC. The Government's concession is consistent with well-settled law. "[A] statute can be money-mandating even if the government enjoys some discretion under it." *Agwiak*, 347 F.3d at 1380. In *Doe v. United States*, the Federal Circuit explained that a statute that invests the government with some discretion nevertheless remains money-mandating where "(1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citations omitted); *see also King v. United States*, 81 Fed. Cl. 766, 770 (2008) (statute permitting but not requiring the Director of the FBI to establish a permanent police force was money-mandating because it "has clear standards for paying money to recipients, specifies precise amounts to be paid, and compels payment once certain conditions precedent are met) (quotations and citation omitted); *Hannon*, 29 Fed. Cl. at 147-48 (statute that provided agency with discretion to adopt, or not, overtime pay was money-mandating where agency did adopt overtime pay pursuant to the statute). Title 31, Code of Federal Regulations, Section 100.11 satisfies each of the *Doe* factors. The regulation has clear standards for paying money to recipients – a recipient is paid when the Mint redeems the recipient's coins, that is, melts the coins to manufacture new coin roll. The regulation specifies precise amounts to be paid – the redemption rates are detailed in the regulation. And the

10

regulation compels payment once certain preconditions are met – namely, once the Mint chooses to redeem the recipient's coins by melting them and using them to manufacture new coin roll.

The Government's only argument in response is to skip to the merits of Plaintiff's claim (based on the same documents not shared with Plaintiff and not part of the FAC). According to the Government, 31 C.F.R. § 100.11 is not money-mandating because "one or more of the prohibitions on redemption apply" to Plaintiff's coins, and "the U.S. Mint *believes* [Plaintiff's coins] are counterfeit and, thus, pursuant to the regulations, no redemption will be made." (Def.'s Br. at 11-12) (emphasis added). The Government's argument confuses jurisdiction with the merits. The only issue presently before the Court is whether, assuming the truth of Plaintiff's allegations, 31 C.F.R. § 100.11 mandates payment to Plaintiff. It does. (*See* Def.'s Br. at 10); *see also King*, 81 Fed. Cl. at 770 ("[T]he presence of a condition itself does not defeat a claim that a statute is money-mandating, although whether the condition is met bears on the merits of a claim.") (quotations and citation omitted). Further, Defendant's belief – particularly a belief based on documents kept hidden from Plaintiff and not yet part of the record – cannot undo Plaintiff's well-pleaded allegations. For purposes of deciding Defendant's Motion to Dismiss, the Court must accept as true that Plaintiff's coins were genuine, mutilated U.S. coins that were redeemed by the Mint and used to manufacture new coin roll. Defendant's Motion to Dismiss Count One of the FAC should be denied.

## IV.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S BREACH OF CONTRACT CLAIM, WHICH HAS BEEN SUFFICIENTLY PLEADED IN THE FAC

The FAC alleges a valid, implied-in-fact contract between Plaintiff and Defendant. Specifically, the FAC alleges that the Portland Mint offered to redeem approximately 427,000 pounds of genuine, mutilated U.S. coins through the Redemption Program. On August 1 and 2, 2018, the Mint accepted Plaintiff's shipment, melted Plaintiff's shipment, and, on information and belief, used it to manufacture new coin roll. In the language of contract, there was an *offer* to provide 427,000 pounds of genuine, mutilated U.S. coins by the Portland Mint; *acceptance* by the Mint; and

11

*consideration* – the Mint redeemed the coins and used them to manufacture new coin roll.  (FAC ¶¶ 49-59).  Defendant offers two arguments in response.  First, Defendant argues that because the redemption rates are fixed by regulation, the contract between Plaintiff and Defendant was not an implied-in-fact contract, but rather was an implied-in-law contract over which this Court has no jurisdiction.  (*See* Def.'s Br. at 13-14).  Second, Defendant argues that, even if the contract was an implied-in-fact contract, the FAC fails to establish the necessary elements of such a contract.  Both arguments fail.

### A.       The Contract between Plaintiff and Defendant Was an Implied-in-Fact Contract

"An implied-in fact contract is one founded upon a meeting of minds and 'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2 47 (1996)).  Stated another way, "[i]mplied-in-fact contracts are contracts inferred by a court when 'the light of the surrounding circumstances' demonstrates a meeting of the minds between the parties, even if the agreement was never formalized." *Fox Logistics & Constr. Co. v. United States*, 145 Fed. Cl. 236, 241 (2019) (quoting *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019)); *see also Demodulation, Inc. v. United States*, 103 Fed. Cl. 794, 807 (2012) (noting that an implied-in-fact contract is "founded upon a meeting of the minds," whereas an implied-in-law contract is defined as "judicially impose[d] duties that are deemed to arise by operation of law in order to prevent an injustice[]") (internal quotations and citations omitted); *First Nat. Bank of Fort Worth v. United States*, 8 Cl. Ct. 774, 776 (1985) ("Contracts implied in law are … legal fictions; they denote transactions in which an obligation is imposed as a matter of equity and fairness rather than as the enforcement of a duty borne of assent.").

4817-2232-8023.v1

Taking Plaintiff's well-pleaded allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must on a motion to dismiss, Plaintiff has sufficiently pleaded a valid claim against the Government for breach of an implied-in-fact contract.  *See Forest Glen Props., LLC v. United States*, 79 Fed. Cl. 669, 683 (2007) (citation omitted) ("[A]llegation of the existence of an implied-in-fact contract suffices for purposes of establishing subject matter jurisdiction, and [] any infirmity of proof of such contract presents a merits question."); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1325 (Fed. Cir. 2009) (citing *Trauma Serv. Grp.*, 104 F.3d at 1325) ("A well pleaded allegation of a breach of either an express or implied-in-fact contract is sufficient to overcome challenges to jurisdiction.").  The FAC alleges a "meeting of the minds" and mutuality of assent. Plaintiff offered to redeem a specific amount of mutilated coins; Defendant accepted that offer, and did redeem those coins.  That the amount now owed to Plaintiff is informed by regulation does not convert an implied-in-fact contract to one implied in law.  *See La Van v. United States*, 382 F.3d 1340, 1346 (Fed. Cir. 2004) (finding that while approval of conversation was required by regulations, negotiation for good will evidenced "something more"); *Davis Wetlands Banks, LLC v. United States*, 114 Fed. Cl. 113, 120 (2013) (rejecting government's argument that alleged contract was a regulatory pronouncement because the agreement went beyond mere approval of a wetland bank and addressed specific credits for specific types of restorations).  Accordingly, Defendant's Motion to Dismiss Count Two of the FAC for lack of subject matter jurisdiction should be denied.

**B.    Plaintiff Has Alleged a Plausible Claim for Relief Based on Defendant's Breach of an Implied-In-Fact Contract**

"In order to establish an implied-in-fact contract, the plaintiff must demonstrate the same elements needed for an express contract." *Fox Logistics*, 145 Fed. Cl. at 242-43 (citing *Turping*, 913 F.3d at 1065).  Specifically, the plaintiff must prove "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the Government's representative to bind the Government in contract."  *Id*. at 242 (internal quotation and citation

13

omitted).  Defendant contends that Plaintiff has failed to plausibly allege each of these elements.  Defendant is wrong and ignores the well-pleaded allegations contained in the FAC.  *See Anchorage v. United States*, 119 Fed. Cl. 709, 715 (2015) (denying motion to dismiss breach of contract claim where plaintiff sufficiently pleaded facts and the parties had yet to conduct discovery on the disputed issues regarding contractual duties).

### 1.    The FAC Sets Forth Plausible Allegations of a Mutual Intent to Contract

A contract requires "[a]n objective manifestation of voluntary, mutual assent."  *American Fed. Bank, FSB v. United States*, 58 Fed. Cl. 429, 436 (2003) (citing *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003)); *see also Stevens Van Lines, Inc. v. United States*, 80 Fed. Cl. 276, 281 (2008) ("To find an implied-in-fact contract, the claimant must demonstrate that there was an unambiguous offer to contract upon specific terms and mutuality of intent between the parties to enter a contract.").  Such mutuality of intent requires the plaintiff to "show, by objective evidence, the existence of an offer and a reciprocal acceptance."  *Anderson*, 344 F.3d at 1353.  In determining whether mutuality of intent has been established, the inquiry is an objective one.  *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521 (2003).  "Acceptance of the offer must be manifested by conduct, which, viewed objectively, indicates assent to the proposed bargain."  *Id*. at 536-37.

The FAC alleges mutuality of intent.  The Portland Mint offered a specific number of coins for redemption, and the Mint accepted that specific number of coins for redemption (and did in fact redeem them).  The objective evidence alleged in the FAC demonstrates the intent of the parties and, in particular, Defendant's acceptance of Plaintiff's offer.  Among other things, Defendant approved of the amount of Plaintiff's shipment; directed Plaintiff where to deliver that shipment; met Plaintiff at that designated location to accept the shipment; accepted the shipment; melted the shipment to make new coin roll; and, thereafter, reported to Plaintiff that the melt had proceeded smoothly and Plaintiff would be paid promptly.  Plaintiff has met its pleading burden.  *See Anderson*, 344 F.3d at

14

1353 ("To satisfy its burden to prove . . . mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 22(1) (1981) (mutuality of intent usually "takes the form of an offer or proposal by one party followed by acceptance by the other party or parties").

In response, the Government sets up strawman arguments to easily knock down. First, the Government argues that the FAC implies "that a contract was formed, at least in part, through [Plaintiff's] application to and acceptance into the redemption program[.]" (Def.'s Br. at 17). That is not what the FAC implies or alleges. The FAC alleges that the parties formed a contract when the Portland Mint offered to redeem a specific number of coins, and the Mint accepted that specific number of coins for redemption (and did ultimately redeem them). Second, the Government argues that there was no mutuality of intent because the Portland Mint submitted coins for "possible redemption" only, (*id.* at 15), and "nothing require[d] the Government to pay any amount if the coins [were] determined to be non-redeemable and non-returnable under the regulations, due to intentional mutilation, fraud, criminal activity, or material misrepresentation." (*Id.* at 16-17). While that may be an accurate restatement of 31 C.F.R. § 100.11, it is not what the FAC alleges. The FAC alleges that Plaintiff delivered genuine, mutilated U.S. coins, Defendant accepted those genuine coins, and *Defendant did redeem them*. Defendant may have been permitted by regulation to reject Plaintiff's shipment, but it did not, and its decision to accept Plaintiff's shipment and redeem it was objective evidence of Defendant's intent to contract. *See Estate of Bogley v. United States*, 206 Ct. Cl. 695, 704 (1975) ("It is fundamental that in order to have a valid contract one party must make an offer that is a promise which is conditional upon receipt by the offeror of some act or promise from the offeree, and the offer must be accepted as to all its terms by the offeree.").

Addressing the facts as actually alleged in the FAC, Defendant argues that "even if the Government may arguably be bound by its regulations to redeem . . . lawfully-held, genuine United

4817-2232-8023.v1

States coins . . . , such mandatory provisions have been held by courts to *not* indicate intent to contract." (*Id.* at 17) (emphasis in original). Again, Defendant misunderstands the FAC. Plaintiff does not allege that the regulation was the objective evidence of the Government's intent to contract. The objective evidence of the Government's intent to contract was the Government's actions – the instructions from Mr. Holmes to Plaintiff; Mr. Holmes' acceptance of Plaintiff's shipment; the Mint's redemption of Plaintiff's shipment; and the Mint's promise to pay Plaintiff. There was no similar Government action in the one case cited by Defendant, *ARRA Energy Co. I v. United States*, 97 Fed Cl. 12 (2011). (*See* Def.'s Br. at 17). Indeed, *ARRA Energy* involved no Government action at all. At issue there was a program under which the Department of Treasury awarded reimbursement grants in lieu of tax credits to entities that invested in specific types of renewable energy. Plaintiffs invested in solar-powered generating systems, made them available to end-users pursuant to leasing agreements, and thereafter submitted reimbursement grants to the Treasury Department. Treasury denied plaintiffs' reimbursement applications, and plaintiffs filed suit. In their complaint, "plaintiffs argue[d] that [the statute creating the program] constituted an offer by the government to enter into a unilateral contract, and that plaintiffs accepted that offer when they filed their applications for reimbursement grants." *ARRA Energy*, 97 Fed Cl. at 25. In granting the Government's motion to dismiss for failure to state a claim, this Court held that "[t]here is no indication in [the particular statute] that the government intended to enter into a contractual relationship with any reimbursement grant recipient." *Id.* at 28. In reaching its decision, the Court rejected defendant's argument that "a statute can never constitute an offer to enter into a contract," and held that the "general presumption that statutes are not intended to create any vested contractual rights" can be overcome based on "conduct on the part of the government that allows a reasonable inference that the government intended to enter into a contract." *Id.* at 27.

The differences between the allegations in *ARRA Energy* and the allegations in the FAC are several.  Plaintiffs in *ARRA Energy* alleged a unilateral contract.  The Portland Mint alleges a bilateral contract.  Plaintiffs in *ARRA Energy* alleged no conduct by the Treasury Department beyond serving as passive recipient of reimbursement applications.  The Portland Mint alleges considerable Government conduct.  And, perhaps most importantly, plaintiffs in *ARRA Energy* based their contract claim on the statute alone.  The Portland Mint bases its contract claim on the Mint's actions – "conduct . . . that allows a reasonable inference that the [Mint] intended to enter into a contract" with Plaintiff. *Id*.  Defendant's acceptance, melting, and use of Plaintiff's mutilated coins made clear Defendant's assent to the terms of the implied contract.  While the "essential terms of th[at] . . . contract were found in [and informed by] the Mint's own regulations," (FAC ¶ 89), the manifestation of mutual assent to the contract was found in the parties' actual conduct, not the regulations themselves.

Defendant finally argues, and rather confusingly, that its "physical acceptance" of the Portland Mint's shipment did not actually constitute "acceptance," but rather, "merely reflect[ed] the Mint's 'performance of its regulatory or sovereign functions.'"  (Def.'s Br. at 18).  To support its argument, Defendant cites *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003).  In that case, D & N sought to recover damages for an alleged breach of an express or implied-in-fact contract that occurred when, because of newly-adopted federal legislation, D & N was not able to use the goodwill value of the thrift that it had recently acquired in a merger done with the approval of the Federal Home Loan Bank Board.  *Id*. at 1376-77.  D & N argued that its ability to use the goodwill value it gained in the merger was a term of the contract it had with the Federal Home Loan Bank Board regarding the acquisition.  *Id*.  In affirming this Court's decision granting the Government's motion for summary judgment of no contract liability, the Federal Circuit found that D & N did not provide sufficient evidence that a contract existed between it and the Federal Home Loan Bank Board.  The court explained that none of the documents submitted by D & N "expresse[d] the government's intention

17

to contract at all, much less contract to permit certain accounting treatment[]" and that "any suggestion that the government impliedly had the intent to contract as to the treatment of goodwill because of its approval of the merger [was] implausible because none of the documents proffered by D & N mention[ed] goodwill or the accounting treatment thereof." *Id*. at 1378. The court further noted that there was no evidence of negotiation and no evidence of mutual intent to contract. *Id*. In the absence of such evidence, the Federal Circuit concluded that the Federal Home Loan Bank Board's approval of the merger was a function of its regulatory or sovereign duty rather than evidence of its intent to contract with D & N. *Id*. at 1380, 1382. The Federal Circuit thus held that "performing regulatory duties or setting up a regulatory program is consistent with the regulatory function of any agency and says nothing about the role of the agency as an independent contracting body *without further evidence*." *Id.* at 1380 (emphasis added).

The Defendant's reliance on *D & N* is misplaced. As an initial matter, *D & N* was decided in the context of a motion for summary judgment. Moreover, in that case, the court based its decision, in part, on a lack of evidence demonstrating either negotiations between the parties or a mutual intent to contract. According to the court, "D & N . . . simply submitted an application for approval of the merger, and the Bank Board accepted it." *Id*. at 1379; *see also ARRA Energy*, 97 Fed Cl. at 28-29 (plaintiffs submitted reimbursement applications to the Treasury Department and had no interaction with the Treasury Department beyond those submissions). Here, the FAC plausibly alleges both negotiations between the parties and a mutual intent to contract. Plaintiff's claim, unlike that of the plaintiff in *D & N*, is not based on a simple submission of an application and the approval of that application by a government agency. In addition, as argued above, Plaintiff does not allege that its mere acceptance into the Redemption Program constituted an implied contract with the Government. Plaintiff alleges instead that an implied contract was formed based on the objective actions of the

18

parties, namely Plaintiff's delivery of mutilated coins to Defendant, and Defendant's acceptance and redemption of those coins to manufacture new coin roll.

> **2.    The FAC Sets Forth Plausible Allegations of an Unambiguous Offer and Acceptance**

Plaintiff has alleged facts sufficient to plausibly demonstrate an unambiguous offer and acceptance of the implied contract.  Specifically, Plaintiff alleges that:

- The Portland Mint "offered to deliver an agreed-upon number of mutilated coins to the Mint, and the Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018."

- "The Mint accepted the delivery, and redeemed the mutilated coins delivered by the Portland Mint.  In doing so, the Mint agreed to pay the Portland Mint for the value of the coins that the Mint accepted and redeemed, approximately $8.51 million."

- "On August 1 and 2, 2018, the Portland Mint performed its contractual obligations by delivering the agreed-upon number of mutilated coins to Olin Brass."

- "On August 1 and 2, 2018, the Mint accepted the Portland Mint's mutilated coins, melted them, and, on information and belief, used them to manufacture new coin roll."

(FAC ¶¶ 88, 92-94).  The Government's conclusory assertion that the "Portland [Mint] has not sufficiently alleged an unambiguous offer or acceptance" ignores these well-pleaded allegations. (Def.'s Br. at 21).

Defendant's arguments are more of the same.  Defendant calls Plaintiff's delivery of coins "a submission for examination for 'possible redemption,'" (*id.*), characterizes the parties' actions as "mere intention[s]," (*id.* at 22-23), and argues that the "Government [wa]s under no obligation to actually redeem any coins, and, indeed, the regulations provide[d] a number of situations in which the Government w[ould] *not* redeem submitted coins." (*Id.* at 23).  Again, the FAC is not Defendant's to re-write.  On August 1, 2018, the Portland Mint delivered approximately 427,000 pounds of genuine, mutilated U.S. coins to Olin Brass at the direction of the Mint for redemption.  While it is true that the Mint was "under no obligation to actually redeem any coins" – just as no offeree is

obligated to accept any offeror's offer – the Mint did accept the Portland Mint's offer.  The Mint did melt the coins.  On information and belief, the coins were used to make new coin roll.  They were redeemed.  The Government's only response is to argue the illogical.  According to the Government, the Mint did not redeem the coins "even upon the melting of the coins, because that legal determination to ultimately redeem the coins is not made upon physical acceptance of the coins or even melting of the coins.  Thus, matters were yet to be concluded for redemption of Portland's coins upon delivery and melting, and no contract was formed." (*Id.* at 24).  That argument is nonsensical and has no support anywhere in 31 C.F.R. § 100.11.  The purpose behind the Redemption Program was for the Mint to convert mutilated U.S. coins into new coinage by accepting mutilated coins, melting them, and using them to manufacture new coin roll.  (FAC ¶ 1).  The FAC alleges that the Mint melted the Portland Mint's coins and used them to manufacture new coin roll.  The Mint would have done so only if the Portland Mint's coins were genuine, mutilated U.S. coins.  Had they not been, the Mint would have rejected them pursuant to 31 C.F.R. § 100.11(c)(6).  There can be no "matters … yet to [] conclude[]." (Def.'s Br. at 24).  By any definition of the word "redeemed," the Mint redeemed the Portland Mint's shipment when it melted the coins and used them to manufacture new coinage – the Portland Mint's shipment is in our collective pockets, literally.  In short, the FAC alleges an unambiguous offer by Plaintiff and an equally unambiguous acceptance by Defendant.

### 3. The FAC Sets Forth Plausible Allegations of Consideration for the Implied Contract

Plaintiff has also alleged facts sufficient to plausibly demonstrate that there was consideration for the implied contract.  As the Federal Circuit has held, "[c]onsideration generally requires bargained-for exchange . . . When the promisor may choose to perform based solely on a whim, then the promise will not serve as consideration." *NSK Ltd. v. United States*, 115 F.3d 965, 975 (Fed. Cir. 1997) (citations omitted); *see also Woll v. United States*, 45 Fed. Cl. 475, 478 (1999) ("Whenever one of the parties to an agreement can terminate without consequence, an enforceable contract does

4817-2232-8023.v1

not exist."). The FAC alleges consideration. Defendant received approximately 427,000 pounds of mutilated coins from Plaintiff, and used those coins to Defendant's benefit – to manufacture new coinage. Defendant again relies on facts different from the FAC in arguing that consideration is absent from the contract as alleged. Specifically, Defendant contends that consideration did not "flow[] to the Government at the time of submission of the coins," because the Mint has not yet "determine[d] whether [the coins] are redeemable under the regulations[.]" (Def.'s Br. at 26). Defendant misstates the well-pleaded allegations in the FAC. The FAC is clear that not only were Plaintiff's coins melted, they were used to manufacture new coin roll. In short, they were redeemed. Whatever Defendant's ability was to reject Plaintiff's shipment under the regulations on August 2, 2018, that ability did not exist on August 3 after Defendant had melted Plaintiff's coins and used them to manufacture new coin roll. Indeed, on August 3, the Government was required to do just one thing – pay the Portland Mint for the coins it had redeemed. *See* 31 C.F.R. § 100.11(d) ("The United States Mint *will redeem* bent or partial coins on the basis of their weight and denomination *at the following rates* …) (emphasis added).

### 4.   The FAC Sets Forth Plausible Allegations Regarding Anthony Holmes, Jr.'s Implied Actual Authority to Bind the Government in Contract

Plaintiff has also plausibly alleged that Mr. Holmes, in his capacity as Materials Handler Supervisor at the Mint, had the implied actual authority to bind the Government to the contract underlying Count Two of the FAC.

To recover for breach of an express or implied-in-fact contract with the United States, a plaintiff must establish "that the officer whose conduct is relied upon had actual authority to bind the government." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984). "Although apparent authority will not suffice to hold the government bound by the acts of its agents, *see Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, [] 92 L.Ed. 10 (1947), implied actual authority, like expressed actual authority, will suffice." *H. Landau & Co. v. United States*, 866

21

F.2d 322, 324 (Fed. Cir. 1989) (citations omitted).  Implied authority is "created by the party's own actions and intentions."  *Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147, 151 (2005). In general, a government official has implied authority when "such authority is considered to be an integral part of the duties assigned to a Government employee."  *Stevens Van Lines, Inc.*, 80 Fed. Cl. at 280 (quotation and citation omitted); *Fed. Crop Ins.*, 332 U.S. at 384 (finding implied authority when government employee possessed the authority to ensure that a contractor acquired raw materials necessary for the contract and to draw checks on the government bank account).  *See also Advanced Team Concepts*, 68 Fed Cl. at 150-51 (finding implied authority given that the duties of scheduling, hiring, and paying invoices were central to the officer's work).  In other words, a government agent has implied authority "when the power to contract is 'appropriate or essential' to the performance of the agent's duties.'"  *Stevens Van Lines*, 80 Fed. Cl. at 280 (quoting *Brunner v. United States*, 70 Fed. Cl. 623 (2006)).

Contrary to Defendant's assertions, Plaintiff plausibly alleges that Mr. Holmes, in his role as Materials Handler Supervisor at the Mint, had implied actual authority to contract on behalf of the Mint.  The FAC alleges that "[a]s demonstrated by the communications and actions of Anthony Holmes, Jr. and other Mint employees, arranging and contracting for the delivery of mutilated coins was an integral part of Mr. Holmes' duties as a supervisor employed by the Mint."  (FAC ¶ 90).  Those "communications and actions" around the Redemption Program were many, and Mr. Holmes' authority to contract on behalf of the Government may be implied from his "communications and actions."  Specifically, the FAC alleges that Mr. Holmes "informed Mr. Youngs [the founder of the Portland Mint] that the Portland Mint's application to participate in the Redemption Program was approved."  (*Id*. at ¶ 49).  He further coordinated with Mr. Youngs regarding the Portland Mint's delivery of mutilated coins to Olin Brass, (*id*. at ¶¶ 51-55), "specifically stated that the coins redeemed by the Portland Mint were without issue . . . [and] promised that the Portland Mint would receive

4817-2232-8023.v1

payment for its redeemed shipment in 4-6 weeks." (*Id*. at ¶ 57).  Given these "communications and actions," and Mr. Holmes' clear representations to the Portland Mint, it stands to reason that Mr. Holmes had the actual or implied authority to bind the Government to the implied contract at issue. *See Brunner*, 70 Fed. Cl. at 641.  Against that background, at a minimum, Plaintiff should be permitted discovery regarding the factual issue of Mr. Holmes' duties and responsibilities.

The FAC plausibly alleges each of the requisite elements of a contract implied-in-fact between the Portland Mint and the Mint.  Accordingly, Defendant's Motion to Dismiss Count Two of the FAC should be denied.

## V.      PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIEF BASED ON THE GOVERNMENT'S BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner.  The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  "'[B]ecause the existence of th[e] covenant [of good faith and fair dealing] depends on the existence of an underlying contractual relationship, there is no claim for a breach of th[e] covenant where a valid contract has not yet been formed.'" *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (quoting *Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1171 (10th Cir. 2010)).

Here, Plaintiff alleges that "[t]he Mint breached the duty of good faith and fair dealing by destroying the Portland Mint's reasonable expectations of the fruits of the contract." (FAC ¶ 99). Specifically, "the Mint accepted and redeemed the coins provided to it by the Portland Mint, but refused to pay the Portland Mint for the property the Mint accepted and redeemed." (*Id*.).  As discussed above, the FAC plausibly alleges each of the requisite elements of a contract implied-in-

23

fact between Plaintiff and Defendant.  As such, the FAC sufficiently alleges a breach of the implied duty of good faith and fair dealing with respect to that implied-in-fact contract.  Accordingly, Defendant's Motion to Dismiss Count Three of the FAC should be denied.

## VI.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIM FOR DECLARATORY RELIEF RELATING TO MONETARY DAMAGES

The FAC seeks declaratory relief as follows: (1) a declaration that Defendant's failure to pay Plaintiff for the value of the mutilated coins that the Mint accepted and redeemed on or about August 1 and 2, 2018 constitutes a violation of the Mint's own regulations as set forth in 31 C.F.R. § 100.11; and (2) a declaration that Defendant is obligated to pay Plaintiff approximately $8.51 million for the coins the Mint accepted and redeemed.  (FAC ¶ 115).  The declaratory relief sought is not injunctive in nature, but rather tied to a monetary judgment and is, therefore, within the Court's jurisdiction.

Claims for declaratory relief may survive a motion to dismiss when they are primarily related to a request for monetary damages.  When determining its jurisdiction over a claim for declaratory relief, the Court must consider "whether the true character of the plaintiff['s] action is one for equitable relief . . . which is clearly outside the Court's jurisdiction, or one for money damages which is clearly within this Court's jurisdiction."  *Doko Farms v. United States*, 13 Cl. Ct. 48, 56 (1987) (holding declaratory relief may issue from the Court of Federal Claims if it is associated with and subordinate to a claim for money damages) (citation omitted).  Specifically, this Court has recognized that it has authority to issue rulings of law declaring the rights of parties where necessary to resolve a claim for money presently due and owing.  *Hydrothermal Energy Corp. v. United States*, 26 Cl. Ct. 7, 16, *supplemented*, 26 Cl. Ct. 1091 (1992) (citation omitted); *see also DaVita, Inc. v. United States,* 110 Fed. Cl. 71, 87 (2013) (denying motion to dismiss request for declaratory relief seeking an interpretation that plaintiff was entitled to payment for services provided under the contract at the contract rate); *Halim v. United States,* 106 Fed. Cl. 677, 688 (2012) (finding that plaintiff may be

24

entitled to declaratory relief for money damages stemming from defendant's alleged breach of contract and violation of its own regulations).

As set forth in the FAC, the Portland Mint is seeking a declaratory judgment that the Mint violated its own regulations by failing to compensate the Portland Mint at the regulatory rates for the coins it redeemed and for money damages.  Thus, Count Five falls squarely within the category of cases seeking a ruling of law declaring the rights of parties to resolve a claim for money presently owed.  As such, Defendant's Motion to Dismiss Count Five of the FAC should be denied.

## VII.   PLAINTIFF HAS SUFFICIENTLY PLEADED FACTS TO SUSTAIN AN EQUITABLE ESTOPPEL CLAIM, WHICH HAS BEEN RECOGNIZED AS VIABLE WITHIN THE COURT OF FEDERAL CLAIMS

Equitable estoppel "'is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled.'"  *Carter v. United States*, 98 Fed. Cl. 632, 638 (2011) (quoting *Am. Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 679 (2007)).  A complaint alleging equitable estoppel must allege sufficient facts to demonstrate: "(1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such right is permitted."  *Solaria Corp. v. United States*, 123 Fed. Cl. 105, 124 (2015), *aff'd*, 671 F. App'x 797 (Fed. Cir. 2016) (quoting *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992)).  This Court has denied motions to dismiss equitable estoppel claims when they are pleaded to prevent an adversary from taking a position due to its own alleged actions or omissions, as opposed to being pleaded to enforce a promise.  *See 27-35 Jackson Ave. LLC v. United States*, No. 16-947C, 2017 WL 4296703, at *14 (Fed. Cl. Sept. 28, 2017) (denying motion to dismiss in part as to plaintiff's claim for equitable estoppel and holding that the plaintiff may pursue such a claim in the litigation).

25

The FAC sets forth sufficient facts to support a claim for equitable estoppel. First, there is misleading conduct by the Government. The FAC alleges that the Portland Mint's shipment contained genuine, mutilated coins, and the Government agreed. The FAC details the many ways it did. *First*, the Mint actually redeemed the coins – they were melted and, on information and belief, used to manufacture new coin roll. Had they been "counterfeit" as the Government now wants to allege (improperly on a motion to dismiss), the Mint would have returned the coins or destroyed them. *See* 31 C.F.R. § 100.11(c)(6). *Second*, Mr. Holmes explicitly told Mr. Youngs that Plaintiff's coins were redeemed and were without issue. (FAC ¶ 57). *Third*, since at least February 2010, the Mint has been assaying all shipments prior to redemption to ensure their authenticity; the Portland Mint's shipment would not have been redeemed had it not been determined genuine. (*Id.* ¶ 27). *Fourth*, bulk redeemers like the Portland Mint undergo a screening process to ensure the integrity of the redemption process; the Portland Mint's shipment would not have been redeemed had it failed that screening process. (*Id.* ¶ 63(d)). *Fifth*, the Mint's website alerted participants in the Redemption Program that they would be notified if their shipment was rejected; the Portland Mint was never notified of a rejection – at least not until the undated letter was received by Plaintiff while Defendant's Motion to Dismiss was pending. By actions and words, Defendant agreed that the Portland Mint's shipment was genuine.

The Portland Mint relied on the Government's actions and words that its shipment was genuine. Indeed, had Mr. Holmes (or anyone) said that the Mint had concerns about the genuineness of Plaintiff's coins – rather than the coins were without issue, had been redeemed, and the Portland Mint would receive prompt payment – Mr. Youngs and the Portland Mint could have taken immediate, real-time action to prove that the shipment was genuine. Now, some 29 months later, the Portland Mint is at a serious disadvantage in rebutting the Government's newfound position that Plaintiff's coins were counterfeit. Most notably, the shipment is gone. Melted. The Portland Mint

26

has lost its best – and only – evidence to challenge the Government's conclusory allegations of counterfeiting.

The Portland Mint would be severely prejudiced if Defendant were to now raise as a defense to this action that the Portland Mint's shipment was counterfeit, contained "technical anomalies," or otherwise failed to meet the requirements of the Redemption Program.  At a most basic level, it would be fundamentally unfair.  It is easy for the Government to claim the Portland Mint's coins were counterfeit.  It is impossible for the Portland Mint to demonstrate otherwise – the coins are gone.  The Government should not be rewarded for taking one position in August 2018 and the opposite position in January 2021 when it is too late for Plaintiff to meaningfully challenge the Government's newly discovered position.  *See, e.g.*, *Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2017 WL 7512896, at *4 (D. Ariz. May 25, 2017) (district court "expressed its inclination to either preclude argument or evidence and/or allow an adverse inference to favor Plaintiffs where spoliation of video recordings adversely affects them").  Defendant's Motion to Dismiss Count Four of the FAC should be denied.

## VIII.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S TAKINGS CLAIM

The Portland Mint's takings claim should not be dismissed because the well-pleaded facts establish jurisdiction in this Court and a cause of action, and it would be premature to dismiss the takings claim based on disputed facts or alternatively-pleaded causes of action.

Count Six of the FAC plainly sets forth the facts in support of the claim for a violation of the Fifth Amendment takings clause.  The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  The FAC alleges the Portland Mint's coins (private property) were accepted and redeemed (taken) by the Mint to produce new coin roll (public use) without payment (just compensation).  (FAC ¶¶ 118-120).  As such, the well-pleaded facts in the FAC establish this Court's jurisdiction.

4817-2232-8023.v1

Defendant has mischaracterized the Portland Mint's takings claim in an attempt to persuade the Court that it does not have jurisdiction over the claim. Defendant suggests that the Portland Mint is challenging the propriety of the seizure of the coins delivered to Olin Brass and cites to cases holding that the Tucker Act does not create jurisdiction in this Court for parties alleging an unlawful seizure. But a plain reading of the FAC shows the Government's interpretation is wrong – the Portland Mint willingly delivered the coins to Olin Brass. Nowhere in the FAC is there any allegation that the Mint unlawfully seized or took physical possession of the coins. Rather, this case falls under the second category that Defendant concedes would result in this Court having jurisdiction – the Portland Mint is challenging Defendant's failure to provide just compensation for taking its coins. *See Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1365 (Fed. Cir. 2001) (citing *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) ("[A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,'" and "a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims.").

Defendant next argues that if the Portland Mint is claiming that the Mint violated its own regulations, then there is no basis for a takings claim. The cases cited in support of this argument, however, are inapposite. In *Acadia Tech. Co., Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006), the plaintiff claimed that Customs made unauthorized seizures of imported goods. Similarly, in *Meschkow v. United States*, 109 Fed. Cl. 637 (2013), the plaintiff did not claim a failure to provide compensation, but rather asserted that the Government violated an agreement to maintain the subject litigation documents under seal. And in *Lion Raisins, Inc. v. United States*, 416 F.3d 1356 (Fed. Cir. 2005), the plaintiff alleged that the government agency improperly distributed statutory reserve funds and failed to compensate them for property lost in transit. The court dismissed the takings claims

because the plaintiff was challenging the propriety of the taking (decreasing plaintiff's share of statutory funds) and because the applicable statute provided for administrative remedies for the loss of property. *Id.* Here, the Portland Mint is not challenging the propriety of the taking itself and has already exhausted administrative remedies, which the Mint advised did not apply. (FAC ¶¶ 70-72). Instead, the Portland Mint is simply asserting its right under the Fifth Amendment takings clause to just compensation for the Government's acceptance and use of its property. Thus, none of the case law cited by Defendant has any bearing on the circumstances this case.

Surprisingly, after devoting several pages of argument as to why the Portland Mint's breach of contract claim must fail, Defendant argues that the takings claim must be dismissed because the Portland Mint's case is based on a breach of contract. (Def.'s Br. at 37). Defendant's argument is not only self-contradicting, but also unsupported by the case law. This Court has recognized that when "the rights respecting the 'taken' [property] were not reduced to writing by the parties, both takings and breach claims have been permitted." *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 439 (2009) (quoting *Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 262 (1999)). In *Barlow,* the court denied a motion to dismiss to avoid "an early ruling that could prevent plaintiff[s] from vindicating [their] rights – whether under the [contract] or takings jurisprudence, assuming . . . that plaintiff has rights that are due to be vindicated." *Id.* (quoting *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302 (2003)). The court in *Barlow* explained that judges in this Court "routinely allow Fifth Amendment taking allegations to proceed where breach of contract is pled as an alternative – at least until determining whether there has been a breach, and sometimes until the entry of judgment." *Id.*; *see also Consol. Edison Co. of N.Y. v. United States,* 67 Fed. Cl. 285, 292 (2005) ("[C]laims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim.").

Thus, it is well-established that judges in this Court will allow a breach of contract and takings claim pleaded in the alternative to survive a motion to dismiss.  Both the Portland Mint's contract and takings claims should be allowed to proceed to determine which theory is available to Plaintiff.  If it is eventually determined that the Portland Mint is entitled to damages under breach of contract or another claim, then the Court may choose to dismiss the takings claim.  But because it is too early to make that decision at the motion to dismiss stage, the takings claim must survive.

Finally, Defendant contends that the Portland Mint would not be entitled to compensation if the delivered coins were counterfeit.  As previously discussed, Defendant's assertion that the subject coins were counterfeit, or may be counterfeit, or are currently being assessed for deficiencies is not a basis to grant the Motion to Dismiss.  This is an issue of fact that requires discovery.  For all of these reasons, Defendant's Motion to Dismiss Count Six of the FAC should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss the First Amended Complaint in its entirety.

Respectfully submitted,

*/s/ Lee Vartan*_____
LEE VARTAN
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
T:  973.325.1500
F:  973.325.1501
lvartan@csglaw.com
*Attorneys for Plaintiff The Portland Mint*

4817-2232-8023.v1