IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE PORTLAND MINT, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 20-518C <br> ) (Judge Horn) <br> ) <br> ) <br> ) <br> ) |

PLAINTIFF'S STATUS REPORT SUBMITTED PURSUANT TO
THE COURT'S ORDERS OF APRIL 9, 2021 AND MAY 13, 2021

Plaintiff The Portland Mint ("TPM") submits this status report pursuant to the Court's Orders of April 9, 2021 and May 13, 2021.

**I.**     **Relevant Background and Procedural History**

The United States Mint (the "Mint") operated a Mutilated Coin Redemption Program (the "Redemption Program").  Under regulations governing the Redemption Program, the Mint accepted bent and partial U.S. coins from individuals and businesses in exchange for payment. Payment was based on the weight and denomination of the mutilated coins redeemed, with, for example, nickels being redeemed at $4.5359 per pound, and dimes, quarters, and half-dollars being redeemed at $20 per pound.  *See* 31 C.F.R. § 100.11(d).  The Mint would melt the redeemed coins and use them to manufacture new coin roll.  The Redemption Program was designed to accept both small shipments of mutilated coins, as well as bulk shipments.  (*See* Am. Compl. ¶ 1).  TPM is an off-sort coin processor for a number of businesses.  As part of its business model, it bulk-redeemed mutilated coins through the Redemption Program.  (*See id.* ¶ 18).

At the direction of the Mint, on or about August 1 and 2, 2018, TPM delivered 425,100 pounds of dimes, quarters, and half dollars, and 1,819 pounds of nickels to Olin Brass, a foundry designated by the Mint, to be redeemed through the Redemption Program. The total approximate value of TPM's shipment was $8.51 million. (*See id.* ¶¶ 52-53). Prior to delivering the coins to the Mint via Olin Brass, TPM complied with all of the Mint's requests for information regarding the coins and TPM's business model. (*See id.* ¶ 44-51). There were no outstanding questions from the Mint at the time the Mint accepted and melted TPM's property. Following the melt, two Mint employees complimented TPM on its professionalism, reported that TPM's coins had been redeemed without issue, and stated in no uncertain terms that TPM would receive payment for its redeemed coins in 4-6 weeks. (*See id.* ¶ 57). Payment never came. What came instead was obfuscation and delay. From September 2018 through April 2020, the Mint told TPM that it was continuing to evaluate TPM's coins for redemption even though the Mint had already redeemed them. (*See id.* ¶¶ 61-63; 70-72). Unable to get any straight answers from the Mint, TPM filed its Complaint in this Court on April 28, 2020 seeking payment for the coins the Mint had redeemed. (ECF No.1). On September 25, 2020, the government moved to dismiss the Complaint pursuant to RCFC 12(b)(1) and (6). (ECF No. 13). TPM filed its First Amended Complaint on October 23, 2020 (ECF No. 14), and the government again moved to dismiss pursuant to RCFC 12(b)(1) and (6) on December 4, 2020. (ECF No. 21).

On December 30, while the government's motion to dismiss was pending, the Mint issued an "official determination" to TPM declaring that the coins the Mint had already redeemed were counterfeit. The official determination was bereft of any meaningful information. It claimed that based on a sample of .0082% of TPM's shipment—only 4.8% of which was actually tested—the Mint was able to conclude (through unidentified testing procedures) that "a very high percentage"

of the sample was made by a "manufacturer other than the United States Mint." The Mint reached this conclusion even though the sample was consistent with genuine, U.S. coins "in terms of metallurgical composition and weight." The official determination then concluded that based on undisclosed "[m]ethods of inferential statistics … [TPM's] entire submission was inconsistent with genuine United States coinage and found to be counterfeit." The official determination reached this conclusion without any explanation as to why, if TPM's shipment was "counterfeit," the Mint had redeemed the shipment 29 months earlier.

Seeing opportunity, on February 17, 2021 the government filed a motion with the Court requesting 10 additional pages for its reply submission. (ECF No. 29). It sought the additional pages to discuss the official determination (and the investigative report underlying it) even though TPM had never seen the report and, according to the government, could never see the report. (ECF No. 21 ("The Mint has prepared a final report regarding its investigation into the authenticity of [TPM's] submission. This report is subject to the investigatory files privilege as well as potentially subject to other privileges.")). TPM opposed the government's motion, the Court heard argument at a status conference on February 19, 2021 and issued an Order that day denying both the government's motion for leave to exceed the page limit and the government's motion to dismiss. (ECF No. 33). The Order also directed the parties to file a statement detailing the administrative process that would govern the appeal of the Mint's official determination. The parties did so on March 5, 2021 and, approximately one week later, the Mint issued a perfunctory letter denying TPM's administrative appeal and concluding TPM could "pursue its rights in the appropriate court of law." (ECF No. 36).

The Court held another status conference on March 22, 2021 and thereafter issued an Order directing the government to answer TPM's Amended Complaint on or before April 5, 2021 and

directing the parties to file a proposed discovery schedule. (ECF No. 38). The government ignored the Order and, instead, on March 30, 2021, filed a status report declaring its intention to file another motion to dismiss or, in the alternative, a motion to transfer to district court. (ECF No. 39).

The question now posed by the Court to Plaintiff is whether the Court of Federal Claims is the "appropriate court of law" for Plaintiff to pursue its claims for monetary relief against the government. It is.

## II. The Amended Complaint and Jurisdiction

The Amended Complaint includes seven counts: Count 1 (Violation of Federal Regulation); Count 2 (Breach of Implied Contract); Count 3 (Breach of Implied Duty of Good Faith and Fair Dealing); Count 4 (Equitable Estoppel); Count 5 (Declaratory Judgment); Count 6 (Takings); and Count 7 (Equal Access to Justice Act). The counts are variations on a single theme: TPM delivered several hundred thousand pounds of mutilated coins to the Mint; the Mint accepted and redeemed those coins; and the Mint now owes TPM $8.51 million under the Mint's regulations, contract principles, and the Constitution. The Tucker Act gives "the United States Court of Federal Claims … exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00, 'founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.'" *Howard v. United States*, 106 Fed. Cl. 343, 353 (2012).

### a. Count 1 (Violation of Federal Regulation)

"When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, … the trial court at the outset shall determine … whether the Constitutional provision, statute, or regulation is one that is money-mandating." *Fisher v. United States*, 402

F.3d 1167, 1173 (Fed. Cir. 2005). "[J]urisdiction under the Tucker Act exists if the statute, regulation, or constitutional provision that is the basis for the complaint can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained, and is reasonably amenable to the reading that it mandates a right of recovery in damages." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (quotations and citations omitted). Plaintiff need only make a "nonfrivolous assertion that it is within the class of plaintiffs entitled to recover under the money-mandating source." *Id.*

Under this "fair interpretation" rule, it is clear that the Court has jurisdiction over Count 1 of the Amended Complaint. *See, e.g.*, *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 473 (2019) (noting that the "fair interpretation" rule "'demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity'" and it is "'enough … that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages'") (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472–73 (2003)). Count 1 alleges that TPM delivered several hundred thousand pounds of mutilated coins to Olin Brass on August 1 and 2, 2018, and that, upon receipt, the Mint accepted TPM's coins, melted them, and used them to manufacture new coin roll. (*See* Am. Compl. ¶¶ 81-82). When the Mint redeemed coins through the Redemption Program, the Mint was required to pay the redeeming party rates prescribed by regulation. *See* 31 C.F.R. § 100.11(d). Payment was mandatory: "The United States Mint *will* redeem bent or partial coins on the basis of their weight and denomination at the following rates…" *Id.* (emphasis added). The Federal Circuit has "repeatedly held that … mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes." *Britell v. United States*, 372 F.3d 1370, 1378 (Fed. Cir. 2004); *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) (The Federal Circuit

has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."); *San Antonio Hous. Auth.*, 143 Fed. Cl. at 473 ("statutes that make use of the word 'shall' to require payment of money or damages are likely to be interpreted as money-mandating") (quotations and citations omitted); *Montana Health Co-Op v. United States*, 139 Fed. Cl. 213, 217 (2018), aff'd sub nom. *Sanford Health Plan v. United States*, 969 F.3d 1370 (Fed. Cir. 2020) (finding jurisdiction where statute used "shall" and implementing regulations used "will").

In its motion to dismiss, the government argued that 31 C.F.R. § 100.11 is not money-mandating, and this Court is without jurisdiction, because the "regulation itself shows that redemption of submitted coins is highly contingent and not guaranteed." (ECF No. 21, p. 10). The government is wrong for two reasons. First, the Amended Complaint alleges that the Mint did redeem TPM's coins, and on a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quotations and citation omitted). Second, Tucker Act jurisdiction is not limited to "narrow statutory entitlements" where the government is without any discretion. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). Rather, "[c]ertain discretionary schemes also support claims within the Court of Federal Claims jurisdiction. These include statutes: (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." *Id.* (quotations and citation omitted). Title 31, Code of Federal Regulations, Section 100.11 satisfies each of these factors. The regulation has clear standards for paying money to recipients—a recipient must be paid when the Mint redeems the recipient's coins, that is, melts the coins to manufacture new coin roll. The regulation specifies precise amounts to be paid—the redemption rates are detailed in the regulation. And the regulation compels payment once certain

preconditions are met—namely, once the Mint chooses to redeem the recipient's coins by melting them and using them to manufacture new coin roll. *See, e.g.*, *Hannon v. United States*, 29 Fed. Cl. 142, 147–48 (1993) (statute that provided agency with discretion to adopt, or not, overtime pay was money-mandating where agency did adopt overtime pay pursuant to the statute); *King v. United States*, 81 Fed. Cl. 766, 770 (2008) (statute permitting but not requiring Director of the FBI to establish a permanent police force was money-mandating because it "has clear standards for paying money to recipients, specifies precise amounts to be paid, and compels payment once certain conditions precedent are met") (quotations and citation omitted).

The Amended Complaint alleges that the Mint redeemed TPM's coins. If the Mint did so, then 31 C.F.R. § 100.11(d) required the Mint to pay TPM approximately $8.51 million. This Court has Tucker Act jurisdiction over Count 1. *See Hannon*, 29 Fed. Cl. at 146 (where a claimant alleges that "he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication" and his claim is "at least … arguable" and "not frivolous," the Court of Federal Claims has jurisdiction) (quotations and citation omitted).

      b. **Count 2 (Breach of Implied Contract) and Count 3 (Breach of Implied Duty of Good Faith and Fair Dealing)**

Jurisdiction "requires no more than a non-frivolous allegation of a contract with the government." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011). "'A well-pleaded allegation [of express or implied-in-fact contract] in the complaint is sufficient to overcome challenges to jurisdiction.'" *Mendez v. United States*, 121 Fed. Cl. 370, 378 (2015) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)). "Thus, [w]hen this court hears such a jurisdictional challenge, its task is necessarily a limited one." *Mendez*, 121 Fed. Cl. at 378 (quotations and citations omitted). "The relevant issue … is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." *Id.* at 379 (quotations and citation omitted). "[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs. … The party must show a mutual intent to contract including offer, acceptance, and consideration. … A contract with the United States also requires that the government representative who entered or ratified the agreement had actual authority to bind the United States." *Id.* at 380 (quotations and citations omitted).

The Amended Complaint states each of the elements for the formation of a contract. There was an offer by TPM to redeem several hundred thousand pounds of mutilated coins; there was acceptance by the Mint of that offer when it directed TPM to deliver TPM's coins to Olin Brass and redeemed TPM's coins; there was consideration—the Mint used TPM's coins to manufacture new coin roll; and the Mint employees who oversaw and approved the redemption had actual authority to do so. (*See* Am. Compl. ¶¶ 86-96). The government argued in its motion to dismiss that Count 2 "is based solely on the legal duties created by the regulations," and therefore does not allege an implied-in-fact contract, but instead alleges an implied-in-law contract over which this Court has no jurisdiction. (ECF No. 21, p. 13). The government is wrong. The Amended Complaint alleges an implied-in-fact contract, the terms of which were informed by the Mint's regulations. This Court has recognized implied-in-fact contracts under similar circumstances. *See, e.g.*, *New York Airways, Inc. v. United States*, 369 F.2d 743, 751–52 (Ct. Cl. 1966) (finding an implied-in-fact contract because the Civil Aeronautics Board's rate order was "in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and plaintiffs' "actual transportation of the mail was the … acceptance of that offer. … [F]rom a contract standpoint, the transportation of mail by the carrier provided the consideration for both the service and subsidy elements of the compensation which became enforceable on

performance of the services."); *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405–06 (Ct. Cl. 1957) (holding Atomic Energy Commission's Circular, enacted pursuant to statute, "was an offer, which ripened into a contract when it was accepted by the plaintiff[] putting itself in a position to supply the ore or the refined uranium described in it" and noting that it "could surely not be urged that one who had complied in every respect with the terms of the Circular could have been … told that the Government would not purchase his uranium at all"); *Molina Healthcare of Ca., Inc. v. United States*, 133 Fed. Cl. 14, 42 (2017) (stating that "absent some express declaration of an intent to contract, Congress's creation of a program in which it promises to pay a sum of money in exchange for some specified performance is evidence of an intent to contract").

Given that the Court has jurisdiction over TPM's breach of contract claim, it likewise has jurisdiction over TPM's claim for breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Threshold Techs., Inc. v. United States*, 117 Fed. Cl. 681, 709 (2014) ("Once an implied-in-fact contract has formed, there is no reason that the covenant of good faith and fair dealing should not apply.  This court will not, generally, as a matter of law, on a motion to dismiss, dismiss plaintiff's claim of a breach of the covenant of good faith and fair dealing as long as a potentially valid implied-in-fact contract claim is outstanding.").

    **c.  Count 4 (Equitable Estoppel)**

Equitable estoppel "is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled." *Carter v. United States*, 98 Fed. Cl. 632, 638 (2011) (quotation marks and citation omitted).  A complaint alleging equitable estoppel must allege sufficient facts to demonstrate: "(1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3)

9

due to this reliance, material prejudice if the delayed assertion of such right is permitted." *Solaria Corp. v. United States*, 123 Fed. Cl. 105, 124 (2015), *aff'd*, 671 F. App'x 797 (Fed. Cir. 2016) (citations omitted).  This Court has recognized the availability of equitable estoppel claims when they are pleaded to prevent an adversary from taking a position due to its own alleged actions or omissions.  *See 27-35 Jackson Ave. LLC v. United States*, No. 16-947C, 2017 WL 4296703, at *14 (Fed. Cl. Sept. 28, 2017) (denying motion to dismiss as to plaintiff's claim for equitable estoppel and holding that plaintiff may pursue claim in the litigation).

The Amended Complaint sets forth sufficient facts to support a remedy for equitable estoppel.  First, there is misleading conduct by the government: (1) the Mint actually redeemed TPM's coins by melting them and using them to manufacture new coin roll; (2) Mint employees explicitly told TPM that TPM's coins had been redeemed and were without issue (*see* Am. Comp. ¶ 57); and (3) the Mint's website alerted participants in the Redemption Program that they would be notified if their shipment was rejected—TPM was never notified of a rejection until the Mint issued its "official determination" letter while the government's motion to dismiss was pending.  By actions and words, the government agreed that TPM's shipment was genuine.

Second, TPM relied on the government's actions and words that its shipment was genuine.  Indeed, had Mr. Holmes (or any Mint employee) said that the Mint had concerns about the genuineness of TPM's coins, TPM could have taken immediate, real-time action to prove that the shipment was genuine.  Now, more than two years later, TPM is at a serious disadvantage in rebutting the government's newfound position that TPM's coins were counterfeit.  The shipment has been melted.  TPM has lost its best—and only—evidence to challenge the government's conclusory allegations of counterfeiting.

Third, TPM would be severely prejudiced if the government were allowed to raise as a defense to this action that TPM's shipment was counterfeit or otherwise failed to meet the requirements of the Redemption Program. In fact, it would be fundamentally unfair. It is easy for the government to claim TPM's coins were counterfeit. It is impossible for TPM to demonstrate otherwise—the coins are gone. The government should not be rewarded for taking one position in August 2018 and the opposite position in 2021 when it is too late for TPM to meaningfully challenge the government's new position.

For all of the above reasons, TPM maintains and preserves its right to assert the judicial remedy of equitable estoppel in response to any claims or defenses by the government that the coins submitted by TPM were counterfeit or otherwise deficient. Inasmuch as equitable estoppel is not an independent claim for damages, TPM will voluntarily dismiss Count 4. However, this should not be deemed as a waiver of TPM's right to rely upon equitable estoppel in this matter where appropriate.

### d. Count 5 (Declaratory Judgment)

"[L]imited equitable relief sometimes is available in Tucker Act suits" where that relief is "'an incident of and collateral to' a money judgment." *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (quoting 28 U.S.C. § 1491(a)(2)). That is, the Court of Federal Claims can grant affirmative, non-monetary relief where "it is tied and subordinate to a money judgment." *Id.* (quotations and citation omitted). Count 5 is "tied and subordinate" to TPM's claims for a money judgment. Nevertheless, TPM will voluntarily dismiss Count 5.

### e. Count 6 (Takings)

As the Federal Circuit has observed, the Tucker Act "broadly provides jurisdiction for 'any claim against the United State founded . . . upon the Constitution,'" which "includes on its face *all*

*takings claims* against the United States." *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362 (Fed. Cir. 2005) (emphasis added). "A Fifth Amendment takings claim falls within The Tucker Act's grant of jurisdiction because it is 'a claim against the United States founded upon the Constitution.'" *Acceptance Ins. Cos Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) (quoting *Blanchette v. Conn. Gen. Ins. Corps*, 419 U.S. 102, 126 (1974)). As this Court has held, "so long as there is some material evidence in the record that establishes the predicates for a traditional takings claim … a plaintiff succeeds in demonstrating subject matter jurisdiction in this court based on the Tucker Act and the Taking Clause of the Fifth Amendment." *Hansen v. United States*, 65 Fed. Cl. 76, 80–81 (Ct. Cl. 2005).

This Court has already considered and rejected the government's motion to dismiss TPM's takings claim, and the fact that the Mint subsequently issued an "official determination" that TPM's entire submission was "found to be counterfeit" changes nothing with respect to that analysis or the jurisdictional analysis. TPM vigorously contests the Mint's conclusion that each and every one of the coins taken by the Mint and melted for new coin roll without compensation to TPM was counterfeit—particularly given that the Mint's determination was made years after the coins were inspected, redeemed, and converted to public use by the Mint, was based on undisclosed testing methods, and was based on a tiny sample of coins that could not possibly be extrapolated to support a conclusion that the entire collection of coins taken by the government was counterfeit. As this Court has held, "If there are factual disputes that could make a difference under governing law, courts must resolve them in favor of the nonmoving party" at summary judgment, and, by the same principle, in the context of a motion to dismiss. *Hansen*, 65 Fed. Cl. at 95; *see Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (confirming that on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all

reasonable inferences in plaintiff's favor"). Further, the Mint melted the coins and converted them to public use *prior to any determination that the coins were counterfeit*. (*See* Am. Compl. ¶¶ 12-14, 57-59, 116-122). There was a completed and actionable taking as soon as the Mint melted and converted TPM's property to its own use without just compensation.

The Mint not only took possession of TPM's coins, it promptly melted them down and used them to manufacture new coin roll, in a textbook case of conversion of private property to public use without just compensation in violation of the Fifth Amendment. *See* U.S. Const. Amend. V. ("nor shall private property be taken for public use without just compensation"). There can be no dispute that the Court of Federal Claims has subject matter jurisdiction over such a claim.

### III. Administrative Procedure Act

While TPM undoubtedly has potential claims under the Administrative Procedure Act ("APA" claim) that could potentially be adjudicated in a U.S. District Court, TPM's claims, at bottom, are claims for monetary compensation, and TPM has not elected to file an APA action in a U.S. District Court. "[T]he APA only waives sovereign immunity for circumstances meeting three conditions: 1) the claims are not for money damages, 2) an adequate remedy is not available elsewhere, and 3) the claims do not seek relief expressly or impliedly forbidden by another statute." *Holloway v. England*, 50 F. App'x 836, 838 (9th Cir. 2002) (holding that plaintiff's claim failed the second prong of this test because plaintiff had an adequate remedy in the Court of Federal Claims); *Russell v. United States*, 78 Fed. Cl. 281, 288 (Fed. Cir. 2007) ("[T]he APA only allows for judicial review of 'final agency action for which there is no other adequate remedy in a court . . .'") (quoting 5 U.S.C. § 704); *Hindes v. F.D.I.C.*, 137 F.3d 148, 161 (3d Cir. 1998) (noting that the right to judicial review under the APA is "limited," and "the APA only provides for review of those actions 'made reviewable by statute and final agency action for which there is *no other*

13

*adequate remedy in a court*'") (quoting 5 U.S.C. § 704) (emphasis added).[1]  Were TPM to file an APA action in district court, the government would no doubt seek its dismissal based on TPM having an "adequate remedy" in another court—this Court.  *See, e.g., Roseberry-Andrews v. Wilson*, 292 F. Supp. 3d 446, 457 (D.D.C. 2018) (transferring APA claims seeking monetary relief to the Court of Federal Claims, sua sponte); *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 196-97 (D.D.C. 2007) (transferring claims to Court of Federal Claims on motion of the government and observing that "The Court of Federal Claims has the authority . . . to determine whether a federal agency has complied with applicable law.").

In *Columbus Regional Hospital v. United States*, the Federal Circuit recently held that where an action is "explicitly one for money" or "in essence one for money," and there is no "reason to believe that any equitable remedy will be necessary to give [plaintiff] the full relief requested in its complaint," the "action is properly before the Court of Federal Claims, and [plaintiff] would be barred by section 704 of the APA from bringing this action in district court." 990 F.3d 1330, 1353 (Fed. Cir. 2021).  In delineating "between the kinds of requests for relief that can be brought in the Court of Federal Claims and the kinds that cannot," *id.* at 1351, the Federal Circuit explained that claims that "'attempt to compensate a particular class of persons for past injuries or labors'" permit Tucker Act suits, and those that "'subsidize future state expenditures" do not.  *Id.* (quoting *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1329 (2020)).  Where plaintiff seeks "'specific sums, already calculated, past due, and designed to compensate for completed labors,'" plaintiff's claims are "properly within the jurisdiction of the Claims Court."  *Columbus Reg'l Hosp.*, 990 F.3d at 1352 (quoting *Cmty. Health Choice, Inc. v. United*

---

[1] TPM cites caselaw from the Third and Ninth Circuits because venue for any APA action would be properly laid in the Third Circuit, where the Mint is headquartered, or the Ninth Circuit, where TPM is based.  *See* 28 U.S.C. § 1391(e)(1).

*States*, 970 F.3d 1364, 1374, n.6 (Fed. Cir. 2020)); *see also Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 788 (Fed. Cir. 1998) (where "a single, uncomplicated payment of money would provide [plaintiff] with an entirely adequate remedy[,] [n]o prospective relief would be required and there would be no ongoing relationship to monitor and referee," plaintiff had an adequate remedy for its grievance in the Court of Federal Claims, and Section 704 of the APA precluded an action in district court); *Kanemoto v. Reno*, 41 F.3d 641, 645–46 (Fed. Cir. 1994) (district court was without jurisdiction under the APA because a "naked money judgment would provide [plaintiff] an adequate remedy" and the "Court of Federal Claims under its Tucker Act jurisdiction [could] interpret the statute and render a judgment against the United States that [would] provide [plaintiff] with the entire relief" sought); *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005) ("The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes.").

Other circuit courts of appeal have echoed the Federal Circuit. *See, e.g.*, *Eagle-Picher Indus., Inc. v. United States*, 901 F.2d 1530, 1532 (10th Cir. 1990) ("A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (quotations and citation omitted); *Warner v. Cox*, 487 F.2d 1301, 1304 (5th Cir. 1974) (dismissing APA action for lack of jurisdiction where "[n]one of the substantive claims presented to the [district court] concerned anything but the payment of money–when, how much, and by whom it should be paid"); *Deaf Smith Cty. Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1210–11 (D.C. Cir. 1998) ("[T]he Tucker Act—which waives sovereign immunity and provides the United States Court of Federal Claims … with jurisdiction over certain claims for monetary relief from the federal Government …—provides an 'adequate remedy' in the Claims

Court, which would preclude district court jurisdiction under § 704 of the APA."); *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) ("[T]o determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act."); *Marshall Leasing, Inc. v. United States*, 893 F.2d 1096, 1099 (9th Cir. 1990) ("A party may not avoid the Claims Court's jurisdiction by framing an action against the federal government that appears to seek only equitable relief when the party's real effort is to obtain damages in excess of $10,000.").

The fact that this Court's adjudication may involve review of an agency decision does not prevent this Court from considering TPM's claims. For example, in *Martinez v. United States*, 333 F.3d 1295, 1313–14 (Fed. Cir. 2003) (en banc) the Federal Circuit expressly recognized that in monetary actions brought under the Tucker Act, the Court of Federal Claims has "often reviewed . . . the action of correction boards," and "has granted relief if we have found that the correction board's decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." In so holding, the Federal Circuit distinguished between cases "under the APA seeking equitable relief," and "Tucker Act actions for money," focusing on the "underlying basis for the suit," which in the case of *Martinez*, as in the present case, was a claim for money. *Id*. at 1313–14. In *Martinez*, the Federal Circuit observed that plaintiff's right to sue for money accrued prior to the final agency action, and at the time of final agency action, "[plaintiff] still had that right" to pursue a monetary remedy under the Tucker Act. *Id*. at 1314 ("The injury caused by the separation was not altered or exacerbated by the correction board action. The only thing that was different was that [plaintiff] had exercised the optional remedy provided him by [statute], which offered him an alternative means of obtaining relief."). In other words, *Martinez* confirms that TPM's right to bring a Tucker

Act claim for monetary relief is unchanged by the agency action, which is still subject to review by the Court of Federal Claims.

Knowing that the Court must look to the "true nature of the action in determining the existence or not of jurisdiction," *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994), TPM brought its action in this Court. The Amended Complaint seeks money damages; a "naked money judgment" would provide TPM with complete relief. The Court agreed that it had subject matter jurisdiction when it denied the government's motion to dismiss. The intervening final agency action from the Mint has changed nothing. The Mint melted all but a small sample of TPM's shipment and used the shipment to manufacture new coin roll. The question before the Court is not whether the Mint's testing process was reasonable, its sample size statistically significant, or its conclusion correct. The sole question before the Court is whether the Mint's regulation means what it says, and the Mint must pay for what it took and already used.

Dated: May 14, 2021                                     Respectfully submitted,

 

/s/ Lee Vartan
  LEE VARTAN
  Chiesa Shahinian & Giantomasi PC
  ONE BOLAND DRIVE
  WEST ORANGE, NJ 07052
  T: 973.325.1500
  F: 973.325.1501
  lvartan@csglaw.com
  Attorneys for Plaintiff The Portland Mint

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of May, 2021, a copy of the foregoing "PLAINTIFF'S STATUS REPORT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Additionally, service was made upon the following via electronic mail:

>Alison S. Vicks, Esq.
>Trial Attorney
>Commercial Litigation Branch
>Civil Division Department of Justice
>P.O. Box 480
>Ben Franklin Station
>Washington, D.C. 20044
>*Attorneys for Defendant*

>*/s/* Lee Vartan
>LEE VARTAN