IN THE UNITED STATES COURT OF FEDERAL CLAIMS

20-518C
(Senior Judge Horn)

PORTLAND MINT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

DEBORAH A. BYNUM
Assistant Director

ALISON S. VICKS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7573
Alison.S.Vicks@usdoj.gov

June 28, 2021                    *Attorneys for Defendant*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ..................................................... iv

STATEMENT OF FACTS ..................................................... 1

    I.       Background On U.S. Mint Mutilated Coin Redemption Program ......................... 1

    II.      Portland's August 2018 Submission To The Redemption Program ..................... 4

    III.     Course Of Proceedings ...................................................... 5

ARGUMENT ...................................................... 9

    I.       Standards Of Review ...................................................... 9

    II.      This Court Lacks Jurisdiction To Entertain Portland's Claims Overall Because They Challenge The U.S. Mint's Final Agency Action Denying Redemption .... 11

    III.     Portland's First Count Alleging A Regulatory Violation Must Be Dismissed For Lack Of Jurisdiction And Failure To State A Claim ................... 16

    IV.     This Court Lacks Jurisdiction Over Portland's Implied-In Law Contract Claim, And Portland Fails To Demonstrate That An Implied-In-Fact Contract Was Formed ............................................... 17

          A.      Portland's Implied-In-Law Contract Claim Must Be Dismissed For Lack Of Jurisdiction ............................................... 17

          B.      The Governing Statute And Regulations Do Not Establish An Intent To Create Contracts To Redeem Mutilated Coins ................... 19

          C.      Portland Has Failed To Adequately Allege The Formation Of An Implied-In-Fact Contract ...................................... 22

                1.      The Amended Complaint Alleges Apparent Authority Only, Which Is Not Enough To Establish That An Implied-In-Fact Contract Was Formed ................................... 22

                2.      Portland's Allegations Otherwise Fail To Show That The U.S. Mint Formed An Implied-In-Fact Contract Through Its Actions ...................................... 25

V.      Portland Fails To Sufficiently Allege Its Cause Of Action For
        Breach Of The Implied Duty Of Good Faith And Fair Dealing .........................31

VI.     Portland's Takings Claim Must Be Dismissed ........................................31

VII.    Portland's EAJA Claim Is Premature ....................................................36

CONCLUSION .........................................................................................36

## TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

*Acadia Tech., Inc. v. United States,*
    458 F.3d 1327 (Fed. Cir. 2006)..................................................................... passim

*Anderson v. United States,*
    344 F.3d 1343 (Fed. Cir. 2003)............................................................................ 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................... passim

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................ 11

*Bell/Heery v. United States,*
    106 Fed. Cl. 300 (2012) .................................................................................. 10

*Bennis v. Michigan,*
    516 U.S. 442 (1996)........................................................................................ 36

*Boggs v. Rubin,*
    161 F.3d 37 (D.C. Cir. 1998) ........................................................................... 29

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)........................................................................................ 15

*Brunner v. United States,*
    70 Fed. Cl. 623 (2006) .................................................................................... 23

*Cedars-Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993)........................................................................... 10

*Centex Corp. v. United States,*
    395 F.3d 1283 (Fed. Cir. 2005)......................................................................... 31

*City of Cincinnati v. United States,*
    153 F.3d 1375 (Fed. Cir. 1998)......................................................................... 18

*Cooke v. United States,*
    91 U.S. 389 (1875)......................................................................................... 23

*Crocker v. United States,*
    125 F.3d 1475 (Fed. Cir. 1997)......................................................................... 15

*Crocker v. United States*,
　　37 Fed. Cl. 191 (1997) ............................................................................... 36

*D & N Bank v. United States*,
　　331 F.3d 1374 (Fed. Cir. 2003) ........................................................... passim

*De Archibold v. United States*,
　　57 Fed. Cl. 29 (2003) ................................................................................. 22

*Del-Rio Drilling Programs, Inc. v. United States*,
　　146 F.3d 1358 (Fed. Cir. 1998) ........................................................... 33, 34

*Del-Rio Drilling Programs, Inc. v. United States*,
　　37 Fed. Cl. 157 (1997) ............................................................................... 36

*Dodge v. Bd. of Educ.*,
　　302 U.S. 74 (1937) ..................................................................................... 19

*Doe v. United States*,
　　95 Fed. Cl. 546 (2010) ............................................................................... 23

*eVideo Owners v. United States*,
　　126 Fed. Cl. 95 (2016) ......................................................................... 17, 18

*FCC v. Florida Power Corp.*,
　　480 U.S. 245 (1987) ................................................................................... 32

*Fisher v. United States*,
　　402 F.3d 1167 (Fed. Cir. 2005) ................................................................. 16

*Gibbs v. Buck*,
　　307 U.S. 66 (1939) ..................................................................................... 10

*Gonzalez-McCaulley Investment Grp., Inc. v. United States*,
　　93 Fed. Cl. 710 (2010) ................................................................................. 9

*Gould v. United States*,
　　67 F.3d 925 (Fed. Cir. 1995) ....................................................................... 9

*H. Landau & Co. v. United States*,
　　886 F.2d 322 (Fed. Cir. 1989) ................................................................... 23

*Hall v. United States*,
　　74 Fed. Cl. 391 (2006) ............................................................................... 10

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995)............................................................................... 10

*Hercules, Inc. v. United States*,
    516 U.S. 417 (1996)................................................................................... 9, 17

*Holley v. United States*,
    124 F .3d 1462 (Fed. Cir. 1997).......................................................................... 9

*Ingham Regional Med. Ctr. v. United States*,
    126 Fed. Cl. 1 (2016) ......................................................................................... 10

*James v. Caldera*,
    159 F.3d 573 (Fed.Cir.1998)............................................................................. 15

*Kam-Almaz v. United States*,
    682 F.3d 1364 (Fed. Cir. 2012).......................................................................... 34

*KVOS, Inc. v. Associated Press*,
    299 U.S. 269 (1936)........................................................................................... 10

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed. Cir. 1995)............................................................................ 15

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)........................................................................................... 33

*Lion Raisins, Inc. v. United States*,
    54 Fed. Cl. 427 (2002) ................................................................................. 17, 18

*Lion Raisins, Inc. v. United States*,
    416 F.3d 1356 (Fed. Cir. 2005)..................................................................... 32, 33

*Love Terminal Partners, L.P. v. United States*,
    889 F.3d 1331 (Fed. Cir. 2018).......................................................................... 32

*M & J Coal Co. v. United States*,
    47 F.3d 1148 (Fed. Cir. 1995)............................................................................ 34

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003).......................................................................... 15

*Martinez v. United States*,
    Nos. 10-569C, 10-730C, 2011 WL 1346941 (Fed. Cl. April 8, 2011)............................ 11

*McAfee v. United States*,
    46 Fed. Cl. 428, (2000) ................................................................................................ 22

*Merritt v. United States*,
    267 U.S. 338 (1925)......................................................................................................... 18

*Meschkow v. United States*,
    109 Fed. Cl. 637 (2013) ........................................................................................... 33, 34

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka And Santa Fe Railway Co.*,
    470 U.S. 451 (1985)................................................................................................... 19, 20

*Nelson v. United States*,
    16 Cl. Ct. 510 (1989) ..................................................................................................... 30

*New Era Constr. v. United States*,
    890 F.2d 1152 (Fed. Cir. 1989)...................................................................................... 30

*Pennsylvania Department of Public Welfare v. United States*,
    48 Fed. Cl. 785 (2001) ................................................................................................... 30

*Radium Mines, Inc. v. United States*,
    139 Ct. Cl. 144 (1957) ................................................................................................... 20

*Res. Invs., Inc. v. United States*,
    85 Fed. Cl. 447 (2009) ................................................................................................... 35

*Rith Energy, Inc. v. United States*,
    270 F.3d 1347 (Fed. Cir. 2001)..................................................................................... 34

*Rogers v. United States*,
    95 Fed. Cl. 513 (2010) ..................................................................................................... 9

*Russell v. United States*,
    78 Fed. Cl. 281 (2007) ........................................................................................ 9, 15, 16

*Schrader v. United States*,
    103 Fed. Cl. 92 (2012) ................................................................................................... 34

*Scott Timber Co. v. United States*,
    692 F.3d 1365 (Fed. Cir. 2012)..................................................................................... 31

*Seuss v. United States*,
    535 F.3d 1348 (Fed. Cir. 2008)..................................................................................... 22

*Shangai Power Co. v. United States*,
    765 F.2d 159 (Fed. Cir. 1985) ........................................................................ 35

*Shanghai Power Co. v. United States*,
    4 Cl. Ct. 237 (1983) ........................................................................................ 35

*Sutton v. United States*,
    256 U.S. 575 (1921) ........................................................................................ 24

*Tabb Lakes, Ltd. v. United States*,
    10 F.3d 796 (Fed. Cir. 1993) .......................................................................... 34

*Tellabs Inc. v. Makor Issues and Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 10

*Trauma Serv. Grp. v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997) ........................................................................ 9

*United States v. $7,990.00 in U.S. Currency*,
    170 F.3d 843 (8th Cir. 1999) .......................................................................... 35

*United States v. Farrell*,
    606 F.2d 1341 (D.C. Cir. 1979) ...................................................................... 29

*United States v. Jeffers*,
    342 U.S. 48 (1951) .......................................................................................... 29

*United States v. Mitchell*,
    463 U.S. 206 (1983) ........................................................................................ 16

*United States v. North Am. Transp. & Trading Co.*,
    253 U.S. 330 (1920) ........................................................................................ 33

*United States v. Simmons*,
    96-5948 AWISWS, 2000 WL 33138083 (E.D. Cal. Dec. 14, 2000) ......... 14, 35

*Wilber National Bank of Oneonta, N.Y., v. United States*,
    294 U.S. 120 (1935) ........................................................................................ 24

*XP Vehicles, Inc. v. United States*,
    121 Fed. Cl. 770 (2015) .................................................................................. 27

## **STATUTES**

5 U.S.C § 706(2) .................................................................................................... 15

18 U.S.C. § 492 ............................................................................ 4, 14, 29, 35

28 U.S.C. § 1491(a)(l) ................................................................................ 9

28 U.S.C. § 2201 ........................................................................................ 5

28 U.S.C. § 2412 .................................................................................... 5, 36

28 U.S.C. § 2412(d)(1)(B) ......................................................................... 36

31 U.S.C. § 321(b) ..................................................................................... 2

31 U.S.C. § 5112 ....................................................................................... 28

31 U.S.C. § 5120 .................................................................................... 2, 20

41 U.S.C. § 7103(f)(3) ................................................................................. 5

## **RULES**

Fed. R. Civ. P. 8(a)(2) ............................................................................... 11

RCFC 12(b)(l) ........................................................................................... 10

RCFC 12(h)(3) ............................................................................................ 9

## **REGULATIONS**

31 C.F.R. part 100 ...................................................................................... 2

31 C.F.R. § 100.3 ...................................................................................... 19

31 C.F.R. § 100.10(a)-(b) .......................................................................... 19

31 C.F.R. § 100.11 ............................................................................. passim

31 C.F.R. §100.16 ..................................................................................... 19

## **OTHER AUTHORITIES**

The Inspector General Act Amendments of 1988,
    Pub. L. 100-504 .................................................................................. 7

*Suspension of Bent and Partial Coin Exchange by United States Mint,*
    84 Fed. Reg. 35,181 (July 22, 2019) .................................................... 3

Treasury Directive 27-12, March 3, 2020
available at https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/td27-
12.aspx  ....................................................................................................................7

Audit report, OIG-20-042, August 18, 2020,
available at https://oig.treasury.gov/sites/oig/files/2020-12/OIG-20-042.pdf.  ..................2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE PORTLAND MINT,                    )
                                      )
                  Plaintiff,          )
                                      )
v.                                    )
                                      )      No. 20-518C
                                      )      (Senior Judge Horn)
THE UNITED STATES,                    )
                                      )
                  Defendant.          )
                                      )

DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT

Pursuant to Rules 12(b)(l) and 12(b)(6) of the Rules of the United States Court Federal

Claims, defendant, the United States, respectfully requests the Court dismiss the second amended

complaint filed by plaintiff, The Portland Mint (Portland). See Plaintiff's Second Amended

Complaint (2nd Am. Compl.), ECF No. 54.  Portland fails to establish that this Court has

jurisdiction over any of its claims.  Further, even if the Court determines that it has jurisdiction

over some of Portland's claims, Portland has failed to state any cognizable claims upon which

relief can be granted.  Portland's claims should be dismissed.

In support of this motion, we rely upon the second amended complaint, filings with the

Court, and the following brief.

STATEMENT OF FACTS[1]

I.    Background On U.S. Mint Mutilated Coin Redemption Program

The U.S. Mint, a bureau of the Department of the Treasury, is the sole manufacturer of

---

[1] For the purposes of this motion to dismiss, the Government accepts the facts, to the extent they are pled as facts and not as characterizations or legal conclusions, in Portland's complaint as true.  In the event the Court does not grant the Government's motion, the Government does not concede the facts and will contest them as necessary.

legal tender coinage for the United States and is responsible for producing and circulating

coinage for the nation to conduct its trade and commerce.  2nd Am. Compl. ¶ 19.

Treasury has established a discretionary regulatory program to receive submissions of

bent or partial coins for examination and "possible redemption" at the U.S. Mint (redemption

program), pursuant to 31 U.S.C. § 321(b) (General authority of the Secretary) and 31 U.S.C.

§ 5120 (Obsolete, mutilated, and worn coins and currency).  *See* 31 C.F.R. part 100, subpart C

("Request for examination of bent or partial coin for possible redemption") (effective January 19,

2018).[2]  The redemption program was the subject of an investigation by Treasury's Office of the

Inspector General in 2010 due to concerns about possible abuse of the program and the potential

for criminal activity.  *Id.* ¶ 24-25 (citing coinworld.com/news/precious-metals/mint-adopts-

mutilated-coin-redemption-program.html).

In 2015, due to concerns about increased counterfeiting of coins and the potential

submission of those counterfeit coins to the redemption program, the U.S. Mint's redemption

program was suspended.  2nd Am. Compl. ¶ 4.  The U.S. Mint re-opened its program in January

2018 under its revised regulations.  *Id.* ¶ 10.  In August 2018, the OIG recommended that the

U.S. Mint further enhance its ability to detect counterfeits in the redemption program.  *See* Audit

report, OIG-20-042, August 18, 2020, at 12 (stating that the OIG issued a recommendation to the

U.S. Mint in 2018 to strengthen its counterfeit detection ability), available at

https://oig.treasury.gov/sites/oig/files/2020-12/OIG-20-042.pdf.  In response to the

recommendation, the U.S. Mint immediately stopped all submissions to the program, and it

---

[2]  This regulation has been in effect at all times relevant to this case and are a revision
from the previous regulations.  The regulations were changed effective January 19, 2018, when
the program was reinstated.  Prior to reinstatement, the mutilated coin redemption program had
been suspended since 2015.

officially suspended its program in July 2019. "*Suspension of Bent and Partial Coin Exchange by United States Mint*," 84 Fed. Reg. 35,181, July 22, 2019, available at https://www.federalregister.gov/documents/2019/07/22/2019-15490/suspension-of-bent-and-partial-coin-exchange-by-united-states-mint.

While the program was open, holders of purportedly genuine, mutilated U.S. coins could voluntarily submit their materials to the program for examination. 31 C.F.R. § 100.11(a) ("Lawfully held bent or partial coins of the United States *may* be submitted to the United States Mint for examination in accordance with the provisions in this subpart.") (emphasis added). The regulations establish that submissions to the program will be examined for "possible redemption." 31 C.F.R. § 100.11. The regulatory program includes sampling, testing, and examination of submissions and establishes when redemption will not be made. *See* 31 C.F.R. § 100.11(c). When making a submission, participants in the program accept governance by the program. 31 C.F.R. § 100.11(a) ("Any submission under this subpart shall be deemed an acceptance of all provisions of this subpart.").

To be legally redeemed, the bent or partial coins that are submitted must be determined to be, upon examination, "lawfully held" and "readily and clearly identifiable as to genuineness and denomination." *See* 31 C.F.R. § 100.11(a)-(b). Under the program, no redemption will be made at all when "[a] submission, *or any portion of a submission*, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States[,]. . . [a] submission appears to be part of, or intended to further, any criminal activity," or a submission "contains a material misrepresentation of facts" under other parts of subsection (c). *See* 31 C.F.R. § 100.11(c)(6)(i)-(iii) (emphasis added). If redemption is denied for any of these reasons, the submission will not be returned. Accordingly, a determination of whether coins are suitable for redemption under the

regulations is a legal conclusion reached by the Mint pursuant to its examination of the submission and application of the regulations, including any prohibitions on redemption.  The regulations vest the Director of the U.S. Mint, or a designee, with "final authority with respect to *all aspects* of redemptions of bent or partial coin submissions."  31 C.F.R. § 100.11(c)(7) (emphasis added).

In addition, materials submitted to the U.S. Mint and found to be counterfeit are forfeited by operation of law, as possession of counterfeit material is illegal.  18 U.S.C. § 492 (mandating that all counterfeit coins of the United States be forfeited to the United States); U.S. Mint Denial of Appeal, ECF No. 36-1.  The U.S Mint may not pay for counterfeit material nor may it form a contract for it, as it cannot contract to acquire illegal material.  *See* 18 U.S.C. § 492.

II.    Portland's August 2018 Submission To The Redemption Program

In January 2018, Portland submitted an application to participate in the re-opened redemption program.  *See* 2nd Am. Compl. ¶ 43.  The U.S. Mint processed and approved Portland's application to participate in the program, and Portland was thus allowed to deliver submissions for examination and possible redemption.  *See id.* ¶¶ 10, 43-51.  Portland delivered a large submission on August 1 and 2, 2018, to the Olin Brass foundry in Illinois for participation in the program.  *Id*. ¶¶ 49-54.  Samples of the coins were taken for testing.  Defendant's Status Report, ECF No. 34 at ECF No. 34-1, Exhibit A (Denial letter); Notice of Filing, ECF No. 36 and 36-1 (Denial of appeal); 31 C.F.R. § 100.11(c)(4).  The remainder of the submission was melted, and Portland was informed that payment for submissions generally issues 4-6 weeks after delivery.  2nd Am. Compl. ¶ 56.

In the two months following Portland's submission, the U.S. Mint informed Portland that it was still evaluating Portland's submission for final receipts. *Id*. ¶ 60. The U.S. Mint told Portland that it would be contacted upon completion of the evaluation. *Id.* ¶ 60c.

Portland was dissatisfied with this response and contacted its U.S. Senator, who contacted the U.S. Mint in March 2019. *Id.* ¶ 61. The U.S. Mint responded to the senator's inquiry, informing him that preliminary testing of the materials submitted by Portland identified technical anomalies that required additional, detailed testing to determine if the submission was appropriate for redemption, and that testing was ongoing. *Id.* ¶ 62. On March 13, 2020, after Portland sent a claim to the U.S. Mint, purportedly pursuant to the Contract Disputes Act, 41 U.S.C. § 7103(f)(3), the U.S. Mint again responded that preliminary testing of the materials submitted by Portland identified technical anomalies that required additional, detailed testing to ensure the coins were appropriate for redemption. *Id.* ¶¶ 67-69.

III.    Course Of Proceedings

In April 2020, Portland filed suit in this Court seeking $8.51 million for its August 2018 submission, Complaint (Compl.) at ¶ 113(b), and after the Government moved to dismiss, Portland amended its complaint in October 2020. Portland alleged a regulatory violation because the United States has not provided payment pursuant to 31 C.F.R. § 100.11(d); breach of implied contract; breach of the implied duty of good faith and fair dealing; equitable estoppel to preclude the Government from claiming that the coins are counterfeit; declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201; violation of the Fifth Amendment takings clause; and for reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412. Amended Complaint (Am. Compl.), ¶¶ 97-125. The Government again moved to dismiss. Defendant's Motion To Dismiss Plaintiff's Amended Complaint, ECF No. 21.

Concurrent with Portland's suit proceeding in this Court, the U.S. Mint was concluding its evaluation of Portland's submission, and, consistent with what had been communicated to Portland, 2nd Am. Compl. ¶ 60c, Portland was notified at the conclusion of that process. Accordingly, in December 2020, the U.S. Mint sent Portland a letter informing Portland that the U.S. Mint's investigation had concluded and redemption of Portland's submission was denied. Denial letter, ECF No. 34-1.  Specifically, the U.S. Mint determined that Portland's submission contained counterfeit coins and would not be redeemed under the regulations.  *Id.*  Pursuant to its internal policies, the U.S. Mint utilized its subject matter expert and tested the coins and then conducted statistical analyses on the tests.  *Id.*  The denial letter further informed Portland that it could submit a written appeal of the denial and include any additional information that Portland wanted the U.S. Mint to consider.  *Id.*  Portland appealed and submitted with its appeal a copy of its amended complaint in this Court.  Portland appeal of denial, ECF No. 34-4.  Portland also propounded discovery requests on the U.S. Mint, which were denied because the U.S Mint's appeal process does not include discovery.  *See* Def. Status Report, ECF No. 34; Ex. 6 to Def. Status Report, ECF No. 34-6 (Denial of Discovery requests).

The U.S. Mint's denial letter was issued after the Government filed its motion to dismiss Portland's first amended complaint and prior to Portland filing its response to the motion.  The Government did not inform the Court of the denial letter and Portland did not mention the U.S. Mint's denial of its submission in its response to the Government's motion to dismiss.  Because the parties had not otherwise informed the Court of the U.S. Mint's official denial of Portland's submission, the United States requested additional pages in its reply brief in order to inform the Court of the conclusion of the U.S. Mint's agency action, which had been referenced in the motion to dismiss and the amended complaint.  *See* Mot. to Dismiss, ECF No. 21, n.4; 2nd Am.

Compl. ¶ 76.  During a status conference to address the Government's motion for more pages,

the parties apprised the Court of the U.S. Mint's denial letter and Portland's appeal.  The Court

then denied the Government's motion for more pages and denied the Government's motion to

dismiss without prejudice "because of the numerous factual issues presented by the defendant

after the defendant's motion to dismiss was filed and presented at the February 19, 2021 status

conference."  *See* Order, ECF No. 33.  The Court also directed the parties to "separately file on

ECF a brief statement of the administrative process for resolving the open administrative issues

at the United States Mint[]" and ordered the parties to file, beginning April 19, 2021, joint status

reports regarding "the status of the plaintiff's administrative appeal before the United States

Mint."  *Id.*

On March 5, 2021, the parties submitted their status reports regarding the U.S. Mint's

administrative process.  *See* Def. Status Report, ECF No. 34 and exhibits; Plaintiff's Status

Report, ECF No. 35.  Although the parties were not required to report on the status of Portland's

open administrative appeal before the U.S. Mint until April 19, 2021, the parties also addressed

that appeal, including Portland's discovery requests and the U.S. Mint's denial of those requests.

Def. Status Report, ECF No. 34, at 7-10.  The U.S. Mint additionally noted that its determination

on Portland's appeal was forthcoming, *see id.* at 9, and on March 15, 2021, the U.S. Mint denied

Portland's appeal.  Denial of appeal, ECF No. 36-1.  The U.S. Mint's status report noted that the

Mint had referred the matter to the United States Treasury Office of the Inspector General, which

has investigatory and law enforcement functions,[3] upon its preliminary finding in November

2019 that the submission contained counterfeit coins.  Def. Status Report, ECF No. 34, at 7; *id.*

---

[3]  *See* Public Law (Pub. L.) 100-504, "The Inspector General Act Amendments of 1988."
*See also* Treasury Directive 27-12, available at https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/td27-12.aspx.

at Exhibit B, ECF No. 34-2 (Referral to OIG).  The Mint continued to update TOIG on this matter, including providing TOIG with the Mint's official determination that Portland's August 2018 submission to the Mutilated Coin Redemption Program was counterfeit.  Def. Status Report, ECF No. 34, at 7; Def. Status Report, ECF No. 39, at 3-4.  In addition to TOIG, the U.S. Mint referred the matter to the Philadelphia Field Office of United States Secret Service for further investigation.  *Id.*  As of now, the United States knows of no U.S. Attorney's office that has accepted the case for investigation or prosecution.

The U.S. Mint's final determination, as upheld on appeal, is its final agency action.  On March 30, 2021, the Government indicated its intent to file a motion to dismiss or transfer Portland's first amended complaint because of the implications of the U.S. Mint's final agency action on the exercise of this Court's jurisdiction and the viability of Portland's allegations before this Court.  *See* Def. Status Report, ECF No. 39.  The Court held a status conference to discuss the Government's status report and intended motion to dismiss, after which the Court ordered Portland to file a response explaining whether Portland wanted to file an action in district court "regarding any possible Administrative Procedure Act claims challenging the final decision of the United States Mint, issued on March 15, 2021 by David Croft, the Associate Director of Manufacturing for the United States Mint, that rejected The Portland Mint's January 25, 2021 appeal,"  and which counts should be transferred, if so; which counts should be dismissed from this Court for lack of jurisdiction; and which counts could be retained by this Court.  *See* Order, ECF No. 43.  Accordingly, Portland filed a response to the Government's status report, indicating that this Court could retain jurisdiction over most of its counts and indicating that it would dismiss other counts.  Plaintiff Status Report, ECF No. 51.  The Court

ordered Portland to file a second amended complaint, which Portland did on June 7, 2021.  2nd

Am. Compl., ECF No.  54.  This is the operative complaint.

ARGUMENT

IV.    <u>Standards Of Review</u>

"The Tucker Act supplies the Court of Federal Claims with jurisdiction for claims against

the United States founded upon the Constitution, an Act of Congress, a regulation of an

executive department, or an express or implied contract."  *Trauma Serv. Grp. v. United States*,

104 F.3d 1321, 1324 (Fed. Cir. 1997); 28 U.S.C. § 1491(a)(l); *Gould v. United States*, 67 F.3d

925, 928 (Fed. Cir. 1995).  "The party invoking jurisdiction has the burden to show compliance

with the Tucker Act."  *Id*.; *see Rogers v. United States*, 95 Fed. Cl. 513, 515 (2010) ("Plaintiffs

bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence

before the Court proceeds to the merits of the action" (citation omitted)).  "If jurisdiction is

found to be lacking, the court must dismiss the action."  *Gonzalez-McCaulley Investment Grp.,*

*Inc. v. United States*, 93 Fed. Cl. 710, 713 (2010); RCFC 12(h)(3).  This Court does not possess

jurisdiction to review final agency actions, such as the U.S. Mint's final determination.  *Russell*

*v. United States*, 78 Fed. Cl. 281, 288 (2007) ("[T]he APA confers jurisdiction for judicial

review of final agency decisions on the United States district court and not the Court of Federal

Claims.").  And where Tucker Act jurisdiction is based on a contract theory, as is Portland's

complaint, jurisdiction "extends only to contracts either express or implied in fact, and not to

claims on contracts implied in law."  *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996).

"When analyzing jurisdiction, the court starts with the complaint, 'which must be well-

pleaded in that it must state the necessary elements of the plaintiff's claim.'"  *Gonzalez-*

*McCaulley*, 93 Fed. Cl. at 713 (quoting *Holley v. United States*, 124 F .3d 1462, 1465 (Fed. Cir.

1997)).  And when deciding a motion to dismiss under RCFC 12(b)(l), the Court "assume[s] all

9

factual allegations [in the complaint] to be true and draw[s] all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citation omitted); *see also Hall v. United States*, 74 Fed. Cl. 391, 393 (2006).  But if a motion to dismiss under RCFC 12(b)(1) denies or controverts the pleader's allegations of jurisdiction, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction.  *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993) (internal citations omitted). In such a case, the allegations in the complaint are not controlling, *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 277-79 (1936), and only uncontroverted factual allegations are accepted as true for purposes of the motion. *Gibbs v. Buck*, 307 U.S. 66, 72 (1939).

It is also "well-established that, in addition to the complaint itself and exhibits thereto," when resolving a motion to dismiss under Rule 12(b)(1), "the court 'must consider . . . documents incorporated into the complaint by reference and matters of which a court may take judicial notice.'" *Bell/Heery v. United States*, 106 Fed. Cl. 300, 307 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir. 2014) (quoting *Tellabs Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  "In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings[.]" *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1584.  And while this Court must accept all factual allegations as true at this stage in the proceedings, it need not do so for legal conclusions couched a factual allegations or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).

With respect to Rule 12(b)(6), a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Ingham Regional Med. Ctr. v. United States,* 126 Fed. Cl. 1, 19 (2016), *aff'd in part, rev'd in part*, 874 F.3d 1341

(Fed. Cir. 2017) ("[f]actual allegations must be enough to raise a right to relief above the speculative level." (citation omitted)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *Iqbal*, 556 U.S. at 678 (to avoid dismissal, a complaint must "state a claim to relief that is plausible on its face") (quoting *Twombly*, 550 U.S. at 570)).

"[D]etermining whether a complaint states a plausible claim will . . . be a context-specific task." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). "[O]nce the court excises any conclusory or formulaic components of a plaintiff's complaint, the court must determine whether the remaining factual allegations in the complaint 'plausibly suggest an entitlement to relief.'" *Martinez v. United States*, Nos. 10-569C, 10-730C, 2011 WL 1346941, *2 (Fed. Cl. April 8, 2011) (quoting *Iqbal*, 556 U.S. at 681).

II.    This Court Lacks Jurisdiction To Entertain Portland's Claims Overall Because They Challenge The U.S. Mint's Final Agency Action Denying Redemption

Throughout its second amended complaint, Portland fails to acknowledge the effect of the U.S. Mint's regulatory process on its claim. Specifically, Portland never recognizes that the U.S. Mint's program receives submissions of mutilated coins "for examination and possible redemption," pursuant to the process set forth in the regulations. *See* 31 C.F.R. § 100.11; Denial letter, ECF No. 34-1. Instead, Portland erroneously conflates delivery of its submission to the foundry, and subsequent melt, with ultimate redemption, or the payment from the U.S. Mint of money in exchange for a submission of genuine, lawful U.S. currency. This error underlies all of Portland's causes of action. For instance, in Portland's first count alleging a regulatory violation, Portland contends that the U.S. Mint redeemed its submission upon delivery of the submission to the foundry (including the subsequent melt and purported use of the metal to make new coin

roll), and from that point on, the U.S. Mint's failure to issue payment was a breach of the regulations.  2nd Am. Compl. ¶¶ 83-88.  Likewise, Portland's breach of contract claim is premised on U.S. Mint's purported agreement to "redeem" Portland's submission at delivery, *id.* ¶¶ 91-92, 94-98, as is its claim for breach of the implied duty of good faith and fair dealing, *id.* ¶ 102, and Portland's takings claim is premised on its view that its submission was "redeemed" at time of delivery to the foundry.  *Id.* ¶¶ 107-111.

Portland is wrong because redemption is a legal conclusion reached by the U.S. Mint at the conclusion of its regulatory process, and the delivery of a submission to the program does not mean the submission is redeemed.  Instead, redemption is governed by the regulations, under which the U.S. Mint examines submissions for possible redemption and may redeem submissions at the end of its examination, if none of the reasons for denial of redemption are present.  *See* 31 C.F.R. §100.11(c).  The regulations are clear that only lawfully-held, genuine coins can ultimately be redeemed at the rates set forth under 31 C.F.R. § 100.11(d).  *See* 31 C.F.R. § 100.11(a) ("Lawfully held bent or partial coins of the United States may be submitted to the United States Mint for examination in accordance with the provisions in this subpart.").  The regulations are also clear that submissions might not be redeemed because redemption is prohibited in certain circumstances.  *Id.* at (c)(6).  Moreover, coins that are submitted to the redemption program might not even be returned to the submitter, if intentional mutilation, fraud, criminal activity, or material misrepresentation of facts are discovered upon the Mint's examination of the submission.  *Id.* at (i)-(iii).  Only after the U.S. Mint determines that the coins submitted are genuine legal tender and suitable for redemption can they be exchanged for payment ("redeemed") in the manner and at the rates set forth in the regulations.  *See* 31 C.F.R. § 100.11.  Portland's submission has not been "redeemed," the U.S. Mint determined it

contained counterfeit coins, and denied redemption pursuant to its regulations. Portland's inaccurate characterizations aside, the Mint did not redeem Portland's submission via any physical act, and, instead, determined that they are not suitable for redemption, as it has communicated to Portland.  Denial letter, ECF No. 34-1.

Accordingly, Portland's conflation of delivery of its submission with ultimate redemption is not a factual allegation that needs to be taken as true.  *See*, *e.g.*, 2nd Am. Compl. ¶ 63b (alleging that the Mint "redeemed the Portland Mint's shipment"); ¶ 64 (incorrectly stating that the Mint directed Portland to "redeem" its coins when the Mint, in fact, merely scheduled delivery of the coins).  The redemption process is highly regulated and contingent, and whether a submission is redeemed is not governed by any physical act of the parties such as delivery of a submission by a program participant, receipt of the submission by the U.S. Mint, or even melting or purported use of the submission.  Indeed, melting and use are not referenced in the regulations at all.  *See, generally*, 31 C.F.R. § 100.11.

Thus, instead of establishing that its submission was redeemed upon a certain physical act (delivery, melting, or use of the coins), Portland's allegations illustrate that it participated in a regulatory program through which its submission was denied.  Portland delivered its submission in August 2018 for "examination and possible redemption" pursuant to the terms of the U.S. Mint's regulatory program.  31 C.F.R. § 100.11(a).  The U.S. Mint's regulations provide that it will take and test samples of submissions.  31 C.F.R. § 100.11(c)(4).  The U.S. Mint did so.  Denial letter, ECF No. 34-1.  Pursuant to these tests, the U.S. Mint determined that the tested coins were not made by the U.S. Mint and thus were counterfeit.  *Id.*  The U.S. Mint then conducted a statistical analysis on the samples tested to extrapolate the extent of the counterfeits in Portland's submission.  *Id.*

The U.S. Mint's regulations provide that the Mint must deny redemption when "[a] submission, *or any portion of a submission*, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States[,]. . . [a] submission appears to be part of, or intended to further, any criminal activity," or a submission "contains a material misrepresentation of facts" under other parts of subsection (c).  *Id.*  The U.S. Mint, as it explained in its denial letter, denied redemption of Portland's submission pursuant to those regulatory provisions, based on the results of its tests and statistical analysis.  *Id.* (citing 31 C.F.R. § 100.11(c)(6)(i)-(iii)).  The U.S. Mint further explained that counterfeit coins are contraband *per se* and are forfeited.  *Id.* (citing 18 U.S.C. § 492; *United States v. Simmons*, CV F 96-5948 AWISWS, 2000 WL 33138083, at *3 (E.D. Cal. Dec. 14, 2000) (coins deemed to be counterfeit are per se contraband, their mere possession is illegal, and they should not be returned to the holder)).  The U.S. Mint has no authority to redeem counterfeit coins, which result from criminal activity and are contraband *per se*.  18 U.S.C. § 492.

In short, the U.S. Mint examined the coins, determined that Portland's submission contained counterfeit coins, and denied redemption pursuant to its regulations.  Denial letter, ECF No. 34-1.  The U.S. Mint's final determination, issued at the conclusion of its evaluation, confirms that Portland's submission underwent a regulatory process and the U.S. Mint denied redemption pursuant to its regulatory authority, in direct contrast to Portland's allegations that the U.S. Mint's non-payment violated its regulations.  Instead, the U.S. Mint's determination that the submission is not redeemable is agency action undertaken pursuant to its regulations and internal policy and evidences no violation of the governing regulations or policy.  *See* Def. Status Report, ECF No. 34; Denial letter, ECF No. 34-1 (referencing the program's regulations); Denial of appeal, ECF No. 36-1 (referencing the U.S. Mint's informal adjudication process).

Accordingly, Portland's claims, which challenge the lawfulness of the U.S. Mint's denial of payment and thus challenge the U.S. Mint's regulatory process and its final determination, are not properly before this Court.

Claims that an agency's process is unlawful or must be set aside are claims for relief pursuant to section 706 of the Administrative Procedure Act.  5 U.S.C § 706(2).  This Court does not possess jurisdiction to evaluate the lawfulness of the U.S. Mint's regulations, its internal policy, or the determination that it made pursuant to its regulations.  *Russell*, 78 Fed. Cl. at 288 ("[T]he APA confers jurisdiction for judicial review of final agency decisions on the United States district court and not the Court of Federal Claims.") (citing *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc)).  And this Court does not possess jurisdiction to determine whether the U.S. Mint acted unreasonably or failed to follow its own regulations in relation to Portland's submission, or to order specific performance.  *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief."). To the extent that Portland takes issue with the length of the agency's process, delay in completing a regulatory process is a due process claim and cannot form the basis for Portland's regulatory violation claim in this Court.  *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1334 (Fed. Cir. 2006) ("A violation of due process rights, however, does not give rise to a claim for money damages against the United States in the Court of Federal Claims.") (citing *James v. Caldera*, 159 F.3d 573, 581 (Fed.Cir.1998)); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

III.   Portland's First Count Alleging A Regulatory Violation Must Be Dismissed For Lack Of Jurisdiction And Failure To State A Claim

For the reasons explained just above, Portland's claim for a regulatory violation must be dismissed for lack of jurisdiction.  Instead of identifying a regulatory violation, the gravamen of Portland's challenge is that the U.S. Mint's process is unlawful.  The Court does not possess jurisdiction over this claim and it must be dismissed.  *Russell*, 78 Fed. Cl. at 288.

 Portland's first count, for violation of a money-mandating regulation, must also be dismissed for failure to state a claim because the U.S. Mint's refusal to redeem coins for a lawful reason under the regulations does not equate to a violation of those regulations.  To proceed on a regulatory violation in this Court, Portland must identify a "breach of the duties [the regulation] impose[s]." *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (quoting *United States v. Mitchell,* 463 U.S. 206, 219 (1983)).  Portland contends that the U.S. Mint's denial of redemption for its submission is a "regulatory violation," 2nd Am. Compl. ¶¶ 83-88, but, as explained, Portland erroneously conflates delivery of the submission with the ultimate redemption.

Contrary to Portland's allegations, nothing in the U.S. Mint's denial or final determination shows that the agency violated its own regulations.  Instead, the U.S. Mint explained how, at each step, it was following its regulatory process.  Denial letter, ECF No. 34-1.  Accordingly, the Mint denied payment *pursuant* to its regulations after conducting tests and analysis on Portland's submission and determining that it contained counterfeit coins.  *Id.*  In other words, the denial is the result of the U.S. Mint applying its regulations, not a breach of them.  Portland has failed to identify a breach of the regulations that could support its claim in this Court, and its claim must be dismissed.

IV.    This Court Lacks Jurisdiction Over Portland's Implied-In Law Contract Claim, And Portland Fails To Demonstrate That An Implied-In-Fact Contract Was Formed

Portland also claims that "a valid implied contract existed between the Mint and the Portland Mint[,]"  2nd Am. Compl. ¶ 90, but as Portland's allegations show, Portland's entire interaction with the Mint was governed by the redemption program regulations, not a contractual relationship.  Portland points to no arms-length negotiations or agreements to establish the purported contract, nor could it as a matter of law.  The Mint would not have negotiated with Portland to redeem some or all of its submission; it does not negotiate the rates at which redemption is made if coins are genuine; and it has not negotiated with Portland to deny redemption.  Thus, in addition to showcasing that Portland's claim is one for a contract implied-in-law, the lack of any negotiations or bargaining power on the part of either party demonstrates that no implied-in-fact contract was formed.

A.    Portland's Implied-In-Law Contract Claim Must Be Dismissed For Lack Of Jurisdiction

Portland concedes that the "essential terms of the *implied contract* were found in the Mint's own regulations."  2nd Am. Compl. ¶ 92 (emphasis added).  Because Portland bases its implied contract claim on the terms of the regulations and the duties arising therefrom, it is alleging that it had a contract implied-in-law with the U.S. Mint.  *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996) ("[A]n agreement implied in law is a 'fiction of law' where 'a promise is imputed to perform a legal duty[.]" (citation omitted)).  "[D]ut[ies] imposed by law do not create a contract within the Tucker Act jurisdiction of the [C]ourt."  *eVideo Owners v. United States*, 126 Fed. Cl. 95, 104 (2016), *aff'd*, 680 F. App'x 1004 (Fed. Cir. 2017) (citing *Lion Raisins, Inc. v. United States*, 54 Fed. Cl. 427, 432 (2002)).

Portland's allegations only identify actions on the part of both parties that arise by operation of law, showing that Portland was participating in a regulatory program, not establishing a contract with the Mint.  *See* 2nd Am. Compl. ¶ 92 (citing 31 C.F.R. § 100.11(d)); *D & N Bank v. United States*, 331 F.3d 1374, 1380 (Fed. Cir. 2003).  Moreover, the program is governed by 31 C.F.R § 100.11, entitled "Request for examination of bent or partial coin for possible redemption," and the U.S. Mint has no discretionary negotiating power in this process: it did not negotiate with Portland to redeem some or all of its submission; it does not negotiate the rates at which redemption is made if coins are genuine; and it did not negotiate with Portland to deny redemption.

Portland has alleged no duties or actions other than those provided for in the regulations, thus, the contract that Portland appears to allege was "implied" is based solely on the legal duties created by the regulations.  These assertions are classic allegations of an implied-in-law contract over which this Court does not possess jurisdiction.  *Merritt v. United States*, 267 U.S. 338, 341 (1925); *City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed. Cir. 1998) ("Implied-in-fact contracts, which are within the jurisdiction of the Court of Federal Claims, differ significantly from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims."); *eVideo Owners*, 126 Fed. Cl. at 104 ("This Court has long recognized, . . . that 'a duty imposed by law [does] not create a contract within the Tucker Act jurisdiction of the [C]ourt.'")) (citing *Lion Raisins, Inc.*, 54 Fed. Cl. at 432).  Portland's claim for relief is based on an implied-in-law contract and must be dismissed for lack of jurisdiction.

B.     The Governing Statute And Regulations Do Not Establish An Intent To Create
         Contracts To Redeem Mutilated Coins

The Supreme Court has "[f]or many decades, . . . maintained that absent some clear

indication that the legislature intends to bind itself contractually, the presumption is that 'a law is

not intended to create private contractual or vested rights but merely declares a policy to be

pursued until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison,*

*Topeka And Santa Fe Railway Co.*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Bd. of Educ.*,

302 U.S. 74, 79 (1937)).  This "well-established presumption is grounded in the elementary

proposition that the principal function of the legislature is not to make contracts, but to make

laws that establish the policy of the state."  *Id.* at 466.  Thus, "the party asserting the creation of a

contract must overcome this well-founded presumption," and, "absent 'an adequate expression of

an actual intent' of the State to bind itself . . . this Court simply will not lightly construe that

which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which

the State is a party."  *Id.* at 466-67 (citation omitted).

The United States operates programs whereby mutilated or worn currency or coins can be

exchanged for valid, legal tender.  *See* 31 C.F.R. §§ 100.10(a)-(b); 100.3, 100.16, 100.11.   The

programs are set up to exchange lawful currency that is no longer usable for lawful currency that

is usable and are intended to promote confidence in U.S. currency and coins.  *See* 2nd Am.

Compl. ¶¶ 25-26 (citing https://www.coinworld.com/news/precious-metals/mint-adopts-

mutilated-coin-redemption-program.html, in which a Mint spokesperson states that, "The

Mutilated Coin Redemption Program's basis is to back and promote confidence in U.S. coinage

by ensuring that even mutilated U.S. coins (which financial institutions are unlikely to accept

because bent, deformed, or partial coins generally cannot be counted by machine) are ultimately

redeemable for their face value [ . . . ] As such, it is *essentially a cash-for-cash redemption*

*program* that, *if abused, could potentially be used as a mechanism for money laundering, fraud, tax evasion, and Bank Secrecy Act violations*.")) (emphasis added).  Thus, the U.S. Mint carries out its regulatory duties to promote confidence in U.S. coinage by accepting for examination and "possible redemption" submissions of purportedly genuine, but unusable, mutilated U.S. coins. 31 C.F.R. § 100.11.

Nothing in any of these regulatory programs indicates an intent to *contract* for exchange of one valid legal tender for another.  Instead, valid, legal tender that is unusable is merely exchanged for valid, legal tender that is usable under these programs.  Moreover, materials that are not valid U.S. legal tender will not be exchanged for valid legal tender.  31 C.F.R. §§ 100.11(e), (c)(6).  The regulations setting forth the circumstances under which the U.S. Mint will redeem mutilated coins does not "create or speak of a contract" between the United States and those who submit mutilated coins for redemption.  *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467 (courts first look to the language of the relevant statutes and regulations to determine whether they indicate the Government's intent to contract).  There are no duties or actions alleged in the amended complaint other than those provided for in the regulations, which do not provide that separate contracts will be formed to redeem submissions of coins.  *See, e.g.*, *Radium Mines, Inc. v. United States*, 139 Ct. Cl. 144, 147 (1957) (the regulations provided that the Government would contract to purchase uranium ore upon certain conditions).  A plain reading of the regulations does not support a finding that U.S. Mint intends to contract for redemption of submissions to its mutilated coin program.  And although the Treasury is required by statute to melt obsolete or worn coins, the statute does not require payment in exchange for obsolete or worn coins.  31 U.S.C. § 5120

With regard to Portland's submission, the U.S. Mint performed its regulatory function of examining—for "possible redemption"—the coins submitted by Portland, and it did not form a contract by undergoing its own regulatory process.  And although "performing regulatory duties or setting up a regulatory program is consistent with the regulatory function of any agency and says nothing about the role of the agency as an independent contracting body without further evidence[,]" nothing in the regulations or the Mint's actions provides "further evidence" about the role of the Mint as an independent contracting body.  *D & N Bank*, 331 F.3d at 1380.  As a result, like the plaintiff in *D & N Bank*, Portland is left alleging that it "simply submitted an application for approval [to participate in the program]," and "the [Mint] accepted it."  *D & N Bank*, 331 F.3d at 1379.[4]  Under Federal Circuit precedent, this is not enough to establish the Government's intent to contract.

Instead, Portland must show "something more" than documentation of the Mint's regulatory action to demonstrate intent to contract.  For instance, in the *Winstar* cases, the "something more" was commonly found where the parties engaged in arm's length negotiation or bargaining concerning the accounting treatment of supervisory goodwill – the critical term in dispute in the *Winstar* cases.  *See D & N Bank*, 331 F.3d at 1381 (discussing the *Winstar* cases in the context of contract formation).  Here, Portland and the Mint did not engage in arms-length bargaining over any aspect of Portland's coin submission; rather, Portland merely submitted coins in accordance with the Mint's regulatory program allowing for examination and possible redemption of such coins.  "Something more" than mere participation in a regulatory program has not been demonstrated and cannot be shown, and Portland has not demonstrated an intent to

---

[4]  The result is the same if Portland's delivery of coins is seen as the offer.  In that case, Portland is left alleging that it "simply submitted [coins for examination]," and "the Mint accepted [delivery of] them."

contract on the part of the Mint based on its regulatory provisions.  *See* 2nd Am. Compl. ¶ 92

("The essential terms of the implied contract were found in the Mint's own regulations[.]").

      C.      Portland Has Failed To Adequately Allege The Formation Of An Implied-In-Fact Contract

But even treating Portland's allegations as attempting to establish an implied-in-fact

contract, Portland's claim fails.  None of its allegations support a finding that an implied-in-fact

contract was formed.  To establish a valid contract with the Government, a plaintiff must allege

and prove (1) mutuality of intent to contract, (2) lack of ambiguity in offer and acceptance, (3)

consideration, and (4) authority on the part of the Government agent entering the contract.  *Seuss*

*v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008).  Moreover, "[a] well pleaded allegation

of an express, or implied-in-fact, contract necessarily includes allegations going to each of the

requisite elements of a contract."  *De Archibold v. United States*, 57 Fed. Cl. 29, 32 (2003)

(quoting *McAfee v. United States*, 46 Fed. Cl. 428, 432, (2000), *appeal dismissed*, 250 F.3d 762

(Fed. Cir. 2000)).  Portland cannot demonstrate any of these elements, but most importantly, it

has failed to allege that the Government officials on whose actions it relied had authority to

contract on the part of the Government.  Portland has thus failed to establish the formation of a

contract between the U.S. Mint and Portland, warranting dismissal of its contract claims.

      1.      The Amended Complaint Alleges Apparent Authority Only, Which Is Not Enough To Establish That An Implied-In-Fact Contract Was Formed

Portland's contract claim should be dismissed because, at most, Portland alleges apparent

authority to contract on the part of Mr. Holmes, the U.S. Mint employee who received Portland's

submission, but apparent authority is not enough to sustain Portland's claim.  Failure to establish

that a Government agent had actual authority to contract is fatal to Portland's contract claim.

"[A]pparent authority will not suffice to hold the government bound by the acts of its agents." *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed. Cir. 1989); *Brunner v. United States*, 70 Fed. Cl. 623, 627 (2006) ("[P]rinciples of agency apply somewhat differently when the principal is a government, rather than a private, entity. [. . . A] government agent must have actual or implied authority in order to bind the government in a contract, as opposed to the apparent authority that enables agents to bind other entities."). Thus, to adequately allege Government authority, Portland must "allege that the Government agent had *actual* authority to bind the Government to a contract. Plaintiff's subjective belief is irrelevant." *Doe v. United States,* 95 Fed. Cl. 546, 583 (2010). Further, when dealing with an agent of the Government, third parties have a duty to inquire about that agent's authority. *Brunner*, 70 Fed. Cl. at 629. This duty requires that a potential contractor consult publicly-available laws and regulations to help determine the authority of the Government employee they interact with. *Id.*

Portland does not reference the laws and regulations governing the U.S. Mint's redemption program as the basis for its claim that Mr. Holmes had actual authority (implied or otherwise) to contract to redeem coins. Thus Portland effectively admits that it was derelict in its obligation to know the law, including the extent, or lack thereof, of any contracting authority possessed by Mr. Holmes.

Instead, Portland's allegations show that it *appeared to Portland* that Mr. Holmes had contracting authority because he communicated with Portland about delivery of its coin submission, received the delivery, and told Portland when payments for redemption usually issue. 2nd Am. Compl. ¶¶ 52, 56. Portland's subjective belief that Mr. Holmes had authority to contract is irrelevant. *Cooke v. United States*, 91 U.S. 389, 402 (1875) (explaining that people dealing with a Government agent "are presumed to know his exclusive authority, for it is public

law"); *Sutton v. United States*, 256 U.S. 575, 579 (1921); *Wilber National Bank of Oneonta,
N.Y., v. United States*, 294 U.S. 120, 124 (1935) (assuming "statutes and regulations which
govern" a Federal agency "are known by those who deal with it").

Moreover, as a legal matter, the redemption program vests discretion in the Director of
the U.S. Mint over all aspects of the redemption program.  *See* 31 C.F.R. § 100.11(c)(7).  Thus,
Mr. Holmes did not possess authority to declare that coins are redeemable under the regulations
or to make a binding promise for payment for a submission.  Accordingly, at most, Portland's
allegations show that it may have believed Mr. Holmes had apparent authority to contract, based
on Mr. Holmes's actions.  But apparent authority is not enough to establish that an implied-in-
fact contract was formed.

Further, taking Portland's allegations at face value, the most that Portland alleges is that
Mr. Holmes had apparent authority, and then only to *accept delivery* of a submission to the
redemption program, not even to form a contract.  *See, e.g.*, 2nd Am. Compl. ¶¶ 50, 52-53
(allegations that Mr. Holmes communicated to Portland where it should deliver its submission,
was present during the delivery, and informed Portland of the average timetable for payment).
Indeed, Portland even states that Mr. Holmes actions show that contracting for *delivery* of
redemption submissions (only) was an "integral part of his job."  *Id*. ¶ 93.

Thus, Portland's allegations do not even amount to a contention that Mr. Holmes *actually
formed a contract* in this case, merely that he purportedly could accept delivery of a submission
to the redemption program.  Further, the allegations do not contend that Mr. Holmes had
authority to form a contract to redeem a submission, rather than just accept a delivery.  And,
regarding payment, Portland has merely alleged that "Anthony Holmes, Jr. . . . relayed to Mr.
Youngs that . . . the Portland Mint should expect payment of approximately $8.51 million in

between 4-6 weeks," but Portland has not alleged that Mr. Holmes has authority to approve or issue mutilated coin redemption payments.  *See* 2nd Am. Compl. ¶ 13.  Portland's allegations at most merely contend that Mr. Holmes provided an estimate of the timeline for payment consistent with that provided to any applicant who inquired about payment processing times.[5] Portland has failed to adequately allege that Mr. Holmes had actual authority to contract to redeem coins, and its implied-in-fact contract claim must, therefore, be dismissed.

2.   Portland's Allegations Otherwise Fail To Show That The U.S. Mint<br>Formed An Implied-In-Fact Contract Through Its Actions

Although the lack of authority disposes of Portland's contract claim, Portland has also otherwise failed to establish that the U.S. Mint formed a contract to redeem its submission. Portland alleges no negotiations with the U.S. Mint, merely participation in a regulatory program, and none of the actions Portland alleges can be said to have concluded a bargain. Instead, each action recounted by Portland showed that matters were yet to be concluded.  Most importantly, the U.S. Mint has determined that Portland's submission is not suitable for redemption under the regulations, and it has denied payment because the submission contained counterfeit coins.  Denial Letter, ECF No. 34-1.  Thus, no bargain to redeem Portland's submission was ever concluded.  *Id.*  And, in fact, redemption was denied by final agency action. *Id.*

---

[5]  Moreover, the Second Amended Complaint does not allege that Mr. Holmes approved the application, but merely that Mr. Holmes communicated that the application was approved. The Second Amended Complaint also noticeably does not indicate that the Deficiency Notice letter—indicating that Portland's application was deficient, or not approved—was sent by, signed by, or even communicated about by Mr. Holmes—because it was not.  Portland's contentions that Mr. Holmes had any authority with regard to approving Portland's participation in the redemption program, or to contract with Portland as an incident of that approval, are thus unsupported.

In any event, Portland first fails to demonstrate intent to contract.  It is axiomatic that "there must . . . be a clear indication of intent to contract" to conclude that "a contract was formed." *D & N Bank v*, 331 F.3d at 1378.  Portland alleges that "mutual intent to contract" was demonstrated "whereby the Portland Mint, after having been accepted to participate in the Redemption Program, offered to deliver an agreed-upon number of mutilated coins to the Mint, and the Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018." 2nd Am. Compl. ¶ 91.  But these allegations do not describe the intent required for a contract.  Instead, they demonstrate, at most, that Portland was approved to participate in a regulatory program, under which it could deliver submissions for "examination and possible redemption," and that it did make such a delivery.  *Id.*

Moreover, every action that Portland alleges on the part of the Mint, *see* 2nd Am. Compl. ¶¶ 91-98 (recounting the actions of the U.S. Mint through employee Anthony Holmes, Jr.), shows the Mint acting in accordance with its regulatory program, not negotiating an arms-length transaction with changeable terms pursuant to the negotiations.  *D & N Bank*, 331 F.3d at 1380. Thus Mr. Holmes's actions in communicating to Portland where it should deliver its submission, being present during the delivery, and informing Portland of the average timetable for payment are mere recitations of him fulfilling his duties to receive submissions of mutilated coins for examination and possible redemption.  *See, e.g.*, 2nd Am. Compl. ¶¶ 13, 48, 50, 52-53, 56, 93. The actions of the Government, including Mr. Holmes, do not evidence an intent to contact, and Portland again conflates Government actions pursuant to a regulatory regime with actions that form a contract, meanwhile again admitting that the terms of the contract itself are found in the Mint's regulations.  2nd Am. Compl. ¶ 92.  In any event, none of the actions that Portland

identifies establish "something more" than regulatory functions that could support a finding that the Mint formed an implied-in-fact contract.  *D & N Bank*, 331 F.3d at 1380.

 For these same reasons, Portland's allegations regarding consideration fail.  There is no bargaining reflected in any of the Mint's actions as alleged—not for the amount of coins submitted and received, the number to be redeemed, the rates to be paid, or the fact that the foundry melted much of the submission.  Instead, there are merely facts reflecting Portland's participation in a regulatory program, including Portland communicating to the Mint about the size of its submission and the Mint directing Portland to an appropriate facility to receive the submission.  2nd Am. Compl. ¶¶ 50, 53.  This is instruction, not bargaining, and it is insufficient to demonstrate consideration.  *See XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 785 (2015).

 Further, the fact that the U.S. Mint melted much of Portland's submission does not demonstrate that the U.S. Mint formed a contract to redeem the submission.  *See* 2nd Am. Compl. ¶ 57 ("If the [Portland] Mint's shipment was not authentic, or in any way problematic, it would not have been melted by the Mint and Olin Brass.").  Portland appears to allege that the melting and potential use of the melted metal is equivalent to a determination that its submission was genuine.  But this is belied by the regulatory scheme and Portland's own allegations.  Nothing in the regulations says that if a coin submission is melted, it is presumed to consist of genuine coins.  Rather, the regulations provide that, in its redemption *process*, 31 C.F.R. § 100.11(c), the Mint may take and keep samples for examination.  *Id*. at (4).  Moreover, upon delivery of its submission, Portland agreed that it accepted all provisions of the regulatory program, including the provisions that allow the U.S. Mint to take samples of a submission and examine the samples, and to deny redemption.  31 C.F.R. § 100.11(a) ("Any submission under

this subpart shall be deemed an acceptance of all provisions of this subpart.").  Samples from

each of Portland's delivery trucks were collected and sent to the U.S. Mint's laboratory for

further testing, in accordance with 31 C.F.R. § 100.11(c)(4), to validate the authenticity of the

submission, as Portland even acknowledges in its amended complaint, recounting that the U.S.

Mint samples shipments "to ensure their authenticity before redeeming them."  2nd Am. Compl.

¶ 57; *see also* Denial Letter, ECF No. 34-1.  There is no requirement in the regulations that the

sampling and determination be done prior to shipment or that the sampling and determination of

authenticity is completed upon delivery of a submission, nor is there such an allegation.[6]  Thus,

as a legal matter, the Mint could not, and did not, contract to "redeem" coins merely upon

delivery.

In any event, just because Portland's submission may have been made up of metal that

closely mimics the composition of genuine United States coins does not mean that its submission

contained genuine U.S. coins made by the U.S. Mint.[7]  In fact, Portland's submission contained

coins not made by the U.S. Mint that could not legally be redeemed.  Denial letter, ECF No. 34-

1.

---

[6]  Other than the purported assurances from Mr. Holmes, which we do not concede are
true or legally binding, Portland does not allege that it received any other indication, or anything
in writing, that its submission was suitable for redemption upon delivery of the submission.
Samples from each delivery truck were collected and sent to the Mint's laboratory for further
testing, in accordance with 31 C.F.R. § 100.11(c)(4), to validate the authenticity of the
submission, as Portland even acknowledges in its amended complaint, recounting that the Mint
samples shipments "to ensure their authenticity before redeeming them."  2nd Am. Compl. ¶ 57.
Moreover, an official with authority to do so at the U.S. Mint, David Croft, has determined the
submission was not redeemable because it contained counterfeit coins, and the U.S. Mint had
made a final determination that the submission was not suitable for redemption.  Denial Letter,
ECF No. 34-1.

[7]  The weight and composition of coins are set forth in a statute, 31 U.S.C. § 5112, and
are thus easily mimicked.  An appearance of consistency with genuine coins, therefore, does not
mean that the coins are, in fact, genuine.

Portland also fails to explain how the melting or use of the melted coins would affect the analysis of whether a contract was formed when the Mint received Portland's submission for examination and possible redemption.  Indeed, Portland's factual allegations stop at the delivery and acceptance stage, *see, e.g.*, 2nd Am. Compl. ¶ 58 ("[Portland's] delivery and the Mint's acceptance of several hundred thousand pounds of mutilated coins at Olin Brass – a foundry specifically designated by the Mint to accept and redeem bulk shipments of mutilated coins – demonstrated that an implied-in-fact contract existed between the two parties."), while the remainder of its allegations rely on legal conclusions.  *See id.* (contending that upon delivery, the Mint agreed to "redeem" the coins).  But, as we have explained, the Mint did not agree to "redeem" a certain amount of coins simply because it received Portland's submission and melted it, nor could it negotiate to "redeem" any amount of coins.  Rather, the Mint's regulations are clear that it will redeem mutilated coins that are genuine and lawfully-held, if, after any necessary examination (of the coins, the submission paperwork, etc.) the submission is determined to be redeemable.  31 C.F.R. § 100.11(c).  The Mint has no option to change these requirements on an *ad hoc* basis (it must do so through rule-making), and neither does Portland. In addition, the U.S. Mint may not return counterfeit coins, which are contraband *per se* and forfeited.  *Boggs v. Rubin*, 161 F.3d 37, 40 (D.C. Cir. 1998)) ("Individuals have no property right in contraband materials and contraband materials may not be returned to them.") (internal citation omitted); *United States v. Farrell*, 606 F.2d 1341, 1344 (D.C. Cir. 1979) ("It is well established that a claimant has no right 'to have [per se contraband] returned to him.'") (citing *United States v. Jeffers*, 342 U.S. 48, 54 (1951))).  Nor does the U.S. Mint have the authority to contract to pay for counterfeit coins, in which Portland does not have a property interest.  *Boggs*, 161 F.3d at 40; 18 U.S.C. § 492.

Finally, Portland's implication that a contract was formed, at least in part, through its application to and acceptance into the redemption program is incorrect.  *See* 2nd Am. Compl. ¶¶ 44-49, 91.  The purported "acceptance" here—the Mint's approval of Portland's application and its physical acceptance of a delivery of coins, 2nd Am. Compl. ¶¶ 91, 95—merely reflects the Mint's "performance of its regulatory or sovereign functions."  As the Federal Circuit made clear in *D & N Bank*, such actions "do[] not create contractual obligations."  *D & N Bank*, 331 F.3d at 1378-79 (citing *New Era Constr. v. United States*, 890 F.2d 1152, 1155 (Fed. Cir. 1989)); *see Anderson v. United States*, 344 F.3d 1343, 1357 (Fed. Cir. 2003) (holding that "regulatory proclamations are insufficient to create contractual obligations").

In short, Portland cannot establish the existence of a contract or the Government's intent merely by relabeling regulatory application actions as part of the contracting process.  In *Pennsylvania Department of Public Welfare v. United States*, the Court granted dismissal of a breach of contract claim for failure to state a claim, notwithstanding the existence of an alleged offer and acceptance through the completion of application forms by the plaintiff which were approved by the Department of Health and Human Services, because neither the statute or the regulations at issue expressed an intent on the part of the Government to be bound by contract. 48 Fed. Cl. 785, 791 (2001); *see also Nelson v. United States*, 16 Cl. Ct. 510, 514-15 (1989) (rejecting the existence of a contract based on an application to and acceptance by the Government where the governing statute did not contemplate the creation of a contractual obligation).  The same is true here.  Portland's acceptance into the redemption program did not form a contract, but instead merely indicated that Portland met the preliminary certification requirements to be allowed to submit mutilated coins over a certain amount for examination and possible redemption.  *See* 31 C.F.R. § 100.11(c)(1) (certification requirement).

Accordingly, Portland has not met its pleading burden regarding offer, acceptance, and mutuality of intent to contract.  None of Portland's allegations show that the U.S. Mint undertook any actions other than its regulatory actions or that, alternatively, it was engaging in negotiating terms for a contact separate from its regulations.  *D & N Bank*, 331 F.3d at 1380.  Portland's allegations fail as a matter of law and must be dismissed.

V.    Portland  Fails To Sufficiently Allege Its Cause Of Action For Breach Of The Implied Duty Of Good Faith And Fair Dealing

Portland fails to sufficiently allege its cause of action for breach of implied duty of good faith and fair dealing.  A cause of action based on the implied duty of good faith and fair dealing is simply a specific breach-of-contract claim.  *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner.").  The duty of good faith and fair dealing is applicable in both private and Government contracts, *id.*, and its existence "depends on the existence of an underlying contractual relationship." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (internal quotation marks omitted).  Because the existence of the covenant of good faith and fair dealing depends on the existence of an underlying contractual relationship, there is no claim for a breach of this covenant where a valid contract has not been formed.  *Id*.  As described above, Portland has failed to sufficiently allege an implied contract; therefore, because there is no underlying contract, this claim must be dismissed.

VI.   Portland's Takings Claim Must Be Dismissed

In Count Four of its second amended complaint, Portland alleges that the U.S. Mint's "permanent impairment" of its property constitutes a taking without just compensation in violation of the Fifth Amendment.  Portland's takings claim must be dismissed for at least three reasons.

First, it is undisputed that Portland voluntarily delivered its submission for examination and possible redemption pursuant to the U.S. Mint's regulatory program.  2nd Am. Compl. ¶ 107 ("Portland delivered to the Mint . . . [its submission]."); *see also* Plaintiff's Response to Defendant's Motion to Dismiss, ECF No. 24, at 28 ("Portland Mint willingly delivered the coins to Olin Brass.").  It is axiomatic that a voluntary transfer of property is not a taking.  *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1348-49 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2744 (2019); *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987) ("Th[e] element of required acquiescence is at the heart of the concept of occupation.").

It is also undisputed that the U.S. Mint did not require Portland to participate in its program or to make any submissions to the program.  Instead, Portland chose to do so to take advantage of the U.S. Mint's regulatory program.  *See* 2nd Am. Compl. ¶ 3 ("As part of its business model, [Portland] aggregates mutilated U.S. coins, separates them by allow, and bulk redeems them through the Redemption Program.").  Portland cannot demonstrate a Fifth Amendment taking based on its voluntary submission of materials for examination and possible redemption pursuant to the U.S. Mint's regulatory program, even if the submission consisted of genuine coins, because Portland's voluntary delivery of its materials to the program does not equate to Government appropriation.  *Love Terminal Partners*, 889 F.3d at 1348-49.

Second, Portland's takings claim is premised on its contention that the U.S. Mint violated its regulations by not issuing payment upon delivery and melting of Portland's submission.  *See* 2nd Am. Compl. Section F ("The Mint Refuses to Pay the Portland Mint in Violation of its Regulations").  As we have explained above, Portland's submission was not redeemed upon any physical act, but more importantly, for the purpose of Portland's takings claim, an alleged regulatory violation cannot form the basis for a takings claim.  *Lion Raisins, Inc. v. United*

*States*, 416 F.3d 1356, 1369 (Fed. Cir. 2005) ("We have made clear that a claim premised on a regulatory violation does not state a claim for a taking."); *Acadia Tech.*, 458 F.3d at 1331 ("Because [plaintiff's] takings claim was premised on the allegations that the [Government agency] violated the statute and regulations, the Court of Federal Claims properly dismissed the complaint.") (quoting *Lion Raisins, Inc.*, 416 F.3d at 1369).  A compensable taking arises only if the Government action in question is authorized.  *Del-Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362-63 (Fed. Cir. 1998) (*citing United States v. North Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920).  Thus, Portland's claim that a compensable taking occurred pursuant to the Government's alleged violation of 31 C.F.R. § 100.11(d) fails.

Third, a Fifth Amendment takings claim in this Court must be premised on lawful Government action and is separate from complaints regarding the wrongfulness of the Government's action.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) (The Fifth Amendment "requires compensation 'in the event of *otherwise proper* interference [with property rights] amounting to a taking.'") (emphasis in original) (internal citation omitted).  Thus, Portland's attack on the lawfulness of the U.S. Mint's denial of redemption through a takings claim is not properly before this Court.  *Lion Raisins*, 416 F.3d at 1369 ("We have made clear that a claim premised on a regulatory violation does not state a claim for a taking."); *Meschkow v. United States*, 109 Fed. Cl. 637, 644 (2013) ("There is a critical distinction between seeking redress for an alleged unauthorized government action, on the one hand, and just compensation for a taking, on the other.").

"Because a takings claim is separate from a challenge to the lawfulness of the government's conduct," complaints "about the wrongfulness of the [Government action] are therefore not properly presented in the context of its takings claim[.]"  *Acadia Tech., Inc.*, 458

F.3d at 1330-31 (Fed. Cir. 2006) (quoting *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352-53 (Fed. Cir. 2001)).   "The two actions constitute 'two separate wrongs that give rise to two separate causes of action.'"   *Meschkow*, 109 Fed. Cl. at 644 (quoting *Del-Rio Drilling Programs*, 146 F.3d at 1364).   "[A] property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action *or* to sue for an uncompensated taking in the Court of Federal Claims."   *Acadia Tech*, 458 F.3d at 1331.   In order to do the latter, however, the plaintiff must premise the entitlement to just compensation on lawful Government action.   *Id*.   ("[I]n a takings case, we assume that the underlying action was lawful and we decide only whether the governmental action in question constituted a taking for which compensation must be paid.") (internal citation omitted); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir. 1993) ("[The] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act.")

   This Court may not entertain Portland's collateral challenge to the validity of the Government's actions via a takings claim.   *Schrader v. United States*, 103 Fed. Cl. 92, 98 (2012) (citing *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995)).   The district court, not the Court of Federal Claims, may possess jurisdiction over Portland's claim that the denial of redemption was unlawful or unauthorized.   *See Kam-Almaz v. United States*, 682 F.3d 1364, 1371 (Fed. Cir. 2012); *see also* Section II, *supra*.

   Portland's allegations regarding the alleged taking do not specifically acknowledge the U.S. Mint's final agency action at all (although they do incorporate all of Portland's other allegations, including its allegations that the U.S. Mint violated its regulatory process).   *See generally*, 2nd Am. Compl. ¶¶ 105-111.   Thus, they are fatally flawed in that they fail to adequately account for all of the relevant agency action with regard to Portland's claims.   But

even if Portland contends that the taking occurred upon the U.S. Mint's denial of redemption

when it determined that the coins were counterfeit, Portland's claim is still foreclosed.  As an

initial matter, unlike Portland's claim of a regulatory violation, a lawful Government action such

as the U.S. Mint's final agency action can properly form the basis of a takings claim.  *Res. Invs.,

Inc. v. United States*, 85 Fed. Cl. 447, 493 (2009) ("Generally, a final agency action is usually

necessary to ripen a regulatory takings claim.").  But even if Portland conceded the lawfulness of

the U.S. Mint's process and final determination, Portland's takings claim fails because, by

conceding the lawfulness of the U.S. Mint's actions, Portland would be necessarily conceding

the correctness of the U.S. Mint's determination that Portland's submission contained counterfeit

coins, which are contraband *per se*.  18 U.S.C. § 492; *Simmons*, 2000 WL 33138083, at *3.

Portland does not have a cognizable property right in contraband.  *Shanghai Power Co. v. United

States*, 4 Cl. Ct. 237, 240 (1983) ("A person . . . acquires no property interest in contraband[.]"),

*aff'd sub nom. Shangai Power Co. v. United States*, 765 F.2d 159 (Fed. Cir. 1985).  And

"forfeiture of contraband is an exercise of the government's police power, not its eminent

domain power."  *United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999);

*Acadia Tech.*, 458 F.3d at 1332 ("[S]eizure of goods suspected of bearing counterfeit marks is a

classic example of the government's exercise of the police power to condemn contraband or

noxious goods, an exercise that has not been regarded as a taking for public use for which

compensation must be paid.").  To the extent that Portland wants to contest the U.S. Mint's

forfeiture of its submission, this Court lacks jurisdiction because "the Tucker Act does not create

jurisdiction in the Court of Federal Claims for a party contesting the propriety of a seizure."

*Acadia Tech., Inc.*, 458 F.3d at 1331.

In addition, although Portland alleges in a conclusory fashion that its submission consisted of genuine coins, whether or not Portland believed the coins were genuine or knew they were counterfeit is immaterial to a takings analysis. *Bennis v. Michigan*, 516 U.S. 442 (1996). If the Government lawfully acquires title to property under the exercise of governmental authority other than the power of eminent domain, such as the police power, compensation is not warranted. *Id*. at 452; *Crocker v. United States*, 37 Fed. Cl. 191, 196 (1997) ("The Constitution should not be invoked to force the Government, in effect, to purchase property if the challenged action is not in accordance with law for other reasons.") (citing *Del-Rio Drilling Programs, Inc. v. United States*, 37 Fed. Cl. 157 (1997)). The U.S. Mint has determined the submission contained counterfeit coins and is contraband; this is an exercise of its police power and no payment is necessary.

Accordingly, Portland's takings claim should be dismissed.

VII.   Portland's EAJA Claim Is Premature

Portland contends that, "[p]ursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, in the event the Portland Mint is the 'prevailing party' in this matter, it is entitled to its reasonable attorneys' fees and expenses incurred during this litigation as long as the position of Defendant is not found to be "substantially justified." 2nd Am. Compl. ¶ 113. The EAJA provides that a party seeking an award of fees and other expenses shall apply for such "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B). This Court has not made a ruling on the merits in this case, nor has it issued a final judgment. Accordingly, Portland's EAJA claim is premature and must be dismissed.

CONCLUSION

For these reasons, we respectfully request that the Court dismiss plaintiff's complaint for lack of jurisdiction and failure to state a claim.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

/s/ Alison S. Vicks
ALISON S. VICKS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7573
Fax: (202) 307-0972
Alison.S.Vicks@usdoj.gov

June 28, 2021                              *Attorneys for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 28th day of June, 2021, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT" was filed electronically.

I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and that the parties may access this filing through the Court's system.

In addition, a copy of the foregoing was sent to the plaintiff's counsel, Lee Vartan, by email at <u>lvartan@csglaw.com</u>.


<u>s/ Alison S. Vicks</u>
ALISON S. VICKS
Trial Attorney