IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

20-518C
(Senior Judge Horn)

---

THE PORTLAND MINT,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

---

LEE VARTAN
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
T:  973.325.1500
F:  973.325.1501
lvartan@csglaw.com

*Attorneys for Plaintiff*

July 12, 2021

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF RELEVANT FACTS ............................................................... 2

STANDARD OF REVIEW .................................................................................. 4

ARGUMENT ........................................................................................................ 6

    II.    COUNT 1 ALLEGES A VIOLATION OF A MONEY-MANDATING
            REGULATION OVER WHICH THIS COURT HAS TUCKER ACT
            JURISDICTION AND ALLEGES FACTS THAT DEMONSTRATE THAT
            PLAINTIFF FITS WITHIN THE SCOPE OF THAT REGULATION. ................. 6

          A.    Count 1 alleges a violation of the Mint's money-mandating
                regulations, not the Mint's "regulatory process." ........................................ 7

          B.    Count 1, as pled, falls within the scope of 31 C.F.R. § 100.11 ..................... 9

    III.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S BREACH OF
           CONTRACT CLAIM, WHICH HAS BEEN SUFFICIENTLY PLEADED
           IN THE SAC. ....................................................................................... 13

          A.    The contract between TPM and the United States was an implied-in-
                fact contract. ....................................................................................... 14

          B.    TPM has alleged a plausible claim for relief based on Defendant's
                breach of an implied-in-fact contract. ...................................................... 20

    IV.   PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIEF
           BASED ON THE GOVERNMENT'S BREACH OF THE IMPLIED DUTY
           OF GOOD FAITH AND FAIR DEALING. ...................................................... 29

    V.    PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR VIOLATION
           OF THE TAKINGS CLAUSE. ...................................................................... 30

    VI.   THE COURT NEED NOT DISMISS PLAINTIFF'S EAJA CLAIM .................. 39

CONCLUSION ................................................................................................... 39

## **TABLE OF AUTHORITIES**

Page(s)

Cases

*Acadia Technology, Inc. v. United States,*
    458 F.3d 1327 (Fed. Cir. 2006) ...................................................................................... 36, 37

*Adair v. United States,*
    497 F.3d 1244 (Fed. Cir. 2007) ...................................................................................... 10, 11

*Advanced Team Concepts, Inc. v. United States,*
    68 Fed. Cl. 147 (2005) ......................................................................................................... 20

*AG Route Seven P'ship v. United States,*
    57 Fed. Cl. 521 (2003) ......................................................................................................... 26

*Air Pegasus of D.C., Inc. v. United States,*
    424 F.3d 1206 (Fed. Cir. 2005) ........................................................................................... 30

*American Fed. Bank, FSB v. United States,*
    58 Fed. Cl. 429 (2003) ........................................................................................................... 6

*American Fed. Bank, FSB v. United States,*
    62 Fed. Cl. 185 (2004) ......................................................................................................... 18

*Anchorage v. United States,*
    119 Fed. Cl. 709 (2015) ....................................................................................................... 20

*Anderson v. United States,*
    344 F.3d 1343 (Fed. Cir. 2004) ...................................................................................... 15, 27

*Arbitraje Casa de Cambio, S.A. de CV v. United States,*
    79 Fed. Cl. 235 (2007) .................................................................................................... 21, 22

*Arkaki v. United States,*
    62 Fed. Cl. 244 (2004) .................................................................................................... 23, 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................................................... 5, 37

*Bailey v. United States,*
    78 Fed. Cl. 239 (2007) ........................................................................................... 35, 36, 37, 38

*Bank of Guam v. United States,*
    578 F.3d 1318 (Fed. Cir. 2009) ........................................................................................... 19

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................................... 1, 6, 9

ii

*BP Expl. & Prod. Inc. v. United States,*
   147 Fed. Cl. 623 (2020) ........................................................................................ 7

*Brunner v. United States,*
   70 Fed. Cl. 623 (2006) ............................................................................ 22, 24, 25

*Centex Corp. v. United States,*
   395 F.3d 1283 (Fed. Cir. 2005) ......................................................................... 30

*Century Exploration New Orleans, Inc. v. United States,*
   103 Fed. Cl. 70 (2012) ...................................................................................... 31

*Chapman Law Firm Co. v. Greenleaf Constr. Co.,*
   490 F.3d 934 (Fed. Cir. 2007) ......................................................................... 6, 9

*D & N Bank v. United States,*
   331 F.3d 1374 (Fed. Cir. 2003) ........................................................ 15, 16, 17, 18

*Davis Wetlands Banks, LLC v. United States,*
   114 Fed. Cl. 113 (2013) .................................................................................... 19

*Del-Rio Drilling Programs, Inc. v. United States,*
   146 F.3d 1358 (Fed. Cir. 1998) .................................................................*passim*

*Demodulation, Inc. v. United States,*
   103 Fed. Cl. 794 (2012) .................................................................................... 14

*Engage Learning v. Salazar,*
   660 F.3d 1346 (Fed. Cir. 2011) .......................................................................... 5

*FCC v. Florida Power Corp.,*
   480 U.S. 245 (1987) ......................................................................................... 32

*Figueroa v. United States,*
   57 Fed. Cl. 488 (2003) ...................................................................................... 31

*First Federal Lincoln Bank v. United States,*
   60 Fed. Cl. 501 (2004) ................................................................................ 17, 18

*Ford Motor Co. v. United States,*
   84 Fed. Cl. 168 (2008) ...................................................................................... 12

*Forest Glen Props., LLC v. United States,*
   79 Fed. Cl. 669 (2007) ...................................................................................... 18

*Fox Logistics & Constr. Co. v. United States,*
   145 Fed. Cl. 236 (2019) ............................................................................... 14, 20

*H. Landau & Co. v. United States,*
   886 F.2d 322 (Fed. Cir. 1989) .......................................................................... 21

*H.F. Allen Orchards v. United States,*
    749 F.2d 1571 (Fed. Cir. 1984) ................................................................................ 20

*Hanlin v. United States,*
    316 F.3d 1325 (Fed. Cir. 2003) .............................................................................. 14

*Henke v. United States,*
    60 F.3d 795 (Fed. Cir. 1995) ............................................................................. 5, 38

*Jan's Helicopter Serv., Inc. v. F.A.A.,*
    525 F.3d 1299 (Fed. Cir. 2008) .............................................................................. 5

*Kanemoto v. Reno,*
    41 F.3d 641 (Fed. Cir. 1994) ............................................................................. 8, 9

*Kuwait Pearls Catering Co., WLL v. United States,*
    145 Fed. Cl. 357 (2019) ........................................................................................ 30

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
    79 Fed. Cl. 453 (2007) .................................................................................... 37, 38

*La Van v. United States,*
    382 F.3d 1340 (Fed. Cir. 2004) ...................................................................... 17, 18

*Leonardo v. United States,*
    55 Fed. Cl. 344 (2003) .......................................................................................... 23

*Lewis v. United States,*
    70 F.3d 597 (Fed. Cir. 1995) ................................................................................. 5

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ............................................................................................. 37

*Lion Raisins, Inc. v. United States,*
    416 F.3d 1356 (Fed. Cir. 2005) ...................................................................... 33, 34

*Love Terminal Partners, L.P. v. United States,*
    889 F.3d 1331 (Fed. Cir. 2018) ............................................................................ 32

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992) ........................................................................................... 30

*Marriott Int'l Resorts, L.P. v. United States,*
    61 Fed. Cl. 411, amended, 63 Fed. Cl. 144 (2004) ............................................. 12

*McGee v. Peake,*
    511 F.3d 1352 (Fed. Cir. 2008) ............................................................................ 10

*Mendez v. United States,*
    121 Fed. Cl. 370 (2015) ....................................................................................... 23

*Molina Healthcare of Ca., Inc. v. United States*,
    133 Fed. Cl. 14 (2017) ........................................................................ 20

*Monarch Assur. P.L.C. v. United States*,
    36 Fed. Cl. 324 (1996) ........................................................................ 23

*New York Airways, Inc. v. United States*,
    369 F.2d 743 (Ct. Cl. 1966) ................................................................ 19

*NSK Ltd. v. United States*,
    115 F.3d 965 (Fed. Cir. 1997) ............................................................ 29

*Patton v. United States*,
    64 Fed. Cl. 768 (2005) .......................................................................... 5

*Prudential Ins. Co. of Am. v. United States*,
    801 F.2d 1295 (Fed. Cir. 1986) .......................................................... 32

*Radium Mines, Inc. v. United States*,
    153 F. Supp. 403 (Ct. Cl. 1957) ......................................................... 19

*Reynolds v. Army & Air Force Exch. Serv.*,
    846 F.2d 746 (Fed. Cir. 1988) .............................................................. 5

*Rith Energy, Inc. v. United States*,
    247 F.3d 1355 (Fed. Cir. 2001) ..................................................... 34, 35

*Sommers Oil Co. v. United States*,
    241 F.3d 1375 (Fed. Cir. 2001) ....................................... 21, 22, 24, 25

*Stevens Van Lines, Inc. v. United States*,
    80 Fed. Cl. 276 (2008) ................................................................... 21, 26

*System Fuels, Inc. v. United States*,
    65 Fed. Cl. 163 (2005) ........................................................................ 32

*Tabb Lakes, Ltd. v. United States*,
    10 F.3d 796 (Fed. Cir. 1993) ......................................................... 36, 37

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    535 U.S. 302 (2002) ...................................................................... 30, 37

*Threshold Techs., Inc. v. United States*,
    117 Fed. Cl. 681 (2014) ...................................................................... 29

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) ............................................................ 11

*Toon v. United States*,
    96 Fed. Cl. 288 (2010) .......................................................................... 5

*Trauma Serv. Grp. v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997) ............................................................. 14

*Vargas v. United States*,
    114 Fed. Cl. 226 (2014) ....................................................................... 23

*W.C. v. Secretary of Health and Human Services*,
    100 Fed. Cl. 440 (2011) ....................................................................... 12

*Wade v. United States*,
    136 Fed. Cl. 232 (2018) ......................................................................... 5

*Wheeler v. United States*,
    3 Cl. Ct. 686 (1983) ............................................................................... 8

*Zoubi v. United States*,
    25 Cl. Ct. 581 (1992) ........................................................................... 23

**Statutes and Regulations**

28 U.S.C. § 1491 ............................................................................................ 4

28 U.S.C. § 2412 .......................................................................................... 39

31 C.F.R. § 100.11 ................................................................................ *passim*

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ..................................................... 11

RESTATEMENT (SECOND) OF CONTRACTS § 22(1) (1981) ............................. 27

U.S. CONST. AMEND. V ................................................................................ 30

Plaintiff The Portland Mint ("TPM") respectfully submits this brief in opposition to Defendant United States' Motion to Dismiss Plaintiff's Second Amended Complaint (the "Motion"). (ECF No. 55). Because Plaintiff has adequately established a basis for this Court's jurisdiction under the Tucker Act, and Plaintiff has adequately alleged each and every element of the causes of action raised in the Second Amended Complaint (the "SAC"), the Court should deny Defendant's Motion.

## PRELIMINARY STATEMENT

In evaluating Defendant's Motion, this Court is bound to accept as true all facts pleaded in the SAC and to grant TPM the benefit of any reasonable inference from the alleged facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Many of the facts alleged in the SAC are undisputed. The United States Bureau of the Mint (the "Mint') operated a Mutilated Coin Redemption Program (the "Redemption Program" or the "Program"). The Redemption Program allowed participants to exchange damaged U.S. coins for payment. The Mint would melt the redeemed coins and use them to manufacture new coin roll. Plaintiff TPM participated in the Program. In August 2018, TPM delivered several hundred thousand pounds of mutilated coins valued at approximately $8.51 million to a foundry designated by the Mint. The Mint accepted TPM's coins, melted nearly all of them, and used them to manufacture new coin roll. The Mint, however, refused to pay TPM for what it took and used. TPM brought this action to recover what it is owed, advancing claims for violation of the Mint's regulations, breach of contract, and the Takings Clause.

To all of Plaintiff TPM's claims, Defendant United States responds the same: TPM's coins were "counterfeit," the Mint's determination is unchallengeable, and the SAC should be dismissed in its entirety. Defendant seems to forget that the proceeding is at the motion to dismiss stage only, where Plaintiff's well-pleaded allegations control, not Defendant's bald assertions to the contrary. Defendant's claim that Plaintiff's coins were "counterfeit" is an assertion of fact and a post hoc rationalization for the government's conduct that this Court cannot credit on a motion to dismiss

1

because it contradicts the well-pleaded allegations of the SAC.  Defendant spends the entirety of its brief in support of its Motion invoking its "counterfeit" determination and attempting to recast the SAC as an Administrative Procedure Act challenge.  It is not.

Count 1 alleges a violation of a money-mandating regulation over which this Court has jurisdiction.  It alleges that the Mint redeemed TPM's coins when it melted the coins and used them to manufacture new coin roll.  Counts 2 and 3 allege that TPM and the government had an implied-in-fact contract to redeem TPM's coins, as evidenced by the government's actual redemption and the Mint's communications with TPM.  And Count 4 alleges a classic constitutional claim for violation of the Takings Clause: TPM's coins (private property) were accepted and redeemed (taken) by the government to produce new coin roll (public use) without payment (just compensation).  The government's Motion should be denied in its entirety, and this Court should reject the government's invitation to adjudicate this case on the merits at this early stage of the litigation.

## STATEMENT OF RELEVANT FACTS

For over 100 years, the Mint operated a Redemption Program pursuant to regulations.  (*See* SAC ¶ 1).  Through the Redemption Program, individuals and businesses could tender damaged U.S. coins to the Mint in exchange for payment by denomination and weight.  The Mint, in turn, melted the damaged coins and used them to manufacture new coin roll.  (*See id.*).  Plaintiff TPM first participated in the Redemption Program in 2012 and continued for several years without incident. (*See id.* ¶¶ 3; 30).  In August 2018, TPM tendered a large shipment of mutilated coins to a foundry designated by the Mint for redemption.  The shipment consisted of several hundred thousand pounds of coins with a total redemption value under the regulations of approximately $8.51 million.  (*See id.* ¶ 52).

On August 1, 2018, TPM and its founder, Adam Youngs, delivered the mutilated coins to the foundry.  On August 1 and 2, the Mint melted TPM's coins and used them to manufacture new coin

roll.  (*See id.* ¶¶ 56; 85).  Two Mint employees, Anthony Holmes, Jr. and Thomas Browne, met with Mr. Youngs following the melt and reported that TPM's coins had been redeemed without issue, complimented Mr. Youngs on the professionalism of his operation, and encouraged him to participate in the Redemption Program in the future.  The two employees promised prompt payment.  (*See id.* ¶ 56).  Payment never came.

What followed instead was obfuscation.  TPM demanded payment; the Mint responded that it was "still evaluating the coins for final receipts" and was engaged in "additional, detailed testing" to ensure that coins it had already melted and redeemed were "appropriate for redemption."  (*Id.* at ¶¶ 60; 62).  Frustrated, in April 2020, TPM filed its initial Complaint in this Court.  After months of delay, the government filed a motion to dismiss arguing, without basis, that TPM's coins were "counterfeit" and therefore the Mint did not have to pay for what it took.  (*See* ECF No. 13 at 13).  An Amended Complaint followed, along with another motion to dismiss.  While that motion to dismiss was being briefed, and to substantiate its otherwise baseless factual claim that TPM's coins were counterfeit, the Mint sent an undated "official determination" letter to TPM declaring that TPM's entire August 2018 shipment was "counterfeit."  (*See* SAC ¶ 74).

The "official determination" letter was pure litigation stratagem.  First, it was based on a miniscule sample size (.00082% of TPM's shipment), of which only a small portion (4.83%) was tested.  (*See id.*).  Second, it was based on unknown testing methodologies that, according to the government, could never be made known.  (*See* ECF No. 21 at 7, n.5 (The government declared that the report underlying the "official determination" letter is "subject to the investigatory files privilege as well as potentially subject to other privileges[,]" and that if TPM could ever see the report, it could only see a "version" of the report.)).  Third, the "official determination" letter failed to explain how TPM's "entire submission" could be "counterfeit" when a significant portion of that submission (and a much larger portion than was tested by the Mint) had previously been declared authentic by the

government.  (*See* SAC ¶¶ 74; 37-40).  And fourth, the letter was 29 months too late, coming years after the Mint had melted 99.99918% of TPM's August 2018 shipment and used it to manufacture new coin roll.

The government is now on its third motion to dismiss, but the critical facts have not changed, nor has the basic question presented by TPM: must the government pay for what it took and used for its benefit?  In its Motion, the government argues that the Mint's regulations allowed the Mint to take TPM's property and use it for its benefit without paying TPM.  According to the government, a submission is not redeemed even where it is melted and used by the Mint to manufacture new coin roll.  (*See* Def.'s Mot. to Dismiss Pl.'s SAC ("Def.'s Br.") at 13 ("whether a submission is redeemed is not governed by any physical act . . . even melting or purported use of the submission.")).  The government misreads the Mint's regulations.

The government also misreads the SAC. The SAC does not challenge the Mint's regulatory "process," (*id.* at 15); it challenges the application of the Mint's regulations to TPM and its August 2018 shipment, and alleges that, regardless of what administrative process took place after the Mint redeemed TPM's coins, just compensation is owed to TPM because its property was taken and converted to public use.  The SAC adequately alleges that the Mint redeemed TPM's coins, converted TPM's property to public use, and, despite express promises of payment, failed to pay just compensation.

## **STANDARD OF REVIEW**

The Tucker Act vests this Court with jurisdiction "to render judgment upon any claim against the United States" founded up on the Constitution, federal statute or regulation, "or upon any express or implied contract with the United States."  28 U.S.C. § 1491.  "In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the

class of plaintiffs entitled to recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008). For contract claims, jurisdiction "requires no more than a non-frivolous *allegation* of a contract with the government." *Engage Learning v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (emphasis in original); *Lewis v. United States*, 70 F.3d 597, 603 (Fed. Cir. 1995) ("[A] complaint alleging that the plaintiff has a right to relief on a ground as to which the court has jurisdiction raises a question within the court's subject matter jurisdiction as long as the asserted basis of jurisdiction is not pretextual.")

In considering a motion to dismiss under RCFC 12(b)(1) and/or (6), a court is "obligated to assume all factual allegations [in the complaint] to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-7 (1974)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). A court "must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor." *Wade v. United States*, 136 Fed. Cl. 232, 242 (2018) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Twombly*, 550 U.S. at 555-56 (additional citation omitted))). A plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing *Twombly*, 550 U.S. at 555-57).

The question for the court "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236); *see Toon v. United States*, 96 Fed. Cl. 288, 296 (2010) (quoting *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (internal quotations and citation omitted)). "[A] well-pleaded complaint may proceed even if it strikes

a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks and citations omitted); *see also Chapman*, 490 F.3d at 938 (noting that the court's duty is not to determine "whether the claimant will ultimately prevail" when ruling on a 12(b)(6) motion).

## ARGUMENT

**I.     COUNT 1 ALLEGES A VIOLATION OF A MONEY-MANDATING REGULATION OVER WHICH THIS COURT HAS TUCKER ACT JURISDICTION AND ALLEGES FACTS THAT DEMONSTRATE THAT PLAINTIFF FITS WITHIN THE SCOPE OF THAT REGULATION.**

Count 1 alleges a violation of 31 C.F.R. § 100.11.  Specifically, TPM alleges that it delivered 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels to Olin Brass on August 1 and 2, 2018 at the direction of the Mint, (*see* SAC ¶ 52); the Mint accepted those mutilated coins, melted them, and used them to manufacture new coin roll, (*see id.* ¶¶ 83-88); the Mint "redeemed" TPM's coins when it melted them and used them to manufacture new coin roll, (*see id.*); and under the Mint's regulations, because the Mint redeemed TPM's coins, it is obligated to pay TPM for them at the rates prescribed by regulation.  *See* 31 C.F.R. § 100.11(d) ("The United States Mint *will redeem* bent or partial coins on the basis of their weight and denomination at the following rates…") (emphasis added).

The government largely concedes these facts in its motion to dismiss, acknowledging that it melted 99.99918% of TPM's coins and used them to manufacture new coin roll.  (*See* Def.'s Br. at 4; 27 ("The remainder of the submission was melted…"); ("[T]he fact that the U.S. Mint melted much of [TPM's] submission…")).  It just argues that it is not required to pay for what it took and used. The government advances two arguments in support of its position; neither is persuasive.

6

**A.  <u>Count 1 alleges a violation of the Mint's money-mandating regulations, not the Mint's "regulatory process."</u>**

Defendant attempts to recast Count 1, and the entire SAC, as a challenge to the "Mint's regulatory process" over which this Court has no jurisdiction.  (*See id.* at 15-16 ("Claims that an agency's *process* is unlawful or must be set aside are claims for relief pursuant to [S]ection 706 of the Administrative Procedure Act."); ("the gravamen of [TPM's] challenge is that the U.S. Mint's *process* is unlawful.") (emphasis added)).  Defendant's argument ignores the plain language of the SAC, and mischaracterizes Count 1 in an attempt to avoid Tucker Act jurisdiction.

Count 1 does not ask the Court to "evaluate the lawfulness of the U.S. Mint's regulations," or "its internal policy," or "the length of the agency's process[.]"  (*Id.* at 15).  It could not.  Count 1 was included in the Amended Complaint, which predated the Mint's "official determination" letter by months.  Count 1 has always been about whether the Mint violated 31 C.F.R. § 100.11 when it redeemed TPM's coins by accepting, melting, and using them to manufacture new coin roll, without paying TPM the amount prescribed by regulation.  That is, Count 1 has always been about the definition of "redeem" in 31 C.F.R. § 100.11.  If the Court finds that the government "redeemed" TPM's coins by accepting, melting, and using them, then TPM is owed $8.51 million under the regulations, regardless of whether the Mint's "process" was lawful or unlawful.  Likewise, if the Court finds that "redemption" did not take place, then the regulation does not mandate payment to TPM, regardless of whether the Mint's "internal policy" was good or bad.  Count 1 does not allege that the Mint *should* have redeemed TPM's coins; it alleges that it *did* redeem TPM's coins.  To address Plaintiff's allegations, the Court need only interpret the Mint's regulations, not adjudicate the Mint's process.[1]

---

[1] This Court, however, is not precluded from reviewing the administrative record when its Tucker Act jurisdiction is properly invoked pursuant to a money-mandating regulation.  *See, e.g.*, *BP Expl. & Prod. Inc. v. United States*, 147 Fed. Cl. 623, 632 (2020) ("A claim made pursuant to a money-mandating statute invokes this court's Tucker Act jurisdiction, … and when such a claim challenges

Interpreting statutes and regulations is a task squarely within this Court's charge.  To the extent the government argues otherwise, and that "this Court does not possess jurisdiction to determine whether the U.S. Mint … failed to follow its own regulations[,]" the government is wrong. (Def.'s Br. at 15).  This Court "may properly interpret or apply a money mandating statute or attendant regulation if such is necessary or incident to awarding money damages."  *Wheeler v. United States*, 3 Cl. Ct. 686, 688 n.3 (1983).  If "a District Court decision declaring liability or interpreting a statute was required" before the Court of Federal Claims could award money damages, the Court's "purpose would be negated" and it "would become, in effect, a mere paymaster."  *Id.*; *see also Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998) (holding that just because the Court "may have to interpret [a statute] or make other determinations regarding principles of state and federal law in order to resolve [a] contract claim does not deprive the [C]ourt of jurisdiction to decide that claim").

The Court of Federal Claims is not a "mere paymaster."  It has jurisdiction to interpret a money-mandating regulation and award money damages where required by that regulation; that is the Court's very purpose.   In *Kanemoto v. Reno*, the Federal Circuit addressed the issue directly. *Kanemoto* involved the Civil Liberties Act of 1988, which, among other things, required the Attorney General to pay $20,000 "to each eligible individual" interned during World War II.  41 F.3d 641, 643 (Fed. Cir. 1994).  "Eligible individuals" did not include individuals who "relocated to a country while the United States was at war with that country."  *Id.*  The Justice Department denied plaintiff payment because she had relocated to Japan during the war.  Plaintiff sued in district court under the Administrative Procedure Act and sought an order "declaring that the term 'relocate' as used in [the Act], refers only to voluntary relocations."  *Id.*  The government filed a motion to transfer the action

_____

agency action, the court must proceed by reviewing the agency's decision under the standards of the Administrative Procedure Act[.]").

to this Court arguing, directly contrary to its position in this case, that the Tucker Act precluded jurisdiction in district court.  The Federal Circuit agreed with the government, holding:

> The Court of Federal Claims under its Tucker Act jurisdiction can interpret the statute and render a judgment against the United States that will provide [plaintiff] with the entire relief she sought in the first place from the [Attorney General]—the $20,000 statutory amount of restitution. … Moreover, the decision by the Court of Federal Claims would "declare" the proper interpretation of the statute. … Finally, the Court of Federal Claims' judgment would "compel" the Attorney General to make the redress payments sought by [plaintiff].

*Id.* at 645-46.  TPM adopts the arguments of the Federal Circuit (and the government) in *Kanemoto*. The Court can interpret 31 C.F.R. § 100.11 under its Tucker Act jurisdiction.  Just like the Court was empowered to determine the meaning of "relocate" under the Civil Liberties Act, the Court is empowered to determine the meaning of "redeem" under the Mint's regulations.  If the Court determines that redemption was complete when the Mint melted TPM's coins and used them to manufacture new coin roll, then the Court can compel the Mint to pay TPM, just as it could compel the Attorney General to pay the plaintiff in *Kanemoto*.

**B.   Count 1, as pled, falls within the scope of 31 C.F.R. § 100.11.**

The government's second argument seems to be that even if there is Tucker Act jurisdiction over Count 1, the Court should skip to the end of the case and find that "redemption" means something other than what TPM alleges it means.  There are several problems with the government's argument.

First, the government's argument in favor of its preferred interpretation of "redeem" is premature.  On a motion to dismiss under RCFC 12(b)(6), "the court must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." *Chapman Law Firm Co.*, 490 F.3d at 938 (quoting *Scheuer*, 416 U.S. at 236); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely.")

(internal quotation marks and citations omitted). To survive a motion to dismiss for failure to state a claim on Count 1, all TPM must do is show "that the facts as pled … fit within the scope of a statute that is money-mandating." *Adair v. United States*, 497 F.3d 1244, 1251 (Fed. Cir. 2007). TPM has done so, and the government never argues otherwise. Instead, the government asks the Court to determine that, as a factual matter, TPM's coins were not redeemed. In making its arguments, the government never itself offers a competing definition of "redemption," asks the Court to violate every canon of statutory construction in disregarding TPM's interpretation, and impermissibly attempts to convert the present motion into a motion for summary judgment.

Second, while TPM contends that the question of whether the Mint redeemed its mutilated coins is a question of fact that is inappropriate for resolution at the motion-to-dismiss stage, the government's interpretation of "redemption" is both unclear and inconsistent with the regulation's plain language. The government seems to argue that because the "redemption process is highly regulated and contingent," (Def.'s Br. at 13), "redemption" means something contrary to its plain meaning. The closest the government comes to offering a definition is saying what "redemption" is not: "whether a submission is redeemed is not governed by any physical act … even melting or purported use of the submission." (*Id.*).

Any assessment of the correct interpretation of "redemption" must "begin[] with its 'ordinary, contemporary, common meaning.'" *McGee v. Peake*, 511 F.3d 1352, 1356 (Fed. Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)). "This ordinary meaning may be properly informed by the use of dictionaries." *McGee*, 511 F.3d at 1356. Black's Law Dictionary defines "redemption" as "[t]he act or an instance of reclaiming or regaining possession by paying a specific price." Black's Law Dictionary (11th ed. 2019). Merriam-Webster defines "redemption" as "the act, process, or an instance of redeeming," and "redeem" as "to buy back: repurchase." The government asks the Court to ignore these definitions and define "redemption" in 31 C.F.R. § 100.11, at this preliminary stage

of the proceedings, as permitting the Mint to obtain something for nothing; to realize substantial benefit at no cost.

Finally, the government's proposed definition of "redeem" would also lead to the absurd. "[S]tatutory construction that causes absurd results is to be avoided if at all possible." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) (citing *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) (a reading of a statute that "would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose")). According to the government, the Mint can accept hundreds of thousands of pounds of mutilated coins; melt those coins and use them to manufacture new, authentic U.S. coins; and then never pay for what it took and used by declaring, 2.5 years later, that all of the coins were counterfeit because .00039% of the coins were allegedly determined to be counterfeit based on secret testing. The government does not explain how coins can be counterfeit if they were used to manufacture genuine, U.S. coins, or why, if the government's definition of "redemption" is correct, the Mint would not every time redeem mutilated coins without paying for them. The government's interpretation renders the regulation meaningless, as no participant in the Program would be entitled to payment even if the government accepts, takes, melts, and uses the participant's mutilated coins. According to the government, at any time prior to actually rendering payment – even after melting down a participant's property and converting it to public use – the government can declare the property "counterfeit" to avoid its obligation to pay. Because the property is destroyed, no participant could ever prove that the mutilated coins were, in fact, genuine.

In summary, even if the Court were to ignore the ordinary meaning of "redemption" or the absurdity of the government's definition, it cannot hold now, on a motion to dismiss, that the facts pled in Count 1 do not fit within the scope of 31 C.F.R. § 100.11. *See Adair*, 497 F.3d at 1251. While TPM believes that the meaning of "redemption" is clear, whether TPM's coins were redeemed by the

Mint is a factual question as to which discovery is needed, including discovery that would inform the proper interpretation of "redeem."  *See W.C. v. Sec. of Health & Human Servs.,* 100 Fed. Cl. 440, 457 (2011) ("[W]here a statute is of doubtful meaning . . . the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction." (citing *Hamilton v. Rathbone*, 175 U.S. 414, 419 (1899)); *see also Ford Motor Co. v. United States*, 84 Fed. Cl. 168, 171 (2008) (where meaning of the term "wages" under a statute was at issue, Court held that discovery was required, including discovery of agency's documents concerning its interpretation of "wages"); *Marriott Int'l Resorts, L.P. v. United States*, 61 Fed. Cl. 411, 416, amended, 63 Fed. Cl. 144 (2004) (holding that "background files to the [agency's] final actions, just as a statute's legislative history, might prove[] informative" to assisting the Court in determining the meaning of "liabilities" under a statute) (citation and internal quotation marks omitted).  The Court need not engage in statutory interpretation in order to resolve the present motion, as this analysis would be premature without discovery.[2]

---

[2] Although TPM is without any discovery nearly three years after its coins were redeemed and more than one year after it filed its original Complaint, the government has introduced two critical documents into the record clarifying the *Mint's* definition of "redemption."  The first is an Audit Report from the Office of Inspector General, Department of the Treasury dated August 18, 2020 (the "Audit Report").  (*See* Certification of Lee Vartan ("Vartan Cert."), Ex. A).  The government cited the Audit Report in its motion to dismiss.  (*See* Def.'s Br. at 2).  In the Report, the Treasury Department acknowledged "observ[ing] the Mint's mutilated coin redemption process in which the Mint received approximately 450 thousand pounds of mutilated coins from multiple bulk redeemers during August 2018."  (Vartan Cert., Ex. A at 28).  In an appendix to the Audit Report, the Treasury Department clarified that its "observ[ation]" of the 450,000 pounds of mutilated coins occurred at Olin Brass from July 31, 2018 through August 2, 2018.  (*See id.*, Ex. A at 43).  In other words, the Treasury Department witnessed TPM's melt (perhaps explaining why Mr. Youngs was told that he could not be present for the melt, (*see* SAC ¶ 55)).  The Treasury Department described what it observed at Olin Brass on August 1 and 2, 2018: "the *redemption* and recycling of coins *redeemed* through the Mint's coin exchange programs at Olin Brass from July 31, 2018 through August 2, 2018, which included obtaining coin samples from the *redemptions*."  (Vartan Cert., Ex. A at 43 (emphasis added)).  The United States Department of the Treasury considers TPM's coins to have been redeemed.

Count 1 alleges a violation of a money-mandating regulation and that TPM fits within the scope of that regulation.  TPM's SAC adequately alleges that 31 C.F.R. § 100.11 requires payment when the Mint redeems mutilated coins, and that TPM's coins were redeemed by the Mint.  The government's motion to dismiss Count 1 should be denied.

## II.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S BREACH OF CONTRACT CLAIM, WHICH HAS BEEN SUFFICIENTLY PLEADED IN THE SAC.

The SAC alleges a valid, implied-in-fact contract between TPM and the United States.  Specifically, the SAC alleges that TPM offered to redeem approximately 427,000 pounds of genuine, mutilated U.S. coins through the Redemption Program.  On August 1 and 2, 2018, the Mint accepted TPM's shipment, melted TPM's shipment, and used it to manufacture new coin roll.  In the language of contract, there was an *offer* to provide 427,000 pounds of genuine, mutilated U.S. coins by TPM; *acceptance* by the Mint; and *consideration* – the Mint's promise to pay.  (SAC ¶¶ 49-58).

The government offers two arguments in response.  First, it argues that because the redemption rates are fixed by regulation, the contract between TPM and the government was not an implied-in-fact contract, but rather an implied-in-law contract over which this Court has no jurisdiction.  (*See* Def.'s Br. at 17-21).  Second, the government argues that, even if the contract was an implied-in-fact contract, the SAC fails to allege the elements of such a contract.  (*See id*. at 22-31).  Both arguments are unavailing and ignore the standard applicable on a motion to dismiss.

---

The second document is a Standard Operating Procedure from the Mint appended to one of the government's status reports filed with the Court.  (*See* ECF No. 34, Ex. A).  Section 6.8.2 of the SOP explains that if mutilated coins are rejected by the Mint, "the rejected coin is segregated from other shipments and held in the Mutilated Coin Section until the Participant claims it or it is scrapped." (*Id.*, Ex. A at 9).  If TPM's coins had been rejected, *i.e.*, not redeemed, then they would have either been returned to TPM or destroyed.  Neither happened.  TPM's coins were melted and used to manufacture new, genuine U.S. coins.  TPM's coins were redeemed under the Mint's SOP.  Discovery will no doubt provide additional clarity around how the Mint defines "redemption."

A. **The contract between TPM and the United States was an implied-in-fact contract.**

The government's contention that TPM "bases its implied contract claim on the terms of the regulations and the duties arising therefrom[]" and that TPM is therefore "alleging that it had a contract-implied-in-law with the U.S. Mint[,]" (*id*. at 17), grossly mischaracterizes the allegations contained in the SAC.

"An implied-in fact contract is one founded upon a meeting of minds and 'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923)); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996)). Stated another way, "[i]mplied-in-fact contracts are contracts inferred by a court when 'the light of the surrounding circumstances' demonstrates a meeting of the minds between the parties, even if the agreement was never formalized." *Fox Logistics & Constr. Co. v. United States*, 145 Fed. Cl. 236, 241 (2019) (quoting *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019)); *see also Demodulation, Inc. v. United States*, 103 Fed. Cl. 794, 807 (2012) (noting that an implied-in-fact contract is "founded upon a meeting of the minds," whereas an implied-in-law contract is defined as "judicially impose[d] duties that are deemed to arise by operation of law in order to prevent an injustice[]") (internal quotations and citations omitted).

The SAC alleges a "meeting of the minds."  TPM offered to provide a specific amount of mutilated coins; the government accepted that offer, and did redeem those coins.  Contrary to the government' assertion, TPM does not allege that the regulation was the objective evidence of the government's intent to contract.  The objective evidence of the government's intent to contract was the government's actions – the instructions from Mr. Holmes to Plaintiff; Mr. Holmes's acceptance of TPM's shipment; the Mint's redemption of TPM's shipment; and the Mint's promise to pay TPM.

While the Mint may have been permitted by regulation to reject TPM's shipment, it did not, and its decision to accept the shipment and redeem it was objective evidence of the government's intent to contract.

The government argues that "the U.S. Mint performed its regulatory function of examining – for 'possible redemption' – the coins submitted by [TPM], and it did not form a contract by undergoing its own regulatory process." (Def.'s Br. at 21). According to the government, TPM is required to "show 'something more' than documentation of the Mint's regulatory action to demonstrate intent to contract." (*Id*.). That "something more," according to the government, may include negotiations between the parties; however, the government is quick to argue that no such negotiations occurred. (*See id*.). In support of its argument, the government cites to *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003).

In that case, D & N sought to recover damages for an alleged breach of an express or implied-in-fact contract that occurred when, because of newly-adopted federal legislation, D & N was not able to use the goodwill value of the thrift that it had recently acquired in a merger done with the approval of the Federal Home Loan Bank Board. *Id*. at 1376-77. D & N argued that use of the goodwill value it gained in the merger was a term of the contract it had with the Federal Home Loan Bank Board regarding the acquisition. *Id*. In affirming this Court's decision granting the government's motion for summary judgment of no contract liability, the Federal Circuit found that D & N did not provide sufficient evidence that a contract existed between it and the Federal Home Loan Bank Board. The court noted that the Bank Board's "mere approval of the merger" did not create a contractual obligation. *Id*. at 1378-79. As the court observed, "[s]omething more is necessary." *Id*. at 1379.[3]

---

[3] In *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2004), the Federal Circuit elaborated "[t]hat [the] 'something more' must be . . . a 'manifest assent to the same bargain proposed by the offer.'" *Id*. at 1356 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50 cmt. a (1981)). "[T]he Court of Claims best captured this requirement for 'something more' when it explained that, to create a contract, '[t]he offeree must give in return for the offeror's promise exactly the consideration which

The court explained that none of the documents submitted by D & N "express[ed] the government's intention to contract at all, much less contract to permit certain accounting treatment[]" and that "any suggestion that the government impliedly had the intent to contract as to the treatment of goodwill because of its approval of the merger [was] implausible because none of the documents proffered by D & N mention[ed] goodwill or the accounting treatment thereof." *Id*. at 1378.  The court further noted that there was no evidence of negotiation and no evidence of mutual intent to contract.  *Id*.  In the absence of such evidence, the Federal Circuit concluded that the Federal Home Loan Bank Board's approval of the merger was a function of its regulatory or sovereign duty rather than evidence of its intent to contract with D & N.  *Id*. at 1380; 1382.  The Federal Circuit thus held that "performing regulatory duties or setting up a regulatory program is consistent with the regulatory function of any agency and says nothing about the role of the agency as an independent contracting body *without further evidence*."  *Id.* at 1380 (emphasis added).

The government's reliance on *D & N* is misplaced.  As an initial matter, *D & N* was decided in the context of a motion for summary judgment.  Moreover, in that case, the court based its decision, in part, on a lack of evidence demonstrating either negotiations between the parties or a mutual intent to contract.  According to the court, "D & N . . . simply submitted an application for approval of the merger, and the Bank Board accepted it."  *Id*. at 1379.  Here, contrary to the government's assertion that TPM and the Mint "did not engage in arm[']s-length bargaining over any aspect of [TPM's] coin submission[,]" (Def.'s Br. at 21), the SAC plausibly alleges negotiations between the parties regarding the delivery and redemption of TPM's shipment.  TPM's claim, unlike that of the plaintiff in *D & N*, is not based on a simple submission of an application and the approval of that application by a government agency.  Nor does TPM allege that its mere acceptance into the Redemption Program

---

the offeror requests and the acceptance must be made absolutely and unqualifiedly.'"  *Id*. at 1357 (quoting *Estate of Bogley v. United States*, 514 F.2d 1027, 1032 (1975)).

constituted an implied contract with the government.  Instead, TPM alleges that an implied contract was formed based on the objective *actions* of the parties, namely TPM's delivery of mutilated coins to the Mint, the Mint's acceptance and redemption of those coins to manufacture new coin roll, and TPM's communications with Mint employees.

In evaluating whether plaintiffs can show the "something more" necessary to demonstrate an implied-in-fact contract with the government, courts routinely permit plaintiffs to engage in discovery to determine the extent of negotiations and the scope of the government's assent.  In *La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 2004), for example, the Federal Circuit affirmed a trial court's holding that a plaintiff mutual savings and loan association entered into an implied-in-fact contract with the government concerning the treatment of goodwill in connection with the plaintiff's conversion to a federally chartered stock company.  The court found contractual significance in both the Bank Board resolution approving the use of push-down accounting and amortization of goodwill "over a period not to exceed 35 years" as well as in the principal supervisory agent's recommendation of approval in an internal memorandum sent to the Bank Board's regional director.  *Id*. at 1344.  The Court found that the latter document evidenced that "the treatment of goodwill was at the epicenter of the conversion process."  *Id.* at 1346.  In confirming the arm's-length nature of the transaction, the memorandum referenced negotiations between the parties and specified that "'[t]he purchasers are requesting a 35-year write-off period for the goodwill that arises in the transaction.'"  *Id*.  The Federal Circuit observed that the "memorandum clearly reflects the 'something more,' that is, the recognition that the government was engaged in negotiations about the terms of the conversion as well as the subsequent manifest assent to abide by the Resolution required under *D & N Bank*."  *Id*.

Similarly, in *First Federal Lincoln Bank v. United States*, 60 Fed. Cl. 501 (2004), the Court found the existence of an implied-in-fact contract between a thrift and the government in connection with a merger where the resolution approving the merger contained only regulatory boilerplate

17

language.  The Court determined that "the negotiations and circumstances leading up to approval of the merger gave the same regulatory boilerplate language a contractual meaning," *id*. at 506, and specifically based its finding on testimonial and documentary evidence of "extensive negotiations that specifically addressed the issues of goodwill amortization and purchase accounting."  *Id*. at 505.  *See also Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 200 (2004) (stating that "the documentary and testimonial evidence presented at trial proved that the parties negotiated about the time period over which [plaintiff's] remaining goodwill would be amortized, and the circumstances of those negotiations evidence the contractual nature of the agreement resulting from the negotiations.").

Despite the SAC's well-pleaded allegations to the contrary, the government asks this Court to presume that the parties engaged in no arm's-length negotiations regarding the redemption of TPM's shipment and that no testimonial or documentary evidence would demonstrate such negotiations or the government's manifest assent to TPM's offer to redeem its coins.  As the Federal Circuit specified in *D & N Bank*, in order to demonstrate the "something more," what is needed is "proof of an affirmative statement of the government's intention to be bound *either* in documents or *based on witness testimony* about the words and actions of the relevant government officials."  331 F.3d at 1382 (emphasis added).  Defendant's instant motion, however, asks this Court to conclude, without seeing *any* documents or hearing *any* testimony, that the government did not assent to TPM's offer.  TPM, like the plaintiffs in *D & N*, *La Van*, *First Federal Lincoln Bank*, and *American Fed. Bank*, must be afforded the opportunity to conduct discovery on this issue.

Taking TPM's well-pleaded allegations as true and drawing all reasonable inferences in TPM's favor, as the Court must on a motion to dismiss, TPM has sufficiently pleaded a valid claim against the government for breach of an implied-in-fact contract.  *See Forest Glen Props., LLC v. United States*, 79 Fed. Cl. 669, 683 (2007) (citation omitted) ("[A]llegation of the existence of an

18

implied-in-fact contract suffices for purposes of establishing subject matter jurisdiction, and [] any infirmity of proof of such contract presents a merits question."); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1325 (Fed. Cir. 2009) (citing *Trauma Serv. Grp.*, 104 F.3d at 1325 ("A well pleaded allegation of a breach of either an express or implied-in-fact contract is sufficient to overcome challenges to jurisdiction.")).

That the amount now owed to TPM is informed by regulation does not convert an implied-in-fact contract to one implied-in-law.  This Court has recognized implied-in-fact contracts under similar circumstances.  *See, e.g.*, *New York Airways, Inc. v. United States*, 369 F.2d 743, 751-52 (Ct. Cl. 1966) (finding an implied-in-fact contract because the Civil Aeronautics Board's rate order was "in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer. . . . [F]rom a contract standpoint, the transportation of mail by the carrier provided the consideration for both the service and subsidy elements of the compensation which became enforceable on performance of the services."); *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957) (holding Atomic Energy Commission's Circular, enacted pursuant to statute, "was an offer, which ripened into a contract when it was accepted by the plaintiff[] putting itself in a position to supply the ore or the refined uranium described in it[]" and noting that "[i]t could surely not be urged that one who had complied in every respect with the terms of the Circular could have been . . . told that the [g]overnment would not purchase his uranium at all."); *Molina Healthcare of Ca., Inc. v. United States*, 133 Fed. Cl. 14, 42 (2017) (stating that "absent some express declaration of an intent to contract, Congress's creation of a program in which it promises to pay a sum of money in exchange for some specified performance is evidence of an intent to contract."); *Davis Wetlands Banks, LLC v. United States*, 114 Fed. Cl. 113, 120 (2013) (rejecting government's argument that alleged contract was a regulatory pronouncement because the agreement went beyond mere approval

of a wetland bank and addressed specific credits for specific types of restorations). Defendant's motion to dismiss Count 2 of the SAC for lack of subject matter jurisdiction should be denied.

**B. TPM has alleged a plausible claim for relief based on Defendant's breach of an implied-in-fact contract.**

"In order to establish an implied-in-fact contract, the plaintiff must demonstrate the same elements needed for an express contract." *Fox Logistics*, 145 Fed. Cl. at 242-43 (citing *Turping*, 913 F.3d at 1065). Specifically, the plaintiff must prove "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the [g]overnment's representative to bind the [g]overnment in contract." *Id*. at 242 (internal quotation and citation omitted). The government contends that TPM has failed to plausibly allege each of these elements. The government's contention is wrong and ignores the well-pleaded allegations contained in the SAC. *See Anchorage v. United States*, 119 Fed. Cl. 709, 715 (2015) (denying motion to dismiss breach of contract claim where plaintiff sufficiently pleaded facts and the parties had yet to conduct discovery on the disputed issues regarding contractual duties).

**1. The SAC sets forth plausible allegations regarding Anthony Holmes, Jr.'s implied actual authority to bind the government in contract.**

To prove that an implied-in-fact contract with the United States exists, a plaintiff must show "that the officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984). "Although apparent authority will not suffice to hold the government bound by the acts of its agents, . . . implied actual authority, like expressed actual authority, will suffice." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947)). Implied authority is "created by the party's own actions and intentions." *Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147, 151 (2005). "In general, a [g]overnment official has implied authority when such authority is considered to be an integral part of the duties assigned to a [g]overnment

employee." *Stevens Van Lines, Inc. v. United States*, 80 Fed. Cl. 276, 280 (2008) (quotation and citation omitted); *Fed. Crop Ins.*, 332 U.S. at 384 (finding implied authority when government employee possessed the authority to ensure that a contractor acquired raw materials necessary for the contract and to draw checks on the government bank account). *See also Advanced Team Concepts*, 68 Fed Cl. at 150-51 (finding implied authority given that the duties of scheduling, hiring, and paying invoices were central to the officer's work). In other words, a government agent has implied authority "when the power to contract is 'appropriate or essential' to the performance of the agent's duties.'" *Stevens Van Lines*, 80 Fed. Cl. at 280 (quoting *Brunner v. United States*, 70 Fed. Cl. 623 (2006)).

The government argues that Count 2 of the SAC should be dismissed because, "at most, [TPM] alleges apparent authority to contract on the part of Mr. Holmes[.]" (Def.'s Br. at 22). Contrary to Defendant's assertion, the SAC plausibly alleges that Mr. Holmes, in his capacity as Materials Handler Supervisor at the Mint, had the implied *actual* authority to bind the government to the contract between TPM and the Mint.

The allegations set forth in the SAC are sufficient to withstand the government's motion to dismiss. *See Arbitraje Casa de Cambio, S.A. de CV v. United States*, 79 Fed. Cl. 235, 241 (2007) (citing *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1380 (Fed. Cir. 2001)) ("The Federal Circuit has held that a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss."). In *Sommers Oil*, the Federal Circuit found that while the complaint was "rather indirect in the manner in which it set[] forth" the allegation of authority, it was reasonable to infer from the allegations in the complaint that there were several people who could have had authority to act on behalf of the government. *Sommers Oil*, 241 F.3d at 1379. Similarly, in *Arbitraje*, despite the fact that the plaintiffs did "not clearly allege[] that [the government representative], or any other USPS employee, had authority to enter into the contract [in question]," the Court found that the plaintiffs' complaint, which included allegations that the

government's representative "was in a management position" and "made representations regarding the money available for refund[,]" were sufficient to defeat the government's motion to dismiss. *Arbitraje*, 79 Fed. Cl at 242 ("Liberally construed, these claims can be taken together as an allegation that [the government representative] had authority to contract on behalf of the government.").

Here, the SAC alleges that "[a]s demonstrated by the communications and actions of Anthony Holmes, Jr. and other Mint employees, arranging and contracting for the delivery of mutilated coins was an integral part of Mr. Holmes'[s] duties as a supervisor employed by the Mint."  (SAC ¶ 93). Those "communications and actions" around the Redemption Program were several, and Mr. Holmes's authority to contract on behalf of the government may be implied from his "communications and actions."  Specifically, the SAC alleges that Mr. Holmes "informed Mr. Youngs that [TPM's] application to participate in the Redemption Program was approved."  (*Id*. at ¶ 48).  He further coordinated with Mr. Youngs regarding TPM's delivery of mutilated coins to Olin Brass, (*id*. at ¶¶ 50-54), "specifically stated that the coins redeemed by [TPM] were without issue . . . [and] promised that [TPM] would receive payment for its redeemed shipment in 4-6 weeks."  (*Id*. at ¶ 57).  Given these "communications and actions," and Mr. Holmes's clear representations to TPM, it stands to reason that Mr. Holmes had the actual or implied authority to bind the government to the contract at issue.  *See Brunner*, 70 Fed. Cl. at 641.

At this stage in this litigation, TPM's allegation regarding Mr. Holmes's implied actual authority must be accepted as true.  The government seeks to impose a heightened pleading standard that would make it virtually impossible for any plaintiff's claim of implied actual authority to survive a motion to dismiss.  In essence, the government's position would require a plaintiff, without the benefit of discovery, to allege, in specific detail, the exact nature of the authority assigned or delegated to a government agent without seeing *any* document providing for or hearing *any* testimony regarding the scope of that assignment or delegation.  Such a standard is not only unrealistic, but unsupported

22

by precedent.  As this Court has recognized, "[i]t is appropriate for [a] court to inquire into the precise nature of a government employee's duties 'to determine whether implied actual authority exists.'" *Arkaki v. United States*, 62 Fed. Cl. 244, 262 (2004) (citing *Leonardo v. United States*, 60 Fed. Cl. 126, 130 (2004) ("*Leonardo II*"); *see also Zoubi v. United States*, 25 Cl. Ct. 581, 587 (1992) (holding that the "nature of the duties assigned . . . must be examined to determine whether [the federal employee] had the implied authority to bind the [government.]").  This inquiry is best made, not at the motion to dismiss stage, but rather, after discovery.  *See, e.g.*, *Monarch Assur. P.L.C. v. United States*, 36 Fed. Cl. 324, 329 (1996) (ordering additional discovery on the government's motion for summary judgment because "it is at least possible that through discovery plaintiffs may be able to gather unprivileged information that, when combined with their other evidence, is sufficient to establish a prima facie case of authority"); *Leonardo v. United States*, 55 Fed. Cl. 344, 347-49 (2003) ("*Leonardo I*") (staying motions for summary judgement "pending further discovery and briefing" on the issue of whether the government representative who entered or ratified the alleged contract had the authority to bind the United States); *Mendez v. United States*, 121 Fed. Cl. 370, 380-81 (2015) (deferring consideration of the government's motion to dismiss until after discovery); *Vargas v. United States*, 114 Fed. Cl. 226, 236 (2014) (denying the government's motion to dismiss "at this stage in the case" and stating that "[t]he government will have ample opportunity to raise the issue of actual authority again, once the record is developed, either on summary judgment or at trial"); *Cf. Sommers Oil*, 241 F.3d at 1380 (distinguishing the plaintiff's burden after discovery, on summary judgment, to prove the existence of actual authority, from the plaintiff's burden where a motion to dismiss is filed on the pleadings, with no opportunity for factual inquiry).

In *Arkaki*, the plaintiff, a former owner of an apartment building mortgaged to the Department of Housing and Urban Development ("HUD"), filed suit against the United States alleging that HUD breached an oral promise that he would be allowed to bid on the mortgage if HUD decided to sell it.

The government argued that the HUD agent who allegedly promised plaintiff the right to bid on its mortgage was not authorized to bind the government in contract. *Id*. at 261. The government further argued that the HUD agent's "duties were purely managerial and that he did not have the authority to make the alleged oral contract with plaintiff." *Id*. In denying the government's motion to dismiss, which the Court treated as a motion for summary judgment under RCFC 56, the Court noted that the HUD agent's "duties might indicate the implied actual authority to enter into the alleged oral agreement on behalf of the United States. *Id*. at 264-65 (citing *H. Landau & Co.*, 886 F.2d at 324). According to the Court, "the issue of whether [the HUD agent] possessed the authority to bind [the government] in contract involves genuine disputes of material fact which preclude resolution in [the government's] favor." *Id*. at 265. Against this background, at a minimum, TPM should be permitted discovery regarding the factual issue of Mr. Holmes's defined duties and responsibilities.

Notwithstanding TPM's well-pleaded allegations that Mr. Holmes had the implied actual authority to bind the government to its contract with TPM, the government, citing to *Brunner*, next argues that TPM's contract claim should be dismissed because TPM "does not reference [in the SAC] the laws and regulations governing the U.S. Mint's redemption program as the basis for its claim that Mr. Holmes had actual authority (implied or otherwise) to contract to redeem coins." (Def.'s Br. at 23). No such requirement was imposed in *Brunner*. Rather, in *Brunner*, the Court stated that "[w]hen dealing with an agent of the government, . . . third parties have a duty to inquire into whether restrictions have been placed on that agent's authority." *Brunner*, 70 Fed. Cl. at 629. The Court clarified, however, that "[t]his duty does not require that a potential contractor identify the agent's supervisor and contact that person, but rather that publicly-available laws and regulations are consulted – presumably because public entities act publicly. In other words, this duty is just the complement of the notice of laws and regulations that is assumed for all citizens, and is merely a general rule for transactions with the government that mirrors a special rule that applies when any

24

transactions are subject to law or regulation." *Id*.  The Court's decision certainly did not impose any additional pleading requirement mandating that a plaintiff specifically cite to the laws or regulations upon which its claim of actual authority is based.  Moreover, because the Mint operates the Redemption Program in a decidedly non-public manner, and no additional public laws and regulations concerning the Redemption Program beyond those cited in the SAC exist, it cannot realistically be said that TPM "was derelict in its obligation to know the law[.]"  (Def.'s Br. at 23).

An argument virtually identical to that now posited by the government was summarily rejected by the Federal Circuit in *Sommers Oil*.  There, the government argued that "in order to survive a motion to dismiss for lack of a sufficient allegation of authorization, the plaintiff would have had to plead 'that portion of the Constitution, a regulation, or a statute that grants the [g]overnment official's authority in an unambiguous manner, including facts sufficient to show that the [g]overnment representative who allegedly entered into a contract had actual authority to bind the government.'" *Sommers Oil*, 241 F.3d at 1379-80.  In rejecting the government's argument, the Federal Circuit specifically noted that it disagreed with the government's position that the plaintiff "was required to identify and plead the particular person who approved the contractual arrangement . . . and the particular statute or regulation that authorized that person to commit the government in contract[.]" *Id*. at 1380.  According to the Federal Circuit, "[i]t was sufficient for the complaint to allege that the government's promise was authorized by a person having legal authority to do so[.]" *Id*.  The SAC satisfies that standard.

The government also denies that Mr. Holmes "possess[es] [the] authority to [either] declare . . . coins . . . redeemable under the regulations or . . . make a binding promise for payment for a submission[]" based simply on its contention that "the redemption program vests discretion in the Director of the U.S. Mint over all aspects of the redemption program."  (Def.'s Br. at 24 (citing 31 C.F.R. § 100.11(c)(7)).  What Defendant conspicuously fails to acknowledge is that 31 C.F.R.

§ 100.11(c)(7) explicitly permits the Director of the U.S Mint to assign this discretion to a "designee." *See* 31 C.F.R. § 100.11(c)(7) (stating that "The Director of the United States Mint, *or designee*, shall have final authority with respect to all aspects of redemptions of bent or partial coin submissions.") (emphasis added).  The government pretends that such discretion does not exist and asks this Court to accept its representation regarding Mr. Holmes's alleged lack of authority without any discovery or factual inquiry.  The Court should reject the government's invitation to do so.

    **2.  The SAC sets forth plausible allegations of a mutual intent to contract.**

A contract requires "[a]n objective manifestation of voluntary, mutual assent."  *American Fed. Bank, FSB v. United States*, 58 Fed. Cl. 429, 436 (2003) (citing *Anderson*, 344 F.3d at 1353); *see also Stevens Van Lanes*, 80 Fed. Cl. at 281 ("To find an implied-in-fact contract, the claimant must demonstrate that there was an unambiguous offer to contract upon specific terms and mutuality of intent between the parties to enter a contract.").  Such mutuality of intent requires the plaintiff to "show, by objective evidence, the existence of an offer and a reciprocal acceptance."  *Anderson*, 344 F.3d at 1353.  In determining whether mutuality of intent has been established, the inquiry is an objective one.  *See AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 536-37 (2003) ("Acceptance of the offer must be manifested by conduct, which, viewed objectively, indicates assent to the proposed bargain.").

The SAC alleges mutuality of intent.  Specifically, the SAC alleges that "the parties demonstrated a mutual intent to contract, whereby [TPM], after having been approved to participate in the Redemption Program, offered to deliver an agreed-upon number of mutilated coins to the Mint, and the Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018."  (SAC ¶ 91).  Furthermore, "[t]he Mint accepted the delivery, and redeemed the mutilated coins delivered by [TPM]." (*Id*. at ¶ 95).  The objective evidence alleged in the SAC demonstrates the intent of the parties and, in particular, the government's acceptance of TPM's offer.

Among other things, the Mint approved of the amount of TPM's shipment; directed TPM where to deliver that shipment; met TPM at that designated location to accept the shipment; accepted the shipment; melted the shipment to make new coin roll; and, thereafter, reported to TPM that the melt had proceeded smoothly and TPM would be paid promptly.  TPM has met its pleading burden.  *See Anderson*, 344 F.3d at 1353 ("To satisfy its burden to prove . . . mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 22(1) (1981) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by acceptance by the other party or parties").

### 3.   The SAC sets forth plausible allegations of an unambiguous offer and acceptance.

TPM has also alleged facts sufficient to plausibly demonstrate an unambiguous offer and acceptance of the implied contract.  Specifically, TPM alleges that:

- TPM "offered to deliver an agreed-upon number of mutilated coins to the Mint, and the Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018."

- "The Mint accepted the delivery, and redeemed the mutilated coins delivered by [TPM].  In doing so, the Mint agreed to pay [TPM] for the value of the coins that the Mint accepted and redeemed, approximately $8.51 million."

- "On August 1 and 2, 2018, [TPM] performed its contractual obligations by delivering the agreed-upon number of mutilated coins to Olin Brass."

- "On August 1 and 2, 2018, the Mint accepted [TPM's] mutilated coins, melted them, and, on information and belief, used them to manufacture new coin roll."

(SAC  ¶¶ 91; 95-97).  The government's conclusory assertion that "[TPM] cannot demonstrate any of these elements," (Def.'s Br. at 22), including an unambiguous offer or acceptance, ignores these well-pleaded allegations.

The government calls TPM's delivery of coins a "submission[] for 'examination and possible redemption,'" (*id*. at 26), characterizes the parties' actions as "mere[] participation in a regulatory

program," (*id*. at 25), and argues that "the fact that the U.S. Mint melted much of [TPM's] submission does not demonstrate that the U.S. Mint formed a contract to redeem the submission."  (*Id*. at 27).  The SAC is not the government's to re-write, and this Court must accept the facts in the SAC – as alleged by TPM, not as recharacterized, revised or re-framed by the government – as true for purposes of evaluating the government's Motion.  On August 1, 2018, TPM delivered approximately 427,000 pounds of genuine, mutilated U.S. coins to Olin Brass at the direction of the Mint for redemption.  While it is true that the Mint was under no obligation to actually redeem any coins – just as no offeree is obligated to accept any offeror's offer – the Mint did accept TPM's offer.  The Mint did melt the coins.  The coins were used to make new coin roll.  They were redeemed.  The government's only response is to argue the illogical.  According to the government, "each action recounted by [TPM] shows that matters were yet to be concluded[,]" (*id*. at 25), and "the Mint did not agree to 'redeem' a certain amount of coins simply because it received [TPM's] submission *and melted it*[.]"  (*Id*. at 29) (emphasis added).

That argument is nonsensical and has no support anywhere in 31 C.F.R. § 100.11.  The purpose behind the Redemption Program was for the Mint to convert mutilated U.S. coins into new coinage by accepting mutilated coins, melting them, and using them to manufacture new coin roll.  (*See* SAC ¶ 1).  The SAC alleges that the Mint melted TPM's coins and used them to manufacture new coin roll.  The Mint would only have done so if TPM's coins were genuine, mutilated U.S. coins.  Had they not been, the Mint would have rejected them pursuant to 31 C.F.R. § 100.11(c)(6).  (*See also* ECF No. 34, Ex. A at 9).  There are no "matters . . . yet to [] conclude[]."  (Def.'s Br. at 25).  The coins are gone; the Mint redeemed TPM's shipment when it melted the coins and used them to manufacture new coinage.  In short, the SAC alleges an unambiguous offer by TPM and an equally unambiguous acceptance by the Mint.

**4.   The SAC sets forth plausible allegations of consideration for the implied contract.**

TPM has also alleged facts sufficient to plausibly demonstrate that there was consideration for the implied contract.   As the Federal Circuit has held, "[c]onsideration generally requires bargained-for exchange . . . When the promisor may choose to perform based solely on a whim, then the promise will not serve as consideration."  *NSK Ltd. v. United States*, 115 F.3d 965, 975 (Fed. Cir. 1997) (citations omitted).  The SAC alleges consideration.  (*See, e.g.*, SAC ¶¶ 13, 94.)  Specifically, the SAC alleges that TPM "provided consideration by delivering the mutilated coins to Olin Brass on August 1 and 2, 2018 as instructed by the Mint." (*Id.* ¶ 94), and the SAC alleges that Mr. Holmes and Mr. Browne expressly promised that TPM would be paid approximately $8.51 million in return for TPM's coins, within 4-6 weeks.  (*Id.* ¶ 13).  In short, the SAC goes beyond the regulatory scheme itself and has alleged each and every element of a contract claim, having alleged specific actions by the Mint and its employees inviting TPM to submit coins, directing TPM where to send the coins, and expressly promising payment to TPM in return for the coins.  (*Id.* ¶¶ 48, 50-58)  The SAC plausibly alleges each of the requisite elements of a contract implied-in-fact between TPM and the Mint.  Defendant's motion to dismiss Count 2 of the SAC should be denied.

**III.    PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIEF BASED ON THE GOVERNMENT'S BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.**

Given that the Court has jurisdiction over TPM's breach of contract claim, it likewise has jurisdiction over TPM's claim for breach of the implied covenant of good faith and fair dealing.  *See, e.g.*, *Threshold Techs., Inc. v. United States*, 117 Fed. Cl. 681, 709 (2014) ("Once an implied-in-fact contract has formed, there is no reason that the covenant of good faith and fair dealing should not apply.  This court will not, generally, as a matter of law, on a motion to dismiss, dismiss plaintiff's claim of a breach of the covenant of good faith and fair dealing as long as a potentially valid implied-in-fact contract claim is outstanding.").

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner.  The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  TPM alleges that "[t]he Mint breached the duty of good faith and fair dealing by destroying [TPM's] reasonable expectations of the fruits of the contract." (SAC ¶ 102).  Specifically, "the Mint accepted and redeemed the coins provided to it by [TPM], but refused to pay [TPM] for the property the Mint accepted and redeemed." (*Id.*).  The SAC plausibly alleges each of the requisite elements of a contract implied-in-fact between TPM and the government.  As such, the SAC sufficiently alleges a breach of the implied duty of good faith and fair dealing with respect to that contract.  Accordingly, Defendant's motion to dismiss Count 3 of the SAC should be denied.

## IV. PLAINTIFF HAS ADEQUATELY STATED A CLAIM FOR VIOLATION OF THE TAKINGS CLAUSE.

The Fifth Amendment provides that "nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V (the "Takings Clause").  "For a takings claim to survive a 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts to establish that it has a cognizable interest in the relevant property and that the property interest was 'taken.'  Further, the property must have been taken for public use." *Kuwait Pearls Catering Co., WLL v. United States*, 145 Fed. Cl. 357, 365 (2019) (internal citation omitted).  "Appropriation of private property" constitutes a taking. *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) (observing that the Takings Clause reaches "a direct appropriation of property").  "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,

535 U.S. 302, 322 (2002).  The SAC adequately alleges that TPM's coins (private property) were accepted and redeemed (taken) by the Mint to produce new coin roll (public use) without payment (just compensation).  (*See* SAC ¶¶ 105-10).  Because TPM has alleged each and every element of a claim for violation of the Takings Clause in the SAC, the Court should deny the government's motion to dismiss.[4]

None of the government's arguments in favor of dismissal of TPM's takings claim supports dismissal pursuant to RCFC 12(b)(6) or otherwise.  The government argues that because TPM voluntarily delivered its mutilated coins to the government, TPM has no takings claim.  This is completely unsupported by precedent and would effectively insulate the government from any constitutional obligation to pay "just compensation."  The government argues that "[TPM's] voluntary delivery of its materials to the program does not equate to [g]overnment appropriation," (*see* Def.'s Br. at 32), and TPM agrees; the takings violation took place not when TPM delivered mutilated coins to the government, but rather when the government melted the coins and converted the property to public use (*i.e.*, the manufacture of new coins) without compensation to TPM.

The only case cited by the government in support of its argument on this point is inapposite.  In *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331 (Fed. Cir. 2018), the Federal Circuit determined that there was no physical taking by the government because the government did not mandate taking of the property, but instead mandated, at most, that the city where the property was located "negotiate with plaintiffs and then, if necessary, bring a condemnation proceeding pursuant to which plaintiffs would receive just compensation."  Because the government ordered negotiation

---

[4] A takings claim may be pleaded in the alternative alongside other theories, including breach of contract theories.  *See, e.g., Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 79-83 (2012) (collecting authority).  To the extent this Court finds TPM's takings claim to be inconsistent with one or more other causes of action pleaded in the SAC, such finding is not grounds for dismissal, as "plaintiff is permitted to plead inconsistent claims in the alternative."  *See Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003) (citing RCFC 8(a), (e)).

and, if necessary, condemnation, both of which presupposed just compensation to plaintiffs, the court held that the government had not ordered a taking.  The case did not present a situation in which any property was voluntarily provided to the government, and the government's citation to language from *Love Terminal Partners* takes that language totally out of context.[5]  Moreover, *Love Terminal Partners*, and the cases on which it relied, dealt with real property, the physical occupation of land, and questions as to whether the government had physically occupied or taken property.  Here, there is no question that TPM has adequately alleged that the government physically took TPM's coins and converted them to public use.

Courts have expressly recognized that when a party delivers property or grants a right to the government with an expectation of payment pursuant to a contract or otherwise, and the government fails to pay, the party may assert a claim under the Takings Clause.  *See*, *e.g.*, *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172 (2005) (denying motion to dismiss takings claim, despite the government's argument that "the right taken was created solely by a voluntarily-entered contract," and holding that "contract and takings claims may be pled and argued in the alternative").  For example, the Federal Circuit suggested in *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) that where the government fails to vacate property at the end of a lease term, the lessor "may have an alternate avenue of relief under the Takings Clause" beyond what is provided for in the lease by contract.  In that scenario, the lessor voluntarily entered into a lease with

---

[5] The government's quotation from *FCC v. Florida Power Corp.*, 480 U.S. 245, 252-53 (1987) is likewise taken out of context.  In *Florida Power*, the Supreme Court held that the government's regulation of the rates that utility companies could charge cable television systems for use of utility poles did not constitute a taking, in part reasoning that there was a difference "between a commercial lessee" and "an interloper with a government license."  The utility companies had acquiesced in the cable television systems' occupation of their property, and the government had not forced the utility companies to cede their property to the government or a particular government licensee.  *Id*.  The only issue was the rate that the government permitted the utility companies to charge, which was not a takings issue.  *See id*.  The quote regarding "required acquiescence" cited by the government in its brief, (*see* Def.'s Br. at 32), is taken out of context and has no relevance to the present dispute.

the government and voluntarily acquiesced to the government's occupation of the property, but the government's conduct in holding over on the lease without just compensation could constitute a taking (and not just a claim for damages under the lease). So too here, TPM's allegations that the government converted its property to public use without just compensation state a claim for violation of the Takings Clause.

The government is likewise wrong to the extent it argues that TPM's claim for violation of the Takings Clause is not cognizable because TPM contends that the Mint violated its own regulations. As the Federal Circuit held in *Del-Rio*, 146 F.3d at 1363:

> To the extent that the trial court meant to suggest that a takings claim does not lie if the government's action was legally flawed in some respect, we disagree. If the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct as wrongful in another forum.

Here, TPM contends that regardless of whether the government followed its own regulations (which it did not), the government took possession of TPM's property and converted it to public use by using it to manufacture new coins without just compensation to TPM, in violation of the Takings Clause. In other words, as TPM has alleged in Count 1, the government "redeemed" TPM's mutilated coins, and 31 C.F.R. § 100.11 therefore requires the government to pay TPM pursuant to the terms of the Redemption Program. But even if the government's conduct in taking and melting TPM's mutilated coins somehow was not considered "redemption" within the meaning of 31 C.F.R. §100.11, it was nevertheless a "taking" of property under the Takings Clause when the government not only took possession of the coins, but melted and converted them to public use by manufacturing new coins.

The primary case upon which the government relies, *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370-72 (Fed. Cir. 2005), recognized this distinction between a claim "that property was

taken *regardless* of whether the agency acted consistently with its statutory and regulatory mandate," which is a takings claim, as compared to a different scenario where "plaintiff claims it is entitled to prevail only *because* the agency acted in violation of statute or regulation." *See Lion Raisins*, 416 F.3d at 1369 (emphasis in original) (quoting from *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001)). In *Lion Raisins*, plaintiffs failed to state a takings claim because, as to one of their claims, plaintiffs' alleged property interest arose only by operation of a statutory/regulatory scheme. The facts underpinning that claim, unlike in the present case, did not deal with compensation for the physical taking of property. When the Federal Circuit stated in *Lion Raisins* that "a claim premised upon a regulatory violation does not state a claim for a taking," what the court was referring to (as made clear in the cited case, *Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001)) is a claim where the plaintiff's property interest arises only because of the operation of a government statute or regulation. This is totally different from the present case, where TPM has an undisputed property interest in tangible property, *i.e.*, its mutilated coins. In *Rith*, for example, the case was about the burden that government regulation (in that case, mining regulations) placed on plaintiffs' property (not the physical taking of tangible property), and the Federal Circuit (unsurprisingly) held that plaintiff could not challenge an agency's action in denying a permit as a takings claim in this Court. This is distinguishable from the facts of the present case, which raises allegations relating to the government's physical taking of tangible property.

Plaintiffs' other claim in *Lion Raisins*, for physical taking of storage bins, would have been a cognizable takings claim but for the existence of a "specific and comprehensive scheme for administrative and judicial review" that was "congressionally mandated," and through which money damages were available. *Lion Raisins*, 416 F.3d at 1371-72. This fact, and this fact alone, rendered plaintiffs' claim associated with the government's physical taking of their bins not cognizable under the Tucker Act, because Congress had evidenced specific intent to preempt Tucker Act jurisdiction

by creating a comprehensive review scheme.  *Id*. at 1370-73.  In the present case, of course, there is no such congressionally mandated specific and comprehensive scheme for review.  TPM's takings claim sits squarely within this Court's Tucker Act jurisdiction.

While the government argues that a takings claim "is separate from complaints regarding the wrongfulness of the Government's action," (Def.'s Br. at 33), a plaintiff alleging a taking is always alleging that the government did something wrong – by definition, the claim is that the government has wrongly failed to pay just compensation.  What the government appears to be pointing out – and which TPM does not contest – is that a takings claim must be premised on lawful (in other words, authorized) government action, as compared to action taken *ultra vires*.  *See, e.g., Del-Rio*, 146 F.3d at 1362.  As the Federal Circuit held in *Rith*, "a takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground." 247 F.3d at 1365; *see also Bailey v. United States*, 78 Fed. Cl. 239, 253 (2007) ("A claim in our court for just compensation due to a taking is not defeated merely because a property owner believes that the government action that allegedly took his property was for other reasons invalid—or even because he goes so far as to challenge its validity.").

TPM does not contend that the government's act of taking possession of its property was unauthorized.  This distinguishes the present case from, for example, *Acadia Technology, Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006), where the issue was whether the government had authority to seize property in the first place under the relevant statutory regime, not whether the government had to pay just compensation for its taking of property.  In *Acadia*, the government was alleged to have held the plaintiff's property for a period of time before returning it; plaintiff's property in *Acadia* was never alleged to have been converted to public use.  *Id*. at 1331-32.  This sharply distinguishes *Acadia* from the present case, in which TPM alleges that its property was melted down by the government to manufacture new coin roll (public use).

Likewise, when the Federal Circuit stated in dicta in *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993), that a claimant "must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act," the context of that quotation makes clear that a claimant is not required to concede that the government's action was correct or free from blame, but a claimant is required to acknowledge that the taking must be "authorized by Congress, expressly or by implication." 10 F.3d at 802 (quoting *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Cl. Ct. 1978)); *see Bailey*, 78 Fed. Cl. at 254 (observing that this quote constitutes dicta). Otherwise, the action "do[es] not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner." *Tabb Lakes*, 10 F.3d at 803 (quoting *Armjio v. United States*, 663 F.2d 90, 95 (Cl. Ct. 1981)). In the present case, it is undisputed that the government was authorized to take possession of TPM's coins pursuant to the Redemption Program, and that upon melting the coins, the government effectively had "title" to the melted coins. As the Federal Circuit held in *Del-Rio*, and quoted above, a takings claim is cognizable where a plaintiff seeks just compensation, even where the plaintiff may have a separate claim relating to whatever improprieties or wrongful government conduct led to the taking. 146 F.3d at 1363-64. Cases cited by the government in its motion to dismiss are not to the contrary. *See Acadia*, 458 F.3d at 1331; *Tabb Lakes*, 10 F.3d at 802.[6]

---

[6] Importantly, TPM's claim is one for a physical taking of tangible property, not a claim that government regulation has impaired a property interest, as in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005), which addressed a rent control statute that impacted the rent that oil companies were entitled to charge dealers leasing company-owned gas stations. Cases dealing with so called "regulatory takings" are fundamentally distinguishable from the present case. As the Supreme Court has cautioned: "This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 323. To the extent that the government has characterized TPM's claim as a "regulatory taking," such characterization is incorrect, and the government's reliance on regulatory takings cases is misplaced.

In *Bailey v. United States*, the Court of Federal Claims expressly rejected the government's attempt to broaden language from *Tabb Lakes* and *Rith* to suggest that a takings claim cannot lie where the plaintiff disputes the validity of government action, describing the government's argument in that case – which is identical to the argument raised in the government's brief in support of its motion to dismiss in the present case – as a statement of the law that is "not quite right."  70 Fed. Cl. at 254.  The *Bailey* court observed that the actual holdings of *Tabb Lakes* and *Rith* were "a far cry from the statement that the [government's] actions must always be assumed lawful."  *Id*. at 255.  Here, just as in *Bailey*, there is "no suggestion in [plaintiff's] pleadings" that the government acted "without the requisite jurisdiction or authority," and no basis for dismissal.  *See id*.  TPM has alleged that, having taken TPM's property pursuant to the government's authority under the Redemption Program, the government has failed to pay just compensation.  This is a classic takings claim cognizable in this Court.

The government criticizes TPM's allegations for failing to specifically acknowledge the Mint's final agency action.  (*See* Def's. Br. at 34).  This is curious, given that the government claims that this Court lacks jurisdiction to review the Mint's final agency action.   But despite the government's effort to inject confusion and distract from the standard of review operative at the motion to dismiss stage, TPM's takings claim is straightforward and uncomplicated: the government took possession of TPM's property and, by melting that property and using it for new coin roll, converted that property to public use, without paying just compensation to TPM.  All of this is adequately alleged in the SAC and sufficient to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 465 (2007) (observing that "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low").

TPM does not concede the lawfulness of the U.S. Mint's process and final determination, nor need it do so in order to state a takings claim. *See, e.g., Del-Rio*, 146 F.3d at 1363; *Bailey*, 78 Fed. Cl. at 254. If as the government suggests, the rules of pleading require a plaintiff to concede that the government's rationale for failure to pay just compensation was lawful, no plaintiff could ever state a takings claim. To the extent that the government believes it has a defense that excuses its failure to pay just compensation – *e.g.*, the government's belated determination and claim that all of TPM's property was counterfeit, after the property had already been converted to public use – the government may raise such defense in its answer, the parties will proceed to discovery, and the government may present its arguments to the fact-finder. *See, e.g.*, *L-3 Commc'ns*, 79 Fed. Cl. at 466 (observing that on a motion to dismiss "the issue is not whether a plaintiff is likely to prevail ultimately, but whether it . . . is entitled to offer evidence to support the claims") (internal quotation marks and brackets omitted). To the extent the government seeks to rely on the U.S. Mint's agency action to defend against TPM's takings claim, TPM may challenge the lawfulness of the agency action. *See, e.g.*, *Bailey*, 78 Fed. Cl. at 256 (holding that where "the government itself relies upon the legality of [an agency order] in defense of [plaintiff's] takings claim, then the plaintiff is entitled to the opportunity to challenge its lawfulness").

The government's unsupported factual allegations (1) that the taking constituted a seizure, and (2) that all of the property was counterfeit, may not properly be considered by this Court in assessing this motion to dismiss. This Court is bound to accept all well-pleaded factual allegations of the SAC as true for purposes of the present motion, including TPM's allegation that the coins were taken and converted to public use, and that they were genuine. *See, e.g.*, *Henke*, 60 F.3d at 797 (confirming that in deciding a motion to dismiss, "the court [is] obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor"). TPM has alleged that the coins were taken and converted to public use before any determination that the coins were counterfeit, and has alleged

38

that the coins were taken and melted not because they were counterfeit, but so that the government could use the melted coins to manufacture new coin roll.  (SAC ¶¶ 71-75, 81).  Accordingly, there was a complete and actionable taking as soon as the Mint melted and converted TPM's property without just compensation.  Because TPM has adequately alleged each and every element of a cognizable takings claim, the Court should deny the government's motion to dismiss Count 4 of the SAC.

## V.   THE COURT NEED NOT DISMISS PLAINTIFF'S EAJA CLAIM

TPM acknowledges that its claim pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 is contingent on this Court's determination that TPM is a "prevailing party" within the meaning of the statute.  (*See* SAC ¶ 113).  The SAC expressly contemplates that an application under the EAJA would be made only at the conclusion of the case, and TPM respectfully submits that dismissal of the EAJA claim at this stage of the proceedings is premature and unnecessary.  If granted, such dismissal should be without prejudice to TPM's ability to seek an award under the EAJA at the appropriate time.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss the SAC, in its entirety.

Respectfully submitted,

*/s/ Lee Vartan*
LEE VARTAN
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
T:  973.325.1500
F:  973.325.1501
lvartan@csglaw.com
*Attorneys for Plaintiff The Portland Mint*