1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    THE PORTLAND MINT,                    )

5              Plaintiff,                  ) Case No.

6         vs.                             ) 20-518C

7    THE UNITED STATES OF AMERICA,         )

8              Defendant.                  )

9

10

11

12                    Via Zoom Videoconference

13                 Tuesday, September 24, 2021

14                        10:30 a.m.

15                      Oral Argument

16

17

18

19          BEFORE:   THE HONORABLE MARIAN BLANK HORN

20

21

22

23

24

25   Reported and Transcribed by:   George Quade, CERT

The Portland Mint v. USA                                    9/24/2021

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4              LEE VARTAN, ESQ.

 5              Chiesa Shahinian & Giantomasi, P.C.

 6              One Boland Drive

 7              West Orange, New Jersey 07052

 8              (973) 530-2107

 9              (973) 530-2307 (fax)

10              lvartan@csglaw.com

11

12

13    ON BEHALF OF THE DEFENDANT:

14              ALISON S. VICKS, ESQ.

15              U.S. Department of Justice - Civil Division

16              P.O. Box 480

17              Ben Franklin Station

18              Washington, D.C. 20044

19              (202) 305-7573

20              (202) 307-0972 (fax)

21              alison.s.vicks@usdoj.gov

22

23    Also Present:  Apryl Whitaker, Esq., U.S. Mint

24

25
```

The Portland Mint v. USA                                    9/24/2021

```
 1                    P R O C E E D I N G S
 2                    -    -    -    -    -
 3            (Proceedings called to order at 10:34 a.m.)
 4            THE COURT:  So we're going to start the record
 5   now, and let me get notices of appearance from counsel of
 6   record.  And if you would, please, also introduce anybody
 7   that you have with you, whether they're visually present
 8   or by phone, so that we know who all is listening to the
 9   call and is available to us, if necessary.
10            Let's start with the Plaintiff, Mr. Vartan.
11            MR. VARTAN:  Sure.  Good morning, Your Honor.
12   Lee Vartan on behalf of the Plaintiff, the Portland Mint.
13   With me is my client via, I think audio only, Adam
14   Youngs.
15            THE COURT:  All right.  Mr. Vartan, Adam --
16   spell the last name for the reporter, please?
17            MR. VARTAN:  Y-o-u-n-g-s.
18            THE COURT:  All right.
19            Ms. Vicks?
20            MS. VICKS:  Yes.  Alison Vicks with the United
21   States Department of Justice for the United States.  And
22   with me telephonically is Apryl Whitaker of the U.S.
23   Mint.
24            THE COURT:  And the other folks who are either
25   on the phone or visual, at least two of them belong to
```

The Portland Mint v. USA                                    9/24/2021

1   me, who are my law clerks.  Jason, we've got more than
2   that on here.  Who are the other people, or does that
3   account for everybody?
4           JASON:  I believe everyone has been accounted
5   for.
6           THE REPORTER:  One of the phone lines is --
7   sorry.  One of the phone lines is my backup line, the
8   3809 number.
9           THE COURT:  Okay, super.  Thank you.  That
10  explains it.
11          All righty.  So we're here on -- initially on
12  Defendant's motion to dismiss, the Complainant, Portland
13  Mint, Case Number 20-518C.  And the very first thing I
14  want both parties to address when they start is really
15  what do we have here, because, yes, there are motion-to-
16  dismiss issues, but both parties seem to rely on
17  additional documents which would potentially convert this
18  to a motion for summary judgment.  And the issue, of
19  course, if we do that, is whether or not additional
20  briefing is necessary before we complete summary
21  judgment.
22          I think we can get a pretty good idea of where
23  we are and what the situation is, but there are certainly
24  quite a number of additional factual matters that have
25  been used by both sides that are not attached to

The Portland Mint v. USA                                        9/24/2021

```
 1    Plaintiff's complaint.  So -- nor necessarily to the
 2    motion to dismiss in ways that would not convert it to
 3    summary judgment.
 4            So I'd like to get your opinions, each of you,
 5    as you begin on that issue, and then we'll discuss each
 6    of the four counts separately and try to sort through
 7    what we have here.
 8            I will say this initially, having now delved as
 9    deeply as I can given what I've got into the information
10    that's been filed on ECF, the manner in which the Mint
11    handled this in terms of the timing, and as I went
12    through some drafting that we've done to try to get ready
13    for today, but by no means a final opinion, I tended to
14    call the Portland Mint the Plaintiff, use that
15    denomination, and the U.S. Mint when we talk about the
16    Government institution, because in some of the filings
17    and I think it's very easy to just call it the Mint, and
18    that really doesn't get us anywhere.
19            So I would ask you to be sure that if you are
20    representing Portland Mint, we call it Portland Mint, and
21    if you're representing the Defendant, the United States,
22    you call it the U.S. Mint, and that both of you use those
23    denominations when you talk about your opponent.
24            That being said, I believe that we should start
25    in a traditional manner with respect to the motion to
```

The Portland Mint v. USA                                    9/24/2021

1   dismiss, but I think we're going to have to be very

2   careful how we sort through what we've really got on our

3   hands here.  So we can sort it through, but we're going

4   to have to be careful how we do it.

5            So, Ms. Vicks, I would turn to you initially

6   and have you begin, and we'll go from there.

7            MS. VICKS:  Okay.  And did Your Honor want

8   me to start by talking about the documents, or just

9   begin --

10           THE COURT:  Well, talking about not so much the

11  documents but whether we have a situation which confers

12  this motion to dismiss to a motion for summary judgment.

13  I mean, that does involve the documents, obviously,

14  but --

15           MS. VICKS:  Yes, yes.

16           THE COURT:  -- the harder question is that next

17  step.

18           MS. VICKS:  Sure.

19           THE COURT:  And feel free by all of you to have

20  coffee or water or soda.  You'll see me drinking coffee

21  almost incessantly, so I don't want to do --

22           MR. VARTAN:  Thank you, Your Honor.

23           THE COURT:  -- anything you all can't do.  So,

24  all right.  Go ahead.

25           MR. VARTAN:  Thank you.

The Portland Mint v. USA                                    9/24/2021

1           MS. VICKS:  Thank you.  So in our motion to
2    dismiss, we relied on the U.S. Mint's denial letter that
3    was issued to the Portland Mint, and that was filed with
4    this Court and attached to a status conference.  And --
5           THE COURT:  Let me stop you right there.  Which
6    letter are you talking about?  Date, time, document?
7    Where was it submitted, in which document?
8           MS. VICKS:  Yes.  The document was submitted,
9    it's ECF Number 34-3, and it was submitted and attached
10   to one of the status reports -- hold on, now my computer
11   has decided to be a little slow -- one of the status
12   reports ordered by the Court when the first motion to
13   dismiss -- well, it was technically our second motion to
14   dismiss, but it was attached to our status report on the
15   Mint's administrative process after we brought it to the
16   Court's attention that the Portland -- excuse me, the
17   U.S. Mint process had concluded after we filed our motion
18   to dismiss.  And in December of 2020 a letter had been
19   sent to the Portland Mint telling them that their
20   submission had been denied.
21          THE COURT:  And this was their "informal
22   appeal" or whatever we're going to call it, since it
23   doesn't seem to be a formal appeal?
24          MS. VICKS:  So 34-3, ECF Number 34-3, is the
25   Mint's official determination of denial of redemption,

The Portland Mint v. USA                                    9/24/2021

1    and then also, as you know, there was an appeal process,

2    and that is -- was also attached to our status report,

3    Number 34.  And Portland Mint did appeal, and that is

4    attached as 34-4.  And we did not reference that in our

5    motion.

6              34-5 was also attached to our status

7    report.  That is Portland's discovery request during the

8    appeal.

9              And then 34-6 is the Mint's response to the

10   Portland's discovery request.

11             Also attached to our status report is 34-1,

12   Exhibit A, the Mint's standard operating procedure, and

13   34-2, the referral to OIG.

14             THE COURT:  I'm sorry, you said 34-1 was -- how

15   did you characterize it?

16             MS. VICKS:   The Mint's standard operating --

17             THE COURT:  Standard operating procedure.

18             MS. VICKS:  Standard operating for the

19   redemption program.

20             THE COURT:  So that raises a couple of

21   questions in terms of process.  It doesn't necessarily

22   make it wrong, but it does raise some questions.  And

23   that's, I think, the challenge here, is the sufficiency

24   of the process.  So what you're describing as a

25   discovery request isn't actually an appeal, and is there

The Portland Mint v. USA                                              9/24/2021

1    an appeal process when the U.S. Mint decides to do

2    nothing or to string out the process or whatever we're

3    talking about?

4            MS. VICKS:  Yes.  As described in those

5    documents, there is an appeal of the Mint's determination

6    on redeemability, and it includes -- as you'll see in the

7    Mint's denial letter, 34-3, it includes an invitation to

8    submit additional information if Portland Mint wanted to

9    do so, and then the rest of those documents will show

10   Portland submitting an appeal and attaching its complaint

11   in this Court, and it will show Portland requesting

12   discovery, which is not part of the Mint's appeal

13   process.  It's not a formal appeal process.

14           THE COURT:  So where is the Mint's appeal

15   process to be found in a regulatory guideline or whatever

16   sense it happens to be?

17           MS. VICKS:  Let me just pull up the standard

18   operating procedure.  Yes, it is in the standard

19   operating procedure.  It's Section 6.9.3.

20           THE COURT:  Part of the issue here, of course,

21   is we've had multiple complaints here.  And we're

22   operating, of course at this point, only on the second

23   amended complaint.  Those documents were all filed before

24   the second amended complaint.  How does that play into

25   what we're doing, or does it?

The Portland Mint v. USA                                    9/24/2021

```
 1          MS. VICKS:  Well, the second amended
 2   complaint references the Mint's determination, and it
 3   references the standard operating procedure.  And in my
 4   view those  -- they're incorporated into the complaint,
 5   and therefore valid for the Court to consider on a motion
 6   to dismiss.
 7          THE COURT:  So that would be all of ECF-34, or
 8   just part of it?
 9          MS. VICKS:  Well, for certain 34-3 and 34-1.  I
10   do believe that the Portland Mint also references the
11   appeal process, and I can verify that.  I don't think
12   they cited them, so if I do a control-F right now in the
13   document, I don't think they cited them by ECF number,
14   but they reference the determination and the appeal
15   process.
16          THE COURT:  So what about the other documents?
17   Are they part of our motion to dismiss or not?  And it
18   could be out of 34 or elsewhere.
19          MR. VARTAN:  Can I be heard on that, Your
20   Honor?
21          THE COURT:  You'll get your turn, Mr. Vartan.
22          MR. VARTAN:  Oh, sure.  Thank you, Your Honor.
23          MS. VICKS:  The other documents that -- I don't
24   think -- let's see.  I'm not sure we referenced any other
25   documents besides the denial letter, 34.3.
```

The Portland Mint v. USA                                    9/24/2021

```
1              THE COURT:  Yeah, which, of course, came, what,
2     two years later or something from when this all started?
3     I'm not exactly sure of the exact timing without looking
4     at the documents right now.  But that's part of the
5     problem, is some of what happened, happened only after
6     the complaint was filed -- the original.  So I'm not sure
7     that's significant, but it is certainly troublesome.
8              But so -- so if, in fact, some of these
9     documents upon which your motion relies, or if, in fact,
10    your motion doesn't have enough to dispose of this on a
11    motion to dismiss, what's your position on behalf of the
12    United States in terms of converting it to the case to a
13    motion for summary judgment?  And two questions there:
14    one, is it doable; two, would there be additional
15    submissions required?
16             MS. VICKS:  I believe it -- yes, looking at the
17    Plaintiff's second amended complaint and our response,
18    the motion to dismiss can be converted to a motion for
19    summary judgment because the issues presented in the
20    complaint can be resolved as a matter of law.
21             THE COURT:  Okay.
22             MS. VICKS:  And -- yeah.
23             THE COURT:  Would you feel that you briefed it
24    sufficiently for that, or would there be something else
25    that would need to come from the Government?
```

The Portland Mint v. USA                                    9/24/2021

1          MS. VICKS:  I don't believe there would be
2    anything else needed from the Government, Your Honor.
3          THE COURT:  Okay.  Let's switch over briefly to
4    Mr. Vartan on this same set of issues.  And I would --
5    and then we'll go to the actual counts in the complaint.
6    But, Mr. Vartan, the issue for you, I think, is much of
7    the same with the additional question as to whether if it
8    were to be converted to a motion for summary judgment,
9    whether you believe that you would want to file a cross-
10   motion or you would want in some way to add to the issues
11   on summary judgment.
12         MR. VARTAN:  Thank you, Your Honor.  So giving
13   it thought as you were speaking with the Government, I
14   would agree in part with the Government that this could
15   be resolved on summary judgment because I think there are
16   clear matters of law, especially with respect to Count 1.
17         THE COURT:  Well, it's a question of not just
18   respect to one or more counts.  You've got four counts in
19   your complaint.  I think the takings is a somewhat
20   different issue, but you've got three what you've termed
21   to be related counts.  I'm not sure they're as related as
22   you think, but that's a different issue.
23         The question is whether we take the whole case
24   as Ms. Vicks is suggesting, although I'm somewhat
25   surprised, Ms. Vicks, that you wouldn't want affidavits

The Portland Mint v. USA                                    9/24/2021

1    if it were to be converted to summary judgment.

2                But if you were, Mr. Vartan, to look at this as

3    a complete either motion-to-dismiss process or convert it

4    to summary judgment process, would you anticipate filing

5    a cross-motion for summary judgment, or how would you

6    want to handle it?

7                MR. VARTAN:  I would, Your Honor.  I would

8    anticipate that.  I certainly would want not voluminous

9    supplemental briefing, but I would want to be able to

10   supplement the record if we were going to convert this to

11   a Rule 56 motion.  But I do agree that -- and I

12   understand Your Honor saying that the entirety of the

13   motion would be converted, but I do think there are

14   particular counts in here that would be ripe for summary

15   judgment.

16               THE COURT:  I don't follow that comment.  Are

17   you saying there are counts that will be -- did you

18   misspeak and mean to say that there were counts that you

19   think would be ripe for a motion to dismiss and the rest

20   for summary judgment, or what were you trying to say?

21   I'm not sure.

22               MR. VARTAN:  I was saying that I think there

23   are certain counts that the Court -- I don't think the

24   entirety of this complaint could be resolved on a motion

25   for summary judgment, but I do think certain counts could

The Portland Mint v. USA                          9/24/2021

```
 1    be.

 2              THE COURT:  Which ones?

 3              MR. VARTAN:  I think Count 1 in particular

 4    could be.  And I say that in large measure because of

 5    another document that I just wanted to be sure that we

 6    have a complete record of all of the additional

 7    information that was either mostly used by the Goverment

 8    in its filings.  So looking at ECF Number 34, there's

 9    also in Exhibit B, Your Honor, the OIG report, that was

10    attached to the Government's status report, and that was

11    -- made explicit mention in the Government's moving

12    brief, also in reply, and then as I'm sure Your Honor

13    knows, in my response.

14              THE COURT:  Well, okay.  All right.

15              Let's go back to you, Ms. Vicks, and let you

16    present your motion-to-dismiss argument.  And -- but

17    before you do that, let me ask specifically about the

18    Office of Inspector General report that was just

19    mentioned by Mr. Vartan.

20              The document we have, I believe, is a heavily

21    redacted document.  And how would you propose we use

22    that, if we should use it, and also the timing of that

23    report?  That report was -- if I understand it, but it's

24    so redacted that I have a little trouble with it, but if

25    I understand it, it was a report that was developed not
```

The Portland Mint v. USA                                        9/24/2021

1   on this submission by the Plaintiff but on a programmatic

2   issue that arose before in which the Plaintiff

3   participated, but it wasn't the coins that are at issue

4   in this case.  Is that correct or incorrect?

5         MS. VICKS:  Sure, Your Honor.  I do want to

6   clarify first that 34-2, which is what Mr. Vartan just

7   referenced with the referral to OIG by the U.S. Mint

8   on -- after its determination that the Portland Mint's

9   submission was not legally redeemable, I believe what

10  Mr. --

11        THE COURT:  Is it -- let me just stop you.

12        MS. VICKS:  Sorry.

13        THE COURT:  Is it this submission or is it on

14  previous submissions?  Because Portland Mint participated

15  in the program a couple of times, or multiple times.  So

16  the OIG report, was that on the submission of coins that

17  we're talking about now, the ones that were either

18  totally -- well, they weren't totally melted, but the

19  ones that we're talking about that were tested and found

20  to be deficient by the regulatory standards, but -- or

21  was it on a previous set of submissions by a number of

22  parties, including Portland Mint, and then, of course,

23  leading to some legislative enactment?

24        MS. VICKS:  Yes, Your Honor.  So the Mint's

25  determination at 34-3 was on Portland Mint's -- excuse

The Portland Mint v. USA                                    9/24/2021

1    me, the U.S. Mint's determination at 34-3 was --

2              THE COURT:  Right.

3              MS. VICKS:  -- specifically about Portland

4    Mint's submission.

5              THE COURT:  That wasn't my question.  I'm

6    asking about the OIG report.

7              MS. VICKS:  And if -- and I just want to

8    clarify that the "ETES" referred that, which Mr. Vartan

9    had referenced at 34-2, which is not an OIG report; it's

10   an OIG referral.  So I'm just trying to follow --

11             THE COURT:  All right.  There was -- there is

12   an OIG report, and --

13             MS. VICKS:  Mm-hmm.

14             THE COURT:  -- if I -- there was some

15   suggestion in all of the filings that that had more to do

16   with previous activity under the program.

17             MS. VICKS:  Yes.  There is an OIG report that

18   is an audit of the Mint's redemption program.

19             THE COURT:  Right.  But that wasn't on this

20   submission, correct?

21             MS. VICKS:  I'm sorry, Your Honor?

22             THE COURT:  That was not on this submission

23   that's at issue that we're now having the motion

24   practice.

25             MS. VICKS:  That's correct.  It was -- the

The Portland Mint v. USA                                     9/24/2021

1    report is dated August 18th, 2020, and appears to mention

2    a submission that came in in August 2018, I believe.  But

3    it doesn't actually analyze or make a determination about

4    Portland Mint's submission that is at issue in this case.

5    It is background information concluding that the Mint

6    needed to have stronger controls for its redemption

7    program, and after this report came out, the Mint did

8    complete revising its regulations and reimplemented its

9    program.  Yes, and this report was part of the Mint's

10   process of revising its redemption program.

11            THE COURT:  Right.  Okay.

12            MS. VICKS:  Yes.

13            THE COURT:  I just want to be sure that we all

14   are on the same page because there was an intermingling

15   of some of this Office of Inspector General activity, and

16   that OIG report is not really, except as background,

17   relevant to the case.  So I just want that to be very,

18   very clear.

19            All right.

20            MR. VARTAN:  Your Honor, could I be heard on

21   that one point?

22            THE COURT:  No.  Let's just move on right now

23   and have a complete presentation by Ms. Vicks.

24            MR. VARTAN:  Sure.

25            THE COURT:  I've interrupted her enough, but I

1   wanted to get some basic stuff done so that we're all on

2   the same page.

3            As is normal, take some notes and you can

4   address it when it's your turn.

5            MR. VARTAN:  Very good.  Thank you, Your Honor.

6            THE COURT:  All right.  Ms. Vicks, you're on.

7   Go ahead and take your sip of water.  That's all right.

8   I don't want to interrupt that.  If you need it, take it.

9            MS. VICKS:  All right, thank you.  So good

10  morning and may it please the Court.  I'm going to

11  address the first count of Portland Mint's complaint for

12  a regulatory violation.  And this count can be resolved

13  on a motion to dismiss as a matter of law because

14  Portland Mint makes the contention throughout its

15  complaint that its coins were redeemed upon delivery and

16  that nothing else matters.

17           And all this Court has to do to resolve that

18  issue is actually look at the Mint's regulations at 31

19  CFR 100.1 and see if the Mint followed its regulatory

20  program when it denied redemption of the Portland Mint's

21  submission.

22           THE COURT:  All right.  Let's back up a moment

23  here.  Everything that has been briefed is dependent on

24  that regulation at 31 CFR 100.11.  And is there -- or

25  what is the money-mandating authority for jurisdiction,

1    and is there any statutory background behind 31 CFR

2    100.11?

3           MS. VICKS:  Yes.  So 31 CFR 100.11 was

4    promulgated under the Secretary's authority at 31 USC

5    5120, which authorizes the Secretary to melt mutilated

6    coins.

7           THE COURT:  Okay.

8           MS. VICKS:  To melt obsoleted or worn United

9    States coins withdrawn from circulation.  It does not --

10   the statute itself does not say anything about payment

11   for any such coins that are melted.  The regulation -- so

12   that doesn't have statutory backing for payments of

13   money, but the regulation does contemplate that coins

14   that are submitted and found to be legally redeemable as

15   determined by the Mint in its program will receive

16   payment at the rate set forward in Section (d) of the

17   regulation.

18          So a plaintiff who comes to the Court and has

19   -- you know, potentially has a determination from the

20   Mint that its coins are legally redeemable but has not

21   received payment, may have a claim under this regulation

22   for money damages.

23          THE COURT:  All right.  And a lot of dancing

24   around in some of the briefs without ever kind of

25   defining "redeem" or "redeemed."  That's obviously

The Portland Mint v. USA                                    9/24/2021

1    critical to our consideration here.  Is there a

2    definition of redeem or redeemed anywhere that you would

3    point to?  Is it in other regulations?  Is there a

4    definitional part or a preamble that would give us that

5    to the regulation, or are we getting it from case law,

6    and, if so, from which case law?  Because that is totally

7    critical to what we're doing here as to how we define

8    redeem and not lose -- and it's either redeem or

9    redeemed, but how we not lose sight of the definition of

10   "redeem" because there's a very different perception

11   between Defendant and Plaintiff.  Submission is not the

12   same thing as redeemed, it seems to me.  But that's what

13   the complaint kind of entangles.

14           So tell me where you're getting your definition

15   other than a reading of the regulation, which is a

16   legitimate way to go, and that's certainly one of the

17   ways that I think we might get there, but is there any

18   definitional assistance we can get for the concept of

19   "redeemed"?

20           MS. VICKS:  I do believe that the main

21   assistance we'll get is from the regulation itself, which

22   is, you know, titled Request for Examination of Bent or

23   Partial Coin for Partial Redemption -- excuse me, for

24   Possible Redemption.  And then it sets forth the program

25   by which the Mint will accept submissions and the

The Portland Mint v. USA                                    9/24/2021

1    conditions under which it will actually pay for those
2    submissions.
3              I would have to -- yes, I would say that, you
4    know, only after the U.S. Mint determines that the coins
5    submitted are genuine legal tender and suitable for
6    redemption can they be exchanged for payment, or in other
7    words redeemed, in the manner and at the rate set forth
8    in the regulations.
9              I would have to do a little bit of research to
10   see if "redeem" is -- is -- excuse me, defined anywhere
11   else, but I do believe that the rates set forth in the --
12   in Section D are an approximation of what -- are a one-
13   to-one approximation of genuine currency.  So, for
14   instance, a pound of one-cent coins, as mentioned in
15   D(1)(i), is $1.4585 per pound.  I believe that's an
16   estimation of what a pound of one-cent coins is worth,
17   and that's where the -- so it's essentially a one-for-one
18   exchange program.
19             We do mention in our -- or we do reference in
20   our motion to dismiss, which was also referenced in the
21   complaint, an article where a Mint employee was
22   interviewed and said these programs are essentially one-
23   for-one exchange programs of legal tender -- purportedly
24   legal tender as verified for valid legal tender.
25             We -- if this were converted to a motion for

The Portland Mint v. USA                                    9/24/2021

1    summary judgment, that may be something we would provide

2    additional briefing or an affidavit on, but I think it's

3    pretty clearly set forth in the regulations that

4    redemption means at these rates after the Mint has

5    examined a submission and determined that they are

6    legally redeemable.

7              THE COURT:  Okay.  So you're saying there's not

8    a preamble or definitional section that gives us that.

9              MS. VICKS:  Not that I am aware of at this

10   time.  But I would want to actually look at the

11   regulations again to confirm.

12             THE COURT:  Okay.  We have looked at it, but --

13   we've searched it.  All right, go ahead.

14             MS. VICKS:  Oh, sure.  So, you know, the

15   Plaintiff's allegation of a regulatory violation is

16   premised on their allegation that they're basically --

17   their delivery of coins was redeemed as soon as it was

18   delivered.  And in order to resolve that count, all this

19   Court needs to do is look at the regulations themselves

20   and interpret them and decide whether Portland Mint has

21   stated a claim and has identified a regulatory violation.

22             THE COURT:  Okay.  Look at the regulation with

23   me if you would for a moment because the regulation, like

24   many obviously, could be more clear.  It looks as if, if

25   you look at (c)(6), it says no redemption will be made

The Portland Mint v. USA                                    9/24/2021

1    when -- and then you've got one, two, and three.  And my
2    question to you is which of those was the determination
3    with respect to the Plaintiff's coinage that made it
4    ineligible for payment according to the U.S. Mint?
5               MS. VICKS:  It was all three of those listed in
6    the Mint's determination letter.
7               THE COURT:  So you're saying it was an
8    intentional mutilation?
9               MS. VICKS:  Well, the determination letter
10   specifically says --
11              THE COURT:  Or was it an attempt -- or was it
12   an attempt to defraud out of number one?  There are two
13   options there.
14              MS. VICKS:  Yes.  So as you know, in the
15   determination letter, the Mint determined that Portland
16   Mint's -- the U.S. Mint determined that Portland Mint's
17   submission contained counterfeit coins, and, therefore,
18   they determined that no redemption would be made under 34
19   CFR 100.11(c)(6)(I), in an attempt to defraud the United
20   States, and they also reference (ii) and (iii) if it
21   appears to be part of or intended to further criminal
22   activity, or a submission contains a material
23   misrepresentation of fact.
24              THE COURT:  Okay.  So the mutilation was not
25   part of it, the intentional mutilation.  Is that the one

The Portland Mint v. USA                                        9/24/2021

1    that drops out?

2              MS. VICKS:  No, that's in there.  It says a

3    submission or any portion of a submission demonstrates a

4    pattern of intentional mutilation or an attempt fraud the

5    United States.

6              THE COURT:  No.  I'm not saying is it in the

7    regulation.  I'm asking in the --

8              MS. VICKS:  No, it's in the letter, Your Honor.

9    It is in the letter, Your Honor.

10             THE COURT:  So they just did boilerplate and

11   threw everything in?  Is there any evidence in the case

12   that we have in front of us so far that there was

13   intentional mutilation?

14             MS. VICKS:  There is nothing that has been

15   presented about intentional mutilation.

16             THE COURT:  Okay.  All right.  I just want to

17   be absolutely clear here because we -- there's been a lot

18   of sort of fuzzy back-and-forth.  So -- particularly in

19   the words that the Plaintiff has used in terms of sort of

20   big generic statements.  I think we need to bring this

21   down, and Mr. Vartan will have an opportunity to explain

22   exactly what he's alleging happened here.  So, all right,

23   go ahead, Ms. Vicks.

24             MS. VICKS:  So if this Court were to actually

25   interpret the regulations at issue and the Mint's

The Portland Mint v. USA                                                            9/24/2021

1   determination letter against what Portland has actually
2   alleged, it would find that -- it would determine that
3   Portland has not stated a claim for a violation of the
4   regulations.
5            THE COURT:  Okay.  Now, who signed the
6   determination?  It says in the regulation it can be the
7   director of the United States Mint or a designee.  Was it
8   done by an authorized designee?
9            MS. VICKS:  Yes, Your Honor.  It was signed by
10  -- let me pull it up.  I just had it right here.  It was
11  signed by Richard Robidoux -- Robidoux, I think that's
12  how you say it, Division Chief of Engineering.  We did
13  not attach to that letter or to anything submitted in
14  this Court that he is an authorized designee of the
15  director of the Mint.  David Croft is the director of the
16  Mint.
17           THE COURT:  All right.  I don't know that this
18  is an issue or not, but I noticed that it was named with
19  an unusual title for that kind of decision-making, but it
20  could be perfectly appropriate, and I just thought I
21  would ask.
22           MS. VICKS:  I understand, Your Honor.
23           THE COURT:  But perhaps you can get us
24  something that just indicates that that is not a problem.
25           MS. VICKS:  Yes, we could do that.

1          THE COURT:  Because the director -- the

2    engineering title is not a -- is not typical of that kind

3    of decision-making, but it could be proper.  I don't know

4    the Mint well enough to know.  All right, go ahead.

5          MS. VICKS:  I will note that the denial of

6    Portland Mint's appeal of the final determination was

7    signed by David Croft, who is the director of the Mint.

8          THE COURT:  I saw that.  That's one of the

9    reasons I raised it.  I saw that disparity.  Go ahead.

10          MS. VICKS:  Sure.  So under an actual

11    interpretation of the regulations, which provide that

12    coins will be submitted for examination and possible

13    redemption, that a person who submits coins to the

14    program agrees to be governed by that program, and that

15    the Mint may sample submissions for authenticity, and the

16    Mint may deny redemption.

17          The Court will see that the Mint followed its

18    process as set forth in the regulations and that the

19    regulations do not provide that redemption happens

20    automatically upon delivery or any other physical act.

21          So Portland's allegation that its coins are

22    redeemed basically as soon as they were turned over to

23    the Mint fails under a straightforward reading of the

24    regulations.

25          The denial letter, which was incorporated into

The Portland Mint v. USA                                   9/24/2021

1    the Plaintiff's complaint, as we mentioned, makes clear

2    that the coins were denied redemption pursuant to the

3    Mint's regulations, and after the Mint followed its

4    process as set forth in the regulations.

5         You know, this Court does have the power to

6    look at these regulations and interpret them, and

7    Portland's claim that throughout its complaint it alleges

8    that its coins were redeemed upon delivery, acceptance,

9    or some other physical act, which is just simply not

10   supported by any interpretation of the regulations which

11   set forth how coins are actually redeemed.  So Portland

12   has failed to identify a regulatory violation as it must

13   in order to state a claim for a regulatory violation in

14   this Court, and its first count must be dismissed.

15        If Your Honor would like me to continue to

16   another count or has additional questions, I will just

17   note that Portland appears to largely ignore the Mint's

18   determination and to basically impugn it or call it into

19   question, but that the determination is properly before

20   the Court because it was incorporated into the

21   Plaintiff's complaint.

22        And the Court can consider it and it can

23   consider also the standard operating procedure, which

24   was, I think, also mentioned in the complaint but at

25   least in their response brief.

The Portland Mint v. USA                                    9/24/2021

1            THE COURT:  Are you moving on to the contract
2    claim?
3            MS. VICKS:  Yes, unless Your Honor has any
4    questions.
5            THE COURT:  No, go ahead.  Go ahead.
6            MS. VICKS:  Okay.  Portland's contract claim
7    should be dismissed because it is also entirely governed
8    by the regulations at issue here, as Portland even admits
9    in its complaint and its response.
10           So setting aside whether it's an implied-in-law
11   or an implied-in-fact contract, and just going with, you
12   know, he's attempted to plead an implied-in-fact
13   contract, the claim must be dismissed because it fails to
14   state a claim.  And Portland has failed to establish all
15   of the elements of an implied-in-fact contract.
16           Specifically, for its implied contract claim,
17   Portland relies on the Mint's regulations as evidence of
18   the Government's intent to contract -- excuse me, intent
19   to contract.  For instance, in the second amended
20   complaint at Paragraphs 91 to 92, Portland alleges that
21   mutual intent to contract was demonstrated by Portland's
22   acceptance into the redemption program and that the
23   essential terms of the contract were found in the Mint's
24   regulations.
25           So the Supreme Court has held that there is a

The Portland Mint v. USA                                      9/24/2021

1    presumption against laws creating contractual rights

2    absent clear indication from the legislature that the law

3    is intended to create a contract.  So whether this is,

4    you know, construed as a contract implied in law or a

5    contract implied in fact, Portland admits that the

6    alleged contract is governed by the terms of the

7    regulations.

8              So in instances such as --

9              THE COURT:  Well, let me interrupt here.  Would

10   a contract ever come into place under this regulatory

11   framework?

12             MS. VICKS:  No.  The regulations do not show an

13   intent to form a contract.  It -- the regulations simply

14   set forth a program by which participants can submit

15   coins as a request for examination and possible

16   redemption.  The Mint has -- the regulations don't set

17   forth authority to contract for these coins at all.  And,

18   you know, there's nothing in the Mint's regulations that

19   speak of creating a contract.  There's nothing in the

20   statute about melting worn or obsolete coins that speaks

21   about creating a contract.

22             And the Constitution, which is relevant here to

23   the extent that Article 1, Section 8, you know, gives

24   Congress the power to make coinage, and Congress has

25   delegated that power to the Mint, certainly doesn't speak

1    of contracting for exchange of currency in this type of

2    way.

3            THE COURT:  So, of course, this Court has only

4    one of the two forms of implied contract --

5            MS. VICKS:  Yes.

6            THE COURT:  -- available to it.  Is there any

7    conceivable way in which an implied contract could come

8    into being in this Court under these circumstances?

9            MS. VICKS:  No, Your Honor, because the Court

10   -- because the Plaintiff cannot demonstrate mutuality of

11   intent to contract.  Instead, all Portland has alleged is

12   that the various parties involved, the Plaintiff and the

13   Mint employees, were undertaking roles pursuant to their

14   -- pursuant to the regulations.  For instance, Portland

15   was submitting coins for examination, and the Mint

16   employees were performing their role to direct delivery,

17   which is actually set forth in the regulation at Section

18   (e), and to receive the delivery.

19           The regs -- the regulations certainly don't

20   provide for the execution of a written contract on behalf

21   of the United States.  And -- I'm sorry, I just lost my

22   place for a second.  All that Portland's allegations show

23   are that, you know, Portland Mint voluntarily applied to

24   participate in this program; it voluntarily brought a

25   submission to be examined; Mint employees, in their role

1   in this program, accepted that; and the Mint processed

2   Portland Mint's submission according to its regulations.

3            Portland's allegations also show that it knew

4   its submission would be, you know, subject to a melt upon

5   delivery.  And so --

6            THE COURT:  And where is that?  What -- what --

7   I mean, we've got some very strange timelines in here.

8   And a quick melt, a long process, maybe on a portion of

9   it, not even clear how much of a portion was retained;

10  whether there's anything retained at this point.  I'm not

11  saying that necessarily justifies Plaintiff's complaint,

12  but is it -- where does it say in the regulations or

13  elsewhere or in their operating procedures or in some

14  document that the Plaintiff would have known about that

15  they would, upon submission, quickly be melted down and a

16  portion kept or not?  Where is that process laid out?

17           MS. VICKS:  The regulations provide that the

18  Mint may sample submissions for authenticity.  And

19  Plaintiff's own complaint says that Mr. Youngs was

20  wanting to accompany his delivery and witness the melt,

21  which took place over two days.  So however it was set

22  forth to the Plaintiff, he knew that these -- that a

23  large portion of his submission -- or that his submission

24  would be subject to a melt.

25           He also had the regulations, could have

1    surmised that the Mint would take samples in order to

2    ensure the authenticity of the submission.

3            THE COURT:  There were a couple of mental leaps

4    in there.  You said he wanted to accompany his submission

5    delivery.  Where is that?

6            MS. VICKS:  That is in his complaint, Your

7    Honor.

8            THE COURT:  Okay.

9            MS. VICKS:  He wanted to witness the melt, yes.

10           THE COURT:  Okay.  But how about did he witness

11   the melt?  Do we know that, or we just know that he

12   wanted --

13           MS. VICKS:  We -- if you construe that

14   allegation as true, Your Honor, he did not witness the

15   melt.

16           THE COURT:  I'm not sure that's critical, but I

17   think -- and he did not know what was withheld, correct?

18   And, again, I'm not sure that's critical, but there are a

19   couple of mental leaps from the complaint to knowing

20   exactly what occurred at the time.  And one of the

21   allegations in the complaint, I believe, is that the

22   Plaintiff essentially thought they ought to be allowed to

23   also sample and test a part of the submission if the Mint

24   was going to be -- or wanted to, and if not, was entitled

25   to.

The Portland Mint v. USA                                    9/24/2021

1           Is that typical or is that allowed for in the
2     procedures, or does that typically happen, or obviously
3     they wanted to do it once there was found to be
4     counterfeit issues?  But how is that usually handled?  Is
5     it only a one-way testing by the U.S. Mint, or is there
6     an opportunity for a counter-test for the Plaintiff?
7           MS. VICKS:  My answer to that, Your Honor, is
8     the Plaintiff is allowed to do whatever he wants with his
9     mutilated coins prior to submitting them.  So he can
10    subject them to tests and bring those testing results and
11    have those testing results with him.  The testing that is
12    provided for in the regulation --
13          THE COURT:  You're saying it would -- that
14    would all be prior, in other words?
15          MS. VICKS:  Yeah, if the Plaintiff chose to do
16    that, yes.
17          THE COURT:  Okay.  But there's nothing that --
18    in the operating procedures or in something that is sort
19    of standard that allows for a simultaneous testing.  And
20    it seems to be one of the things Plaintiff wanted at some
21    point.  I'm not sure they were entitled to it, but your
22    position would be on behalf of the Mint that it would
23    have had to have occurred before submission.
24          MS. VICKS:  Yes, and that the regulations
25    provide that the Mint will test and sample for

```
 1     authenticity.  You are correct that in the course of
 2     proceedings before this Court, and as the Mint was
 3     finishing its administrative process, Portland Mint
 4     requested discovery, and that was denied because the
 5     Mint's appeal process does not include discovery, but the
 6     Mint does still have samples.
 7               THE COURT:  They do still currently have
 8     samples?
 9               MS. VICKS:  I -- last I heard, yes, they do.
10               THE COURT:  Can you confirm that with your
11     agency person?
12               MS. VICKS:  Yes, but I don't think that given
13     what the complaint has alleged here that the ability of
14     the Plaintiff to sample is relevant to disposition of the
15     case at this point.
16               THE COURT:  Do they have samples, yes or no?
17               MS. VICKS:  Well, Agency counsel --
18               MS. WHITAKER:  This is Ms. Whitaker, Agency
19     counsel for the Mint.  I can confirm that we have
20     retained the samples.
21               THE COURT:  Okay.  You don't know or you don't
22     want to confirm?
23               MS. VICKS:  No, she did confirm, Your Honor.
24               MS. WHITAKER:  I can confirm.
25               THE COURT:  I'm sorry, Ms. Whitaker?
```

The Portland Mint v. USA                                    9/24/2021

1          MS. WHITAKER:  Yes, I can affirmatively confirm
2     that we have retained the samples.
3          THE COURT:  You do have samples, yes -- yes or
4     no?  Let's be clear here.  I don't like the hedging.
5          MS. WHITAKER:  Yes, Your Honor.
6          THE COURT:  All right.  Okay.  All right.
7          Go ahead, Ms. Vicks.
8          MS. VICKS:  Sure.  So Portland Mint urges the
9     Court to discern contractual intent from the word
10     "redeem" and the actions that the Portland Mint and the
11     U.S. Mint undertook, but this Court must interpret the
12     language in the context in which it is written, and
13     nothing in the regulation speaks of a contract, nor do
14     the regulations provide that redemption happens or a
15     contract is formed based on delivery, acceptance, or any
16     other physical act regarding the coins.
17          Rather, redemption is a legal determination
18     made by the Mint after application of its regulations at
19     31 CFR 100.11.  As this Court is likely very well aware,
20     the Supreme Court has said that a court should not infer
21     a contractual undertaking without adequate expression of
22     an actual intent of the state to bind itself, and that
23     has to be found in the regulations or a statute.
24          And the Portland Mint argues that intent to
25     contract and offer and acceptance are evident from the

The Portland Mint v. USA                                            9/24/2021

1     actions of the parties, but as we have pointed out, the
2     language and structure of the regulations do not reflect
3     a bargain for quid pro quo or any negotiations or even
4     that the Mint has any negotiating power.  The redemption
5     rate is not framed as a contractual obligation of the
6     Mint but rather as a payment to those whose submissions
7     comply with all of the conditions of the regulation.
8              So a proper interpretation of the regulations
9     here show that they do not demonstrate the Government's
10    clear intent to confer best bid contractual rights on
11    persons who submit coins for examination and possible
12    redemption by the Mint.  Therefore, the complaint does
13    not plead facts sufficient to establish the Government's
14    intent to contract and, therefore, fails to state a
15    plausible claim for breach of contract and must be
16    dismissed.
17             The complaint --
18             THE COURT:  Let me stop you -- let me stop you
19    for just a moment if you wouldn't mind.
20             MS. VICKS:  Yes.
21             THE COURT:  I'll be right back.
22             (Brief pause in the proceedings.)
23             THE COURT:  Sorry about that.  I was just
24    trying to quiet some noise outside, but I didn't succeed.
25             All right.  Go ahead, Ms. Vicks.  You were --

 1   you were finishing up, I think, on the contract issues.

 2              MS. VICKS:  Yes.  I just wanted to briefly

 3   address the issue of authority to contract on behalf of

 4   Mr. Anthony Holmes, Jr.  The most salient point here is

 5   that the regulation says the director of the Mint or a

 6   designee with final authority with respect to all aspects

 7   of redemption of bent or partial coin commissions.  The

 8   director of the Mint is appointed by the President

 9   pursuant to 31 USC 304, and -- which provides that the

10   director shall carry out duties and powers proscribed by

11   the Secretary of the Treasury.

12              There is -- so in the first instance, the

13   authority of Mr. Holmes and other Mint employees to

14   contract was knowable by reading the regulations, and the

15   -- you know, the regulations do not support a reading

16   that they did have such contracting authority.

17              To our knowledge, Portland Mint is not alleging

18   that Mr. Holmes was acting ultra vires but under his

19   authority, and so Portland must establish that Mr. Holmes

20   had actual authority; otherwise, its claims fail.

21              And for a case on that point that the absence

22   of authority is dispositive, I have Doe. v. United

23   States, which is a Federal Circuit case.  The cite is 100

24   F.3d 1576.  All Plaintiff here has alleged is apparent

25   authority, and the Federal Circuit has also held that

The Portland Mint v. USA                                    9/24/2021

1    apparent authority will not suffice to hold the

2    Government bound by the agents of its -- acts of its

3    agents.

4             So Portland's allegations show that it appeared

5    to the Portland Mint that Mr. Holmes had contracting

6    authority because he communicated with the Portland Mint

7    about delivery of its submission.  He received the

8    delivery and he apparently told the Portland Mint the

9    schedule for when payments for redemption usually issue.

10            Portland's subjective belief that Mr. Holmes

11   had authority to contract is irrelevant.  The Supreme

12   Court has held that people dealing with a government

13   agent are presumed to know his exclusive authority for it

14   is public law.

15            So in addition to failing to establish

16   mutuality of intent and offer and acceptance, or that the

17   regulations evidence an intent to contract, the Portland

18   Mint has failed to adequately allege that Mr. Holmes had

19   actual authority to contract, rather than just apparent

20   authority.  For that reason as well, its contract claim

21   must be dismissed.

22            THE COURT:  Okay.  So that, in your view, takes

23   care of Counts 2 and 3?

24            MS. VICKS:  Yes, because if there is no

25   contract established, there is no breach of the duty of

The Portland Mint v. USA                                    9/24/2021

 1    good faith and fair dealing.

 2            THE COURT:  Okay.  So the duty of good faith

 3    and fair dealing is dependent upon there being a

 4    contract.  Is that what you're saying?

 5            MS. VICKS:  Yes, Your Honor, that a breach for

 6    the implied duty of good faith and fair dealing depends

 7    on the existence of a valid contract.  And, here, the

 8    Portland Mint has not established the existence of a

 9    valid contract.

10            THE COURT:  Okay.  And what's your authority

11    for that?

12            MS. VICKS:  Centex Corp. v. United States, 395

13    F.3d 1283, pincite 1304, Federal Circuit in 2005.

14            THE COURT:  Okay.  Let's talk about takings.

15            MS. VICKS:  Yes, Your Honor.  Portland's

16    takings claim should be dismissed because it is also

17    wholly governed by the regulations at issue in this case.

18            Although before I get to that, and actually

19    pursuant to the regulations, Portland admits that it

20    voluntarily delivered its coins to the foundry.  And it

21    is axiomatic that a voluntary transfer of property cannot

22    -- sorry, a voluntary transfer of property cannot

23    constitute a taking.

24            The Portland Mint voluntarily delivered their

25    coins to the U.S. Mint.  There was no required

1    acquiescence, which the Supreme Court has held is at the

2    heart of a takings case.  The Mint -- the U.S. Mint did

3    not require the Portland Mint to participate in its

4    redemption program, nor did the U.S. Mint require the

5    Portland Mint to submit any coins.

6          So on the face of Plaintiff's complaint alone

7    where he admits that he aggregates coins as a business

8    opportunity and submits them to the Mint, this Court

9    could dispose of the takings claim because he voluntarily

10   transferred his property.

11         THE COURT:  What about in a takings claim, does

12   the Plaintiff have to admit the legitimacy of the

13   Government's actions in some way or not?

14         MS. VICKS:  Yes, Your Honor.  A takings claim

15   must be premised on lawful government action, and, here,

16   the Government's lawful action was to receive the

17   submission of Portland's coins and process it through its

18   program, and it determined as a legal matter that the

19   submission was not redeemable.

20         So to the extent that -- you know, I could read

21   Portland's complaint as saying that the Mint lawfully had

22   possession of its coins, and then at some point later was

23   converted to a taking.  The Court would have to ask the

24   question of first why did the Mint lawfully have

25   Portland's submission, and it was because, A, the Mint --

1    it was because the Portland Mint voluntarily submitted

2    those coins to the U.S. Mint, and then the Court would

3    have to ask why did the U.S. Mint lawfully keep the

4    coins.  And the U.S. Mint lawfully kept the coins because

5    it determined, pursuant to its regulations, that the

6    coins were legally nonredeemable and, moreover, were

7    counterfeit and could not be returned or paid for because

8    they are contraband and subject to forfeiture.

9              THE COURT:  Okay.  And the subject of

10   forfeiture is outlined where?

11             MS. VICKS:  The forfeiture is mentioned in 18

12   USC 492, which provides that counterfeit coins are

13   contraband, per se, and are forfeited.

14             THE COURT:  For -- did you say 14 or 492?

15             MS. VICKS:  I -- I meant to say 492.  So 18 USC

16   492.

17             THE COURT:  Okay.

18             MS. VICKS:  And a final point that Portland

19   bases its takings claim on a regulatory violation.  In

20   other words, it bases its taking claim on the U.S. Mint's

21   failure to pay the rates established by the regulations.

22   A claim premised on a regulatory violation does not state

23   a claim for a taking.  If this Court were to entertain a

24   claim for a regulatory violation, it can do so adequately

25   under Count 1 and does not need to do so under a takings

1   claim.

2            And, moreover, you know, there's ample

3   authority that a takings claim premised on allegations

4   that the Government agency violated statute or -- excuse

5   me, statute or regulations is not a proper basis on which

6   to bring a takings claim.  And just one cite for that is

7   Acadia Tech at 458 F.3d 1331.

8            THE COURT:  Okay.  Anything else, Ms. Vicks?

9            MS. VICKS:  Unless Your Honor has any

10   questions, not at this time.

11            THE COURT:  I'm good at the moment.  Thank you.

12            Mr. Vartan, do you want a moment to collect

13   your thoughts, and we've been at this for a bit?  Does

14   everybody want about a five-minute break to take care of

15   necessary, and, let's say, a ten-minute break and then

16   we'll be back and have you come up, give you a chance to

17   organize your thoughts.

18            I think you've heard a lot that was developed,

19   the Defendant's motion to dismiss, and so I want to be

20   sure that you have an opportunity to digest that because

21   it does challenge a lot of the assertions you've made in

22   your complaint.

23            So we'll take a ten-minute break.  I believe it

24   is 11:39, so 11:40.  We'll be back at 11:50.

25            MR. VARTAN:  Thank you, Judge.

The Portland Mint v. USA                                    9/24/2021

```
1              THE COURT:  Thank you.

2              MS. VICKS:  Thank you, Your Honor.

3              (Court in recess.)

4              THE COURT:  All right.  It looks like the

5    critical people are back.  So, Mr. Vartan, you're up.

6    Let's take these items count by count, as Ms. Vicks did,

7    and try to join the issues.

8              Let's start with discussion of the regulations,

9    and particularly the concept of redeem versus submitted,

10   and the authority of the agency to do the testing and

11   then their conclusions and how they arrived at it.  I

12   will admit that that prevarication on whether or not

13   there was still coins was unfortunate.  Again, I'm not

14   sure it's significant for our purposes, but it is

15   unfortunate that the agency -- and that, Ms. Vicks, you

16   tried to help her out, which was not a good idea if you

17   knew the answer, and the agency person certainly was not

18   being forthright.

19             So with that, as I say, it may be ancillary to

20   where we have to go here, but it does support the issues

21   of how the agency behaved throughout this process in

22   terms of the timeline and the time lag, particularly.

23             But, Mr. Vartan, your opportunity to respond to

24   what Ms. Vicks has put on the table both in her briefs

25   and now at the oral argument.
```

The Portland Mint v. USA                                    9/24/2021

1            MR. VARTAN:  Thank you, Judge.

2            THE COURT:  She amplified some, I think.  I've

3      joined the issues, I think, better than they've been

4      joined previously by both parties, but go ahead.

5            MR. VARTAN:  Thank you, Your Honor.  So I'll

6      start with Count 1 and the definition of "redeem."  I

7      think Your Honor said -- I took a note -- that the

8      definition is totally critical here, and certainly I

9      would agree with that characterization.  And it sounds

10     like I did the same thing as you, spending a lot of time

11     trying to figure out if "redeem" was elsewhere defined

12     either in statute or regulation.  I came up short.

13           And I think the key issue here, at least from

14     my perspective, is that there is no definition of

15     "redeem" standing here today or being here together on

16     Zoom that anyone can point to with any definiteness.

17           And so given that that is the case, and given

18     that we're on a motion to dismiss, and Plaintiff's well-

19     pled allegations need to be accepted as true, and

20     certainly there's been no discovery in this case, I would

21     submit that we cannot, standing here today, determine the

22     definition of "redeem."  We certainly can't define it the

23     way the Government has defined it.  And I think Your

24     Honor did -- was looking to get an actual definition from

25     Ms. Vicks as to how the Government defines "redeem."  And

1    so far today, and also in the Government's papers, there

2    is no definition.

3           Now, we've proffered a definition that we

4    believe is right, meaning --

5           THE COURT:  Well, let's stop -- let's stop

6    right a moment.  To the extent that there's a definition,

7    and I didn't say otherwise, it is in the regulation and

8    the steps that can be taken in the regulation, it would

9    have been easier if there was an actual definition.  But

10   not being the case, we look at the regulation and

11   particularly, you know, 21 CFR 100.11, and particularly

12   the redemption process part of that regulation, and more

13   particularly, as I had a conversation with Ms. Vicks

14   during the oral argument as well, Subpart (c)(6), which

15   does give you a definition of when it is not redeemed as

16   opposed to perhaps when it is redeemed, and I'm not sure

17   you can say there's nothing in here that establishes the

18   process of redemption and, therefore, when it's not

19   redeemed.

20          So how do you deal with what is clearly in the

21   regulation as to how a submission of coinage is not

22   redeemed?

23          MR. VARTAN:  Well, because ultimately the -- it

24   still gets to the heart of the definition of

25   "redemption," and what we've alleged to have gone on

The Portland Mint v. USA                                    9/24/2021

1    here, Your Honor, which is that the coins were actually
2    redeemed, meaning -- redemption can only mean, at least
3    from Plaintiff's perspective -- and I think that this is
4    a question to be determined ultimately, of course, by the
5    Court -- but "redemption" can only mean use by the Mint.
6    And I'm saying that not based upon --
7              THE COURT:  I'm sorry, say that again?  Can
8    only mean --
9              MR. VARTAN:  Can only mean used by the Mint.
10   And I'm saying that not only because that would be the
11   common sense definition, meaning that if the coins were
12   counterfeit or otherwise fell under Subsection (6), the
13   Mint wouldn't use them, but I'm also saying that because
14   going back to, I guess, the very beginning of the
15   conversation when Your Honor was raising some of the
16   ancillary documents, the Mint's own SOP that is part of
17   the record at this point, and I'm happy to direct Your
18   Honor to it.  The Mint's own SOP says that where coins
19   are fraudulent or any of the other Subsections 1 through
20   I that you walked through with Ms. Vicks, that they'd
21   either be scrapped or returned to the sender.
22             THE COURT:  Okay.  Where does it say return to
23   the sender?
24             MR. VARTAN:  Sure.  So, Your Honor, I would
25   direct you to -- it would be ECF Number 56, Exhibit B, to

1    -- which is Number 3 on the attachments to my

2    certification, is the Mint's SOP.  And I'll give you the

3    exact page number.

4            So, Your Honor, this would be page 9 of the

5    document.  It's Section 6.8.2.  The overall section is

6    6.8, Other Procedures and Policies.  But 6.8.2 says --

7    and I'm quoting -- "If coin was submitted with the

8    application, the rejected coin is segregated from other

9    shipments and held in the mutilated coin section until

10   the participant claims it, or it is scrapped."

11           And so there is very much a difference in the

12   Mint's own SOP -- and this is, of course, without the

13   benefit of discovery three years removed from August of

14   2018 -- but the very little information that we do have,

15   the Mint is very explicitly saying that when coins are

16   counterfeit, they're put to the side.  They're not put

17   through --

18           THE COURT:  Okay.  Well, let me ask you this:

19   Is it your position then -- excuse me, and I have to say

20   the complaint was -- even the second amended complaint

21   was not very clear in some of these issues that you're

22   now raising.  Is it your position that essentially by the

23   standard operating procedures the testing would have to

24   go before it was melted?

25           MR. VARTAN:  It would -- before it was melted

1     and used.  Right?  So there's a difference between --

2             THE COURT:  So what's the difference in melted

3     and used?  Once it's melted, it's no longer segregable.

4     Right?

5             MR. VARTAN:  Well, I mean it could be -- it

6     could be scrapped, as the SOP is saying.  The whole -- it

7     probably makes sense, Your Honor, just to take a step

8     back in terms of the actual --

9             THE COURT:  What's the critical point at which

10    you say that it is redeemed?  Is it when it's submitted?

11    That's clearly not it.

12            MR. VARTAN:  No.

13            THE COURT:  Is the next one when it's melted,

14    or when it was reused allegedly, which we don't even know

15    for sure -- reused as new coinage?

16            MR. VARTAN:  It would be when it was used for

17    new coinage, right, because ultimately the whole purpose

18    of this program, aside from giving individuals and

19    companies an avenue to redeem mutilated coins, is to

20    allow the Mint to manufacture new, genuine, of course,

21    U.S. coinage.  And, Your Honor is correct that we don't

22    know for sure what happened to the 99 -- literally

23    99.99918 percent of the shipment was melted.  We all are

24    in agreement on that.  We don't know ultimately what

25    happened to the shipment, but certainly we've alleged in

1    the complaint, and that has to be accepted as true for

2    purposes of this motion, that the shipment was melted and

3    used to manufacture new coinage.

4            And I would note, of course, that --

5            THE COURT:  Well, what's your basis for even

6    alleging that?

7            MR. VARTAN:  Well, the basis for alleging it is

8    that, number one, Mr. Youngs was told by Anthony Holmes,

9    Jr., that everything had proceeded very smoothly and that

10   payment would be expected in four to six weeks.  Mr.

11   Holmes and Mr. Brown, a second Mint employee, encouraged

12   Mr. Youngs to submit additional shipments.  And it would

13   -- it stands to reason that if this was melted, it's

14   going to be melted for a purpose, meaning to make new

15   coinage.

16           And so we've alleged that in the complaint.

17   There's nothing to the contrary.  And at this point, it

18   needs to be accepted as true.  And the only two documents

19   that we're aware of at this point, Your Honor, that bear

20   upon this issue, one is the SOP -- and I cited the

21   relevant provision there, 6.8.2, that if something is

22   counterfeit, presumably it's not going to be put into

23   circulation by the U.S. Mint, who is responsible for

24   coining genuine U.S. coins.  And then I would go back as

25   well, Your Honor, to Attachment A to my certification

The Portland Mint v. USA                                    9/24/2021

1   because, again, we began the conversation by saying this

2   OIG report from, I believe it's August 20, I think it's

3   August 18 of 2020, but let me get the right date.

4          Right, August 18 of 2020.  That audit report is

5   obviously produced by the Office of Inspector General,

6   Department of the Treasury.  So it's coming from the

7   Treasury Department.  It's not redacted.  Your Honor may

8   have been thinking about another document.  This document

9   exists and is publicly available.  You can read it from

10  start to finish.

11         And I would push back on the notion, Your

12  Honor, that this document doesn't have direct bearing on

13  this case.  And keep in mind, this document was submitted

14  by the Government as part of its brief.  It's not

15  something that I provided --

16         THE COURT:  I believe -- I said I didn't think

17  it had bearing on the case.  So that's exactly [brief

18  audio lapse].

19         MR. VARTAN:  So let me just clarify why I think

20  that it does have bearing on this case and bearing in

21  particular on this redemption and the definition of

22  "redemption."

23         So if Your Honor --

24         THE COURT:  Well, it wasn't for this -- that

25  OIG report was not for this submission of coinage.  It

The Portland Mint v. USA                                    9/24/2021

1    was prior to it.  Correct?

2             MR. VARTAN:  No.  And so that's an important

3    point of clarification.  So --

4             THE COURT:  Well, there's real confusion in the

5    record on that.

6             MR. VARTAN:  Well, I think that's partly

7    because this is not part of my complaint.  This was

8    something that was introduced by the Government for other

9    reasons in its briefing.  But let me clarify the timeline

10   just so it's clear for the record.

11            THE COURT:  I'm not talking about the timeline.

12   I'm talking about the OIG report --

13            MR. VARTAN:  Sure.

14            THE COURT:  -- examined coinage submissions not

15   including the one at issue in this case.  Correct?

16            MR. VARTAN:  So that's not accurate.

17            THE COURT:  Okay.  The Government's clearly

18   suggested that, I think.

19            MR. VARTAN:  Right.  And so I can point Your

20   Honor to why I believe that's not accurate.

21            THE COURT:  Go ahead.

22            MR. VARTAN:  Okay.  So if you look at -- this

23   is Exhibit A.  It's ECF 56-2.  First I'm going to direct

24   Your Honor to page 43 of the document, Appendix 1,

25   Objectives, Scopes, and Methodology.  Now, keep in mind,

1    this report was drafted or dated August 18th, 2020, so

2    roughly two years after the submission of Portland Mint's

3    coins, and we would say the redemption of Portland Mint's

4    coins.

5           So on page 43, the first black bullet, it says

6    that the OIG observed the redemption and recycling -- and

7    I'm stressing redemption there because they now are

8    saying they watched redemption -- and recycling of coins

9    redeemed -- again, their word -- through the Mint's coin

10   exchange programs at Olin Brass, right -- that is where

11   we redeemed our coins -- from -- and here's the key piece

12   -- July 31st, 2018, meaning one day before we arrived,

13   through August 2nd, 2018, which is the last day of our

14   redemption, which included obtaining coin samples --

15          THE COURT:  What was the last date?

16          MR. VARTAN:  August 2nd, 2018.

17          THE COURT:  Okay.

18          MR. VARTAN:  Which included obtaining coin

19   samples from -- and I'm stressing the word again, the

20   redemption.  So this is what the OIG said that it did in

21   producing this report.

22          THE COURT:  Okay.  Is there anything in there

23   that says from Portland Mint?

24          MR. VARTAN:  Well, indirectly.  And this is

25   what I was going to say on page 28 because now the report

The Portland Mint v. USA                                    9/24/2021

1    gives color to what was said in the appendix, and I'm
2    happy to read from the second full paragraph on page 28,
3    ECF 56-2.  And, Your Honor, that reads in relevant part,
4    "As part of our audit, we observed the Mint's mutilated
5    coin redemption process in which the Mint received" --
6    and here's the key -- "approximately 450,000 pounds of
7    mutilated coins from multiple bulk redeemers."  Right?
8              So 427,000 of those 450,000 pounds belonged to
9    us.  This was --
10             THE COURT:  Do we know that?  How do we know
11   that?
12             MR. VARTAN:  There's no other explanation
13   because they're saying in the appendix that they observed
14   a redemption at Olin Brass on the same days that we were
15   there in roughly the same amount.  So --
16             THE COURT:  Without -- without understanding --
17   and, by the way, I mean, both Ms. Vicks and you need to
18   understand that the questions I pose and the statements I
19   make are to try to draw this together --
20             MR. VARTAN:  Sure.
21             THE COURT:  -- and pull it out.  So it's not a
22   question of, you know, making a finding or conclusion or
23   anything of that sort at this point.  What -- there was
24   so little joining of some of the issues that I'm playing
25   devil's advocate to some extent with both of you, but --

1    to try and get a better understanding.  But if you're

2    saying that 427,000 pounds of the coinage out of 450,000,

3    you could equally easily argue that why would they take

4    so little from another one and that one all be yours?  I

5    mean, I -- what I'm searching for is a nexus to Portland

6    Mint specifically.  Yes, it may have been the days that

7    you submitted, but you also don't know whether they that

8    quickly did the melt on your coins in particular.

9           Is there anything in the record that connects

10   this statement that you just read from, which may very

11   well be the Portland Mint?  But I need more than that to

12   come to a conclusion.

13          MR. VARTAN:  Well, you -- I'm sorry, I didn't

14   mean to interrupt, Your Honor.

15          THE COURT:  That's fine.

16          MR. VARTAN:  I was saying -- I would say only

17   that you don't need more to come to a conclusion for

18   these purposes because this is a motion to dismiss.  And

19   I wish -- certainly I've been begging for more

20   information now, as Your Honor knows, for the better part

21   of a year.  We filed this complaint back in April of

22   2020.

23          So I am -- I can only give to the Court the

24   very little information that we've been able to glean or

25   the Government has given to us voluntarily, or I might

 1   say even by mistake given the import of this report.  But

 2   I have no doubt that were we to engage in discovery,

 3   which we're entitled to do -- and I cited, this is

 4   important, I think, for the posture of this case because

 5   ultimately maybe the one thing that we can agree upon for

 6   purposes of today is that the definition of "redeem" is

 7   not clearly set forth in a preamble or in a statute.

 8               Now, obviously --

 9               THE COURT:  But the definition of what is not

10   redeemed looks like it comes out of Subsection (c)(6) of

11   the regulation at issue.  And we all seem to agree that

12   that's the regulation at issue.  But --

13               MR. VARTAN:  But there's not a clear

14   definition, though, what redeem means in Subsection

15   (c)(6).  It is maybe what it's --

16               THE COURT:  But does that matter if there's a

17   clear definition of what's not redeemed?

18               MR. VARTAN:  It does.

19               THE COURT:  I mean, sometimes it can be stated

20   in the negative.  You don't have to have it stated in the

21   positive to have a valid regulation.

22               MR. VARTAN:  I would only say that if that is

23   the Government's definition, and what I've put forward in

24   the complaint --

25               THE COURT:  I don't think it's the Government's

 1    definition.  They haven't said that.  I have right now
 2    for purposes of talking to you.
 3                MR. VARTAN:  Right.  So for -- but if that's
 4    the definition, I would say that would not again comport
 5    with common sense because it would blow a hole in the --
 6                THE COURT:  Well, thank you.
 7                MR. VARTAN:  -- the regulation.  I hope no
 8    offense was taken.
 9                THE COURT:  None was taken.  I just couldn't
10    let it slide by.
11                MR. VARTAN:  Understood.  I probably should
12    have another cup of coffee.  So what I was saying, Your
13    Honor, is that would really -- and I'm not accusing the
14    Government of malfeasance.  Let me be clear.  But it
15    really would allow for a great deal of malfeasance,
16    because even just look at the chronology here.  It's our
17    position that the Government took these coins, melted
18    99.99918 percent, and used them to manufacture new coin
19    roll, meaning used them for public benefit.
20                They then said two and a half years later,
21    because we first learned that the coins were
22    "counterfeit" in December of 2020, and someone said -- I
23    think it may have been -- I'm just looking back at my
24    notes here -- that someone had said at one point that
25    essentially this was done with knowledge of the case,

1    meaning the counterfeit letter was done with knowledge of

2    this prosecution, if you will, but I would say it was

3    done directly in response because --

4            THE COURT:  What prosecution are you talking

5    about?  There's no prosecution here.

6            MR. VARTAN:  Well, I'm saying the prosecution

7    -- this litigation, I should say.

8            THE COURT:  Okay.  Sorry, as a former assistant

9    district attorney, that word has meaning for me.  So --

10           MR. VARTAN:  It has meaning for me as a former

11   AUSA, so I understand, Your Honor.  But I was saying that

12   letter came in direct response to this litigation,

13   meaning the Government wanted a hook to be able to make

14   all the arguments that it's now making.  And so the first

15   that we ever heard the term "counterfeit" formally came

16   literally two and a half years after submission of these

17   coins.

18           So what would prevent the Government, if Your

19   Honor's reading or the Government's reading -- and I

20   understand you're playing devil's advocate in some of

21   this, but if that reading was a fair reading of the

22   regulation, the Government would in every single case

23   take coins in, use them for their benefit, and then

24   whenever it got around to it, issue a letter saying, oh,

25   by the way, the coins that we used for our benefit, they

1    were counterfeit; we're not going to tell you why.

2            And I think that's another critical piece of

3    all of this because, again, now three years removed from

4    the melt, we still don't even know how the Mint came to

5    the determinations it did.  They tested a few hundred

6    coins, Your Honor, according to their own letters, and

7    extrapolated from those few hundred coins to 427,000

8    pounds.

9            And I'm not going to go through this with the

10   Court, but I would encourage Your Honor to go back and

11   look at that OIG audit report, and in particular pages 28

12   and 29 that I was just quoting from about the 450,000

13   pounds, because the OIG takes the Mint to task for

14   sampling too few coins.  And, again, they're referring to

15   this redemption, meaning -- I understand it doesn't say

16   Portland Mint directly in there, but they're critiquing

17   what they saw at Olin Brass on July 31st, August 1st, and

18   August 2nd.

19           And if you look at pages 28 and 29, they said

20   -- and, again, I'm just quoting, "We observed the number

21   of coins inspected and sampled by Mint personnel was only

22   a small fraction of the number required per the SOP,"

23   meaning they're taking the Mint to task for taking too

24   few coins from the Portland Mint to draw conclusions or

25   extrapolate that the sampling plan must be followed in

The Portland Mint v. USA                                         9/24/2021

1    order to have confidence -- and the sampling plan wasn't
2    followed -- that the coins sampled are representative of
3    the entire redemption shipment.
4         And then there's a conclusion in here on page
5    29.  This again is all in response to what they observed
6    at Olin Brass, "As a result we found the mint processed"
7    -- so this means -- again, this is further evidence that
8    our coins were used -- "the mutilated coin redemptions"
9    -- again, their word -- "without the capability to
10   authenticate the genuineness of the coins," meaning that
11   now the Mint is saying two and a half years later that
12   the coins were counterfeit, even though they took a
13   sample by the Treasury's own admission that was too small
14   and insufficient to draw conclusions from.  And I think
15   that is key to all of this.
16        So I guess my refrain to much of what the
17   Government put forward is the same refrain that we put
18   forward in the brief.  This is a motion to dismiss.  I
19   understand that there's been a lot of back-and-forth in
20   the case.  Maybe there were times when things were not
21   clear.  Your Honor's certainly done a good job of making
22   things clearer and crystallizing the issues, but the
23   Government can't now come in on a motion to dismiss two
24   and a half years later after these coins were used, and
25   say the coins were counterfeit, and because we, the

The Portland Mint v. USA                                              9/24/2021

1    Government, are saying the coins are counterfeit, you

2    don't get the benefit, Plaintiff, of the well-pled

3    allegations in your complaint.  That's just not how this

4    works.

5              And if these are the two documents that we have

6    in our possession, almost by happenstance at this point,

7    what would we get through discovery, and that's why we

8    cited in making a determination around what "redeem"

9    actually means, we cited to the Ford Motor case where

10   this Court was charged with determining the definition

11   of "wages" under statute, and there they allowed for

12   discovery of internal documents at the IRS, bearing upon

13   certain reports that were issued by the IRS.  Same thing

14   in the Marriott case that we cited in our brief where the

15   definition of "liability" was at issue.

16             So I would end this section by saying that

17   redeem is not -- is not clear in my mind, at least, in

18   the -- in the regulation.  I think that we certainly have

19   the much better of the argument, but I know that under

20   the governing law we're entitled to discovery to show

21   that we do.

22             THE COURT:  Well, let me ask you this:  If the

23   underlying -- I think you're challenging the underlying

24   rectitude of the counterfeit or purpose to defraud, or

25   misrepresentation, or further criminal activity,

The Portland Mint v. USA                                    9/24/2021

1    conclusion -- I just did it out of order, actually, from
2    memory, as now that I'm looking at the regulation, but
3    it's all in there.
4              If you're challenging the rectitude of those
5    findings, is that enough to create a challenge of the
6    regulatory activity undertaken by the agency?
7              MR. VARTAN:  So I would say that what we're
8    challenging here -- or not even challenging.  We're just
9    saying that there is a regulation, it's a money-mandating
10   regulation, and I would note that Subsection (d), as we
11   noted in our brief, doesn't say "can pay" or "should pay"
12   or "may pay."  It says "will pay" when the coins are
13   being redeemed.
14             Our argument, I think, is pretty
15   straightforward in the sense that we're saying this is a
16   money-mandating regulation, the coins were redeemed, and
17   whether the coins were counterfeit, genuine, or something
18   in between, in redeeming those coins under the
19   regulation, the Government is duty-bound to pay us the
20   amounts they set forth in the regulation.
21             And so that's why I do think that there is a
22   fair amount of confusion.  Some of it may be precipitated
23   by Plaintiff, some of it may be injected by the
24   Government, but at heart -- and this is why I focus some
25   in the brief on the Kanemoto case -- I think this is no

1    different from Kanemoto in the sense that we're asking

2    this Court to define "redeem."

3            And this is why I was saying at the beginning

4    that in some ways this really is an argument on the law,

5    and, you know, could be ripe for summary judgment with

6    the benefits of discovery; how does this Court define

7    "redeem"?

8            If the Court defines "redeem" to mean that --

9    as we say, that the -- that when coins are melted and

10   used to make new coinage, that's redemption, then we're

11   entitled to payment at least for 99.99918 percent.  If

12   the Court says, no, redemption means something else, then

13   we wouldn't be entitled to payment under the regulation,

14   but that's something this Court is well within its rights

15   and bounds and ability to determine.

16           THE COURT:  So since we don't know -- or do we

17   know -- that the coinage was melted and redeemed, what's

18   the status of that?  Do you still need discovery to be

19   absolutely sure of that?

20           MR. VARTAN:  Well, we know for sure -- and

21   certainly I'm happy for the Government to weigh in, but

22   we know for sure from the Govermment's briefing that all

23   but a few hundred coins were melted.  I have -- I

24   repeatedly asked Ms. Vicks, and also her predecessor,

25   were they used to manufacture new coinage, and that was

The Portland Mint v. USA                                         9/24/2021

1    never -- I was never provided an answer.  I have to
2    imagine, given that we've been so out front in saying
3    that the coins were used to manufacture new, genuine --
4    and I stress that -- U.S. coins, that if that were not
5    the case, we would have heard about it.
6              THE COURT:  Well, we don't really know from
7    what we've seen in the record before the Court.
8              MR. VARTAN:  Correct, because, again, we
9    haven't had discovery.  So I would submit that our
10   allegation carries the day.
11             THE COURT:  All right.  Let me ask you another
12   question.  Subsection (c)(7) of the regulation --
13             MR. VARTAN:  Mm-hmm.
14             THE COURT:  -- gives almost unfettered final
15   authority to the director of the United States Mint
16   regarding redemptions of bent or partial coin
17   submissions.  Tell me what you think that means.
18             MR. VARTAN:  I think that that means that the
19   director of the Mint has the absolute right to -- I'll
20   put it in the context of this case.  The Mint and the
21   director have the absolute right to take in our 427,000
22   pounds, evaluate them, and say that they're counterfeit,
23   they're not going to redeem them, and therefore not use
24   them to make new coinage.  But that's not what happened
25   here.

The Portland Mint v. USA                                    9/24/2021

```
 1              THE COURT:  Okay.  So partial coin submissions
 2    is the part -- what you're talking about?  I mean, these
 3    weren't bent, right?  These were -- if anything, they
 4    were -- or were they partially bent or were they mostly
 5    the issue of counterfeit because they had the wrong
 6    percentages?
 7              MR. VARTAN:  So my understanding is -- but I'd
 8    have to go back and look at the definition.  There is a
 9    definition of mutilated and uncurrent coins.  I believe
10    this is just a definition -- bent and partial, I believe,
11    is the definition of mutilated coin, but I'm just
12    speaking off the top of my head.
13              THE COURT:  Okay.  And that definition would be
14    where?  In the statute?
15              MR. VARTAN:  I believe it's in the regulations.
16    It's possible.  I can certainly supplement the record if
17    Your Honor wants with a letter.
18              THE COURT:  I do want that, yes.
19              MR. VARTAN:  Sure.
20              THE COURT:  If you can get that to us within a
21    week or so.
22              MR. VARTAN:  Not a problem.
23              THE COURT:  All right, very good.
24              MS. VICKS:  Your Honor, I would --
25              THE COURT:  Ms. Vicks, you're welcome to do
```

The Portland Mint v. USA                              9/24/2021

1    that as well.  All right.  Let's --

2               MS. VICKS:  Well, I would just note that

3    Subsection (b) has definitions --

4               THE COURT:  Excuse me, it's not your turn, Ms.

5    Vicks.  It's not your turn.

6               MS. VICKS:  I apologize.

7               THE COURT:  Mr. Vartan, let's talk, then, if

8    this is -- well, I don't want to characterize it for you,

9    although I'll ask it as a question.  Is this your primary

10   basis for the complaint?  In other words, based on what

11   you know now, or perhaps knew before, are Counts 2, 3,

12   and 4 counts that you feel you can, as an officer of the

13   court, defend?  I know everybody throws in a takings

14   claim when they think they have a contract, but here you

15   don't even have a contract, or what's the true basis for

16   a contract?  I don't see the contract, and I'm not

17   playing devil's advocate with you.

18              MR. VARTAN:  Yeah, no, I understand.  So I

19   would say that I can certainly defend all three counts

20   as an officer of the court.  I'm happy to admit, or

21   would readily admit, that I would agree with Your Honor

22   that the contract claim is weaker than Counts 1 and 4,

23   meaning the regulatory violation and the takings claim,

24   but I think it's absolutely defensible, and I think it

25   should withstand a motion to dismiss because, again, I

The Portland Mint v. USA                              9/24/2021

1    keep coming back -- and I apologize for being a broken
2    record of sorts -- to where we are.  Even though the
3    case is --
4              THE COURT:  Let me ask you -- let me interrupt
5    before you go much further.
6              MR. VARTAN:  Sure.
7              THE COURT:  The voluntary release of the
8    coinage to the U.S. Mint, I mean, you brought it to them.
9              MR. VARTAN:  Correct.
10             THE COURT:  You agreed to be part of the
11   program.  You agreed to be part of the regulatory
12   structure of the program.  How does that create a
13   contract on the part of the Government?  It may create,
14   you know, a regulatory program in which both sides have
15   responsibilities, but that's not your traditional
16   contract.
17             MR. VARTAN:  It's certainly not a traditional
18   contract.  I would agree with Your Honor.  But I would
19   come back to some of the back-and-forth in the briefs and
20   I would look to the DNN case, in particular, which I know
21   both sides provided ample briefing on.  But let me just
22   get out the relevant quote from there.
23             So in DNN, that was one of the Winstar cases.
24   I know Your Honor is familiar with it.  But --
25             THE COURT:  Well, that's -- that's part of the

The Portland Mint v. USA                                    9/24/2021

1    problem.  I mean, if you're alleging a contract, the

2    takings goes away.  But here your contract allegation is

3    weak, so potentially you would have that takings.  But

4    you voluntary submitted, and Winstar I don't think helps

5    you a whole lot.

6              MR. VARTAN:  Well, in DNN, I would submit, Your

7    Honor, that it does in the sense that, again, we don't

8    have discovery at this point.  But we have put forward

9    nonfrivolous allegations, which is all we're entitled to

10   -- all we're required to do, I should say -- that there

11   was a contract.

12             And the reason I say that, yes, it was against

13   the backdrop of the regulations, and, yes, the amount to

14   be paid was informed by the regulations, but we've also

15   submitted more than that in the sense that, number one,

16   the complaint speaks about a significant back-and-forth

17   between Anthony Holmes and Adam Youngs, both prior to and

18   after the melt, and during, by the way.  And I would note

19   that the reason I was citing to DNN is because we agree

20   that in that case there is the notion of the plaintiff

21   needing to provide "something more."  And I think in DNN,

22   they define the something more as manifest assent by the

23   Government.

24             THE COURT:  So are you using DNN to support

25   that there was a contract, or are you using it to support

1    that a motion to dismiss is inappropriate?

2              MR. VARTAN:  Both.  Because what I'm saying is

3    DNN stands for the proposition -- and DNN, of course, was

4    on summary judgment, but DNN stands for the proposition

5    that you can show that manifest assent, either by

6    documents or -- again, I'm quoting from DNN -- "witness

7    testimony about the words and actions of relevant

8    government officials."

9              So what I'm saying is we have alleged a

10   nonfrivolous allegation of a contract, and we're entitled

11   to proceed to discovery.  It may turn out that this is

12   not a viable contract either because there was a

13   mutuality of intent, there wasn't unambiguous offer or

14   acceptance, but we're at so preliminary a stage here that

15   we are entitled to put forward our various causes of

16   action, even if they're antagonistic, at least at this

17   stage, toward one another.

18             So I --

19             THE COURT:  Well, if, for instance, I were to

20   decide that the motion to dismiss should be denied with

21   respect to Count 1, would you be sanguine if we deferred

22   Counts 2, 3, and 4?

23             MR. VARTAN:  The answer to that is yes because

24   what I would say to the Court, and I probably have said

25   this at a previous status conference, these are all --

1    these counts are variations on a theme.  The relief that

2    we're seeking is the money that we're entitled to under

3    the regulation, the $8.51 million.

4            We believe that we could get there either by a

5    regulatory violation, by a contract breach, or by a

6    taking.  And what is critical for us at this point is

7    just that we have "white," is really what it comes down

8    to.  If you said that I'm going to allow this case to

9    proceed only on Count 1, but three years now removed from

10   August 18th when they took 427,000 pounds of coins from

11   us, we're going to finally allow you to see what was

12   happening behind the scenes, I would be more than

13   sanguine.

14           THE COURT:  Let's talk about a taking for a

15   moment.  What about the proposition that Ms. Vicks put

16   forth about voluntarily surrendering the coinage to the

17   Mint -- the U.S. Mint -- as defeating a takings claim

18   because there's not much voluntary about most takings

19   claims?

20           MR. VARTAN:  Mm-hmm.  Agreed.  But it's wholly

21   unsupported by any precedent.  I read Love Terminal both

22   before I submitted my response and I read it after her

23   reply.  I read it again last night.  It simply is being

24   misquoted by the Government.

25           THE COURT:  It doesn't matter whether it's

1    misquoted or not.  The concept of voluntarily

2    surrendering with a typical takings claim seems to me

3    incongruent, and I'm trying to understand how you get

4    there.  I mean, the Government generally takes it against

5    the owner's will, and I'm not sure I've ever seen one

6    when there has been a voluntary surrender.

7              That can be eminent domain in other than this

8    kind of case where they then go to damages and, you know,

9    work it, but even that's not voluntary.  You know,

10   there's nothing in the takings area that looks like it --

11   it's a voluntary surrender of the property.

12             MR. VARTAN:  Well, I guess two points on that.

13   Number one, Love Terminal, which is what the Government

14   is waving, is not applicable.  And what I would say also

15   is we cited two cases --

16             THE COURT:  But that doesn't matter.  I'm not

17   asking about Love --

18             MR. VARTAN:  No, I understand.  I understand.

19   I think Prudential Insurance, though, is close in

20   concept, meaning there, there was a voluntary release

21   entered into by the Government, and -- or Prudential and

22   the Government; it was, of course, voluntary, and the

23   Government overstayed its welcome, meaning it was a

24   holdover tenant.  And it was made clear, I think, in

25   Footnote 13 to that case that there was a breach of

1   contract, meaning a breach of the lease agreement, but

2   there was also the potentiality of a taking claims based

3   upon a voluntarily entered-into contract.

4          And I also cited another case in the brief, the

5   name of which is escaping me, so if Your Honor gives me a

6   moment --

7          THE COURT:  I can find it.  That's all right, I

8   can find it.

9          MR. VARTAN:  Okay.  But I did cite another --

10  oh, here, I have it in front of me.  Apologies, Your

11  Honor.  We also cited to System Fuels, which, again, was

12  -- it had to do with the disposal of nuclear waste, and,

13  again, it denied a motion to dismiss a takings claim

14  despite the Government's argument that the right taken

15  was created solely by a voluntarily entered contract.

16         So I agree with Your Honor that this is not

17  maybe the typical takings fact pattern, but I think we've

18  come certainly closer in Prudential or System Fuels than

19  the Government did in Love Terminal.

20         THE COURT:  All right.  What else do you need

21  me to know from your perspective?

22         MR. VARTAN:  The only thing I think I would

23  say, Your Honor, on the takings piece, and that's why I

24  wanted to be forthright with the Court that I think

25  Counts 2 and 3 are not as strong as Counts 1 and 4, I

1    think that Count 4, the takings claim, is a paradigmatic

2    takings claim, maybe other than the nuance of the fact

3    pattern at the beginning.

4           And I say that because all of the cases that

5    were cited in the Government's brief -- and so now I'm

6    talking about cases like Rith and Lion Raisins, those are

7    regulatory takings.  This is a physical taking, meaning

8    the Portland Mint's coins -- and I did pull out something

9    that Ms. Vicks said which struck me.  She said, he could

10   have done anything he wanted to with his mutilated coins

11   prior to submission.

12          And so that's exactly my point.  These are his

13   coins.  It's not premised on a violation of the

14   regulations.  We're not saying that he had a property

15   interest once redemption was rejected.  That's not what

16   we're saying.  We're saying that he had a preexisting

17   property right in these coins.  It was his personal

18   property that the Government took and used for public

19   purpose, meaning the manufactured new, genuine, U.S.

20   coinage, and they didn't pay him for it.  And that's,

21   again, a paradigmatic taking, certainly as I understand

22   the Fifth Amendment takings clause.

23          And so I think that there's been a lot of

24   twisting and contorting in citing the cases that are not

25   physical taking cases like this case is.  And I probably

1   would end, Your Honor, on the Lion Raisins point because
2   that was something that the Government waved around in
3   its brief saying here's evidence that we, the Government,
4   are right.
5          But there's a piece of Lion Raisins that's
6   exactly on point here because Your Honor probably knows
7   that there were two pieces -- there were two takings
8   violations alleged in Lion Raisins.  One was born from a
9   purported violation of the Raisin Advisory Committee
10  order and associated regulations.  And the Federal
11  Circuit there said that is not a viable taking because
12  the property interest is only born from a regulatory
13  violation.
14         But there was a second takings violation that
15  was alleged, and that was of the raisin storage bins.
16  And those were property of Lion Raisins.  They were Lion
17  Raisins storage bins.  And so in Lion Raisins, the
18  Federal Circuit said that would have been a viable
19  takings theory because they were Lion Raisins bins but
20  for the fact that there was a comprehensive
21  administrative review process to challenge the taking of
22  the bins, so meaning but for that being in existence,
23  there would have been a viable takings claim.
24         And that's because the bins belonged to Lion
25  Raisins in the same way these coins belong to us.  So --

The Portland Mint v. USA                                    9/24/2021

1    and there is no, of course, administrative process to
2    challenge this.  So I would end there, Your Honor.
3             THE COURT:  All right, very good.
4             Ms. Vicks, please don't repeat what you've
5    already said but respond to anything that you feel you
6    need to respond to in Mr. Vartan's discussion.
7             MS. VICKS:  Yes.  Thank you, Your Honor.  There
8    are just a couple things I would like to point out to
9    Your Honor in response to Mr. Vartan's presentation, and
10   one has to do with the Mint's SOP.  Let me find it.  The
11   -- Mr. Vartan said that, you know, counterfeit coins
12   should be segregated and not -- basically, I think he was
13   implying they should be returned to the submitter.  And I
14   would note that the SOP, which I can't find, which is
15   annoying, on page 9 and 10 in 6.9.1 and 6.9.2, discusses
16   that counterfeit coins are not even considered mutilated
17   coins and will not be redeemed.
18            And, further, in 6.9.1, which is on page 10 of
19   the SOP, the Mint will not accept for redemption
20   mutilated coin that is not readily and clearly
21   identifiable as genuine U.S. Mint coinage and
22   distinguishable by denomination.  And then again we see
23   in 6.9.2, unacceptable items not classified as mutilated
24   coins that the U.S. Mint does not redeem, number four,
25   counterfeit coin.  And then it notes that, you know, that

The Portland Mint v. USA                                    9/24/2021

1   would involve also a report to the OIG.

2        So it's --

3        THE COURT:  Well, what about the fact that in

4   this case we don't know for sure, but there is at least

5   the allegation that it was melted into new coinage?  Does

6   that change the picture a bit?  And if it was melted into

7   new coinage, presumably or potentially it was not

8   illegitimate coin, or the Mint theoretically shouldn't

9   have put it into new coinage.

10        MS. VICKS:  Sure, Your Honor.  I don't think

11   that is actually relevant to the determination of

12   redemption and what the Plaintiff has actually pleaded,

13   which is that he submitted coins and that on delivery

14   they were redeemed, and he doesn't -- he even said -- Mr.

15   Vartan even said, you know, it doesn't matter if they

16   were counterfeit; we should have been paid.  So he

17   appears to contend that anything after delivery actually

18   doesn't matter.  What matters is that they submitted --

19        THE COURT:  No.  He said -- I don't think

20   that's what he said, Ms. Vicks.

21        MS. VICKS:  -- the coins.

22        THE COURT:  I think he said once it was

23   melted and used in what was theoretically legitimate

24   coinage.

25        MS. VICKS:  Sure.  And if the coins were

The Portland Mint v. USA                                    9/24/2021

 1    melted, I mean, they're just metal, and they can be
 2    melted and used to make other things.  I mean, it has no
 3    bearing on whether they were counterfeit because
 4    counterfeit coins are certainly also made of metal.  And,
 5    in fact, as I think this Court is aware through the
 6    numerous pleadings in this case, the metallurgical
 7    composition of coins is set forth in statute and is
 8    easily mimicked.  And so a coin may appear to be genuine
 9    if it looks like it, mimics, you know, the clad -- the
10    copper core and the clad -- whatever is clad outside a
11    quarter, and it still may not be a genuine coin, you can
12    still melt it.  And when metal is melted, it's still just
13    metal.  So I would point out that --
14             THE COURT:  But also presumably the Mint, which
15    has the responsibility to make proper coinage, would not
16    take improper materials to put into that new coinage, or
17    is that a foolish statement?
18             MS. VICKS:  It would not take coinage that are
19    contaminated or otherwise unreusable.  But if someone is
20    submitting coins that are actually counterfeit, they may
21    be counterfeit for reasons other than the composition of
22    the coin itself.  And so the metal itself is just metal.
23             THE COURT:  Okay.
24             MS. VICKS:  It's basically scrap metal, but it
25    is also illegal because it is contraband as it's been

The Portland Mint v. USA                                    9/24/2021

1    passed off as genuine U.S. currency.

2                I would also just like to note that we --

3                THE COURT:  Well, let me ask you this:  Have

4    you at this point -- you, the Goverment, not you

5    personally, but you, the Government, actually given the

6    report of the metallurgy content of what you're claiming

7    is counterfeit to the Plaintiff?

8                MS. VICKS:  No, Your Honor.  The metallurgical

9    content?

10               THE COURT:  Yeah, of the alleged counterfeit

11   coinage.

12               MS. VICKS:  We have -- no.  But, you know,

13   metallurgical composition can be clearly mimicked and

14   easily mimicked as set forth in a statute.  So as long as

15   you can make something that looks like, you know, the 25

16   percent core and the clad outline, say, of a quarter, it

17   doesn't mean much for going towards the authenticity of

18   the coinage, is my point.

19               THE COURT:  I frequently say that, you know,

20   both parties are in the business at an oral argument and

21   briefing to try to fool the judge, and you've managed,

22   both of you, to raise enough issues that I don't know the

23   answer here.  I will say this to you, at this point, I'm

24   going to have to sort through both the summary judgment

25   question, the allegations, the cases you've cited, and

1   we've obviously done enough prep to have a pretty good

2   idea, but not as to the answer.

3          And some things have been raised today that

4   make me think a little bit further beyond where I was

5   thinking even last night as I was working on it.

6          I will say this to you, Ms. Vicks:  Given where

7   we are in the case, I would find this extremely improper

8   if the Mint -- U.S. Mint -- were to do anything to

9   destroy the existing, retained amount of coinage from

10  this delivery.  I don't know that it's going to be

11  relevant, but the answer we got today when in the past --

12  or it was not consistent with some of the past answers

13  about whether there was coinage retained.  Ultimately, we

14  got, I think, the consistent answer, but I just want you

15  to be sure, you're obviously in charge of this case,

16  which puts you in a miserable position potentially with

17  the Mint.

18         You've just disappeared.  Are you there, Ms.

19  Vicks?

20         MS. VICKS:  Sorry, I am here.  It's -- sorry, I

21  have to plug in my phone.  It's on low power mode.  Hold

22  on.  My apologies.  I am here and I hear you clearly.

23         THE COURT:  Well, I'm going to wait until

24  you're back.

25         MS. VICKS:  Okay.

1          (Brief pause.)

2          MS. VICKS:  I'm back.  I apologize, Your Honor.

3          THE COURT:  All right.  Not a problem.  That's

4   happened to me as well.

5          But I'm just saying to you at this point,

6   status quo, keep it, don't let your client destroy the

7   remaining coinage.  If we do get past the motion to

8   dismiss, that's obviously going to become relevant.  So I

9   hope you hear me loud and clearly.  Unfortunately, for

10  you --

11         MS. VICKS:  I do.

12         THE COURT:  -- you're the counsel of record, so

13  it's on you.  And I know that -- what's the name, Apryl

14  -- what's her full name?

15         MS. VICKS:  Whitaker, Your Honor.

16         THE COURT:  Whitaker.  I wrote it down so

17  quickly that I actually -- can you spell that for me?

18         MS. VICKS:  Yes, W-h-i-t-a-k-e-r.

19         THE COURT:  All right.  And, Ms. Whitaker hears

20  me.  Are you still there, Ms. Whitaker?

21         MS. WHITAKER:  Yes, Your Honor.  We take the

22  retention of the samples very seriously.

23         THE COURT:  Well, I hope you do.  All right.

24         All right.  So now we're back to you, Ms.

25  Vicks.

The Portland Mint v. USA                                    9/24/2021

1          MS. VICKS:  Yes.  I also wanted to point out
2     that a definition of bent and partial coins is contained
3     at Section B of 31 CFR 100.11 that Your Honor was asking
4     about that.  And the regulation itself actually talks
5     about bent or partial coin, and we have been referring to
6     that as mutilated coin.  I believe we consider those to
7     be synonymous.
8          But to the extent Your Honor is looking for a
9     definition, that is contained in Section (b), number (i)
10    is bent coins, number (ii) is partial coins, and number
11    (iii) defines participants in the program.
12         I wanted to briefly address the OIG report that
13    Mr. Vartan referenced.  And we did respond to his
14    reference to the OIG report in a footnote in our reply
15    brief, Footnote 4, in which we stated that the report is
16    hearsay and that any use of the word "redemption" there
17    is not reflective of the -- of an in-depth testing or
18    anything that was done -- you know, of the Mint's actual
19    determination of redemption as reflected in the denial
20    letter, which is ECF Number 34.3.  So we did address that
21    in the footnote there.
22         THE COURT:  What's your take on whether the
23    amounts that Mr. Vartan talked about, the 427,000 pounds
24    out of the 450,000 pounds, was the Plaintiff's coinage
25    melted down?  Is there anything that you'd want to

1    comment as to his remarks with regard to that?  He made

2    some mental leaps, admittedly, but what about you?

3              MS. VICKS:  I agree that the amounts

4    represented in the report and the dates of the melt are

5    consistent with what Portland has alleged in its

6    complaint.

7              THE COURT:  You're saying it was the Portland

8    Mint coinage even though Portland Mint's name is not

9    used?

10             MS. VICKS:  I believe that's correct, Your

11   Honor.

12             THE COURT:  What's your basis for that?

13             MS. VICKS:  I am -- well, I am -- so there is

14   -- it's not mentioned in the report, but the time -- the

15   timing and the amount, as Mr. Vartan said.

16             THE COURT:  So is the Government conceding that

17   point, that it is the Portland Mint coinage?

18             MS. VICKS:  I -- I'm -- yes, the auditors were

19   there when Portland Mint submitted its coins.

20             THE COURT:  You're not answering my question.

21             MS. VICKS:  I'm sorry.

22             THE COURT:  I know they were there when

23   they submitted it.  We're talking about what happened

24   next.

25             MS. VICKS:  Right.  So the most I can concede

1    at this point is that the auditors were there when

2    Portland Mint submitted, and based on the report and the

3    timeline and the amount, they witnessed the melt and it

4    does say that that was mixed bulk submitters.  I don't

5    know without further conversation with the Mint which

6    melts may have been witnessed.

7              THE COURT:  Has that been traced, to your

8    knowledge?

9              MS. VICKS:  I -- I have no knowledge about it

10   either way.

11             THE COURT:  How about Ms. Whitaker, does she

12   have knowledge?

13             Ms. Whitaker?

14             MS. WHITAKER:  This is Ms. Whitaker.  I have no

15   personal direct knowledge.  However, I agree with Ms.

16   Vicks' statement regarding this report.

17             THE COURT:  You agree with Mr. Vartan's

18   statement or Ms. Vicks' statements, which are shy of what

19   Mr. Vartan has said?

20             MS. WHITAKER:  I agree with DOJ's position on

21   the report.

22             THE COURT:  All right.  That's not really a

23   position, saying we don't know.

24             All right.  Okay.  Anything else, Ms. Vicks?

25             MS. VICKS:  Yes, one last thing, Your Honor.

1    In regards to the right to be paid for a submission,
2    whether it's under a regulatory theory or a takings
3    theory, the property right to be paid is created in the
4    regulations.  If you have a mutilated coin, if you have
5    a bulk submission of mutilated coins, the only way you
6    can be paid from the Mint for that is through submission
7    to this program --
8              THE COURT:  We're talking -- you're talking at
9    each other again when you use the term "submission."
10             MS. VICKS:  I'm sorry.
11             THE COURT:  Mr. Vartan was pretty clear to
12   take it to the next step of melting into future coin and
13   not stop at submission.  Redemption does not occur at
14   submission.  That's the one thing we probably can all
15   agree on.  But it's that next step or two depending upon
16   how you look at the regulations that we're talking about
17   in terms of redemption.
18             MS. VICKS:  Sure.  And I would say I agree
19   with Your Honor that redemption does not occur upon
20   submission.  It occurs pursuant to the Mint's
21   application of its regulatory process, and that the
22   right to be paid for the submission to receive
23   redemption is created by the regulations.
24             THE COURT:  And if we take it that next step
25   and it's the melting and use of the coin, which is, I

The Portland Mint v. USA                          9/24/2021

1   think, what Mr. Vartan was saying, that is where he gets

2   his taking from.  What's your -- what's your position on

3   that?

4              MS. VICKS:  That he -- that melting and reuse

5   of the coin being a taking has to account for the fact

6   that the Portland Mint voluntarily submitted those coins

7   for participation in a regulatory program and that the

8   melting and reuse does not -- and then the Mint kept the

9   coins, melted them, and determined that they were not

10  redeemable under the regulations.  And so Portland Mint

11  has to account for why the Mint lawfully had its

12  property, which includes this entire process.

13             THE COURT:  And this is why I'm having sort of

14  trouble with this, because you added in there "kept the

15  coin."  And they only kept a very small percentage of

16  the coin.  And it's not that percentage, even, that Mr.

17  Vartan is talking about as much.  So --

18             MS. VICKS:  Yes.  I apologize.  I was using

19  "kept" as in they did not return any part of the

20  submission.  So --

21             THE COURT:  Okay.  That's helpful.  All right.

22  Anything else?

23             MS. VICKS:  No, Your Honor.

24             THE COURT:  All right.  You've given me a

25  lot to think about, even beyond what I thought I had

The Portland Mint v. USA                                    9/24/2021

1   very carefully done last night and during the previous
2   part of this week.  I honestly need to go back and do
3   some very deep dives here and decide what we're going
4   to do.
5          Mr. Vartan, you've got a submission to us,
6   and, Ms. Vicks, you can have the same submission by the
7   end of the week if you want.  And then we'll go forward
8   from there.
9          MS. VICKS:  I'm sorry --
10          THE COURT:  I am -- let's be very clear, Mr.
11   Vartan.  You want to articulate what that submission is
12   so that I can be sure that we've got that right?  And I
13   think from Ms. Vicks' face, I'm assuming she would like
14   that as well.
15          MR. VARTAN:  Sure.  I think Your Honor --
16          THE COURT:  Even when we're not in the
17   courtroom, we can still watch people.  So, go ahead.
18          MR. VARTAN:  I think Your Honor had wanted
19   the definition of bent and partial coins.  And I was
20   going to submit a letter on that.  But Ms. Vicks is
21   correct that the definition was earlier in the actual
22   regulation, 31. CFR 100.11.  So I'm happy to still
23   submit a letter if Your Honor would like, but
24   otherwise --
25          THE COURT:  No.

The Portland Mint v. USA                                    9/24/2021

1            MR. VARTAN:  -- I would agree with Ms. Vicks.

2            THE COURT:  All right.  I don't think we have

3    to -- all right.

4            Very good.  All right.  I thank you for your

5    participation in this morning's hearing.  As I said,

6    you've given us something to think about, and we'll move

7    forward from that to try to figure this out.  I may

8    still, depending upon how easy it is to trace -- and

9    that's the problem, so many of these issues were not

10   joined -- still ask you, but we're going to take a look

11   at it and see if we can trace it easily on whether this

12   is just a straight motion to dismiss or whether it is,

13   in fact, something that needs further consideration of

14   whether it converts to summary judgment because of some

15   of the documents.  And if we can trace it easily, we'll

16   do it on our own.  If not, we'll come back to you to ask

17   you to do it.

18           Does the reporter have any questions?

19           THE REPORTER:  Yes, Your Honor, if they could

20   stay on, I do have a couple clarifications on cases and

21   a couple names mentioned.

22           THE COURT:  All right, very good.  For those

23   of you on my staff, we'll call you after we close out

24   the Zoom.  And thank you all; appreciate your time.

25           MR. VARTAN:  Thank you, Your Honor.  Have a

87

The Portland Mint v. USA                              9/24/2021

1    nice weekend.

2                THE COURT:  Bye-bye.  Thank you.

3                MS. VICKS:  Thank you, Your Honor.

4                (Whereupon, 12:54 p.m., the hearing was

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The Portland Mint v. USA                                      9/24/2021

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3           I, George Quade, court-approved transcriber,

 4   certify that the foregoing is a correct transcript from

 5   the official electronic sound recording of the

 6   proceedings in the above-titled matter.

 7

 8

 9

10   DATE:  12/30/2021              s/George Quade

11                                  GEORGE QUADE, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```