# In the United States Court of Federal Claims

### No. 20-518C
### Filed: June 11, 2022
### Reissued for Publication: June 28, 2022[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **THE PORTLAND MINT,** | \* |
| **Plaintiff,** | \* |
|  | \* |
| **v.** | \* |
|  | \* |
| **THE UNITED STATES,** | \* |
| **Defendant.** | \* |
|  | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

**Lee Vartan,** Chiesa Shahinian & Giantomasi PC, West Orange, N.J., for plaintiff.

**Alison S. Vicks**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Deborah A. Bynum**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Attorney General, Civil Division. **Apryl Whitaker**, United States Mint, of counsel.

# O P I N I O N

<u>**HORN, J.**</u>

## FINDINGS OF FACT

Plaintiff, the Portland Mint, filed an initial complaint in the United States Court of Federal Claims, followed by an amended complaint and a second amended complaint. At issue before the court is defendant's motion to dismiss plaintiff's second amended complaint. In the second amended complaint, plaintiff claims jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2018). According to plaintiff, the claims in the second amended complaint are "founded upon the Constitution, a regulation of an executive department, and upon an implied contract with the United States." In plaintiff's second amended complaint, plaintiff asserts five counts: (1) a regulatory violation for failure to

---

[1] This Opinion was issued under seal on June 11, 2022. The parties were given the opportunity to propose possible redactions, but no redactions were proposed. The original Opinion is hereby unsealed and reissued without redaction.

make payments pursuant to the Redemption Program established in 31 C.F.R. § 100.11; (2) a breach of an implied-in-fact contract between plaintiff and the United States Mint (U.S. Mint); (3) a breach of the implied duty of good faith and fair dealing between plaintiff and the U.S. Mint; (4) a taking without just compensation in violation of the Takings Clause of the Fifth Amendment of the United States Constitution; and (5) a claim for Equal Access to Justice Act (EAJA) payments in the event plaintiff is found to be the prevailing party. Plaintiff seeks $8,510,250.00, according to plaintiff, "for the mutilated coins" the U.S. Mint "accepted and redeemed."

In Count One of plaintiff's second amended complaint, "Violation of Federal Regulation," plaintiff alleges that the U.S. Mint "agreed to accept, and did accept from the Portland Mint, a total of approximately 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels," with a "total approximate value" of "$8.51 million," an amount less precise than plaintiff's prayer for relief of $8,510,250.00 in its second amended complaint. Plaintiff further alleges that U.S. Mint employees "accepted the Portland Mint's shipment, redeemed it, and melted it," that the U.S. Mint "used the melted shipment to manufacture new coin roll," that "[t]he shipment contained genuine, mutilated U.S. coins," and that plaintiff "has suffered economic damages" because of the U.S. Mint's refusal to pay for plaintiff's shipment. According to plaintiff's second amended complaint, the failure of the U.S. Mint to pay the Portland Mint after having accepted and melted down the coins, and, according to plaintiff, having "redeemed" the coins, amounts to a violation of the U.S. Mint's regulations, which is actionable in this court.

In Count Two, "Breach of Implied Contract," plaintiff alleges that plaintiff and the U.S. Mint "demonstrated a mutual intent to contract," whereby plaintiff "offered to deliver an agreed-upon number of mutilated coins to the [U.S.] Mint, and the [U.S.] Mint agreed to accept that agreed-upon number of mutilated coins at Olin Brass on August 1 and 2, 2018." (alterations added). Plaintiff further alleges that "the communications and actions" by Anthony Holmes, Jr., the Materials Handler Supervisor at the U.S. Mint, demonstrated that "arranging and contracting for the delivery of mutilated coins was an integral part of Mr. Holmes's duties as a supervisor," and that "the [U.S.] Mint agreed to pay the Portland Mint for the value of the coins" by accepting delivery. (alteration added). According to plaintiff's second amended complaint, the failure by the U.S. Mint to pay following this alleged acceptance of plaintiff's coins constitutes breach of an implied-in-fact contract.

In Count Three, "Breach of Implied Duty of Good Faith and Fair Dealing," plaintiff alleges that the U.S. Mint "refused to pay the Portland Mint for the property the [U.S.] Mint accepted and redeemed," and that "the [U.S.] Mint has attempted to justify its breach of contract by declaring 'counterfeit' what it already determined to be genuine when it redeemed the Portland Mint's shipment and used it to manufacture new coin roll." (alterations added). Plaintiff argues that the U.S. Mint has "destroy[ed] the Portland Mint's reasonable expectations of the fruits of the contract," and, thereby, breached the implied duty of good faith and fair dealing. (alteration added).

In Count Four, "Violation of Fifth Amendment Takings Clause," plaintiff alleges that the U.S. Mint "accepted, redeemed and melted" plaintiff's August 2018 shipment of coins, but has not "paid the Portland Mint for the redeemed and melted coins," "returned the coins to the Portland Mint," or "provided the Portland Mint with anything of value for

accepting and taking its property." According to plaintiff's second amended complaint, the U.S. Mint's actions represent a "permanent impairment of the Portland Mint's property" which "constitutes a taking without just compensation in violation of the Fifth Amendment."

In Count Five, "Equal Access to Justice Act," plaintiff argues that the Equal Access to Justice Act, 28 U.S.C. § 2412 (2018), entitles plaintiff to reasonable attorney's fees and expenses if plaintiff is the prevailing party, unless the defendant's position is found to be "'substantially justified.'"

Plaintiff's original and first amended complaints had asserted a number of claims which were not within the jurisdiction of the United States Court of Federal Claims. The successive complaints filed by plaintiff dropped some of those alleged grounds for relief, leaving the allegations in the second amended complaint for consideration by the court after defendant filed its motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) (2020) of the Rules of the United States Court of Federal Claims (RCFC) and for failure to state a claim pursuant to RCFC 12(b)(6).

In its second amended complaint, plaintiff describes itself as an "off-sort coin processor" servicing "banks, armored carriers, and coin kiosk companies," among other businesses, "across several states and countries." According to the second amended complaint, since 2012, plaintiff "has redeemed approximately 21 shipments of mutilated coins through the Redemption Program, and been paid approximately $229,632 by the [U.S.] Mint." (alteration added). As noted above, plaintiff claims $8,510,250.00 as the value of the mutilated coins plaintiff submitted to the U.S. Mint. According to plaintiff's second amended complaint, plaintiff "aggregates mutilated U.S. coins, separates them by alloy, and bulk redeems them through the Redemption Program." Plaintiff indicates that a portion of the coins at issue in this case were "imported," that plaintiff "buys coins from international companies," and that the coins plaintiff "sought to redeem were from both domestic and foreign sources." There is no evidence in the public record currently before the court, however, which specifies the origin of all of the coins plaintiff submitted to the U.S. Mint in the above captioned case.

The parties both agree that the U.S. Mint "is the nation's sole manufacturer of legal tender coinage and is responsible for producing and circulating coinage for the nation to conduct its trade and commerce." According to plaintiff's second amended complaint, the U.S. Mint began operating the Mutilated Coin Redemption Program (the Redemption Program) in 1911, and the parties both agree that the U.S. Mint suspended the Redemption Program in November 2015. The parties both agree that the U.S. Mint resumed operation of the Redemption Program in January 2018. According to defendant's motion to dismiss the second amended complaint, the Redemption Program was suspended for a second time in July 2019 and has remained suspended.[2]

---

[2] On May 5, 2021, the U.S. Mint published a Notice of Proposed Rulemaking indicating its intent to resume the Redemption Program under revised regulations. See 86 Fed. Reg. 23,877, 23,879-80 (May 5, 2021) (to be codified at 31 C.F.R. pt. 100). Public comments closed on the Notice as of July 6, 2021, see id. at 23,877, and as of the date of this Opinion, the Redemption Program had not resumed.

The Redemption Program allowed individuals and businesses to submit "bent and partial U.S. coins" and "redeem" them for payment at a rate established by regulation, at the time of the activity in this case: $4.5359 per pound for nickels and $20.00 per pound for dimes, quarters, and half-dollars. See 31 C.F.R. § 100.11(d) (2021). Plaintiff alleges that "[t]he [U.S.] Mint would melt the redeemed coins and use them to manufacture new coin roll." (alterations added). While for much of the Redemption Program's history only small shipments of coins were accepted, plaintiff alleges that beginning in about 1999, "businesses began to redeem a higher volume of mutilated coins with many of the coins originating from overseas, including China."

According to plaintiff's second amended complaint, in March 2015, the United States brought "a civil asset forfeiture action against three businesses that the government alleged were bulk redeeming counterfeit mutilated coins." Plaintiff was not among the parties to the civil asset forfeiture action, but plaintiff alleges "[i]n a seemingly coordinated response to the civil asset forfeiture complaint, the Department of Homeland Security detained mutilated coin shipments at the ports, including three of the Portland Mint's shipments." (alteration added). The Portland Mint and unidentified "others" brought suit as co-plaintiffs against the United States Department of Homeland Security (DHS) on October 29, 2015, seeking the release of the plaintiffs' detained coin shipments. After the Redemption Program was suspended in November 2015, the plaintiffs also "challeng[ed] the suspension of the Redemption Program" by the U.S. Mint. (alteration added). According to the second amended complaint filed in this court, during the 2015 litigation, "the Portland Mint obtained laboratory reports from DHS evaluating samples from the [Portland Mint's] detained shipments." (alteration added). Plaintiff alleges that the "laboratory reports compared the composition of coins from the [Portland Mint's] detained shipments to the composition of coins in circulation" and concluded that the detained coins' "'weights and alloy compositions are indistinguishable from standard currency.'" (alteration added). The detained coins that were the subject of the 2015 lawsuit brought by the Portland Mint and other plaintiffs were ultimately released to the plaintiffs in that case, however, at that time, the Portland Mint was unable to submit the returned coins due to the ongoing suspension of the Redemption Program. Plaintiff ultimately submitted the coins involved in the 2015 litigation as part of its August 2018 submission to the U.S. Mint which is the submission at issue in the above captioned case.

According to the U.S. Mint's website and plaintiff's second amended complaint, the U.S. Mint resumed the Redemption Program in January 2018. See United States Mint Resumes Mutilated Coin Redemption Program, UNITED STATES MINT (Jan. 23, 2018), https://www.usmint.gov/news/press-releases/united-states-mint-resumes-mutilated-coin-redemption-program; see also Exchange of Coin, 82 Fed. Reg. 60,309 (Dec. 20, 2017) (revising Treasury regulations governing the Redemption Program effective January 19, 2018). Therefore, in January 2018, plaintiff indicates that it applied to participate in the resumed Redemption Program. In its second amended complaint, plaintiff alleges that in response to plaintiff's January 2018 application on May 8, 2018, the U.S. Mint sent a "Deficiency Notification Letter" seeking "'sufficient information to demonstrate that the source(s) of Portland's mutilated coins uses adequate controls to ensure genuine U.S. coinage and prevent contamination.'" According to plaintiff's second amended complaint, Adam Youngs, president of the Portland Mint, responded to the U.S.

Mint and in his response indicated "that the coins he sought to redeem were from both domestic and foreign sources. He acknowledged that the bulk of the coins were in fact from a foreign source, and provided the name, address, and telephone number for that foreign source." Mr. Youngs' response is not included in the public record before the court. Further, according to plaintiff's second amended complaint, on June 29, 2018, the Materials Handler Supervisor at the U.S. Mint, Mr. Holmes, informed plaintiff that its application to participate in the program had been approved. Mr. Holmes' message, however, is not included in the public record before the court.

Plaintiff alleges that plaintiff's 2018 application to participate in the Redemption Program specified that plaintiff would deliver "409,427 pounds of dimes, quarters, half-dollars, and Susan B. Anthony dollars, and 2,400 pounds of nickels" to the U.S. Mint. According to plaintiff's second amended complaint, the U.S. Mint's "Mr. Holmes asked Mr. Youngs, 'Are your coins ready for shipment?' and 'How many trucks will you have ready for the melt?'" Also according to plaintiff's second amended complaint, after confirming that plaintiff's coins were ready for shipment, the U.S. Mint "scheduled the Portland Mint's melt for August 1 and 2, 2018 at the Olin Brass foundry in Illinois." According to plaintiff's second amended complaint,

> [a]pproximately one week prior to the scheduled melt, Mr. Youngs confirmed in writing with Mr. Holmes that the Portland Mint would be sending 11 trucks to Olin Brass, and revised, slightly, the total shipment size to include 425,100 pounds of dimes, quarters, and half-dollars, and 1,819 pounds of nickels. The total approximate value of the Portland Mint's shipment was $8.51 million.

(alteration added). Mr. Youngs' message is not included in the public record before the court. Plaintiff alleges that "part of the shipment" submitted in August 2018 were the coins that had previously been detained and were the subject of the 2015 lawsuit. Plaintiff does not indicate what portion of the August 2018 shipment was composed of the coins from the 2015 lawsuit, but alleges that "the total value of those released shipments [in the 2015 lawsuit] was approximately $550,000." (alteration added). Plaintiff also alleges that the Department of Homeland Security "had concluded" that the previously-detained coins "were genuine." Further, according to plaintiff's second amended complaint, "Mr. Youngs informed Mr. Holmes that he would accompany the shipment to ensure that the melt proceeded smoothly," that "Mr. Holmes voiced no objection, and put Mr. Youngs in direct contact with a representative from Olin Brass." Also, according to plaintiff's second amended complaint, one day before the scheduled melt, however, Mr. Youngs was informed by Thomas Browne, another employee of the U.S. Mint, that Mr. Youngs "could not be present for the melt." Therefore, according to plaintiff's second amended complaint, neither Mr. Youngs nor any other representative of plaintiff was present when the melt of plaintiff's coins allegedly occurred.

According to plaintiff's second amended complaint, and uncontroverted by defendant, plaintiff's coins were delivered to and received by the U.S. Mint at Olin Brass foundry on August 1 and 2, 2018. Plaintiff alleges in its second amended complaint that its mutilated coins were "melted by the [U.S.] Mint on August 1 and 2, 2018 at Olin Brass." (alteration added). Further, according to plaintiff's second amended complaint, after

completion of the melt, Mr. Youngs met with U.S. Mint employees, Mr. Holmes and Mr. Browne, who allegedly "specifically stated" to Mr. Youngs "that the coins redeemed by the Portland Mint were without issue" and "encouraged the Portland Mint to redeem additional mutilated coins through the Redemption Program." Plaintiff's second amended complaint also alleges that Mr. Holmes and Mr. Browne assured Mr. Youngs that plaintiff "would receive payment for its redeemed shipment in 4-6 weeks."

Plaintiff's second amended complaint states that at the time when the melt supposedly occurred, in August 2018, plaintiff believed that its entire shipment had been melted, and that the U.S. Mint did not indicate to plaintiff at that time whether the U.S. Mint had retained any of the submitted coins. Plaintiff alleges that "the Portland Mint's shipment was accepted, processed, and melted by the [U.S.] Mint on August 1 and August 2, 2018 at Olin Brass. Messrs. Holmes and Browne specifically said so. There was nothing for the [U.S.] Mint to test." (alterations added). At the oral argument on defendant's motion to dismiss, Apryl Whitaker, counsel for the U.S. Mint, stated that she could "affirmatively confirm that we [the U.S. Mint] have retained the samples" from plaintiff's submission to the Redemption Program. (alteration added). Ms. Whitaker's statement at the oral argument indicates that some of plaintiff's mutilated coins were not melted on August 1 and 2, 2018, although the amount of the coins retained by the government is not indicated in the public record before the court.

Plaintiff additionally alleges in its second amended complaint that at the time of the melt, the U.S. Mint "used the melted shipment to manufacture new coin roll." Defendant does not agree that the U.S. Mint's alleged use of plaintiff's coins occurred at the time of the melt, and refers only to "purported use" or "potential use" of the coins by the U.S. Mint. Defendant also argues that the "redemption" of plaintiff's coins never occurred because "redemption," according to defendant, "is a legal conclusion reached by the [U.S.] Mint pursuant to its examination of the submission and application of the regulations, including any prohibitions on redemption." (alteration added).

According to plaintiff's second amended complaint and uncontroverted by defendant, plaintiff has not received payment for the August 2018 shipment of the coins. In the second amended complaint, plaintiff alleges that "[f]or months, Mr. Youngs contacted the [U.S.] Mint to inquire about payment. His inquiries either went unanswered or were met with indecipherable responses." (alteration added). Plaintiff's second amended complaint recites three responses allegedly received from the U.S. Mint:

    a. On September 10, 2018, Mr. Youngs was told: "At this time, the United States Mint is still evaluating the coins for final receipts."

    b. On September 20, 2018, Mr. Youngs was told: "At this time, we cannot provide additional information or a timeline. When there is a change in status, we will contact you."

    c. On October 23, 2018, the response from the Mint was identical to its response a month earlier: "[T]he United States Mint is still evaluating the coins for final receipts. We will contact you upon completion of our evaluation."

(alteration in original). According to plaintiff, none of these responses from the U.S. Mint disclosed information about tests being conducted on plaintiff's coins or the results of any such tests.

According to plaintiff's second amended complaint, "[e]xasperated by the [U.S] Mint's refusal to meaningfully respond, Mr. Youngs enlisted the help of one of his United States senators, Senator Ron Wyden. On or about March 14, 2019, Senator Wyden contacted the [U.S.] Mint on behalf of Mr. Youngs." (alterations added). Also, according to the second amended complaint, on April 18, 2019, the U.S. Mint's Associate Director for Manufacturing, David Croft, responded to Senator Wyden stating: "'Preliminary testing of the materials submitted by the Portland Mint has identified technical anomalies that have required additional, detailed testing to ensure they are appropriate for redemption. That testing is ongoing.'" The response to Senator Wyden is not included in the public record before the court. In its second amended complaint, plaintiff indicates that Mr. Croft's answer to Senator Wyden is "demonstrably false" because plaintiff's entire "shipment was accepted processed, and melted by the [U.S.] Mint," such that "[t]here was nothing for the [U.S.] Mint to test," because "there were no anomalies in the Portland Mint's shipment," and because "[i]f the Portland Mint's shipment was determined to be counterfeit or in any way problematic, it would not have been melted at Olin Brass." (alterations added).

On March 13, 2020, more than nineteen months after plaintiff's shipment had been delivered to the U.S. Mint at Olin Brass foundry, plaintiff claims the Portland Mint sent Mr. Croft a "'Notice of Claim and Demand for Decision by Contracting Officer'" in which plaintiff alleges it "informed the [U.S.] Mint of the facts underlying its $8.51 million claim – facts that had been well known to the [U.S.] Mint for over 19 months – and attached relevant documents, including relevant correspondence between the [U.S.] Mint and the Portland Mint." (alterations added). Neither plaintiff's Notice of Claim and Demand for Decision, nor the alleged supporting documents are included in the public record currently before the court. Plaintiff further alleges in its second amended complaint that the Chief Counsel for the U.S. Mint, John Schorn, responded in a letter dated April 7, 2020, writing:

> The United States Mint is still reviewing the Portland Mint's August 2018 submission to the Mutilated Coin Redemption Program and has not made a final decision. . . . [P]reliminary testing of the materials submitted by the Portland Mint identified technical anomalies that have required additional, detailed testing to ensure the material is appropriate for redemption. These anomalies are still being reviewed and investigated.

(ellipsis and alteration in original). The Chief Counsel's letter is not included in the public record before the court. According to plaintiff's second amended complaint, as of April 2020, the U.S. Mint had provided no detailed information on the metallurgical content of plaintiff's submitted coins or the nature of the tests being conducted on plaintiff's August 2018 submission.

Plaintiff ultimately received an undated letter from the U.S. Mint, in which the U.S. Mint notified plaintiff of the U.S. Mint's "official determination" finding plaintiff's submission

was counterfeit and denying "redemption" of plaintiff's coins.[3] The U.S. Mint's denial letter also was filed with the court by both plaintiff and defendant. Plaintiff's second amended complaint quotes the denial letter with respect to the testing of plaintiff's August 2018 coin submission. In the denial letter, the U.S. Mint stated, in part, that it had conducted "physical analysis, chemical analysis, and electromagnetic testing" on a "representative subsample" of "101 representative quarters and 102 representative dimes," taken from a "representative sample" of plaintiff's shipment "consist[ing] of 4,205 coins (2,038 quarters, 2,073 dimes, and 94 other pieces)," weighing "approximately 35 pounds" out of the "approximately 425,095 pounds of mutilated coin material" submitted by plaintiff. (alteration added). The U.S. Mint's denial letter concluded:

> the coins you submitted in August 2018 were counterfeit. Based on this finding, and pursuant to 31 C.F.R. § 100.11(c)(6)(i)-(iii) and 31 C.F.R. § 100.11(c)(7), the United States Mint denies redemption of The Portland Mint's material submitted to the Mutilated Coin Redemption Program in August 2018. Counterfeit coins are per se contraband, and will not be returned to the holder. See 18 U.S.C. § 492. All rights are reserved for the government to take appropriate legal action.

> Should you wish to appeal this denial of redemption, you may submit a written appeal within 30 days of receipt of the decision. The appeal should include any and all relevant information as to why the decision should be overturned. The written statement should be sent via email to:

> David Croft
> Associate Director for Manufacturing
> United States Mint
> david.croft@usmint.treas.gov

> with a copy to:

> John Schorn, Esq.
> Chief Counsel
> United States Mint
> john.schorn@usmint.treas.gov

> If no appeal is received within the specified timeframe, the decision becomes final.

(capitalization and emphasis in original). The denial letter was signed by Richard Robidoux, Division Chief, Engineering, at the U.S. Mint.

In the record before the court, defendant submitted a redacted copy of the U.S. Mint's Standard Operating Procedures (SOP) for the Redemption Program, dated January 17, 2020. The SOP is unredacted with respect to the Redemption Program

---

[3] Defendant has not provided an explanation for the considerable length of time between plaintiff's August 1 and 2, 2018 submission of the coins to the Redemption Program and the U.S. Mint's letter denying redemption, received by plaintiff on December 30, 2020.

appeals process. The SOP, to the extent that it was filed on the court's electronic filing system, provides under the heading "6.9.3 Participant Appeal Process:"

**6.9.3.1** If the Participant application to submit mutilated coin is rejected or if the Participant's mutilated coin shipment is rejected following inspection then Participant is informed by the Analyst (see 6.8.1) that they may submit a written appeal of the rejection within 30 days of receipt of the decision. If the Participant has sufficient information or explanation, the rejection decision can be modified.

**6.9.3.2** The Participant submits the appeal including any and all relevant information as to why the rejection should be overturned through written statement to MutilatedCoin@usmint.treas.gov or USPS to the Mutilated Coin Program at the following address:

United States Mint

Attn: Mutilated Coin Redemption Program/Manufacturing Directorate

801 9th Street, N.W.

Washington, DC 20220

**6.9.4** The Analyst notifies the Participant that their appeal has been received and

**6.9.5** The Associate Director of Manufacturing reviews the Participant' appeal and determines if the reasoning is sufficient to overturn the decision.

**6.9.6** If the Associate Director modifies the decision, the process continues depending on where the process was stopped.

**6.9.7** If the Associate Director does not modify the decision, see subsection . . . .[4]

(emphasis and capitalization in original; alteration added).

On January 25, 2021, plaintiff sent a letter to David Croft, Associate Director for Manufacturing at the U.S. Mint, appealing the U.S. Mint's denial of redemption. Plaintiff's appeal letter asserted that "all but an exceedingly small[5] sample of the Portland Mint's shipment was melted in August 2018 and used to manufacture new coin roll." Plaintiff challenged the results of the U.S. Mint's testing, arguing that "[t]he Official Determination

---

[4] The redacted copy of the SOP submitted to the court abruptly ends its description of the appeals process at the word "subsection," and does not indicate whether there are further steps to the Redemption Program's appeals process.

[5] While the government indicated at oral argument that the U.S. Mint had retained a sample of plaintiff's coin submission, and that it continues to retain a sample of an undetermined size. The public record before the court does not indicate the size of the government's retained coins, however, as noted above, it does indicate the amount of the sample tested by the U.S. Mint following the August 1 and 2, 2018 coin submission.

is a thinly-veiled attempt to bolster the Government's pending motion [to dismiss]." (alterations added).

While plaintiff's administrative appeal was pending at the U.S. Mint, plaintiff sent a letter to the U.S. Mint dated March 2, 2021, which both plaintiff and defendant filed with the court, requesting discovery regarding "the test results and any associated report that supports the conclusions reached in the December 2020 determination letter" denying redemption and on "the fate of the Portland Mint's coins." The letter specifically asked "[w]ere the supposedly 'counterfeit' coins used to manufacture new coin roll?" (alteration added). Plaintiff's request for information was denied by Sheila Barnett, an attorney for the U.S. Mint, in a letter, dated March 4, 2021, which also was filed with the court by both plaintiff and defendant. The letter from Ms. Barnett explained that "[t]he U.S. Mint's process, as governed by its policy, is an informal adjudication and does not provide that discovery requests may be propounded on the U.S. Mint or that the U.S. Mint will respond to requests from participants for its internal documents." (alteration added). The authority cited for the U.S. Mint's administrative appeals process was the U.S. Mint's SOP. As of the filing of this Opinion, the U.S. Mint has not disclosed to plaintiff the specific results of the tests conducted on plaintiff's coins, including the metallurgical content of plaintiff's coins. The U.S. Mint also has not disclosed to plaintiff whether the plaintiff's coins were used in the manufacture of new coin roll following the August 2018 melt.

On March 15, 2021, the U.S. Mint sent a letter to plaintiff, signed by Mr. Croft, filed with the court the next day by defendant, which reaffirmed the official determination that plaintiff's shipment had included "counterfeit" coin, and which denied plaintiff's administrative appeal. Plaintiff refers to the letter in its second amended complaint, although plaintiff did not file the U.S. Mint's letter denying plaintiff's administrative appeal with the court. Thereafter, the court ordered the parties to consider and respond to the court regarding the following questions:

> (1) whether or not plaintiff wishes to file a complaint in a United States District Court regarding any possible Administrative Procedure Act claims challenging the final decision of the United States Mint, issued on March 15, 2021 by David Croft, the Associate Director of Manufacturing for the United States Mint, that rejected The Portland Mint's January 25, 2021 appeal, and, if so, in which United States District Court; (2) an analysis of each of the counts listed in plaintiff's amended complaint as to which counts should be dismissed for lack of jurisdiction and why; and (3) an analysis of which counts are properly within the jurisdiction of this court and could be retained by the court, even if certain counts are appropriate for transfer or other related claims are brought in a different court, based on the issues in the amended complaint currently before this court, and why.

In compliance with the court's Order, plaintiff filed a status report reasserting its position that the court should retain jurisdiction over most of its counts, with the exception of plaintiff's equitable estoppel and declaratory judgment claims. Subsequently, on May 14, 2021, plaintiff voluntarily dismissed its claims for equitable estoppel and declaratory judgment, which had been included in the original and first amended complaints. On June 7, 2021 plaintiff filed its second amended complaint. In response, defendant filed its

motion to dismiss the second amended complaint. With the exception of background facts, such as how the Redemption Program operated, the history of the submission of plaintiff's coin shipment, and the descriptions of plaintiff's written submissions and responses, defendant challenges plaintiff's allegations in the second amended complaint. According to defendant, plaintiff's claim that its coins have been "redeemed" "is not a factual allegation that needs to be taken as true," and plaintiff's allegations only "illustrate that it participated in a regulatory program through which its submission was denied." Defendant argues that the court lacks jurisdiction over all of plaintiff's claims because "Portland's claims, which challenge the lawfulness of the U.S. Mint's denial of payment and thus challenge the U.S. Mint's regulatory process and its final determination, are not properly before this Court." According to defendant, "Portland's claim for a regulatory violation must be dismissed for lack of jurisdiction," and, in the alternative, that Count One "must also be dismissed for failure to state a claim because the U.S. Mint's refusal to redeem coins for a lawful reason under the regulations does not equate to a violation of those regulations." With respect to Count Two, defendant argues that "Portland's claim for relief is based on an implied-in-law contract and must be dismissed for lack of jurisdiction." Defendant also argues that plaintiff has "failed to establish the formation of a contract between the U.S. Mint and Portland, warranting dismissal of its contract claims." With respect to Count Three, defendant argues that "Portland fails to sufficiently allege its cause of action for breach of implied duty of good faith and fair dealing." With respect to Count Four, defendant also argues that plaintiff's "takings claim must be dismissed" on the basis that "voluntary delivery of its materials to the [U.S. Mint] program does not equate to Government appropriation." (alteration added). With respect to Count Five, defendant argues that "Portland's EAJA claim is premature and must be dismissed."

Plaintiff filed a response to defendant's motion to dismiss in which plaintiff reiterates that the court has jurisdiction over all its claims and that the second amended complaint contains sufficient factual allegations to support plaintiff's claims. Specifically, plaintiff reasserts that this court is required to "'assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the non-movant's favor.'" (quoting Wade v. United States, 136 Fed. Cl. 232, 242 (2018)). Plaintiff further argues that this court has jurisdiction over plaintiff's claims because, rather than challenging the lawfulness of the U.S. Mint's regulatory process, plaintiff asks this court to interpret the meaning of "redeem" within the context of 31 C.F.R. § 100.11 and determine if the U.S. Mint violated the regulation by failing to pay for plaintiff's coins.

In its reply in support of its motion to dismiss, defendant reiterates that this court is not required to accept plaintiff's "legal conclusions couched as factual allegations" at the dismissal stage of the proceedings, including "Portland's unsupported conclusion that 'redemption' is governed by physical delivery, receipt, and melting of a submission, because the facts do not support that conclusion, and the conclusion is further undercut by the regulations governing redemption." Additionally, defendant maintains that plaintiff has failed to allege the existence of the necessary elements of a contract with the government. Defendant also asserts that plaintiff's taking claim must fail as "the only reason the [U.S.] Mint had possession of Portland's submission at all was because Portland willingly delivered it to the [U.S.] Mint, for participation in its regulatory program," (alterations added), and in any event, plaintiff "does not have a cognizable property

interest" because its property was determined to be counterfeit by the U.S. Mint. After briefing, the court held oral argument on defendant's motion to dismiss plaintiff's second amended complaint.

## DISCUSSION

Defendant argues that plaintiff's claims in the second amended complaint for a "Violation of Federal Regulation," for a breach of implied contract, for a breach of the implied duty of good faith and fair dealing, and for a taking must be dismissed for lack of subject matter jurisdiction and, in the alternative, that plaintiff's claims must be dismissed for failure to state a claim.[6] Addressing subject matter jurisdiction first, "[s]ubject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also St. Bernard Parish Gov't v. United States, 916 F.3d 987, 992-93 (Fed. Cir. 2019) ("[T]he court must address jurisdictional issues, even sua sponte, whenever those issues come to the court's attention, whether raised by a party or not, and even if the parties affirmatively urge the court to exercise jurisdiction over the case." (citing Foster v. Chatman, 136 S. Ct. 1737, 1745 (2016)); Int'l Elec. Tech. Corp. v. Hughes Aircraft Co., 476 F.3d 1329, 1330 (Fed. Cir. 2007); Haddad v. United States, 152 Fed. Cl. 1, 16 (2021); Fanelli v. United States, 146 Fed. Cl. 462, 466 (2020). The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also Me. Cmty. Health Options v. United States, 140 S. Ct. 1308, 1327-28 (2020); United States v. Mitchell, 463 U.S. 206, 216 (1983); Sanford Health Plan v. United States, 969 F.3d 1370, 1378 (Fed. Cir. 2020); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Gulley v. United States, 150 Fed. Cl. 405, 411 (2020); Kuntz v. United States, 141 Fed. Cl. 713, 717 (2019). "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States

---

[6] Discussion of plaintiff's EAJA claim is at the end of this Opinion and can only succeed if plaintiff succeeds on at least portions of its substantive claims.

. . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); N.Y. & Presbyterian Hosp. v. United States, 881 F.3d 877, 881 (Fed. Cir. 2018); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 571 U.S. 945 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Olson v. United States, 152 Fed. Cl. 33, 40-41 (2021); Jackson v. United States, 143 Fed. Cl. 242, 245 (2019), appeal dismissed, No. 2019-2213, 2020 WL 8254415 (Fed. Cir. Jan. 29, 2020). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The Ontario Power Generation, Inc. court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver . . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [(1976)] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see

also <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. at 472; <u>United States v. Mitchell</u>, 463 U.S. at 217; <u>Blueport Co., LLC v. United States</u>, 533 F.3d 1374, 1383 (Fed. Cir. 2008), <u>cert</u>. <u>denied</u>, 555 U.S. 1153 (2009); <u>Szuggar v. United States</u>, 145 Fed. Cl. 331, 335 (2019). The source of law granting monetary relief must be distinct from the Tucker Act itself. <u>See</u> <u>United States v. Navajo Nation</u>, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (<i>e.g.</i>, statutes or contracts)."); <u>see also</u> <u>Me. Cmty. Health Options v. United States</u>, 140 S. Ct. at 1327-28. "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" <u>Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.</u>, 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting <u>Greenlee Cnty., Ariz. v. United States</u>, 487 F.3d at 876); <u>see also</u> <u>N.Y. & Presbyterian Hosp. v. United States</u>, 881 F.3d at 881; <u>Fisher v. United States</u>, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (noting that the absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act"); <u>Olson v. United States</u>, 152 Fed. Cl. at 41; <u>Downey v. United States</u>, 147 Fed. Cl. 171, 175 (2020) ("And so, to pursue a substantive right against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation." (citing <u>Cabral v. United States</u>, 317 F. App'x 979, 981 (Fed. Cir. 2008))); <u>Jackson v. United States</u>, 143 Fed. Cl. at 245 ("If the claim is not based on a 'money-mandating' source of law, then it lies beyond the jurisdiction of this Court." (citing <u>Metz v. United States</u>, 466 F.3d 991, 997 (Fed. Cir. 2006)).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." <u>Holley v. United States</u>, 124 F.3d 1462, 1465 (Fed. Cir.) (citing <u>Franchise Tax Bd. v. Constr. Laborers Vacation Trust</u>, 463 U.S. 1, 9-10 (1983)), <u>reh'g</u> <u>denied</u> (Fed. Cir. 1997); <u>see also</u> <u>Klamath Tribe Claims Comm. v. United States</u>, 97 Fed. Cl. 203, 208 (2011); <u>Gonzalez-McCaulley Inv. Grp., Inc. v. United States</u>, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2021); Fed. R. Civ. P. 8(a)(1), (2) (2022); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677-78 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555-57, 570 (2007)). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." <u>Bradley v. Chiron Corp.</u>, 136 F.3d 1317, 1322 (Fed. Cir. 1998); <u>see also</u> <u>McZeal v. Sprint Nextel Corp.</u>, 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)); "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" <u>Three S Consulting v. United States</u>, 104 Fed. Cl. 510, 523 (2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555), <u>aff'd</u>, 562 F. App'x 964 (Fed. Cir.), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2014); <u>see also</u> <u>Hale v. United States</u>, 143 Fed. Cl. at 190. As stated in <u>Ashcroft v. Iqbal</u>, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555).

In addition to arguing that Counts One, Two, Three, and Four must be dismissed for lack of subject matter jurisdiction, defendant also argues that all plaintiff's claims must be dismissed for failure to state a claim. When examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see also Bell Atl. Corp. v. Twombly, 550 U.S. at 555. The United States Supreme Court has stated:

> While a complaint attacked by Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid. [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. Of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure §1216 pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 535 U.S. 506, 508 n.1 (2002); Nietzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim that relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); First Mortg. Corp. v. United States, 1961 F.3d 1331, 1339 (Fed. Cir. 2020); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380 (Fed. Cir. 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied, (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must

plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570)); <u>Cary v. United States</u>, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555, 570)), <u>reh'g denied</u> (Fed. Cir.), <u>cert. denied</u>, 557 U.S. 937 (2009); <u>Christen v. United States</u>, 133 Fed. Cl. 226, 229 (2017); <u>Christian v. United States</u>, 131 Fed. Cl. 134, 144 (2017); <u>Vargas v. United States</u>, 114 Fed. Cl. 226, 232 (2014); <u>Fredericksburg Non-Profit Hous. Corp. v. United States</u>, 113 Fed. Cl. 244, 253 (2013), <u>aff'd</u>, 579 F. App'x 1004 (Fed. Cir. 2014); <u>Peninsula Grp. Capital Corp. v. United States</u>, 93 Fed. Cl. 720, 726-27 (2010); <u>Legal Aid Soc'y of N.Y. v. United States</u>, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." <u>Engage Learning, Inc. v. Salazar</u>, 660 F.3d 1346, 1355 (Fed. Cir. 2011); <u>see</u> <u>also</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555–56 (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. at 508 n.1))); <u>Scheuer v. Rhodes</u>, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), <u>recognized</u> <u>by</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 190 (1984); <u>Am. Bankers Ass'n v. United States</u>, 932 F.3d at 1380 ("In reviewing a motion to dismiss, we accept as true the complaint's well-pled factual allegations; however, we are not required to accept the asserted legal conclusions." (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678)); <u>Harris v. United States</u>, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing <u>Call Henry, Inc. v. United States</u>, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); <u>United Pac. Ins. Co. v. United States</u>, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); <u>Samish Indian Nation v. United States</u>, 419 U.S. at 1364; <u>Boise Cascade Corp. v. United States</u>, 296 F.3d 1339, 1343 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2002), <u>cert.</u> <u>denied</u>, 538 U.S. 906 (2003).

As indicated above, defendant has asserted a number of grounds for dismissing each of the counts of plaintiff's second amended complaint. First, defendant argues

> Portland erroneously conflates delivery of its submission to the foundry, and subsequent melt, with ultimate redemption, or the payment from the U.S. Mint of money in exchange for a submission of genuine, lawful U.S. currency. This error underlies all of Portland's causes of action. For instance, in Portland's first count alleging a regulatory violation, Portland contends that the U.S. Mint redeemed its submission upon delivery of the submission to the foundry (including the subsequent melt and purported use of the metal to make new coin roll), and from that point on, the U.S. Mint's failure to issue payment was a breach of the regulations. . . . Likewise, Portland's breach of contract claim is premised on U.S. Mint's purported agreement to "redeem" Portland's submission at delivery, . . . as is its claim

for breach of the implied duty of good faith and fair dealing, . . . and Portland's takings claim is premised on its view that its submission was "redeemed" at time of delivery to the foundry.

(italics in original; internal citations omitted). Defendant claims that

redemption is a legal conclusion reached by the U.S. Mint at the conclusion of its regulatory process, and the delivery of a submission to the program does not mean the submission is redeemed. Instead, redemption is governed by the regulations, under which the U.S. Mint examines submissions for possible redemption and may redeem submissions at the end of its examination, if none of the reasons for denial of redemption are present.

Further, defendant emphasizes that "the [U.S.] Mint must deny redemption when '[a] submission, *or any portion of a submission*, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States,'" (emphasis in original; second alteration in original) (quoting 31 C.F.R. § 100.11(c)(6)(i)), as well as in cases in which "'criminal activity'" or "'a material misrepresentation of facts'" are apparent in the submission. (quoting 31 C.F.R. § 100.11(c)(6)(ii)-(iii)).[7] Moreover, defendant, citing 18 U.S.C. § 492 (2018), indicates "[t]he U.S. Mint has no authority to redeem counterfeit coins, which result from criminal activity and are contraband *per se*." (emphasis in original).

Defendant also argues that "the U.S. Mint's determination that the submission is not redeemable is agency action undertaken pursuant to its regulations and internal policy and evidences no violation of the governing regulations or policy." Therefore, according to defendant, all of plaintiff's "claims, which challenge the lawfulness of the U.S. Mint's denial of payment and, thus, challenge the U.S. Mint's regulatory process and its final determination, are not properly before this Court." Defendant also argues that plaintiff's claims are properly characterized as "claims for relief pursuant to section 706 of the Administrative Procedure Act," and that the court should dismiss plaintiff's claims because the court lacks "jurisdiction to evaluate the lawfulness of the U.S Mint's regulations, its internal policy, or the determination that it made pursuant to its regulations." Defendant further argues that this court does not "possess jurisdiction to determine whether the U.S. Mint acted unreasonably or failed to follow its own regulations in relation to Portland's submission, or to order specific performance." In sum, defendant contends that these arguments, regarding the definition of "redemption" in the regulations governing the Redemption Program and the characterization of plaintiff's claims as seeking relief under the Administrative Procedure Act, not only support defendant's arguments to dismiss Count One of plaintiff's second amended complaint for lack of subject matter jurisdiction,

---

[7] The regulation at 31 C.F.R. § 100.11(c)(6)(i), states that when "[a] submission, or any portion of a submission, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States," there will be no redemption, indicating that even a small portion of fraudulent coinage would prevent payment for an entire shipment. See 31 C.F.R. § 100.11(c)(6)(i) (alteration added).

but also are relevant to dismissing Counts Two, Three, and Four of plaintiff's second amended complaint for lack of jurisdiction.

The statute at 31 U.S.C. § 321 provides, in relevant part, that "[t]he Secretary of the Treasury shall . . . mint coins, engrave and print currency and security documents, and refine and assay bullion, and may strike medals . . . ." 31 U.S.C. § 321(a)(4) (2018) (alteration and ellipses added). The statute at 31 U.S.C. § 5120 further provides: "The Secretary of the Treasury shall melt obsolete and worn United States coins withdrawn from circulation. The Secretary may use the metal from melting the coins for reminting or may sell the metal." 31 U.S.C. § 5120(a)(1) (2018).[8] The regulation governing the Redemption Program is set out at 31 C.F.R. § 100.11, and provides, in part: "Lawfully held bent or partial coins of the United States may be submitted to the United States Mint for examination in accordance with the provisions in this subpart. Any submission under this subpart shall be deemed an acceptance of all provisions of this subpart." 31 C.F.R. § 100.11(a). Paragraph (c) of 31 C.F.R. § 100.11 is titled the "Redemption process" and states a number of requirements for prospective participants in the regulatory program:

(1) Depending on submission amount and frequency, participants may be subject to a certification process by the United States Mint. The established annual weight threshold and details about the participant certification process will be published on the United States Mint's website. If certification is required, it must be done prior to submission.

(2) All submissions for review shall include an estimate of the value of the coins and an explanation of how the submission came to be bent or partial. The submission should also contain the bank account number and routing number for a checking or savings account at a bank or other financial institution (such as a mutual fund, brokerage firm, or credit union) in the United States.

(3) Participants may be required to provide documentation for how the participant came into custody of the bent or partial coins.

(4) The United States Mint reserves the right to test samples from any submission to authenticate the material. The size of the sample will be

---

[8] Although 31 U.S.C. § 321 is cited in 31 C.F.R. § 100.11 as the "authority" for the Redemption Program, the Federal Register notices establishing and revising the Redemption Program state that "[t]he Treasury Regulations appearing at 31 CFR part 100, subpart C," including 31 C.F.R. § 100.11, "are promulgated under 31 U.S.C. 5120, and relate to the exchange of uncurrent, bent, partial, fused, and mixed coins." Exchange of Coin, 86 Fed. Reg. 23,877, 23,877 (May 5, 2021) (alteration added); Exchange of Coin, 82 Fed. Reg. 60,309, 60,309 (Dec. 20, 2017); see also Suspension of Bent and Partial Coin Exchange by United States Mint, 84 Fed. Reg. 35,181, 35,181 (Jul. 22, 2019) ("Under the authority of 31 U.S.C. [§] 5120, the United States Mint established a program by which the public could exchange bent and partial coins for reimbursement." (alteration added)).

limited to the amount necessary for authentication. Testing may result in partial or complete destruction of the sample.

(5) The United States Mint reserves the right to conduct site visits for participants over a certain volume threshold to verify information provided to the United States Mint.

(6) No redemption will be made when:

> (i) A submission, or any portion of a submission, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States;

> (ii) A submission appears to be part of, or intended to further, any criminal activity;

> (iii) A submission contains a material misrepresentation of facts;

> (iv) Material presented is not identifiable as United States coins. In such instances, the participant will be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 CFR 102–41.80, and will be retained or disposed of by the United States Mint;

> (v) A submission contains any contaminant that could render the coins unsuitable for coinage metal. In such instances, the participant will be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 CFR 102–41.80, and will be retained or disposed of by the United States Mint; or

> (vi) A submission contains more than a nominal amount of uncurrent coins. In such instances, the participant may be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 CFR 102–41.80, and will be retained or disposed of by the United States Mint.

(7) The Director of the United States Mint, or designee, shall have final authority with respect to all aspects of redemptions of bent or partial coin submissions.

31 C.F.R. § 100.11(c). In paragraph (d), "Redemption rates," the regulation further establishes the amounts to be paid per pound of redeemed coinage:

> (1) Generally. Participants shall separate bent or partial coins by the denomination categories listed below in lots of at least one pound for each

19

denomination category. The United States Mint will redeem bent or partial coins on the basis of their weight and denomination at the following rates:

   (i) One-Cent Coins: $1.4585 per pound.

   (ii) 5-Cent Coins: $4.5359 per pound.

   (iii) Dime, Quarter-Dollar, and Half-Dollar Coins: $20.00 per pound.

   (iv) $1 Coins: $20.00 per pound.

Id. § 100.11(d)(1).

        The meaning of the term "redemption" in the applicable regulation is critical to examining plaintiff's claims as plaintiff uses the term "redeem" or variations thereon frequently in its filings in this court. The language of the regulation at 31 C.F.R. § 100.11 indicates that before the "redemption" process is complete, submitted mutilated coins may be subject to the U.S. Mint's testing process as part of the authorized Redemption Program.[9] The regulation invites "bent or partial coins" to "be submitted . . . for examination . . . ." 31 C.F.R. § 100.11(a) (ellipses added). The "examination" contemplated in paragraph (a) is part of the Redemption Program elaborated in paragraph (c), as the "Mint reserves the right to test samples from any submission." Id. § 100.11(c)(4). The regulation at subparagraph (c)(6) lists six reasons for which "[n]o redemption will be made," including "demonstrat[ing] a pattern of intentional mutilation or an attempt to defraud the United States;" "appear[ing] to be a part of, or intended to further, any criminal activity;" "contain[ing] a material misrepresentation of facts;" being "not identifiable as United States coins;" "contain[ing] any contaminant that could render the coins unsuitable for coinage metal;" and "contain[ing] more than a nominal amount of uncurrent coins." Id. § 100.11(c)(6) (alterations added). The letter in which the U.S. Mint denied redemption of plaintiff's mutilated coin shipment stated that the denial of redemption was "pursuant to 31 C.F.R. § 100.11(c)(6)(i)-(iii) and 31 C.F.R. § 100.11(c)(7)," however, the denial letter did not explain how subparagraphs (i), (ii), and (iii), representing the first three reasons for denying redemption, applied to plaintiff's submission.[10] The provisions of 31 C.F.R. § 100.11 indicate that redemption of a participant's submission to the Redemption Program is not complete, as plaintiff claims, merely by the U.S. Mint "accepting, melting, and using them [the coins] to manufacture new coin roll." (alterations added). Indeed, the regulation at 31 C.F.R. § 100.11 does not refer to "melting" or "using" the coins submitted in the context of redemption. Instead, the

---

[9] The parties confirmed at oral argument, consistent with the court's research, that "redemption" in the context of the Redemption Program is not further defined in any statute or regulation.

[10] While subparagraphs (iv), (v), and (vi) provide for the submitter to be notified to retrieve its unredeemed coinage, the subparagraphs cited by the U.S. Mint in the denial letter, (i), (ii), and (iii), do not provide for any return of an unredeemed submission to the submitter. See 31 C.F.R. § 100.11(c)(6). Subsection 31 C.F.R. § 100.11(c)(7) provides that "[t]he Director of the United States Mint, or designee, shall have final authority with respect to all aspects of redemptions of bent or partial coins submissions." (alteration added).

regulation details an examination process to which all submissions may be subject, and provides for the denial of redemption in certain circumstances, including the possible examination and testing of samples, because, as noted above, "[t]he United States Mint reserves the right to test samples from any submission to authenticate the material." See 31 C.F.R. § 100.11(c)(4) (alteration added).

Although the language and meaning of the implementing regulation are plain as to the purpose of the Redemption Program and the authority of the U.S. Mint to test submissions of mutilated coins, plaintiff argues that this court should understand "redemption," not according to the terms of the regulation at 31 C.F.R. § 100.11, but according to the "'ordinary, contemporary, common meaning'" of the word "redemption," which plaintiff argues "'may be properly informed by the use of dictionaries.'" (quoting McGee v. Peake, 511 F.3d 1352, 1356 (Fed. Cir. 2008) (internal quotations omitted)). According to plaintiff, two generalized dictionary definitions are better suited to inform the meaning of "redemption" than the plain words of the applicable regulation. Plaintiff states:

> Black's Law Dictionary defines "redemption" as "[t]he act or an instance of reclaiming or regaining possession by paying a specific price." Black's Law Dictionary (11th ed. 2019). Merriam-Webster defines "redemption" as "the act, process, or an instance of redeeming," [Redemption, MERRIAM-WEBSTER (Jun. 3, 2022), https://www.merriam-webster.com/dictionary/redemption] and "redeem" as "to buy back: repurchase." [Redeem, MERRIAM-WEBSTER (May 30, 2022), https://www.merriam-webster.com/dictionary/redeem] The government asks the Court to ignore these definitions and define "redemption" in 31 C.F.R. § 100.11, at this preliminary stage of the proceedings, as permitting the [U.S.] Mint to obtain something for nothing; to realize substantial benefit at no cost.

(alterations added).

Plaintiff argues that "the government's proposed definition of 'redeem' would also lead to the absurd." The authority which plaintiff cites for the prohibition on "absurd" readings is Timex V.I., Inc. v. United States, 157 F.3d 879, 885-86 (Fed. Cir. 1998). In Timex V.I., Inc., the Federal Circuit considered "statutory benefits" found at "paragraph (h) of note 5 of the Additional U.S. Notes to Chapter 91 of Section XVIII of the Harmonized Tariff Schedule of the United States (Supp. I 1995)," in which "by its terms the statutory provision provides a rebate for wages paid by watch manufacturers in the insular possessions in any given year." Id. at 880-81. The Timex V.I., Inc. court explained that, according to the statute, "[t]he Secretaries of the U.S. Department of Commerce and the U.S. Department of Interior" determined "that the statute requires that the applicant be a 'producer' in the year in which the certificate is issued, i.e., in the following year," the year after the wages to be rebated were paid. Id. at 881 (alteration added).

In Timex V.I., Inc., the Federal Circuit determined that

> Commerce's 'following-year producer' requirement is contrary to the character of the rebate program created by Congress. By definition and common usage, a rebate is "a retroactive abatement . . . usu. as consideration for a specified volume of business." *Webster's Third New*

*International Dictionary* 1892 (1986); *see also Webster's II New College Dictionary* 924 (1995) (defining rebate as "a return of part of a price paid" or "a deduction from an amount charged"). As such, rebates are commonly issued after the price is paid.

Timex V.I., Inc. v. United States, 157 F.3d at 884-85 (ellipsis in original). The court in Timex V.I., Inc. used the dictionary definitions above to demonstrate the agency's use of rebate was contrary to the purpose of the statute. See id. Plaintiff in the above captioned case uses dictionary definitions that are plainly inapposite to the purpose of the Redemption Program and the statute at 31 U.S.C. § 5120. The statute requires "melt[ing] obsolete and worn United States coins withdrawn from circulation," a very different circumstance than the "[t]he act or an instance of reclaiming or regaining possession by paying a specific price," or "the act, process, or an instance of redeeming," plaintiff uses as support for its definition of redemption. (alterations added). Moreover, the U.S. Mint process in reviewing the coins provided by plaintiff during the redemption process was consistent with the purpose of the statute and the regulation at 31 C.F.R. § 100.11.

The Federal Circuit in Timex V.I., Inc. also determined that "Commerce's 'following-year producer' requirement violates the canon that a statutory construction that causes absurd results is to be avoided if at all possible." Id. at 886 (citing Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940)). The Timex V.I., Inc. court noted, "[u]nder Commerce's statutory construction, a watch manufacturer that stays a few days into the new year (perhaps as few as one day) may qualify for a rebate certificate," for the prior year, but "a manufacturer that leaves at or just before the end of the preceding year does not." Id. (alteration added). The Federal Circuit continued:

> Commerce's inability to make sense of its statutory construction is understandable, because it makes no sense. The result is nonsensical not merely because that, under Commerce's construction, a manufacturer that stays a few more days into the new year qualifies, whereas one that does not stay a few additional days does not qualify; here there is the additional fact that the 'following-year producer' requirement serves no useful purpose.

Id. (footnote omitted). The Federal Circuit concluded:

> The present case provides a perfect example. Timex did not have notice of Commerce's 'following-year producer' requirement. The requirement is not contained in the statute, it is not contained in Commerce's regulations, and it is not expressed in any binding published policy guidance or official opinion. If Timex had been placed on notice, in all likelihood it would have decided (like any sensible business entity) to keep quiet about its plans to leave and instead stay on a few days into January, 1996. Or, worse yet, Timex would have closed its doors early in 1995, so as not to pay substantial wages for which it would not receive a rebate. Either way, Congress's intent is not served.
>
> Secondly, the 'following-year producer' requirement bears no relationship to the benefit provided to the watch manufacturer by Congress's rebate

program. Regardless of how long the manufacturer stays into the new year, the benefit is the same because the amount of the rebate certificate is, by statute, based only on the amount of wages paid during the preceding year. Imposing a requirement that does not affect the amount of the rebate and that does not meaningfully promote the watch industry in the insular possessions is contrary to Congress's purpose.

Quite simply, Commerce's 'following-year producer' requirement serves no useful purpose. Instead, Commerce's statutory construction frustrates Congress's intent, encourages undesirable behavior, and produces absurd results. Such statutory construction is to be avoided, not rubber-stamped under the mistaken notion that it is 'reasonable' and thus somehow binding on the court.

Id. at 886-87 (citing Haggar Co. v. Helvering, 308 U.S. at 394). Despite plaintiff's claim "the government's proposed definition of 'redeem' would also lead to the absurd," citing to Timex V.I., Inc., the court notes that the foregoing demonstrates how different the situation in Timex V.I., Inc. is from the above captioned case.

The Redemption Program under 31 C.F.R. § 100.11 is designed to ensure that only authentic currency is redeemed, including by examination and testing procedures. The statute at 31 U.S.C. § 5120, pursuant to which the regulation is promulgated, directs the Secretary of the Treasury to "melt obsolete and worn United States coins" and to "use the metal from melting the coins for reminting or" to "sell the metal." 31 U.S.C. § 5120(a)(1). The statute does not promote melting down counterfeit United States coins, or coins other than genuine United States coins into new coins, and allows for a testing program to ensure this does not occur. The regulation at 31 C.F.R. § 100.11 provides for the testing and examination of submitted coins as an integral part of the "Redemption process," to ensure authenticity and prevent the United States from "redeeming" other than authentic coins. See 31 C.F.R. § 100.11(c)(4). The regulation at 31 C.F.R. § 100.11(c)(4), as applied to the facts of the above captioned case, serves Congress' purpose by ensuring that only genuine United States coins are paid for and melted down for reminting. See Timex V.I., Inc. v. United States, 157 F.3d at 886. Further, requiring testing of the mutilated coin submissions prior to redemption "bears [a] relationship to th[at] benefit," id. (alterations added), by proactively discouraging those who might otherwise submit counterfeit coins or coins other than authentic United States coins from receiving payment and by incentivizing only those submitting authentic United States coins to seek to participate in the Redemption Program. See id. Plaintiff's dictionary definitions and arguments ignore the promulgated regulations issued by the U.S. Mint which allow the U.S. Mint to test to determine whether any coins submitted are authentic and genuine prior to payment. Although by no means condoning the length of time the U.S. Mint took in this case to process plaintiff's coins, respond to plaintiff's inquiries and claims, and to decide plaintiff's appeal, plaintiff's argument against defining "redemption" in the context of 31 U.S.C. § 5120, 31 C.F.R. § 100.11, or other applicable regulations, including the U.S. Mint's exercise of its discretion to examine and test plaintiff's coins is "absurd." See Timex, V.I., Inc. v. United States, 157 F.3d at 886. To the extent that the counts in plaintiff's second amended complaint depend on the conclusion that plaintiff's

coins were "redeemed" within the meaning of the Redemption Program's regulations, plaintiff's causes of action fail.

Specifically regarding Count One of plaintiff's second amended complaint, defendant argues that the claim described by plaintiff as a "Violation of Federal Regulation," must be dismissed for lack of jurisdiction, because "redemption" must be conducted within the legal parameters of the context of the program described in 31 C.F.R. § 100.11, which includes the examination process. Defendant states regarding Count One that "the gravamen of Portland's challenge is that the U.S. Mint's process is unlawful," and that "[t]he Court does not possess jurisdiction over this claim and it must be dismissed." (alteration added) (citing Russell v. United States, 78 Fed. Cl. 281, 288 (2007)). In response, plaintiff argues:

> Count 1 has always been about the definition of "redeem" in 31 C.F.R. § 100.11. If the Court finds that the government "redeemed" TPM's [the Portland Mint's] coins by accepting, melting, and using them, then TPM is owed $8.51 million under the regulations, regardless of whether the Mint's "process" was lawful or unlawful. Likewise, if the Court finds that "redemption" did not take place, then the regulation does not mandate payment to TPM, regardless of whether the Mint's "internal policy" was good or bad. Count 1 does not allege that the [U.S.] Mint should have redeemed TPM's coins; it alleges that it did redeem TPM's coins.

(emphasis in original; alteration added). Plaintiff also asserts that this court "has jurisdiction to interpret a money-mandating regulation and award money damages when required by that regulation; that is the Court's very purpose." The relevant statutes and regulations demonstrate, however, that the Redemption Program was administered by the U.S. Mint, and that plaintiff sought to and voluntarily participated in that program. The U.S. Mint had discretion to accept or not accept submissions of coinage from plaintiff and other possible participants in the Redemption Program. The statutes and regulation at issue in this case do not mandate payment to plaintiff just for submitting coinage to the U.S. Mint, and payment depends on a participant such as plaintiff meeting the conditions of the "Redemption process" stated in the regulation at 31 C.F.R. § 100.11. The plaintiff accepted the terms of the U.S. Mint's program, including the possibility of having plaintiff's coins tested and potential forfeiture of the coins if any or all of the coins submitted are not in compliance with the conditions of the program. See id. § 100.11(a).

Plaintiff's Count One indeed appears to challenge the statutory, regulatory, and administrative processes established for the Redemption Program for testing, and to seek review of the agency decision to deny "redemption," after plaintiff sought to participate in, and submitted coins to the Redemption Program by voluntarily delivering its coins to the U.S. Mint. To the extent plaintiff alleges a violation of the U.S. Mint's administrative procedures, the Court of Federal Claims lacks jurisdiction over administrative procedure claims. See Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction." (citing Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he Claims Court has no authority to invoke the APA.")), cert. denied, 540 U.S. 1177 (2004); see also Delano Farms Co. v. Cal. Table Grapes Comm'n, 655 F.3d 1337, 1348 (Fed. Cir. 2011) ("[T]he immunity waiver cannot serve as a

'backdoor' to use the APA to obtain what would amount to concurrent district court jurisdiction over a monetary claim that could be brought in the Court of Federal Claims."); Albino v. United States, 104 Fed. Cl. 801, 815 (2012) (citing Martinez v. United States, 333 F.3d at 1303, 1314). As such, the "Federal district courts—not the Court of Federal Claims—are the proper fora for APA actions." Strougther v. United States, 89 Fed. Cl. 755, 762-63 (2009) (citing 5 U.S.C. § 703 (2006); Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005)); see also Crocker v. United States, 125 Fed. 1475, 1476 (Fed. Cir. 1997) (affirming the United States Court of Federal Claims holding "that it lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. § § 701-706 (1994)"); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 126 (2020) (quoting Strougther v. United States, 89 Fed. Cl. at 763 ("The APA does not authorize an award of money damages, 5 U.S.C. § 702 (providing for judicial review of actions 'seeking relief other than money damages') and, in any event, it is well-established that '[f]ederal district courts—not the Court of Federal Claims—are the proper fora for APA actions.'")); Allen v. United States, 140 Fed. Cl. 550, 563 (2018) (citing Strougther v. United States, 89 Fed. Cl. at 763); Amber Res. Co. v. United States, 68 Fed. Cl. 535, 544 (2005), aff'd, 538 F.3d 1358 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008) ("In the absence of a contrary statute, a challenge to administrative discretion can only be reviewed in district court pursuant to the APA."). Plaintiff's challenges in Count One of the second amended complaint to the U.S. Mint's procedures raise APA challenges which fall outside this court's jurisdiction.

The statute at 31 U.S.C. § 5120(a)(1) and regulation at 31 C.F.R. § 100.11 leave discretion to the agency to decide when a coinage submission should be tested, prior to being considered "redeemed" and for which payment should or should not be made to those who have asked to join in the benefits of the Redemption Program. Count One of plaintiff's second amended complaint speaks directly to the U.S. Mint's established procedures. Therefore, plaintiff's Count One is dismissed.

Alternatively, defendant argues that Count One of the second amended complaint "must also be dismissed for failure to state a claim because the U.S. Mint's refusal to redeem coins for a lawful reason under the regulations does not equate to a violation of those regulations." Defendant states that "Portland erroneously conflates" the delivery of its coin submission with the concept of "redemption" and that the denial of plaintiff's claim "is the result of the U.S. Mint applying its regulations, not a breach of them."

In its response to defendant's motion to dismiss the second amended complaint, plaintiff does not specifically address the arguments made by defendant with respect to dismissing Count One for failure to state a claim. In the second amended complaint, however, plaintiff alleges that the U.S. Mint's official determination that plaintiff's submission was counterfeit "was pure litigation stratagem," as part of "a concerted effort to hide a simple truth from Plaintiff" that "Defendant redeemed Plaintiff's coins," and plaintiff argues that the U.S. Mint's official determination merely "call[s] 'counterfeit' what it previously determined was genuine." (alteration added). As indicated above, plaintiff's second amended complaint alleges that when Mr. Youngs met with the U.S. Mint employees, Mr. Holmes and Mr. Browne "specifically stated that the coins redeemed by the Portland Mint were without issue" and plaintiff "would receive payment for its

redeemed shipment in 4-6 weeks." Admittedly, plaintiff is at a disadvantage because the U.S. Mint has refused, based on the U.S. Mint's procedures that it was not required to turn over to the plaintiff the meteorological analysis report upon which defendant bases its assertion of the unacceptability of the coins plaintiff submitted, seeking rather first to adjudicate the case on jurisdiction and failure to state a claim grounds.[11] Plaintiff's response to defendant's motion to dismiss tries to create an alternative to what is really at the heart of Count One of plaintiff's second amended complaint, an APA claim. Plaintiff states, "[t]he Court can interpret 31 C.F.R. § 100.11," and that "[t]o address Plaintiff's allegations, the Court need only interpret the [U.S.] Mint's regulations, not adjudicate the [U.S.] Mint's process." (alterations added). Plaintiff, however, has not identified actions taken by the U.S. Mint that were inconsistent with the applicable regulation when it opted to test plaintiff's coin submission to authenticate the coinage. See 31 C.F.R. § 100.11(c)(4). Moreover, acceptance into the Redemption Program by the U.S. Mint was discretionary, and dependent on plaintiff complying with the applicable regulatory program conditions, including testing. See id. The regulation at 31 C.F.R. § 100.11 indicates that the U.S. Mint was under no obligation to make a payment to plaintiff prior to making a determination that plaintiff's voluntarily submitted coinage was, in fact, genuine and of U.S. origin, and failure of the U.S. Mint upon submission by plaintiff of its coins to pay did not constitute a deviation from the governing regulation. Accordingly, plaintiff's "Violation of Federal Regulation" challenge to the U.S. Mint's administrative process in Count One of the second amended complaint also fails to state a claim over which this court can take jurisdiction.

In Count Two of plaintiff's second amended complaint, plaintiff alleges a breach of an "implied contract" by the United States. Plaintiff states:

92. The essential terms of the implied contract[12] were found in the [U.S.] Mint's own regulations, which state that the [U.S.] Mint will pay for mutilated coins it accepts and redeems at the rates specified in the regulations. See 31 C.F.R. § 100.11(d).
93. As demonstrated by the communications and actions of Anthony

---

[11] At oral argument, plaintiff's counsel of record confirmed that plaintiff had not received data reflecting the results of the U.S. Mint's testing of plaintiff's coins. Plaintiff's counsel stated further:

I think that's another critical piece of all of this because, again, now three years removed from the melt, we still don't even know how the [U.S.] Mint came to the determinations it did. They tested a few hundred coins, Your Honor, according to their own letters, and extrapolated from those few hundred coins to 427,000 pounds.

(alteration added).

[12] With the exception of one use of the specific legal term "implied-in-fact contract," plaintiff's second amended complaint claims that a nonspecific "implied contract" existed. Only in plaintiff's response to defendant's motion to dismiss does plaintiff frequently refer to its claim as one of "implied-in-fact contract."

Holmes, Jr. and other [U.S.] Mint employees, arranging and contracting for the delivery of mutilated coins was an integral part of Mr. Holmes's duties as a supervisor employed by the [U.S.] Mint.

94. The Portland Mint provided consideration by delivering the mutilated coins to Olin Brass on August 1 and 2, 2018 as instructed by the [U.S.] Mint.

95. The [U.S.] Mint accepted the delivery, and redeemed the mutilated coins delivered by the Portland Mint. In doing so, the [U.S.] Mint agreed to pay the Portland Mint for the value of the coins that the [U.S.] Mint accepted and redeemed, approximately $8.51 million.

(alterations added).

In addition to arguing for the dismissal of all of plaintiff's claims on the basis that plaintiff's coins were never "redeemed" within the meaning of 31 C.F.R. § 100.11, defendant separately argues that the court should dismiss Count Two of plaintiff's second amended complaint for lack of jurisdiction on the grounds that plaintiff has alleged the existence of a contract implied-in-law, not a contract implied-in-fact.

With respect to defendant's arguments to dismiss Count Two for lack of jurisdiction, defendant argues that plaintiff's "assertions are classic allegations of an implied-in-law contract over which this Court does not possess jurisdiction." The Federal Circuit has explained:

> While the Tucker Act does cover "implied contract[s]," the Supreme Court has long held that the scope of the Tucker Act's waiver of sovereign immunity "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States*, 516 U.S. 417, 423, 116 S. Ct. 981, 134 L. Ed. 2d 47 (1996). Generally speaking, implied-in-law contracts "impose duties that are deemed to arise by operation of law" in order to prevent an injustice, whereas implied-in-fact contracts are "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S. Ct. 425, 67 L. Ed. 816 (1923)).

Lumbermens Mut. Cas. Co. v. United States, 654 F.3d 1305, 1316 (Fed. Cir. 2011). As the United States Court of Claims, in Russell Corp. v. United States, 537 F.2d 494, 210 Ct. Cl. 596 (1976), stated:

> Implied-in-fact contracts differ from contracts implied in law (quasi-contracts), where a duty is imposed by operation of law without regard to the intent of the parties. Such arrangements are treated as contracts for the purposes of remedy only. This court, of course, has no jurisdiction to render judgment against the United States based upon a contract implied in law.

Id. at 609; see also Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007) ("The Court of Federal Claims, however, lacks jurisdiction over contracts

implied in law."); Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("Jurisdiction based on contract 'extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.'" (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996))); Baha v. United States, 144 Fed. Cl. 500, 507 (2019) ("To the extent [plaintiff] contends that there is a controlling implied-in-law contract, this court lacks jurisdiction over such a claim." (alteration added).). Moreover, "[a]n agency's performance of its regulatory or sovereign functions does not create contractual obligations." D & N Bank v. United States, 331 F.3d 1374, 1378-79 (Fed. Cir. 2003) (alteration added).

Defendant describes plaintiff's allegation in its second amended complaint that "[t]he essential terms of the implied contract were found in the [U.S.] Mint's own regulations," as demonstrating that because plaintiff "bases its implied contract claim on the terms of the regulations and the duties arising therefrom," plaintiff "is alleging that it had a contract implied-in-law with the U.S. Mint." (alteration added). Defendant further argues that "[p]laintiff's allegations only identify actions on the part of both parties that arise by operation of law," which defendant argues demonstrates "that Portland was participating in a regulatory program, not establishing a contract with the [U.S.] Mint." (alterations added). Defendant argues, therefore, that because the United States Court of Federal Claims does not have jurisdiction to adjudicate claims based on contracts implied-in-law, plaintiff's Count Two "must be dismissed for lack of jurisdiction."

Plaintiff, in its response to defendant's motion to dismiss, argues that defendant "grossly mischaracterizes the allegations contained in the SAC [second amended complaint]." (alterations added). Plaintiff's response to defendant's implied-in-law contract argument is simply to assert that it has demonstrated the elements of a contract, as plaintiff refers to "objective evidence of the government's intent" and the "objective *actions* of the parties, namely TPM's [the Portland Mint's] delivery of mutilated coins to the [U.S.] Mint, the [U.S.] Mint's acceptance and redemption of those coins to manufacture new coin roll, and TPM's [the Portland Mint's] communications with [U.S.] Mint employees." (emphasis in original; alterations added). Plaintiff also states, without explanation, that "the SAC [second amended complaint] plausibly alleges negotiations between the parties regarding the delivery and redemption of TPM's [the Portland Mint's] shipment," (alterations added), although no reference to negotiations appears in plaintiff's second amended complaint. Plaintiff's response does not address plaintiff's own contradictory allegation in the second amended complaint that "[t]he essential terms of the implied contract were found in the [U.S.] Mint's own regulations," (alteration added), which appears to concede that the actions which plaintiff alleges were taken by U.S. Mint personnel and by plaintiff were in accordance with the regulation at 31 C.F.R. § 100.11. Accordingly, plaintiff's own complaint appears to indicate that, if duties existed between the parties, those duties existed by operation of the regulation at 31 C.F.R. § 100.11, or by operation of statute, not because of any contractual agreement, negotiated or otherwise. The actions of the U.S. Mint's personnel are attributable to the U.S. Mint's "performance of its regulatory or sovereign functions" in its administration of the Redemption Program, which "does not create contractual obligations." D & N Bank v. United States, 331 F.3d at 1378-79. For this reason, plaintiff's contract claims in Count Two of plaintiff's second amended complaint must be dismissed for lack of jurisdiction.

In the alternative, defendant argues that the court should dismiss plaintiff's Count Two for failure to state a claim, because plaintiff's allegations do not demonstrate the elements of an implied-in-fact contract with the government. Defendant states "[n]one of its [plaintiff's] allegations support a finding that an implied-in-fact contract was formed." (alterations added). An implied-in-fact contract is an agreement """founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.""" Trauma Serv. Grp. v. United States, 104 F.3d at 1325 (quoting Hercules, Inc. v. United States, 516 U.S. at 424 (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))); see also Bitmanagement Software GmBH v. United States, 989 F.3d 938, 946 (Fed. Cir. 2021); Kam-Almaz v. United States, 682 F.3d at 1368; Bank of Guam v. United States, 578 F.3d 1318, 1329 (Fed. Cir.) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1326), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Bay View, Inc. v. United States, 278 F.3d 1259, 1265-66 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 285 F.3d 1035 (Fed. Cir.), cert. denied, 537 U.S. 826 (2002); XP Vehicles, Inc. v. United States, 121 Fed. Cl. 770, 781 (2015); Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 203 (2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 728 (2010) (citing Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 597; and Russell Corp. v. United States, 537 F.2d 474, 210 Ct. Cl. at 609), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011). Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 598; see also Russell Corp. v. United States, 210 Ct. Cl. at 609.

The elements for both express and implied contracts with the United States are identical. See Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) ("The elements of an implied-in-fact contract are the same as those of an oral express contract."), cert. denied, 550 U.S. 934 (2007); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."); City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998). The required elements to demonstrate an express or implied contract are: "(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance." Night Vision Corp. v. United States, 469 F.3d at 1375; see also Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1339 (Fed. Cir. 2021); Bank of Guam v. United States, 578 F.3d at 1326 (quoting Trauma Serv. Grp. v. United States, 104 F.3d at 1325); Yifrach v. United States, 145 Fed. Cl. 691, 698 (2019), aff'd, 825 F. App'x 899 (Fed. Cir. 2020).

When the United States is a party to an alleged express or implied-in-fact contract, "a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract." City of Cincinnati v. United States, 153 F.3d at 1377 (quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991)); see Columbus Reg'l Hosp. v. United States, 990 F.3d at 1339; Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Total Med. Mgmt. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997) (citing Thermalon Indus. v. United States, 34 Fed. Cl. 411, 414 (1995)). As a general proposition, "[t]he law requires that a Government agent who purports to enter into or ratify a

contractual agreement that is to bind the United States have actual authority to do so." Monarch Assurance P.L.C. v. United States, 244 F.3d 1356, 1360 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325). "The corollary is that any party entering into an agreement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government . . . ." Id. (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)); see also Snyder & Assocs. Acquisitions LLC v. United States, 133 Fed. Cl. 120, 126 (2017).

Defendant also argues that the allegations in plaintiff's second amended complaint do not establish actual authority on the part of any government official which was sufficient to enter into a contract, including Mr. Holmes, the Materials Handler Supervisor at the U.S. Mint with whom Mr. Youngs had multiple interactions. According to defendant, the representations plaintiff alleges were made by Mr. Holmes to plaintiff did not result in a binding contract with the government. Plaintiff argues, however, that "Mr. Holmes's authority to contract on behalf of the government may be implied from his 'communications and actions.'" Plaintiff emphasizes that Mr. Holmes communicated the approval of plaintiff's application to participate in the Redemption Program; that Mr. Holmes coordinated delivery of plaintiff's coins; that Mr. Holmes "specifically stated that the coins redeemed by the Portland Mint were without issue," and that Mr. Holmes told plaintiff to expect "payment for its redeemed shipment in 4-6 weeks." Based on the allegations in the second amended complaint, plaintiff argues that Mr. Holmes "had the implied *actual* authority to bind the government to the contract between TPM [the Portland Mint] and the [U.S.] Mint." (emphasis in original; alterations added).

Rejecting plaintiff's theory of "implied actual authority" to contract in this case, defendant states that "at most, Portland alleges apparent authority to contract on the part of Mr. Holmes, the U.S. Mint employee who received Portland's submission, but apparent authority is not enough to sustain Portland's claim." According to defendant, "[f]ailure to establish that a Government agent had actual authority to contract is fatal to Portland's contract claim." (alteration added). Defendant argues that "Portland does not reference the laws and regulations governing the U.S. Mint's redemption program as the basis for its claim that Mr. Holmes had actual authority," but rather "Portland's allegations show that it *appeared to Portland* that Mr. Holmes had contracting authority because he communicated with Portland about delivery of its [plaintiff's] coin submission, received the delivery, and told Portland when payments for redemption usually issue." (emphasis in original; alteration added). Defendant further states that "taking Portland's allegations at face value, the most that Portland alleges is that Mr. Holmes had apparent authority, and then only to *accept delivery* of a submission to the redemption program, not even to form a contract." (emphasis in original). Therefore, defendant argues that "Portland has failed to adequately allege that Mr. Holmes had actual authority to contract to redeem coins" submitted by plaintiff, or implied actual authority to do so, and plaintiff's Count Two must be dismissed.

In Liberty Ammunition, Inc. v. United States, 835 F.3d 1388 (Fed. Cir. 2016), the Federal Circuit explained:

A Government agent must have actual authority to bind the Government to a contract. *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Although apparent authority—which exists when an agent with no actual authority holds himself out to have such authority to another's detriment—can generally bind a principal, the Government is immune to actions of its agents who merely possess apparent authority. Our past cases have elaborated on the precept that there must be actual authority for an agent to bind the Government:

> It is a well recognized principle of procurement law that the contracting officer, as agent of the executive department, has only that authority actually conferred upon him by statute or regulation. . . . The government is not bound by its agents acting beyond their authority and contrary to regulation. A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself was unaware of the limitations on his authority.

*CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993) (internal citations omitted); *see also H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) ("[A]pparent authority will not suffice to hold the government bound by the acts of its agents.").

Liberty Ammunition, Inc. v. United States, 835 F.3d at 1401-02 (italics in original); see also Winter v. Cath-dr Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government."); Doe v. United States, 100 F.3d 1576, 1584 (Fed. Cir. 1996) ("Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations."). "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop. Ins. Corp. v. Merrill, 332 U.S. at 384. When determining whether plaintiff has pled "facts sufficient to allege that the Government agent had actual authority to bind the Government to a contract," "[p]laintiff's subjective belief is irrelevant." Doe v. United States, 95 Fed. Cl. 546, 583 (2010) (alteration added) (citing Harbert/Lummus Agrifuels Projects, 142 F.3d 1429, 1432 (Fed. Cir. 1998)). "An employee of the Government has implied actual authority to enter an agreement only when that authority is an 'integral part of the duties assigned to [the] government employee.'" Liberty Ammunition, Inc. v. United States, 835 F.3d at 1402 (alteration in original) (quoting H. Landau & Co. v. United States, 886 F.2d at 324 (internal quotation marks omitted)). A government employee's "[a]uthority [to contract] is integral 'when the government employee could not perform his or her assigned tasks without such authority.'" Id. (alterations added) (quoting Flexfab, LLC v. United States, 62 Fed. Cl. 139, 148 (2004), aff'd, 424 F.3d 1254 (Fed. Cir. 2005)).

The "communications and actions" attributed by plaintiff to Mr. Holmes and relied on by plaintiff establish only that Mr. Holmes may have had a role in assisting plaintiff's

participation in the Redemption Program and relaying information about plaintiff's participation in that program. Plaintiff's allegations, however, fall well short of indicating that Mr. Holmes had actual contracting authority on behalf of the government. According to plaintiff's allegations regarding Mr. Holmes' role at the U.S. Mint, contracting authority was not "an 'integral part'" of his duties, as Mr. Holmes' duties of supervising plaintiff's participation in the Redemption Program and relaying information did not require that Mr. Holmes possess contracting authority. Id. (quoting H. Landau & Co. v. United States, 835 F.3d at 1402). Moreover, even if plaintiff believed that Mr. Holmes had contracting authority, "[p]laintiff's subjective belief is irrelevant," and neither Mr. Holmes nor officials at the U.S. Mint represented that Mr. Holmes had contracting authority. See Doe v. United States, 95 Fed. Cl. at 583. Additionally, plaintiff bore "the risk of having accurately ascertained" Mr. Holmes' authority to contract, yet plaintiff did not provide any documentation or allegation of actual authority on the part of Mr. Holmes. See Fed. Crop Ins. Corp. v. Merrill, 332 U.S. at 384. Accordingly, plaintiff's second amended complaint fails to establish that Mr. Holmes had actual authority to contract on behalf of the government, and, therefore, plaintiff's Count Two must be dismissed for failure to state a claim.

In Count Three of plaintiff's second amended complaint, plaintiff alleges a breach of the implied covenant of good faith and fair dealing. As noted above, defendant argues that Count Three must be dismissed for lack of jurisdiction as one of plaintiff's claims that "challenge the lawfulness of the U.S. Mint's denial of payment," although defendant does not make independent arguments to dismiss Count Three for lack of jurisdiction. Defendant further argues that, because plaintiff has failed to allege facts sufficient to establish the existence of a contract, the court also must dismiss plaintiff's Count Three for failure to state a claim. The Federal Circuit has explained that "'the existence of th[e] covenant [of good faith and fair dealing] depends on the existence of an underlying contractual relationship'" and, therefore, "'there is no claim for breach of this covenant where a valid contract has not yet been formed.'" Scott Timber Co. v. United States, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (alterations in original) (quoting Mounter Highlands, LLC v. Hendricks, 616 F.3d 1167, 1171 (10th Cir. 2010)); see also Brenes v. United States, 152 Fed. Cl. 365, 370 (2021); Yifrach v. United States, 145 Fed. Cl. at 707 n.9; Sigma Constr., Inc. v. United States, 113 Fed. Cl. 13, 24 (2013). Because the court has determined that the plaintiff has not alleged sufficient facts to demonstrate the existence of a contract, there can be no breach of the implied covenant of good faith and fair dealing in the case currently before the court. Accordingly, the court dismisses plaintiff's Count Three for failure to state a claim.

In Count Four of plaintiff's second amended complaint, plaintiff alleges a violation of the Takings Clause of the Fifth Amendment to the United States Constitution and claims entitlement to just compensation thereunder. Plaintiff alleges that the actions of the U.S. Mint constituted a taking of its property, coinage which was submitted to the U.S. Mint for processing in the Redemption Program, and that defendant failed to pay just compensation for the coins received. Plaintiff argues that "the takings violation took place not when TPM [the Portland Mint] delivered mutilated coins to the government, but rather when the government melted the coins and converted the property to public use (i.e., the manufacture of new coins) without compensation to TPM [the Portland Mint]." (alterations

added). At no point in plaintiff's filings in this court does plaintiff allege that plaintiff's submission to the Redemption Program was not voluntary.

In addition to arguing that Count Four, along with Counts One, Two, and Three, must be dismissed for lack of subject matter jurisdiction as a challenge to the U.S. Mint's administrative process, defendant also argues that Count Four must be dismissed for failure to state a claim. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. CONST. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 31 (2018) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. at 49), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009)); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. at 536; E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Reoforce, Inc. v. United States, 853 F.3d 1249, 1265 (Fed. Cir.), cert. denied, 138 S. Ct. 517 (2017); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (2009); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "'classic taking'" is one in which the government directly appropriates private property for its own use (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002)), cert. denied, 579 U.S. 902 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)) reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373

(1945)); see also McCutchen v. United States, 14 F.4th 1355, 1364 (Fed. Cir. 2021) (quoting Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377 (Fed. Cir.), cert. denied, (2008)); Welty v. United States, 926 F.3d 1319, 1323-24 (Fed. Cir. 2019) ("To maintain a cognizable claim for a Fifth Amendment taking, a plaintiff must establish that he possessed an enforceable property right." (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014-19 (1992))); Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 ("'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992))); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (stating that the court does not address the second step "without first identifying a cognizable property interest" (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002))), reh'g denied and reh'g en banc denied (Fed. Cir. 2005); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and M & J Coal Co. v. United States, 47 F.3d at 1154); see also Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1329 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372), cert. denied, 567 U.S. 917 (2012).

Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372). In this case, there is no challenge that the coinage submitted to the U.S. Mint was not the plaintiff's property as alleged in plaintiff's second amended complaint.

Defendant argues that plaintiff's Count Four, alleging a Fifth Amendment takings claim, must be dismissed because plaintiff sought to and voluntarily participated in the Redemption Program when it submitted its mutilated coins to the U.S. Mint pursuant to the regulatory Redemption Program for processing. Therefore, according to defendant, plaintiff fails to state a claim that a taking has occurred. Defendant argues that "[i]t is axiomatic that a voluntary transfer of property is not a taking." (alteration added) (citing Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1348-49 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 2744 (2019)).[13]

---

[13] In Love Terminal Partners, the Federal Circuit also relied on Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-95 (1985), to hold that "[i]t is axiomatic that property is not taken without just compensation in violation of the Fifth Amendment when the act that allegedly effects a taking incorporates a provision to receive just compensation." Love Terminal Partners, L.P. v. United States, 889 F.3d at 1349 (alteration added). The Supreme Court overruled Williamson County in Knick v. Township of Scott, Pennsylvania, 139 S. Ct. 2162, 2179 (2019). The holding of the Federal Circuit in Love Terminal Partners which relied on

Defendant relies on the Federal Circuit's decision in <u>Love Terminal Partners, L.P. v. United States</u> for its argument that plaintiff's voluntary submission to the Redemption Program "does not equate to Government appropriation." In its response, plaintiff argues that two cases involving contracts with the government, <u>Prudential Insurance Co. of America v. United States</u>, 801 F.2d 1295 (Fed. Cir. 1986), and <u>System Fuels, Inc. v. United States</u>, 65 Fed. Cl. 163 (2005), illustrate that "[c]ourts have expressly recognized that when a party delivers property or grants a right to the government with expectation of payment pursuant to a contract or otherwise, and the government fails to pay, the party may assert a claim under the Takings Clause." (alteration added).

As an initial matter, plaintiff's reliance on <u>Prudential Insurance Co. of America v. United States</u> and <u>System Fuels, Inc. v. United States</u> is misplaced, because both cases recognize the possibility of taking liability for property voluntarily delivered or rights granted to the government only in the context of an existing express contract with the government and as an alternative to a breach of contract claim. See <u>Prudential Ins. Co. of Am. v. United States</u>, 801 F.2d at 1300 n.13; <u>Sys. Fuels, Inc. v. United States</u>, 65 Fed. Cl. at 172-73. As discussed above, plaintiff has not alleged the existence of an express contract with the U.S. Mint under which plaintiff's coins were submitted, and plaintiff cannot claim "an expectation of payment" under an express contract it has not alleged in order to support its claim for a taking.

Moreover, as the Supreme Court and the Federal Circuit have held, a voluntary transfer of property does not effect a cognizable Fifth Amendment taking claim. See <u>Yee v. Escondido</u>, 503 U.S. 519, 527 (1992) (holding that a taking is only effected "if the government authorizes a compelled invasion of property"); <u>FCC v. Fla. Power Corp.</u>, 480 U.S. 245, 252 (1987); <u>Love Terminal Partners, L.P. v. United States</u>, 889 F.3d at 1348 ("Acquisition of plaintiffs' property through negotiation could not constitute a taking because any property transfer would be voluntary."); <u>Norman v. United States</u>, 429 F.3d 1081, 1089 (Fed. Cir. 2005) ("To the extent that appellants' claim of loss of possession is predicated on the transfer of title, we have already concluded that that transfer was voluntary and therefore not a proper basis on which to premise a takings claim."). Based on the allegations contained in the second amended complaint, the arguments made in the parties' briefs, and the public record before the court, it is uncontested in the case currently before the court that plaintiff's submission of its mutilated coins to the U.S. Mint was voluntary when plaintiff sought to participate in the Redemption Program. Plaintiff applied to join the Redemption Program upon resumption of the program in January 2018, and voluntarily delivered the coins to the U.S. Mint for inclusion in the Redemption Program. Accordingly, due to the voluntary nature of plaintiff's submission, plaintiff cannot now claim that the U.S. Mint's acceptance of plaintiff's coins, voluntarily submitted by plaintiff, effected a taking. In sum, plaintiff has not alleged sufficient facts to support a

---

<u>Williamson County</u> is distinct from the Federal Circuit's holding in <u>Love Terminal Partners</u> that a voluntary transfer of property does not effect a taking, at issue in the above captioned case, and the Supreme Court's overruling of <u>Williamson County</u> does not disturb that holding in <u>Love Terminal Partners</u>. See <u>Love Terminal Partners, L.P. v. United States</u>, 889 F.3d at 1348-49.

taking claim in this court, and Court Four of plaintiff's complaint must be dismissed for failure to state a claim.

Finally, defendant argues that plaintiff's Count Five, "Equal Access to Justice Act," seeking EAJA attorney's fees and expenses, was premature because "[t]his Court has not made a ruling on the merits in this case, nor has it issued a final judgment." (alteration added). Plaintiff, in its response to defendant's motion to dismiss, "acknowledges that its claim pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is contingent on this Court's determination that TPM [the Portland Mint] is a 'prevailing party' within the meaning of the statute." (alteration added). As the Federal Circuit indicated, EAJA is a fee-shifting statute that allows a party which prevails in a civil action against the government to recover attorney's fees and costs. See Robinson v. O'Rourke, 891 F.3d 976, 980 (Fed. Cir. 2018); Gurley v. Peake, 528 F.3d 1322, 1326 (Fed. Cir. 2008); Davis v. Nicholson, 475 F.3d 1360, 1363 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007). The Supreme Court has stated the requirements for an award of attorney's fees pursuant to EAJA:

> (1) that the claimant be a "prevailing party"; (2) that the Government's position was not "substantially justified"; (3) that no "special circumstances make an award unjust"; and, (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement.

Comm'r, I.N.S. v. Jean, 496 U.S. 154, 158 (1990) (quotations omitted); see also Scarborough v. Principi, 541 U.S. 401 408 (2004) (quoting the eligibility criteria at 28 U.S.C. § 2412(d)); Smith v. McDonough, 995 F.3d 1338, 1344 (Fed. Cir. 2021) ("In general, the EAJA requires an award of fees, including reasonable attorney fees and expenses, to a prevailing party upon proper application, unless the Government's contrary position was substantially justified, or special circumstances make an award unjust."); Libas, Ltd. v. United States, 314 F.3d 1362, 1365 (Fed. Cir. 2003). Because the court has determined that the other four counts of plaintiff's second amended complaint must be dismissed, plaintiff cannot satisfy the "prevailing party" requirement to be eligible for recovery of attorneys' fees. See 28 U.S.C. § 2412. Accordingly, the court also dismisses plaintiff's Count Five claim seeking EAJA attorney's fees and expenses for failure to state a claim.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss the second amended complaint for lack of subject matter jurisdiction and for failure to state a claim is **GRANTED**. Plaintiff's second amended complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**